**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| DUNELLEN LLC,<br>Plaintiff,<br>v.<br>GETTY PROPERTIES CORP.,<br>Defendant. | C.A. No. 06-014-ML |

**MOTION FOR PARTIAL SUMMARY JUDGMENT OF GETTY PROPERTIES CORP.**

Now comes Defendant Getty Properties Corp., through counsel, and moves for partial summary judgment dismissing Plaintiff Dunellen LLC's claim. In support of its motion, Defendant relies upon the accompanying memorandum of law.

GETTY PROPERTIES CORP.

By Its Attorneys,

PARTRIDGE SNOW & HAHN LLP

/s/ Robert K. Taylor
James W. Ryan (#4042)
Robert K. Taylor (#6514)
180 South Main Street
Providence, RI 02903
(401) 861-8200
(401) 861-8210 FAX
jwr@psh.com
rkt@psh.com

DATED: February 27, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing MOTION FOR PARTIAL SUMMARY JUDGMENT OF GETTY PROPERTIES CORP. was filed with the Clerk of the United States District Court for the District of Rhode Island this 27th day of February, 2007 and is available for viewing and downloading to the following ECF registered counsel of record:

Gerald J. Petros, Esq. / Hinckley, Allen & Snyder LLP
Mitchell R. Edwards, Esq. / Hinckley, Allen & Snyder LLP

/s/ Robert K. Taylor

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| DUNELLEN LLC,<br>Plaintiff,<br>v.<br>GETTY PROPERTIES CORP.,<br>Defendant. | C.A. No. 06-014-ML |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT OF GETTY PROPERTIES CORP.

Defendant Getty Properties Corp. ("Getty"), through counsel, submits the following memorandum in support of its motion for partial summary judgment dismissing Plaintiff Dunellen LLC's ("Dunellen") claim.

## I. INTRODUCTION

The premise of Dunellen's claim is that where the owner of a structure (here, a pier) gives another the non-exclusive right to use that structure in common with the owner and others, the right carries with it as a matter of law the obligation to pay for repairs and improvements to the structure undertaken by the owner for its own financial benefit. According to Dunellen, the obligation to pay exists even though the agreement creating the non-exclusive right says nothing about it, and even though the holder of the right is not actually using the owner's structure. Dunellen's claim – first asserted in a post-trial memorandum in litigation between these same parties over the same pier in 2003 – must be dismissed because it should have been asserted as a compulsory counterclaim in that earlier litigation. Dunellen's claim is also barred by the doctrine of accord and satisfaction on account of the 1997 Settlement Agreement whereby Getty was allowed to withdraw from the then-operative Wilkesbarre Pier

Operating Agreement and relieved of any obligations relating to the Pier. Finally, even if Dunellen's claim were not foreclosed by prior litigation between the parties, it fails on the merits because there is no contractual or equitable basis for the asserted liability.

## II. BACKGROUND FACTS.

The facts on which Getty's motion is based are set forth in the accompanying Statement of Undisputed Facts ("Getty SUF").

## III. SUMMARY JUDGMENT STANDARD.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue is 'genuine' if the pertinent evidence is such that a rational fact finder could render a verdict in favor of either party and a fact is 'material' if it 'has the capacity to sway the outcome of the litigation under the applicable law.'" *Young v. City of Providence*, 301 F. Supp. 2d 163, 172 (D.R.I. 2004) (quoting *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir. 1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986)). At the summary judgment stage, the Court should "determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Barreto-Rivera v. Medina-Vargas*, 168 F.3d 42, 45 (1st Cir. 1999) (quoting *Liberty Lobby*, 477 U.S. at 251-52). The court must view the facts in the light most favorable to the nonmoving party. *See Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 6 (1st Cir. 1997). However, the court need not accept the nonmovant's "subjective characterizations of events, unless the underlying events themselves are revealed." *Simas v. First Citizens' Fed. Credit Union*, 170 F.3d 37, 501 (1st Cir. 1999) (citation omitted).

## IV. DUNELLEN'S CLAIM FOR COSTS SHOULD BE DISMISSED.

### A. Dunellen's Claim Is Barred By *Res Judicata*.

Fed. R. Civ. P. 13(a) provides that "[a] pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction." The First Circuit has stated that the "purpose of Rule 13(a) is 'to prevent multiplicity of actions and to achieve resolution in a single lawsuit of all disputes arising out of common matters.'" *Carteret Sav. & Loan Ass'n v. Jackson*, 812 F.2d 36, 38 (1st Cir. 1987) (quoting *Southern Construction Co. v. Pickard*, 371 U.S. 57, 60 (1962)). There are at least four tests to determine whether a counterclaim is compulsory or permissive:

> 1. Are the issues of fact and law raised by the claim and counterclaim largely the same?
>
> 2. Would *res judicata* bar a subsequent suit on defendant's claim absent the compulsory counterclaim rule?
>
> 3. Will substantially the same evidence support or refute plaintiff's claim as well as defendant's counterclaim?
>
> 4. Is there any logical relation between the claim and the counterclaim?

*Iglesias v. Mutual Life Insurance Co*., 156 F.3d 237, 241 (1st Cir. 1998).

The "'logical relationship' test enjoys 'by far the widest acceptance among the courts.'" *McCaffrey v. Rex Motor Transport, Inc*., 672 F.2d 246, 248 (1st Cir. 1982) (citing 6 Wright & Miller, Federal Practice and Procedure, § 1410, at 48). Under the logical relationship test, a claim qualifies as compulsory if:

> it arises out of the same aggregate of operative facts as the original claim in two senses: (1) that the same aggregate of operative facts serves as the basis of both claims; or (2) that the aggregate core of facts upon which the original claim rests activates additional legal rights in a party defendant that would otherwise remain dormant.

*Iglesias* at 241 (citations omitted).

Dunellen's claim that Getty's continuing right to use the Pier carries with it an obligation to pay Pier expenses arises out of the same transaction or occurrence that was the subject of the June 2003 bench trial to which Getty and Dunellen were parties, and should have been pleaded as a compulsory counterclaim in that earlier litigation. The "same aggregate of operative facts serves as the basis of both claims." *Id*. Those operative facts include the series of instruments and agreements on which Getty's right to use the Pier (and its purported obligation to pay Pier expenses) is based; events surrounding the 1997 Settlement Agreement and Throughput Agreement; Getty's withdrawal from the 1991 Pier Operating Agreement; and the conduct of Dunellen, Getty and Getty Marketing from 1998 forward. *See* Getty SUF Ex. A (September 5, 2003 Memorandum and Decision in *Getty Petroleum Marketing v. Capital Terminal Co.*, *et al*.). Dunellen conceded as much when it belatedly raised the issue of Getty's obligation to pay for Pier repairs in its post-trial memorandum in the prior lawsuit filed in June 2003. Getty SUF ¶ 12.

Even absent Rule 13(a), Dunellen's current lawsuit is barred by *res judicata*. *Res judicata* applies if there is "(1) a final judgment on the merits in an earlier suit, (2) sufficient identicality between the causes of action asserted in the earlier and later suits, and (3) sufficient identicality between the parties in the two suits." *Mass. School of Law v. American Bar Assoc.*, 142 F.3d 26, 37 (1st Cir. 1998); *Aunyx Corp. v. Canon U.S.A., Inc.*, 978 F.2d 3, 6 (1st Cir. 1992), *cert. denied,* 113 S. Ct. 1416 (1993). "Once these elements are established, claim preclusion also bars the relitigation of any issue that was, or *might have been,* raised in respect to the subject matter of the prior litigation." *Grella v. Salem Five Cent Savings Bank,* 42 F.3d 26, 30 (1st Cir. 1994) (citations omitted) (emphasis in original).

The first and third tests for *res judicata* are easily met: there was a final judgment in the earlier suit, and the parties are the same. The second test is also satisfied.

In determining whether "causes of action are sufficiently related to support a *res judicata* defense," the First Circuit has "adopted a transactional approach." *Mass. School of Law*, 142 F.3d at 38. The court will look to see "whether the facts are related in time, space, origin or motivation," "whether they form a convenient trial unit," and "whether their treatment as a unit conforms to the parties' expectations." *In re Iannochino*, 242 F.3d 36, 46 (1st Cir. 2001) (internal citations omitted). Again, the agreements and instruments underlying both Getty's right to use the Pier and its purported obligation to pay Pier maintenance costs are the same. Trying Getty's rights and obligations at the same time in 2003 would also have formed a convenient trial unit, had Dunellen asserted its claim in a timely way. Trying the claims as a unit would have conformed to the parties' expectations that all open issues relating to the Wilkesbarre Pier should be addressed and resolved together. Applying the First Circuit test for *res judicata*, Dunellen's claim is clearly barred.

Dunellen was certainly on notice in the prior litigation of Getty's contention that it had the right to use the Pier, but no obligation to pay for repairs. Getty's Second Amended Complaint alleged that Getty "does not own the Pier and has not agreed to share in any expenses other than those described above which relate solely to the repair and maintenance of the Petroleum Pipelines." Getty SUF, Ex. S ¶ 36. Getty alleged that it justifiably expected Dunellen's predecessor "to assume full responsibility for the maintenance and operation of the Pier as stated in the letters outlining P&W's Rehabilitation Program and as stated in the Throughput Agreement." *Id.* ¶ 37. Getty alleged that it is "not the obligation of Getty Properties or Getty Petroleum Marketing to repair the Pier." *Id.* ¶ 56. At the same time, Getty sought declaratory relief confirming its right to use the north side of the Pier. Faced with Getty's claim

of a right to use the Pier, and assertion that it had no obligation to make repairs, Dunellen was required to assert the claim now before the Court, but failed to do so. Because Dunellen failed to pursue its claim of entitlement to Pier expenses in the prior suit, its present action is barred.

**B. <u>The 1997 Settlement Agreement Bars Dunellen's Claim.</u>**

In its 1997 arbitration claim against Getty, P&W asserted that under the 1991 Pier Operating Agreement, Getty could not withdraw from the 1991 Pier Operating Agreement because it was still responsible for its pro rata share of deferred Pier maintenance costs:

> Getty's various aforesaid obligations to consent to, and to pay its pro-rata share of, Pier Maintenance Costs, including but not limited to the Priority Repair Items indicated in the September 1986 schedule, are accrued obligations which must be satisfied in full before Getty may effectively withdraw from the [1991 Pier Operating] Agreement.

Getty SUF, Ex. O ¶ 20. That claim was settled and resolved in December 1997 by the 1997 Settlement Agreement. Getty SUF, Ex. Q.

In Rhode Island, the "doctrine of accord and satisfaction provides that when two parties agree to give and accept something in satisfaction of a right of action which one has against the other, and that agreement is performed, the right of action is subsequently extinguished." *ADP Marshall, Inc. v. Brown University*, 784 A.2d 309, 313 (R.I. 2001); *see also Weaver v. American Power Conversion Corp.*, 863 A.2d 193, 197 (R.I. 2004). In the 1997 Settlement Agreement, P&W agreed to accept payment from Getty and a Throughput Agreement with Getty Marketing in satisfaction of its right of action against Getty for deferred pier maintenance costs. Getty SUF ¶ 8. Getty performed the Settlement Agreement, and Getty Marketing performed the Throughput Agreement, paying P&W and its successors over $1 million during the next five years. P&W and its successors, on the other hand, breached their obligation to repair the Pier, as the jury held in December 2002. Getty SUF ¶¶ 9-11. Having failed to make Pier repairs and improvements during the term of the Throughput Agreement with

funds that Getty Marketing paid for that purpose, Dunellen began to address outstanding items in 2003. Getty SUF ¶ 16. Dunellen is barred by the doctrine of accord and satisfaction from attempting to recover the cost of such repairs a second time over from Getty in this lawsuit.

Accord and satisfaction bars not only any claim for Pier maintenance and improvements identified as of December 1997, but also all Pier-related claims against Getty. Had Getty remained an operative member under the 1991 Pier Operating Agreement, it would have continued to be responsible for Pier costs. The purpose of the 1997 Settlement Agreement was to free Getty of that responsibility. The Court appears to have already ruled on this very issue, noting the 1997 Settlement Agreement was "in accordance with the parties' attempt to reach a resolution on the repair issue." The 1997 Settlement Agreement "was entered into for the purpose of resolving the difficulties that had been encountered by the parties in assigning Pier usage costs . . . . [F]ees paid pursuant to the Throughput Agreement were intended to satisfy the total cost of Getty's Pier usage, including its tax obligation." *Id.* at 29. While the Throughput Agreement has expired, there has been no further Pier usage by Getty, and therefore no new costs for which Getty might be held responsible.[1]

The purpose of the Settlement Agreement was to relieve Getty of any remaining responsibility for Pier-related costs. Dunellen's failure to secure a renewal of the Throughput Agreement with Getty Marketing did not trigger any change in the legal relationship between Dunellen and Getty. Effective January 1, 1998, Getty had no further liability to Dunellen for Pier-related costs.

---

[1] In the prior litigation, Dunellen asserted that Getty was responsible for a portion of Pier taxes under the 1941 Deed. Dunellen has not pressed that argument in this lawsuit, with good reason. The 1941 Deed required Getty's predecessor to pay a portion of Pier taxes in the event that a new Pier was ever constructed. Obviously, no new Pier was ever constructed. Had Dunellen's predecessor P&W exercised its right to build a new Pier, instead of suing to recover the old one (as approved by the R.I. Supreme Court in 1976), many of the capital improvement and Pier maintenance expenses that Dunellen is suing to recover from Getty would be unnecessary.

### C. **<u>Getty Has No Contractual Or Equitable Obligation To Pay Pier Expenses</u>**

Even if Dunellen's claim is not barred by *res judicata* or the doctrine of accord and satisfaction, it fails on the merits. There is no contractual or other legal basis for Dunellen's claim.

#### 1. **<u>The 1975 Agreement Does Not Require Getty To Pay Pier Expenses Pro Rata.</u>**

Dunellen's predecessor P&W granted Getty the right to use the Pier in the 1975 Agreement, which incorporates an earlier reservation of Pier rights from 1941. Getty SUF Ex. C.[2] Dunellen wants the Court to read into the 1975 Agreement a major new obligation: the obligation to pay Pier maintenance and improvements expenses pro rata, regardless of Pier use. Not only is there nothing in the 1975 Agreement obligating Getty to contribute to Pier expenses based solely on its unexercised right; such an obligation is inconsistent with the other agreements executed at the time, and with all of the agreements among Pier users since. In every case, these other agreements allocated expenses based on proportionate use.

---

[2] As set forth in the Court's September 5, 2003 Memorandum and Decision, the 1975 Agreement resulted from P&W's lawsuit asserting ownership of the Pier. After the Rhode Island Superior Court ruled that P&W was not required to construct a new Pier in order to exercise its Pier access rights, Getty and P&W entered into the 1975 Agreement and several other contemporaneous agreements as part of a settlement. Memorandum and Decision at 6. The 1975 Agreement reserves to Getty the right to

> Erect, replace, use and maintain its pipelines and equipment appurtenant thereto on the northerly side of said Wilkesbarre Pier or any pier hereafter constructed in place of said Wilkesbarre Pier and the right to have the free and uninterrupted use of the berth on the northerly side of said pier for the delivery of petroleum products and other merchandise used in connection with its petroleum products business as set forth in deed to Colonial Beacon Oil Company dated August 28, 1941 . . .

Getty SUF Exhibit C. Getty also executed a Grant and Agreement with Robert Eder agreeing to install two new sixteen inch pipelines from the unloading facilities on the Pier to Phillipsdale, and giving Eder the right to use the north side of the Pier, the vessel berth, and Getty's pipelines in common with Getty and any others entitled thereto. Getty SUF Ex. E at 2. Getty and Eder further entered into an Operating Agreement (For Use Of Pipelines), which spelled out certain rights and obligations of the parties regarding the pipelines to be constructed pursuant to the Grant and Agreement. Getty SUF Ex. F.

For example, the 1975 Grant and Agreement, whereby Getty extended to Eder Getty's right to use the north side of the Pier and Getty's pipelines, provides that Eder shall share in the cost of pipeline maintenance based on his proportionate use of the pipelines. Getty SUF Ex. E at 7; *see also* 1975 Operating Agreement (For Use Of Pipelines), Getty SUF Ex. F at 4 ("Eder shall be invoiced by Getty Oil (Eastern) at the determined unit thruput charge times the total volume received and discharged by Eder").[3] Moreover, in the event that Eder or Getty decided to make improvements to the pipelines, the other party had no obligation to contribute to the cost unless it "subsequently thereto becomes a new user." *Id*. at 5. Thus, one party could not unilaterally burden the other with the cost of unused pipeline improvements.

The same is true of the Pier. From 1977 until 1997, Pier users entered into the series of Pier Operating Agreements and contributed to Pier costs based on use. All of the Pier Operating Agreements provided that the parties had no obligation to contribute to the cost of additions, enlargements or improvements to the Pier that they did not use. Getty SUF Ex. L, 1977 Operating Agreement at 7 ("a new user of additions, enlargements or improvements made by another party or parties hereto, and who derives additional economic or other benefit from the use of the new facility . . . thereby will be obligated, by reason of such use, to pay to such other party or parties who have already paid for the additions, enlargements or improvements its share of the cost"); Getty SUF Ex. M, 1985 Operating Agreement at 19 ("Any 'new user' using said addition, enlargement or improvement within the twenty year period commencing on the date the [sic] completion of the addition, enlargement or improvement shall pay its proportionate share of the cost . . . "); Getty SUF Ex. N, 1991 Operating Agreement Sections V and IX B (a party that withdraws from the Pier Operating Agreement but later returns and becomes a "new user" of

---

[3] Through a series of assignments, Dunellen now holds Eder's rights under these agreements. The obligation to contribute to pipeline expenses was largely eliminated as part of the 1997 Settlement Agreement.

additions, enlargements or improvements must contribute to the cost according to a specified formula). Again, it was clearly understood that one Pier user could not burden another user (or a non-user) with the cost of unwanted and unused improvements. Further, in the event that one Pier user withdrew from the Operating Agreement, routine Pier maintenance and operating costs would be divided up among the remaining users regardless of whether the withdrawing member had the legal right to continue using the Pier. Getty SUF Ex. N (1991 Pier Operating Agreement) Section IX B (returning user only required to reimburse other users for Pier improvements). Dunellen's claim that Getty must contribute to maintenance expenses regardless of use is contrary to this prior practice.

From 1997 to the present, Dunellen has continued to look to Pier users to share in the costs of the Pier. Getty Marketing used the Pier and contributed to costs from 1998 to 2003. Dunellen's tenant, Global Companies, LLC ("Global"), used the Pier and contributed to costs from 1998 to the present. Conversely, Getty did not use the Pier, and was not asked to pay maintenance or improvement costs (until Dunellen filed this lawsuit in December 2005). P&W and Unocal have the right to use the Pier, but Dunellen has not made them part of this lawsuit. Getty SUF ¶¶ 3-4.

In construing the 1975 Agreement, as with any other agreement, it is a court's duty to effectuate the intent of the parties. *Carpenter v. Hanslin*, 900 A.2d 1136 (R.I. 2006) (citing *Mattos v. Seaton*, 839 A.2d 553, 557 (R.I. 2004)). "When the written terms of an agreement are clear and unambiguous, they can be interpreted and applied to the undisputed facts as a matter of law." *Id.* However, "where the language employed is ambiguous the court may 'properly resort to a consideration of `any concomitant circumstances' which have a legitimate tendency to show the intentions of the parties.'" *Id*. (quoting *Waterman v. Waterman,*93 R.I. 344, 348-49, 175 A.2d 291, 294-95 (1961). To the extent the Court determines that the terms of

the 1975 Agreement and related documents are ambiguous, the Court may properly consider the thirty year course of dealing of Getty, Dunellen, and the other Pier users to determine that Getty's right to use the Pier does not carry with it the unwritten obligation to pay half or more of Dunellen's Pier expenses.

### 2. <u>Getty Is Not Equitably Obligated To Pay Expenses Unless Using The Pier.</u>

Dunellen alleges in its complaint that Getty's right to use the Pier is in the nature of an easement, and that as an easement holder Getty must pay half of all Pier-related expenses. This allegation is flawed because the Rhode Island Supreme Court has ruled that the Pier is personalty, not real property. *Providence & Worcester Railroad Co. v. Exxon Corp.*, Getty SUF Ex. H at 26 ("We believe that plaintiffs correctly perceived the meaning of the trial justice's order as requiring defendants to give plaintiffs a fee simple to personalty . . . "). An easement is an interest in real property, not personalty. *See Ham v. Massasoit Real Estate Co.*, 42 R.I. 293, 301, 107 A. 205 (1919) ("the restrictions contended for in this case are easements and interests in land").

Indeed, the operative agreements consistently refer to Getty's "right" to use the Pier, in contrast with its "easement" over the strip of land between the Pier and its East Providence terminal facility. *See* Getty SUF Ex. E (1975 Grant and Agreement), at 1. Had the parties viewed Getty's right to use the Pier as an easement, they would not have made that distinction. Getty's right is like any other contractual right: its scope is defined by the applicable agreements. Dunellen's effort to impose major new obligations on Getty that are not set forth in the applicable agreements should be rejected.

Even if easement law is applied by analogy, Dunellen fares no better. In Rhode Island,

> The right of the easement owner and the right of the landowner are not absolute, irrelative, and uncontrolled, but are so limited, each

> by the other, that there may be a due and reasonable enjoyment of both. It has been held that the rights of the owner of the easement are paramount, to the extent of the grant, to those of the owner of the soil, and it is an established principle that the unrestricted grant of an easement gives the grantee all such rights as are incidental or necessary to the reasonable and proper enjoyment of the easement.

*Hickey v. Town of Burrillville,* 713 A.2d 781, 785 (R.I. 1998). Further, "where a structure is reasonably necessary to the enjoyment of the right granted under a right-of-way, the courts have so construed the grant as to permit its maintenance." *Carpenter v. Hanslin*, 900 A.2d at 1150. "For example, it has been held the grantees of the easement of a private roadway could repair or replace an existing bridge at a point where the roadway crossed a stream, and could construct a new bridge at another point where the roadway and stream intersected, where such projects were necessary for *reasonable use* of the easement granted." *Id*. (emphasis in original). Thus, while an easement holder may repair or replace a structure in order to enjoy the easement, it is not required to do so. The owner of a structure may not force the easement holder to pay for repairs desired by the owner, but not by the dominant estate.

It is also true under Rhode Island law that

> where there are several owners in common of a private way, *each owner* may make reasonable repairs which do not injuriously affect his [or her] co-owners, but he [or she] *cannot make any* * * * *change in its grade or surface, which makes the way less convenient and useful to any appreciable extent to any one who has an equal right in the way*.

*Renaissance v. Universal Properties Group*, 821 A.2d 233-37 (R.I. 2003) (quoting *Crowley v. J.C. Ryan Construction, Inc.*, 247 N.E.2d 714, 717 (Mass. 1969)) (emphasis in original). Dunellen, as assignee of Robert Eder's right to use the Pier and Getty's pipelines pursuant to the 1975 Grant and Agreement and 1975 Operating Agreement (For Use Of Pipelines), has the right to make reasonable Pier repairs and has chosen to do so because Dunellen is using the Pier and the repairs benefit Dunellen's business. Dunellen has no right to demand that Getty pay half of expenses incurred to benefit Dunellen. Likewise, Getty is not responsible for half the cost of

building a new Pier, despite its right to use the new Pier should Dunellen decide to construct one. Getty SUF Ex. C (1975 Agreement), p. 2 (Getty has right to use the "northerly side of said Wilkesbarre Pier or any pier hereafter constructed in place of said Wilkesbarre Pier . . . ").

Dunellen' complaint that it would be unfair to allow Getty to resume using the Pier years from now without having paid half or more of all Pier expenses along the way rings hollow. Dunellen's expenditures on the Pier are voluntary, and made because those expenditures benefit Dunellen and its tenant Global, which uses and has an option to purchase Dunellen's terminal and the Pier. Getty SUF ¶¶ 14-15. As the Court will no doubt recall, Dunellen consistently maintained in the prior litigation between the parties that it had no obligation to make any particular Pier repairs, and that remains Dunellen's position today. Getty SUF Ex. K, Noe Depo. at 92 ("Q: Is Dunellen obligated to make any of the repairs reflected on Exhibit 10 [10 year Pier Improvement Schedule]? A: They are not."). Getty's unexercised right to use the Pier in the future does not give rise to a duty to pay for Pier expenses Dunellen says it has no obligation to incur; that are being incurred to suit Dunellen's business ends; and that Dunellen has undertaken without prior notice to Getty, and forewarned of Getty's position that it has no duty to pay for such improvements.

Dunellen's business is booming. It has more than tripled the storage capacity of its East Providence terminal, from roughly 300,000 barrels in 1996 to over 1 million barrels today, by building several new storage tanks. Getty SUF ¶ 14.[4] The volume of petroleum products Dunellen offloads at the Pier and transports through Getty's pipeline has increased tenfold, from roughly 700,000 barrels in 1998 to 7 million barrels this year. *Id*. Dunellen

---

[4] In contrast, the capacity of Getty's terminal facility is approximately 300,000 barrels, and has not increased since 1996. Getty SUF Ex. K, Noe Depo. at 36.

receives hundreds of thousands of dollars of rent for its terminal facility pursuant to an Amended and Restated Lease Agreement with Global Companies, LLC, which has an initial term extending to 2013 and is renewable thereafter. *Id.*; Getty SUF Ex. T (Lease Agreement). By separate agreement, Global has agreed to reimburse Dunellen for half of Dunellen's Pier improvement expenses up to $1 million. Getty SUF ¶ 15; Getty SUF Ex. W (Pier Improvement Letter Agreement). Thus, if Dunellen were to succeed in this lawsuit, it would be able to fund millions of dollars of Pier improvements at no cost to itself, a highly inequitable result.

Dunellen's claim is also inequitable because it would substantially alter the settlement worked out between Getty and P&W in 1975. Under that settlement, Getty secured the continuing right to use the Pier, but gave valuable consideration in return: it agreed to build and maintain pipelines and to allow Eder to use them. Getty SUF ¶ 1. In 1975 and for three decades thereafter, all parties involved with the Pier understood that Pier expenses would be allocated among Pier users. Dunellen, Eder's assignee, is benefiting handsomely from the pipeline rights granted by Getty, but wants to rewrite other parts of the 1975 settlement to make them more favorable. The Court should reject this effort, and grant partial summary judgment in favor of Getty.

## V. <u>CONCLUSION</u>

For all of the foregoing reasons, Getty's motion for partial summary judgment should be granted.

GETTY PROPERTIES CORP.

By Its Attorneys,

PARTRIDGE SNOW & HAHN LLP

/s/ Robert K. Taylor
James W. Ryan (#4042)
Robert K. Taylor (#6514)
180 South Main Street
Providence, RI 02903
(401) 861-8200
(401) 861-8210 FAX
jwr@psh.com
rkt@psh.com

DATED: February 27, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT OF GETTY PROPERTIES CORP. was filed with the Clerk of the United States District Court for the District of Rhode Island this 27th day of February, 2007 and is available for viewing and downloading to the following ECF registered counsel of record:

Gerald J. Petros, Esq. / Hinckley, Allen & Snyder LLP
Mitchell R. Edwards, Esq. / Hinckley, Allen & Snyder LLP

/s/ Robert K. Taylor

903060_2/2900-7