UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| DUNELLEN, LLC, | : | |
| Plaintiff, | : | |
| v. | : | No. 06-014-ML |
| GETTY PROPERTIES CORPORATION, | : | |
| Defendant. | : | |

**DUNELLEN, LLC'S STATEMENT OF UNDISPUTED FACTS**

Dunellen, LLC hereby submits its statement of undisputed facts in support of its motion for partial summary judgment.

1. For decades, Getty Properties' predecessors-in-interest used the Pier, which was constructed in the 1870s. See Exhibit 1 (September 2003 Memorandum and Decision at pp. 3-13).

2. Prior to 1998, the users of the Pier operated on the Pier under the terms of pier operating agreements. See Affidavit of Avery Noe at ¶ 2.

3. To the best of Dunellen's knowledge, there were a total of eight (8) pier operating agreements: (1) the November 21, 1969 Operating Agreement; (2) the August 31, 1977 Operating Agreement (For Use of Wilkesbarre Pier); (3) the November 8, 1977 Operating Agreement (For Use of Wilkesbarre Pier); (4) the December 18, 1978 Amendment to Operating Agreement (For Use of Wilkesbarre Pier); (5) the May 28, 1982 Wilkesbarre Pier Operating Agreement; (6) the January 29, 1985 Agreement Concerning Wilkesbarre Pier Operating Agreement; (7) the June 12, 1985 Wilkesbarre Pier Operating Agreement; and (8) the January 1, 1991 Amended and Restated Wilkesbarre Pier Operating Agreement. See Affidavit of Avery Noe at ¶ 3.

4. In 1997, "a dispute arose between P&W and Getty Realty [k/n/a Getty Properties] involving the parties' respective Pier repair obligations *under the 1991 Pier Operating Agreement*. Getty hired an engineering firm to investigate and survey the Pier. The firm reported back that the Pier was in poor condition and had exceeded its useful life. The repair dispute was submitted to arbitration." Exhibit 1 (September 2003 Memorandum and Decision at p. 12).

5. On December 15, 1997, Getty Realty (k/n/a Getty Properties) and P&W entered into a Settlement Agreement. See Exhibit 2.

6. Among other things, under the 1997 Settlement Agreement, Getty Realty (k/n/a Getty Properties) (a) withdrew form the 1991 Pier Operating Agreement effective December 1, 1997 and (b) made a lump sum payment to P&W, representing its accrued and final obligations *under the 1991 Pier Operating Agreement*. See Exhibit 1 (September 2003 Memorandum and Decision at pp. 12-13).

7. On December 19, 1997, Dunellen's predecessor-in-interest, P&W, entered into a Throughput Agreement with Getty Petroleum Marketing Inc. ("Getty Marketing"). See Exhibit 2.

8. The Throughput Agreement replaced the 1991 Amended and Restated Wilkesbarre Pier Operating Agreement. See Exhibit 1 (September 2003 Memorandum and Decision at p. 27).

9. The Throughput Agreement contained a five (5) year term. See Exhibit 2.

10. On August 22, 2002, Getty Properties filed a second amended complaint against Capital Terminal Company ("CTC"), Dunellen's predecessor-in-interest, in the United States District Court for the District of Rhode Island seeking a declaratory

judgment confirming its right to use the north side of the Pier and appurtenant facilities. See Exhibit 1 (September 2003 Memorandum and Decision at p. 2).

11. CTC argued that Getty Properties had abandoned its right to use the north side of the Pier and appurtenant facilities. See Exhibit 1 (September 2003 Memorandum and Decision at pp. 25-27).

12. This Court declared that Getty Properties has the right to use the north side of the Pier and appurtenant facilities. See Exhibit 1 (September 2003 Memorandum and Decision at pp. 25-27).

13. The Court stated that "[i]t is undisputed that Getty Properties (formerly Getty Realty), pursuant to a reservation of rights under the 1941 Deed and through a series of subsequent agreements, had an *easement* giving it the right to use the north side of the Wilkesbarre Pier up until, at least, 1997." See Exhibit 1 (September 2003 Memorandum and Decision at p. 25) (emphasis added).

14. At Getty Properties' request, this Court expressly declined to declare Getty Properties' obligations that burden its right to use the north side of the Pier. See Exhibit 1 (September 2003 Memorandum and Decision at p. 29-30) (emphasis added).

15. The Throughput Agreement between Getty Marketing and Dunellen expired in March 2003. See Exhibit 1 (September 2003 Memorandum and Decision at p. 13), Affidavit of Avery Noe at ¶ 4.

16. Getty Properties has not used the Pier since December 1997. See Exhibit 3 (Deposition of Getty Properties at pp. 37-38).

17. None of the pier operating agreements is in effect today. See Exhibit 3 (Deposition of Getty Properties at p. 39) and Avery Noe's Affidavit at ¶ 3.

18. Indeed, there has not been a pier operating agreement in effect since 1998. See Exhibit 3 (Deposition of Getty Properties at p. 39).

19. There is no agreement in effect governing the parties' obligations with respect to Pier expenses. See Exhibit 3 (Deposition of Getty Properties at pp. 39-40); Affidavit of Avery Noe at ¶ 2-3.

20. Furthermore, there is no contract, express or implied, between Getty Properties and Dunellen that Getty Properties will not have to pay for Pier expenses unless and until it uses the Pier. See Exhibit 3 (Deposition of Getty Properties at pp. 40-42).

21. The Court recognized in a footnote in its September 2003 Memorandum and Decision that ". . . if Getty Marketing left the Pier there would not be a pier operating agreement in place governing the *obligations that accompany Getty Realty's (now Getty Properties') rights to the Pier*." Exhibit 1 (September 2003 Memorandum and Decision at p. 29).

22. According to Getty Properties, it has the right to use the Pier at any time it wishes to do so. See Exhibit 3 (Deposition of Getty Properties at pp. 22-23).

23. Getty Properties has no intention of abandoning its right to use the Pier. See Exhibit 3 (Deposition of Getty Properties at p. 22).

24. According to Getty Properties, it will never "use" the Pier because it is a "landlord" and will lease space for others to use. See Exhibit 3 (Deposition of Getty Properties at pp. 40-41).

25. Getty Marketing, Getty Properties' tenant until at least 2015 and potentially until 2049, does not have a "present intention" to use the Pier. See Exhibit 3 (Deposition of Getty Properties at p. 27).

26. On November 10, 2005, Dunellen sent a letter to Getty Properties requesting payment for half of the Pier expenses beginning in January 2003. See Exhibit 4.

27. Dunellen requested payment in the amount of $494,100.50 for the period January 1, 2003 through September 30, 2005, which is 50 percent of the Pier expenses for that period. See Exhibit 4.

28. On November 24, 2005, Getty Properties sent a letter to Dunellen refusing to reimburse Dunellen for any portion of these expenses. See Exhibit 5.

29. Several Pier expenses must be paid regardless of whether Getty Properties or Dunellen actually use the Pier. For example,

- After the terrorist attacks on September 11, 2001, the Department of Homeland Security propounded rules and regulations for facilities that receive petroleum to secure their facilities. See 33 C.F.R. 105 et seq. To date, Dunellen has spent approximately $50,000 to secure the Pier in accordance with the requirements of the United States Coast Guard, which is part of the Department of Homeland Security. See Exhibit 6 (Dunellen's Supplemental Answers to Interrogatories) and Exhibit 7 (Deposition of Avery Noe at pp. 70-71).

- Dunellen intends to install a new fendering system for the East Dolphin and the West Dolphin because the certification from the United States Coast Guard mandates that the Pier be able to accommodate a certain range of vessels, whether or not those vessels actually use the Pier. The new fendering system will also allow for better and safer operations. See Exhibit 8 (Deposition of Todd Turcotte at pp. 52-54).

- Certain repairs and maintenance needs to be done regardless of use. For example, the tide and storms bring debris onto the Pier, which sometimes requires expensive equipment to clean. See Exhibit 7 (Deposition of Avery Noe at p. 68).

- Real property taxes on the Pier must be paid regardless of use. Getty Properties testified that if taxes were not paid on the Pier, the City [of East Providence] would file a lien. See Exhibit 3 (Deposition of Getty Properties at pp. 29-30). Of course, the City of East Providence could also force the sale of the Pier if the taxes were not paid for a long enough period of time. See R.I. Gen. Laws §§ 44-9-7, 44-9-8, and 44-9-14.

- Insurance must be paid for the Pier regardless of its use. For example, if there is damage to the Pier, insurance is necessary to make the Pier functional for those entitled to use it. See Affidavit of Avery Noe at ¶ 7.

- Electricity is necessary for safety reasons so users of the Narragansett Bay can see the Pier and avoid accidents. See Affidavit of Avery Noe at ¶ 5. Electricity is also necessary for security reasons. See Affidavit of Avery Noe at ¶ 5.

- Engineering is necessary on the Pier, even if the Pier is not in use, so that the Pier's functionality can be evaluated in light of natural erosion or other phenomena that may occur. See Affidavit of Avery Noe at ¶ 6.

HINCKLEY ALLEN & SNYDER LLP

/s/Mitchell R. Edwards
Gerald J. Petros (#2931)
Charles D. Blackman (#5522)
Mitchell R. Edwards (#6942)
50 Kennedy Plaza, Suite 1500
Providence, RI 02903-2393
(401) 274-2000
(401) 277-9600 (fax)

Attorneys for Dunellen, LLC

Dated: February 27, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that on February 27, 2007, a copy of foregoing Statement of Undisputed Facts was filed and sent electronically to the following counsel of record:

James W. Ryan, Esq.
Robert K. Taylor, Esq.
Partridge, Snow & Hahn LLP
180 South Main Street
Providence, RI 02903

/s/Mitchell R. Edwards