# EXHIBIT

# 3

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

DUNELLEN, LLC,
Plaintiff

VS. C. A. NO. 06-014-ML

GETTY PROPERTIES CORPORATION,
Defendant

----------------------------------/

**DEPOSITION OF ANDREW W. SMITH**, a witness, in the above-entitled cause, taken on behalf of the Plaintiff, pursuant to notice, before Jo Anne M. Sutcliffe, Notary Public in and for the State of Rhode Island, at the offices of Hinckley Allen Snyder, 50 Kennedy Plaza, Suite 1500, Providence, Rhode Island, on February 9, 2007, at 1:00 p.m.

**APPEARANCES:**

**FOR THE PLAINTIFF:** HINCKLEY ALLEN SNYDER
BY: MITCHELL R. EDWARDS, ESQ.

**FOR DEFENDANT:** PARTRIDGE, SNOW & HAHN
BY: ROBERT K. TAYLOR, ESQ.



ORIGINAL

A. No.
Q. No?
A. No.
Q. There's another letter?
A. This just doesn't seem familiar to me, this particular letter.
Q. Okay.
A. This says withdrawal from the -- from the operating agreement.
Q. And you see in that paragraph the sentence after that it says, "Although the withdrawal will not be effective until April 1, 1998, please be further advised that Getty will cease using the pier in the very near future, and in any event, no later than December 31, 1997." Do you see that sentence?
A. Uh-huh.
Q. Does that refresh your recollection at all?
A. No.
Q. Well, let me ask you this. Does Getty Properties intend to abandon its right to use the pier?
A. No.
Q. And it's Getty Properties' position that it has the right to use the pier at any time it wishes

to do so, correct?
A. Yes.
Q. You will recall that there was a trial before Judge Lisi between Capital Terminal Company and Getty Properties.
A. Yes.
Q. And are you familiar with or -- let me rephrase that. Are you aware that Judge Lisi issued a decision, a memorandum and decision in that case?
A. Yes.
Q. Did Getty Properties appeal from any portion of Judge Lisi's decision?
A. I don't think so.
Q. Did Getty Properties move to have any portion of Judge Lisi's decision reconsidered?
A. I don't think so, but the record will show you that.
Q. Does Getty Properties have any plans for using the terminal in East Providence, the Getty terminal in East Providence?
A. Again, we're not an operating company.
Q. Okay.
A. We wouldn't plan to use it because we are a landlord. We're a real estate investment trust.

Q. Two days ago?
A. Uh-huh.
Q. Why did he have that conversation two days ago?
A. They had a general conversation about the portfolio covered by the master lease. This is one of those properties.
Q. Does Getty Properties have the right to sell the terminal in East Providence?
A. Yes, I think so.
Q. How long is left on the master lease with Getty Petroleum Marketing?
A. The current term expires in December of 2015 and then there are a number of renewal options that take it out to 2049.
Q. Who owns the Wilkesbarre Pier?
A. It appears to be Dunellen.
Q. And does Getty Properties have information about the condition of the pier as of 2003?
A. Only what's been provided to us by your client.
Q. So you don't have any -- Getty Properties didn't have any information about the condition of the pier other than what Dunellen has provided to you?

different from what it was before, whatever you told us it was. You furnished us -- your client furnished us with a list of expenses related to some work and that's basically it.

Q. To prepare for the deposition today what did you do?

A. I reviewed the pleadings and some of the documents referred to in the pleadings.

Q. Do you remember what documents you referred to that were referred to in the pleadings?

A. I think the deed that granted the right, there was an operating agreement, there were two -- there was a settlement agreement of an arbitration, there was a settlement agreement I think from 1985, there was a letter I think from Unocal to Dunellen about pier expenses. Generally that's what I recall.

Q. Other than your counsel, did you speak with anyone to prepare for your deposition?

A. No.

Q. In order for the pier to remain operational do you know what steps need to be taken to maintain the pier?

A. No.

Q. Does anyone at Getty know that -- Getty Properties know that?
A. I'm not sure.
Q. Do real estate taxes need to be paid to the City of Providence for the pier?
A. I think so.
Q. Do you know what would --
A. Although I'm not sure.
Q. When Getty Properties or its predecessors were part of the pier operating agreements, did real estate taxes need to be paid for the pier then?
A. I wouldn't know.
Q. You wouldn't know? Do you know what would happen if real estate taxes -- what would happen to the pier if real estate taxes were not paid?
MR. TAYLOR: Objection.
A. If real estate taxes had to be paid and they weren't paid, then the city would or who -- the entity, the jurisdiction that's to collect the taxes would file a lien.
Q. Are you aware of any of the improvements to the pier that Dunellen has made since 2003?
A. Yeah, some of them. I think there was a water -- some kind of a water -- a fire

context of the arbitration that was going on at the time and the fact that this settled the arbitration. So to the extent there were issues in the arbitration related to pier maintenance expenses, the settlement agreement resolved the arbitration, and therefore, all disputes and disagreements raised in the arbitration.

Q. The settlement agreement, though, does not expressly say that Getty Properties is not responsible for pier maintenance costs unless and until it resumes using the pier; it doesn't expressly say that, correct?

A. Expressly -- it doesn't expressly provide that I don't think, and we wouldn't be using the pier. At that point in time, 1997, we wouldn't have used the pier.

Q. I understand.

A. We're not an operating company. The only party that could have, would have, may have used the pier would have been Getty Petroleum Marketing, Inc. or a tenant since we leased to them all of our rights in connection with the pier.

Q. I understand that. My question is just that the

settlement agreement doesn't expressly say that Getty Properties is not responsible for pier maintenance expenses unless and until Getty Properties resumes using the pier.

A. Specifically I don't see those particular words.

Q. And you've identified for me what you're relying upon for your answer to interrogatory, the whereas clauses you've identified and the context of the arbitration?

A. Yes.

Q. Is there anything else you were relying upon for that?

A. At -- I don't recall.

MR. EDWARDS: Let's take five minutes and -- if that's all right.

THE WITNESS: Sure.

MR. TAYLOR: Yes. That's fine.

(RECESS)

MR. EDWARDS: We'll go back on.

Q. Mr. Smith, can you describe for me the course of dealing that Getty Properties or its predecessors had with Dunellen or its predecessors regarding payment for pier expenses?

A. Well, up until 1997, that's all a part of the record. Since the matter was settled, we haven't paid any pier expenses; we haven't been billed for any pier expenses. I'm not aware that we have any -- our course of dealing is that we have none, that you haven't looked to us for any expenses.
Q. And prior to 1997, what was the course of dealing?
A. We were party to a pier operating agreement.
Q. And are any of those pier operating agreements in effect today?
A. I don't believe so. I can tell you we're not a party to any pier operating agreement.
Q. Are you aware of any agreements in effect today that -- between Getty Properties and Dunellen that address the apportionment of pier expenses?
A. No.
Q. So there's no --
A. Other than the settlement agreement which indicates that we have none.
Q. And is that going back to the whereas clauses that you were referring to?
A. Yes. I don't believe that since the pier

operating agreement was dissolved by virtue of all the parties having withdrawn and the settlement to the arbitration that there's any document that obligates us to pay pier operating expenses on any basis going forward.

Q. Is it Getty Properties' position that the -- that Getty Properties and Dunellen intended for pier expenses to be allocated based on use even after the pier operating agreements were no longer in effect?

MR. TAYLOR: I object to the form of the question.

A. Yeah. I don't -- I think you've asked me what my -- the position is on the intention or what the intention is. I can't comment on an intention.

Q. Okay. Well, did Getty Properties -- let me rephrase it. When the Wilkesbarre Pier agreement was no longer in effect, which was for Getty Properties as of 1998, is that correct?

A. Yes, it seems so.

Q. Okay. As of that time, was it Getty Properties' position that it would not be responsible for any pier expenses unless and until it started to use

the pier?

MR. TAYLOR: I object to the form of the question.

A. I'll answer it this way. At the time that the settlement agreement was entered into and the through-put agreement was entered into with Getty Petroleum Marketing, it was Getty Properties' understanding that it would no longer be responsible for any pier related expenses, that it wasn't a -- ever going to use the pier because it's not an operator, it's a landlord; its tenant had entered into a through-put agreement. So it wasn't a question of not being responsible for expenses until it resumed use or used. As far as it was concerned, it could never be and would never be a user itself because it was not in that business. It was a landlord. It would always lease the premises for use by others.

Q. Is it Getty Properties' position that there is an implied contract between Getty Properties and Dunellen that Getty Properties will not have to pay for pier expenses unless and until it uses the pier?

A. No. Our position is that there's no legal,

contractual or other basis for Dunellen to seek pier related expenses from Getty Properties or any of its affiliates.
Q. And what's the basis for that position?
A. Reality.
Q. What's the factual basis for that position?
A. That there is no legal basis; that's the law. The factual basis is there is no contract, and I'm not aware of any other reason, any other basis that would support a recovery of expenses against Getty Properties Corp. or any of its affiliates for pier maintenance expenses.
Q. And the through-put agreement to which Getty Petroleum Marketing was a party, that's no longer in effect, correct?
A. I don't think it is.
Q. Are you familiar with the negotiations between Dunellen and Getty Petroleum Marketing for a potential new through-put agreement?
A. Somewhat.
Q. What do you know about those negotiations?
A. My understanding is that there was an attempt to negotiate a continuation or new through-put arrangement and we were told by Getty Petroleum

**C E R T I F I C A T E**

I, Jo Anne M. Sutcliffe, Notary Public, in and for the State of Rhode Island, duly commissioned and qualified to administer oaths, do hereby certify that the foregoing deposition of **ANDREW W. SMITH**, a witness, in the above-styled cause, was taken before me on behalf of the Plaintiff pursuant to notice at the offices of Hinckley Allen Snyder, 50 Kennedy Plaza, Suite 1500, Providence, Rhode Island on February 9, 2007, at 1:00 p.m.; that said witness personally appeared; that previous to the examination of said witness, who was of lawful age, he was sworn by me, whereupon he was first duly cautioned and sworn to testify the truth, and that he thereupon testified as in the foregoing manner as set out in the annexed report.

I further certify that the foregoing deposition was taken down by me in stenotype and was later reduced by computer to typewriting, and that the foregoing deposition is a true and accurate record of the testimony of said witness.

**IN WITNESS WHEREOF,** I have set my hand this 10th day of February, 2007.

Jo Anne M. Sutcliffe

JO ANNE M. SUTCLIFFE, CSR/RPR
Notary Public, State of Rhode Island