# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| DUNELLEN LLC,<br><br>Plaintiff,<br><br>v.<br><br>GETTY PROPERTIES CORP.,<br><br>Defendant. | C.A. No. 06-014-ML |

## GETTY PROPERTIES CORP.'S LOCAL RULE 56(a) STATEMENT OF UNDISPUTED FACTS

Pursuant to Local Rule 56(a), Getty Properties Corp. ("Getty") submits the following statement of undisputed facts in support of its contemporaneous motion for partial summary judgment.

1. Dunellen, LLC ("Dunellen") is the owner of the Wilkesbarre Pier located on the Seekonk River in the City of East Providence, Rhode Island ("the Pier"). Dunellen Complaint ¶ 9; *see generally* Ex. A, September 5, 2003 Mem. and Decision in *Getty Petroleum Marketing v. Dunellen LLC, et al*., C.A. No. 00-381ML ("2003 Mem. and Decision"). Getty has the non-exclusive right to use the northerly side of the Pier to receive and discharge petroleum products pursuant to agreements dating back to 1941. Ex. B, 1941 Deed; Ex. C, 1975 Agreement; Ex. D, 1975 Conveyance. Getty owns and maintains two pipelines running approximately two miles from the Pier to a point in the Phillipsdale section of East Providence, and from there to petroleum storage facilities owned by Getty. Dunellen Complaint ¶ 6; Ex. A, 2003 Mem. and Decision at 8-9. Under agreements dating to 1975, Dunellen uses Getty's pipelines to transport petroleum products from the Pier to an East Providence terminal facility owned by Dunellen.

Ex. E, 1975 Grant and Agreement; Ex. F, Operating Agreement (For Use Of Pipelines); Dunellen Answer to Counterclaim ¶ 6.

2. Dunellen is a successor in interest of Providence & Worcester Railroad Company ("P&W") and Capital Terminal Company ("Capital Terminal"). Dunellen Complaint, ¶¶ 8-9.

3. P&W has the right to use the Pier in common with Getty. Ex. G, Deed from Capital Terminal to Dunellen, at 2 (conveyance of Pier is subject to the "permanent right, privilege and easement of P&W to utilize the Pier, Rights of Way as aforesaid and any other rights and easements as may of record appear pertaining thereto, for all business purposes, including, but not limited to, the handling of petroleum products . . ."). Ex. K, Depo. of Avery Noe at 20-27.

4. Union Oil Co. of California ("Unocal") or its successor in interest has the right to use the Pier in common with Getty. As of 1969, Unocal owned an undivided two-fifths interest in the Pier and underlying land. Ex. A, 2003 Mem. and Decision, at 5. In June 1976, the Rhode Island Supreme Court affirmed a lower court's finding that P&W owned "the totality of interests in the existing pier save for defendants' right to use the north side of said pier." Ex. H, June 10, 1976 Opinion in *Providence & Worcester Co. v. Exxon Co.*, No. 74-309, at 26. In 1998, Unocal deeded its interest in land underlying the Pier to P&W, but did not transfer the right to use the Pier affirmed by the Rhode Island Supreme Court in 1976. Ex. I, Deed from Unocal to P&W (conveying "all of its right, title and interest in and to a twenty percent (20%) undivided interest in that certain parcel of land in the City of East Providence, State of Rhode Island, bounded and described in Exhibit A attached hereto and incorporated herein."). Unocal asserted its continuing right to use the Pier in 1999. Ex. J, August 10, 1999 letter from Unocal to Capital Terminal Co. ("The Deed by which Unocal acquired ownership of our property in East Providence gives us the

right to use the Pier and participate in the maintenance of the Pier based on our share of use."). Dunellen has never questioned that right. Ex. K, Depo. of Avery Noe at 99-100.

5. Until early 1998, Dunellen, Getty, and other Pier users were parties to a series of Pier Operating Agreements. All of these agreements provided that Pier-related expenses were to be allocated based on proportionate usage of the Pier. Ex. L (1977 Pier Operating Agreement) at 6-7; Ex. M (1985 Pier Operating Agreement) at 12-13; Ex. N (1991 Pier Operating Agreement), Section IV D. In many years, Getty was the heaviest user of the Pier, and accordingly paid the largest share of Pier-related expenses. In 1997, Getty paid for 85% of Pier maintenance expenses. Ex. Q at 2 (reflecting expense allocation).

6. In February 1997, Getty entered into a long term lease (the "Master Lease") with Getty Petroleum Marketing, Inc. ("Getty Marketing"). Among the properties leased to Getty Marketing under the Master Lease were Getty's East Providence terminal facility and related rights, including Getty's right to use the Pier. Ex. A, 2003 Mem. and Decision at 11-12.

7. In 1997, P&W filed an arbitration claim against Getty pursuant to the pier operating agreement then in effect (the "1991 Pier Operating Agreement"). The arbitration involved liability for the cost of major Pier repairs. Ex. O, Claimant's Statement of Claim ¶ 4 ("P&W seeks a determination of Getty's obligations in respect of necessary Pier repair and/or replacement, and an order requiring Getty to satisfy those obligations."). P&W alleged that Getty was responsible to pay for its pro rata share of necessary projects at the Pier, including all of the projects identified on a Priority Repair List. *Id.* ¶ 9; Ex. P, September 1996 Priority Repair List. Dunellen's predecessor further alleged that Getty could not withdraw from the 1991 Pier Operating Agreement without satisfying that obligation. Ex. O, Claimant's Statement of Claim, ¶ 24.

8. In December 1997, Getty and P&W executed a settlement agreement resolving the arbitration claim. Ex. Q, Settlement Agreement; *see also* Ex. A, 2003 Mem. and Decision at 12-13. Under the settlement, Getty paid almost $300,000 and was allowed to withdraw from the 1991 Pier Operating Agreement effective January 1, 1998. The settlement further provided that Getty's tenant, Getty Marketing, would sign a five year renewable Throughput Agreement with Dunellen's predecessor Capital Terminal Company. Getty Marketing agreed in the Throughput Agreement to pay Capital Terminal over $1 million during the initial five year term of the Throughput Agreement. *See* Throughput Agreement, attached to Ex. Q, at 2. Capital Terminal Company agreed that it would be responsible for Pier repairs, and that Getty Marketing would have no additional responsibility for repair costs. *Id*. at 7.

9. From January 1, 1998 to the present, Getty has not used the Pier. Ex. R, Smith Deposition at 16. Getty Marketing made all of the required payments under the Throughput Agreement. Ex. K, Noe Depo. at 40-42.

10. In 2000, Getty and Getty Marketing commenced litigation against Dunellen's predecessor Capital Terminal Company (the "2000 Litigation"). The 2000 Litigation alleged that Capital Terminal had breached its obligation to make Pier repairs. Ex. S, Second Amended Complaint ¶¶ 59-68. The 2000 Litigation also sought a declaration confirming Getty's right to use the north side of the Pier for its petroleum product pipelines. *Id*. ¶¶ 69-77. The Court divided the 2000 Litigation into jury and non-jury phases. Dunellen was added as a defendant and counter-plaintiff by stipulation of the parties. Ex. A, 2003 Mem. and Decision at 1, n. 1.

11. In December 2002, a jury entered a verdict for Getty Marketing and against Capital Terminal, finding that Capital Terminal had breached its obligation under the Throughput Agreement to make Pier repairs. Ex. A, 2003 Mem. and Decision, at 1, 30-33. After a bench

trial in June 2003, the Court issued a Memorandum and Decision addressing the parties' injunctive and declaratory claims in September 2003. Ex. A.

12. The Memorandum and Decision held in part that Getty had not abandoned its right to use the north side of the Pier. Ex. A, 2003 Mem. and Decision at 25-27. The Court expressly declined to address to address the issue of Getty's liability for Pier-related expenses going forward, which was not raised by Capital Terminal or Dunellen in any of their claims or defenses:

> Having concluded that Getty Properties' rights under the 1941 Deed remain intact, the Court declines Capital Terminal's request to "declare the obligations that burden those rights" with respect to the parties joint usage of the Pier. See Defendant's Post-Trial Memorandum at 20. It is not clear, at this point, whether there is actually a controversy for the Court to decide, as it appear that Getty Marketing is no longer using the Pier. Rather than plunge into this sea of uncertainty, the Court chooses to remain ashore.

Ex. A, 2003 Mem. and Decision at 29-30.

13. The Throughput Agreement expired at the end of 2002. Getty Marketing and Dunellen discussed extending the Throughput Agreement, but could not reach an agreement on the terms of that extension. Getty Marketing has not used the Pier since early 2003. Ex. K, Noe Depo. at 51-53.

14. Beginning in 1998, Global Companies, LLC ("Global") began using the Wilkesbarre Pier and the pipelines owned by Getty to offload petroleum products and move them to Dunellen's terminal facility. Ex. K, Noe Depo. at 42-48. In June 2003, Dunellen and Global entered into a new long term lease of all of Dunellen's storage tanks at its terminal facility and also executed an option agreement giving Global the option to buy Dunellen's East Providence terminal. *Id*. at 46, 75-76, 82-84; Ex. T (Lease Agreement). In 2006, Global used the Wilkesbarre Pier and Getty's pipelines to offload and transport to Dunellen's terminal approximately 7 million barrels of petroleum products, ten times more than it offloaded in 1998

when it first began using the Pier. Ex. U, Dunellen Supplemental Interrogatory Answers, Answer No. 2; Ex. K, Noe Depo. at 63-65. During the same period, Dunellen expanded the storage capacity of its terminal facility from roughly 300,000 barrels to over 1 million barrels, and made other improvements to its terminal. Ex. K, Noe Depo. at 34-36. According to filings with the United States Securities Exchange Commission, Dunellen's 2005 revenues from leasing its petroleum storage facility to Global and using Getty's pipelines exceeded $2.5 million. Ex. V, Capital Properties Inc. Form 10KSB for period ending 12/31/05, at 17.

15. Global also agreed in June 2003 to pay up to $1 million for Pier improvements on a 50-50 basis with Dunellen. Ex. W, Pier Improvement Letter Agreement. Dunellen agreed to refund to Global half of any money it recovers for Pier improvements from any third party, such as Getty. *Id*.

16. In 2003, Dunellen developed a schedule of improvement projects for the Pier. Ex. W, Pier Improvement Letter Agreement. Dunellen discussed the projects with its tenant, Global, but is not required to do any specific projects. Ex. K, Noe Depo. at 91-92. From 2003 to the present, Dunellen has completed several major Pier repairs and improvements that have been discussed for years, including repairs that were the subject of the arbitration between P&W and Getty in 1997. Ex. K, Noe Depo. at 55-61, 92-95; Ex. P, 1996 Priority Repair List; Ex. X, May 24, 2006 Noe Memorandum; Ex. Y, January 26, 2003 Improvements Project Letter; Ex. Z, Turcotte Depo at 32-40, 46-51, 68-74. Global has reimbursed Dunellen for half the cost of those projects. Ex. W; Ex. X.

17. In December 2005, Dunellen filed suit against Getty asserting that as a result of Getty having a right "in the nature of an easement" to use the Pier, it should be held liable for "at least" one half of all Pier related expenses from January 1, 2003, or $494,000 through the filing of the complaint. Dunellen Complaint ¶ 14. Dunellen alleges that Getty is liable for "at least an

equal share of all pier expenses, including expenses associated with pier security improvements, pier improvements, electricity, engineering, insurance, real property taxes, and certain repairs and maintenance for as long as it maintains its rights to use the Pier." Complaint ¶ 14. Dunellen is also seeking a declaratory judgment making Getty liable for half of all future Pier-related expenses. Complaint ¶ 21.

GETTY PROPERTIES CORP.

By Its Attorneys,

PARTRIDGE SNOW & HAHN LLP

/s/ Robert K. Taylor
James W. Ryan (#4042)
Robert K. Taylor (#6514)
180 South Main Street
Providence, RI 02903
(401) 861-8200
(401) 861-8210 FAX
jwr@psh.com
rkt@psh.com

DATED: February 27, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing GETTY PROPERTIES CORP.'S LOCAL RULE 12.1 STATEMENT OF UNDISPUTED FACTS was filed with the Clerk of the United States District Court for the District of Rhode Island this 27th day of February, 2007 and is available for viewing and downloading to the following ECF registered counsel of record:

Gerald J. Petros, Esq. / Hinckley, Allen & Snyder LLP
Mitchell R. Edwards, Esq. / Hinckley, Allen & Snyder LLP

/s/ Robert K. Taylor

903059_1/2900-7