# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

GETTY PETROLEUM MARKETING, INC.

v. C.A. No. 00-381ML

CAPITAL TERMINAL COMPANY and
DUNELLEN LLC[1]

v.

GETTY PROPERTIES CORPORATION

**MEMORANDUM AND DECISION**

This case arises from a dispute between the parties over their respective rights and obligations as they relate to a pier located in East Providence, Rhode Island (the "Wilkesbarre Pier" or the "Pier"). Plaintiffs, Getty Petroleum Marketing, Inc. ("Getty Petroleum") and Getty Properties Corporation ("Getty Properties"), filed suit against Defendant, Capital Terminal Company ("Capital Terminal"), seeking monetary damages and equitable relief. Capital Terminal, in turn, countersued. The Court bifurcated the jury and non-jury claims and counter-claims and conducted a jury trial in December 2002. Following the conclusion of that trial, several post-trial motions were filed, including Defendant's renewal of its motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50. Plaintiff, Getty Petroleum, was awarded $100,000 in damages by the jury and filed a motion seeking prejudgment interest on that award.

---

[1] By stipulation of the parties, Dunellen LLC is joined as the party defendant pursuant to Rule 25(c) of the Federal Rules of Civil Procedure as to Counts II, III, and V of the Second Amended Complaint and as the party plaintiff as to Count I of the counterclaim.

Those motions have yet to be ruled on by this Court.

On June 23-25, 2003, the four remaining claims in the case were tried to the Court sitting without a jury. In Count II of their complaint Plaintiffs seek a declaratory judgment[2] that (1) neither of them have any obligation to install a fire suppression system or a waterline at the Wilkesbarre Pier; and (2) that they are not obligated to increase the diameter of the fourteen-inch petroleum pipeline on the Pier to sixteen inches, as has been demanded by the Defendant, until such time as it is "necessary to do so." In Count III of their complaint Plaintiffs seek a mandatory injunction requiring the Defendant to repair the Pier in its entirety and remove the waterline from the pipeline supports immediately. Count V of the complaint seeks a declaratory judgment confirming rights allegedly created by a 1941 deed, a 1975 grant, and a 1975 license giving Plaintiffs the right to use the north side of the Pier, its appurtenant facilities, and the petroleum pipelines located on the Pier.[3] Defendant filed a counter claim asking this Court to issue an order directing Getty Properties, at its sole cost and expense, to take all steps and to supply all necessary labor and material to replace the petroleum pipeline on the Wilkesbarre Pier with a sixteen-inch pipeline. At the close of Plaintiffs' case-in-chief, Defendant moved for

---

[2] The Declaratory Judgment Act, 28 U.S.C. § 2201, captioned "Creation of remedy" provides in relevant part:

> In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

(emphasis added).

[3] At the conclusion of the trial Getty Marketing voluntarily withdrew its claims in Counts II and III.

judgment as a matter of law pursuant to Fed. R. Civ. P. 52 as to all of Plaintiffs' claims. The Court granted the motion as to Count III and denied the motion as to Counts II and V. This memorandum sets forth the Court's rationale for granting Defendant's motion pursuant to Rule 52, decides the remaining claims in this case, and resolves those motions still pending from the jury trial.

## I. BENCH TRIAL STANDARD

Pursuant to Federal Rule of Civil Procedure 52(a), this Court may enter judgment following a trial without a jury. Fed. R. Civ. P. 52(a). In its decision the Court "shall find the facts specially and state separately its conclusions of law thereon." Id. It is within the province of the trial court to weigh the credibility of witnesses for the purpose of making findings of fact. See id. To the extent there is no dispute, the following findings of fact having been gleaned from the parties' post-trial submissions[4]; otherwise, the findings are based upon the evidence presented during the three days of trial conducted before this Court sitting without a jury. For the most part, however, the relevant facts are undisputed.

## II. FINDINGS OF FACT

The Wilkesbarre Pier extends from the shore in the city of East Providence, Rhode Island into Providence harbor. The Pier was constructed during the 1870s by the Wilkesbarre Coal and

[4] Getty Properties in its Proposed Findings of Fact accepted and incorporated by reference into its submission certain facts submitted by Capital Terminal in its Proposed Findings of Fact. Paragraphs 1-7; 9-18; 25; 27-31; and 33-35 of Capital Terminal's proposed findings of fact have been agreed to by both parties, have been adopted by the Court, and have been incorporated herein. With respect to those facts not stipulated to, the Court has made its own findings. The Court notes as well that, to appreciate the parties' respective positions, it is necessary to provide a lengthy, detailed, and somewhat ancient, historical recitation of the facts.

Iron Company and was later acquired by the Providence and Worcester Railroad Company ("P&W"). Until the Pier was damaged by the 1938 hurricane, it was used primarily as a facility for unloading coal from deep water vessels onto railroad cars. The hurricane destroyed only the coal-unloading facilities on the Pier; the Pier itself remained structurally sound. On August 28, 1941, the trustees-in-bankruptcy of the New York, New Haven, and Hartford Railroad Company, acting pursuant to a general power of attorney provided under an 1892 lease ("1892 lease") with P&W, conveyed the Pier, the appurtenant facilities, and the underlying land and river flats to the Colonial Beacon Oil Company ("Colonial Beacon") subject to an express reservation of rights (the "1941 Deed"). Joint Exh. 1.

Under the 1941 Deed, P&W expressly reserved the right to tear down the existing pier and to construct a new pier that it would own; provided that if and when P&W exercised this right, Colonial Beacon and its successors and assigns would have the conditional and nonexclusive right (1) to "erect, replace, use and maintain" pipelines and appurtenant equipment and (2) to have the "free and uninterrupted use of the berth on the northerly side of said pier for the delivery of petroleum products and other merchandise used in connection with its or their petroleum products business." Id. at 4. In the event that P&W elected to exercise its reserved rights and construct a new pier, Colonial Beacon's (and its successors and assigns) right to use the new pier was conditioned on: (1) the noninterference by Colonial Beacon's pipelines and equipment with P&W's use of the Pier, (2) the removal of any pipelines and equipment upon Colonial Beacon's abandonment of the Pier, and (3) Colonial Beacon reimbursing P&W, annually, in an amount equivalent to what the tax assessment would have been, on the last assessed valuation of the Pier, had the Pier not been removed and, instead, Colonial Beacon had

continued to be the owner. Id.

Humble Oil and Refining Company ("Humble") became the corporate successor to Colonial Beacon. In 1962, Humble conveyed to Tidewater Oil Company ("Tidewater") an undivided two-fifths ownership in the Pier, the northern ship berth, underwater land, two petroleum product lines, and other facilities and appurtenances. Humble and Tidewater subsequently corrected the legal description of the property conveyed by a deed in 1964. Thus, as of 1964, Humble had a three-fifths interest, and Tidewater a two-fifths interest, in the Pier, the northern ship berth, the underwater land, the then- existing two petroleum pipelines, and the unloading facilities and appurtenant equipment. Tidewater later became Getty Oil Company ("Getty Oil").

On November 21, 1969, Humble conveyed to Union Oil Company of California ("Unocal") a one-fifth interest in the Pier, the northern ship berth, underwater land, and the buildings, structures, improvements, appurtenances, and pipelines serving Unocal's adjacent chemical plant. Humble expressly reserved, however, "those facilities, structures, and improvements and appurtenances [on the Pier] utilized exclusively to transfer petroleum products from the tanker or barge berth to the 12" and 14" pipelines extending from the Wilkesbarre Pier." The parties agree that, as of 1969, the ownership of the Pier, the northern ship berth, and the underwater land rested 40 percent in Humble, 40 percent in Getty Oil, and 20 percent in Unocal, and that the ownership of the petroleum pipelines and appurtenances used exclusively to transfer petroleum products rested 60 percent in Humble and 40 percent in Getty Oil.[5]

---

[5] To the extent the parties dispute ownership of the pipe supports and unloading apparatus on the Pier, the Court notes that the question of ownership is not an issue before the Court;

In 1970, Hudson Realty Company ("Hudson"), a company owned by Robert Eder, acquired a pipeline easement from P&W that ran from the Pier to the oil terminals in Phillipsdale, Rhode Island. Hudson subsequently changed its name to Seekonk Realty Company.

In 1972, there was a fire in the petroleum pipelines then-connecting the Pier to the oil terminals in Phillipsdale. At that time, the pipelines ran partly under city streets and partly through P&W land under a sublease by the New Haven Railroad pursuant to the 1892 lease. The pipelines then-serving the oil terminals in Phillipsdale needed to be both replaced and relocated. In June of 1972, and later in September 1973, P&W filed suit against Getty Oil, Humble (which later became Exxon Corporation), and Unocal, seeking a declaratory judgment that it was the owner of the Wilkesbarre Pier. The Superior Court of Rhode Island ruled in P&W's favor in 1974. Applying the doctrine of economic waste, the superior court held that P&W was not required to raze the Pier, which was structurally sound, in order to assert the rights it reserved in the 1941 Deed. Instead, the court held that P&W's act of asserting ownership rights to the Pier was the equivalent of tearing it down and building it anew. Thus, the court held that P&W was the 100 percent owner of the Wilkesbarre Pier, the northern ship berth, and all of the equipment, and ordered the oil companies to convey the presently existing Pier to P&W in fee simple. Getty Oil, Exxon, and Unocal appealed.

On August 6, 1975, P&W and Getty Oil reached a settlement. The settlement was embodied in six instruments and two letters, and had seven parts. First Seekonk Realty, one of the plaintiffs in the superior court litigation, granted Getty Oil its pipeline easement running from

---

rather, this case concerns rights associated with Pier usage.

the Pier to the oil terminals in Phillipsdale ("1975 Grant"). Joint Exh. 8. Second, Getty Oil agreed, <u>inter alia</u>, to convey back to P&W its entire interest in the Wilkesbarre Pier, underwater land, and related property so as to conform to the superior court judgment (the "1975 Agreement"). Joint Exh. 9. Third, Getty Oil conveyed by deed its entire interest in the property described by its metes and bounds as "its undivided two-fifths interest and all its right, title and interests in and to the pier and berthing facilities" (the "1975 Deed"). Joint Exh. 10. Fourth, Getty Oil agreed, <u>inter alia</u>, to install two new sixteen-inch petroleum pipelines from the unloading facilities on the Pier to an agreed upon point in Phillipsdale (the "1975 Grant and Agreement"). Joint Exh. 12. The 1975 Grant and Agreement provided that Getty Oil had

> the right to use the north side of [the] Wilkesbarre Pier, including the unloading platform and other appurtenances thereto for the construction and operation of pipelines, unloading hoses and related facilities, apparatus and equipment required for the convenient unloading of petroleum products from ships and barges, together with the right to have such ships and barges use the berth serving said north side of the pier.

<u>Id.</u> at 1. Fifth, Getty Oil reached an agreement with Robert Eder, individually, on the use, operation, and maintenance of the pipelines (the "1975 Pipeline Operating Agreement"). Joint Exh. 11. Sixth, Getty Oil dismissed its appeal. Seventh, Getty Oil promised to convey any after-acquired title from Exxon or Unocal to P&W.

The 1975 Grant and Agreement obligated Getty Oil to "promptly commence and diligently pursue to completion the construction of two 16" petroleum pipelines running from the existing unloading facilities . . . along the north side of the pier to the easement area, and thence along and within the easement area to [a] point in Phillipsdale . . . . at which point Getty [Oil]

will install a new manifold for each of the two pipelines." Joint Exh. 12 at 2-3. All work was to be performed at Getty Oil's sole expense. Id. Once installed, Getty Oil would own the new petroleum pipelines. Meanwhile, Getty Oil granted to Robert Eder the permanent right to use all of the pipelines, equipment, unloading facilities, and the permanent right to "install, construct, use, maintain, [and] operate . . . lines of pipe for the transmission of petroleum products, and activities incidental thereto . . . ." Id. at 3. In addition to Robert Eder's company, Seekonk Realty, granting Getty Oil the pipeline easement in the 1975 Grant, Eder paid Getty $250,000 for rights received under the settlement. Mr. Eder also agreed to pay taxes and maintenance associated with his proportionate use of the pipelines.

Getty Oil began construction of the new pipelines in 1976. In June 1976, Getty Oil requested Mr. Eder's permission to route the pipelines outside of the agreed upon easement area. Mr. Eder agreed to a First Amendment to the Grant and Agreement on June 9, 1976, and requested that Getty Oil bear all cost and expense if the new pipelines ever had to be relocated to the easement area.

On June 10, 1976, the Rhode Island Supreme Court decided the appeal between P&W and the remaining oil company defendants (Exxon and Unocal). Joint Exh. 17 (Sup. Ct. decision). The supreme court agreed with the superior court decision concluding that P&W did not need to tear down and rebuild the Pier in order to assert its rights under the 1941 Deed. The supreme court also affirmed the finding that P&W owned "the totality of interests in the existing pier." Id. at 26 and n.12. This decision was recorded in the Land Evidence Records for the City of East Providence on June 14, 1976.

By 1977, pursuant to the 1975 Grant and Agreement, Getty Oil had completed installation of the two sixteen-inch pipes running from the manifolds to the foot of the Pier. Robert Eder testified at trial that Getty Oil asked for and received his permission to postpone replacement of the existing pipelines on the Pier itself with the larger sixteen-inch pipes. Testimony of Robert Eder, 6/25/03. Mr. Eder further testified that he consented to Getty Oil's request because, at that point in time, it would not have served any useful business purpose to insist that Getty Oil perform the work. Id. At that time, according to Mr. Eder, the ship berth at the Pier was dredged to less than thirty-feet and, as such, could only accommodate barges. Id. Barges, according to Mr. Eder, have substantially less capacity and pump product at a slower rate than ocean-going vessels; larger pipelines on the Pier would not have assisted in increasing the flow rate from the barges. Id. The Court finds the testimony of Mr. Eder on this point to be credible. On June 1, 1977, Getty Oil sent Mr. Eder a letter, authored by G. W. Druckenmiller, confirming that both parties had agreed to postpone the replacement of the on-pier pipelines ("1977 Druckenmiller Letter Agreement"). Joint Exh. 18. The letter stated:

> Under the Grant and Agreement dated August 6, 1975 executed between yourself and Getty Oil Company (Eastern Operations), Inc., now known as Getty Refining and Marketing Company (and hereinafter referred to as GRMC), GRMC agreed to construct "two 16" petroleum pipelines running from existing loading and unloading facilities or from loading and unloading facilities to be constructed on the (Wilkesbarre) pier by Getty . . ." to a certain point in Phillipsdale.
>
> As you know, we have constructed said pipelines but have not replaced those pipelines located on the pier itself since such replacement at this time would serve no useful purpose. However, GRMC hereby agrees to repair and/or replace said pipelines located on the Wilkesbarre Pier if and when necessary at our sole cost and expense to the extent that such cost and expense is attributable to the fact that new lines have not been installed on said pier as per the above-mentioned Agreement. That is, it is our intent that you shall

> have no more nor any less liability with reference to those lines which have not been replaced than you would have had, had new piping been installed on said pier at the time of the construction of the remainder of the pipeline.

Id. (emphasis added). Mr. Eder signed the letter, indicating his consent to the postponement. Id.

On November 6, 1980, Getty Oil and Mr. Eder amended the 1975 Grant and Agreement by a Second Amendment to include provisions obligating Mr. Eder to pay a proportionate share of Pier maintenance expenses attributable to his company's use for which Getty was then liable under the Pier operating agreement then in effect. In return, Getty Oil reaffirmed its pre-existing obligations under the 1977 Druckenmiller Letter Agreement and incorporated it into the Grant and Agreement as an exhibit to the Second Amendment. Joint Exh. 19, sec. 1. Getty also gave Mr. Eder the right to assign his rights under the Grant and Agreement to a family trust. Id. at sec. 2. On June 23, 1982, Mr. Eder assigned his rights under the 1975 Grant and Agreement, as amended, to a family trust. His wife, Linda Eder, and Edgar M. Masinter, Esq., were the trustees (the "Eder Trustees"). Joint Exh. 20.

In 1984, Texaco Refining and Marketing Company ("Texaco") acquired all of Getty Oil's assets in 1984. In 1985, in connection with a settlement of two lawsuits between P&W and Texaco, the Eder Trustees and Texaco entered into a Third Amendment to the 1975 Grant and Agreement. Joint Exh. 21.Notwithstanding the deletion of several provisions of the Second Amendment, Section 1 of the Second Amendment, which incorporated the 1977 Druckenmiller Letter Agreement, survived and was expressly continued in full force and effect in the Third Amendment. Id. at 6. Shortly thereafter, on February 1, 1985, in connection with an acquisition of the former Getty Oil's assets by Power Test Investors Limited Partnership, Texaco conveyed

to Power Test Realty Co. Limited Partnership ("PT Realty") the Getty Oil terminal, along with:

> [a]n undivided two-fifths ownership interest in that certain parcel of upland and river flats in the City of East Providence . . . together with an undivided two-fifths ownership interest in the pier, berthing facilities, two-product pipelines, valves, equipment and associated appurtenances located on said land . . . .
>
> Excluding, however, that portion of said premises conveyed by Getty Oil Company (Eastern Operations), Inc. to Providence and Worcester Company by deed dated August 6, 1975 and recorded in Book 302 page 367.

Joint Exh. 22, p. 4. PT Realty subsequently leased the terminal facility to Power Test Corporation (Del.). Power Test Corporation (Del.) changed its name to Getty Petroleum Corporation ("Getty Petroleum") on July 27, 1985. In January 1991, Getty Petroleum, Unocal, Capital Properties, Inc. ("CPI"), and P&W entered into a pier operating agreement ("1991 Pier Operating Agreement") that amended and restated an earlier pier operating agreement dated June 12, 1985. Joint Exh. 23. Under the 1991 Pier Operating Agreement, the parties agreed to pay taxes and repairs in proportion to their use. They also agreed that any party could withdraw from the agreement upon six months advanced notice.

In March 1997, according to the trial testimony of Leo Liebowitz, Getty Petroleum spun off its petroleum marketing business to a newly-formed publicly-held company called Getty Petroleum Marketing, Inc. ("Getty Marketing"). Testimony of Leo Liebowitz, 6/23/03. In connection with this spin-off, Getty Petroleum changed its name to Getty Realty Corporation but remained a Delaware Corporation ("Getty Realty"). Getty Petroleum also gave Getty Marketing the right to use the Getty trademark. Leo Liebowitz was president, chairman, and CEO of both Getty Marketing and Getty Realty following the spin-off. Id.

Under a master lease dated February 1, 1997, Getty Realty leased virtually all of its fee-owned properties to Getty Marketing. Joint Exh. 24. The original 1997 Master Lease was a "triple-net lease," meaning that Getty Marketing was responsible for all taxes, maintenance, and insurance obligations, while Getty Realty retained only certain, defined, environmental liabilities. Id.

The testimony at trial established that, following the spin-off in 1997, a dispute arose between P&W and Getty Realty involving the parties' respective Pier repair obligations under the 1991 Pier Operating Agreement. Testimony of Paul Stendardi, 6/23/03. Getty hired an engineering firm to investigate and survey the Pier. Id. The firm reported back that the Pier was in poor condition and had exceeded its useful life. Id. The repair dispute was submitted to arbitration. Id.

On October 1, 1997, Getty Realty sent a letter to the other signatories to the 1991 Pier Operating Agreement (P&W, CPI, and Unocal), and the Eder Trustees, stating "we have been advised that the pier has exceeded its useful life, has inherent design and construction defects and cannot be repaired." Joint Exh. 25. Getty Realty advised that (1) it would be withdrawing from the 1991 Pier Operating Agreement effective April 1, 1998, and (2) that it would "cease using the Pier in the very near future, and in any event, no later than December 31, 1997," and (3) it was tendering the pipelines to the trustees pursuant to section 14 of the 1975 Grant and Agreement, as amended. Id. On October 6, 1997, the Eder Trustees accepted Getty Realty's tender of the pipelines. Joint Exhibit 27. On December 15, 1997, Getty Realty and P&W agreed to settle the arbitration dispute. The 1997 Settlement Agreement, Joint Exh. 28, provided for the following:

> (1) Getty Realty withdrew from the 1991 Pier Operating Agreement effective December 1, 1997 (as opposed to April 1, 1998), Id. at 1;
>
> (2) Getty Realty made a lump sum payment to P&W, representing its accrued and final obligations under the 1991 Pier Operating Agreement, Id. at 2-3;
>
> (3) P&W agreed to execute, simultaneously, a pier usage agreement with Getty Realty's tenant, Getty Marketing, known as the Throughout Agreement, Joint Exhibit 29;
>
> (4) Getty Realty agreed with the Eder Trustees to a First Amendment to the 1975 Pipeline Operating Agreement under which Getty Realty agreed to pay, among other things, all maintenance costs as well as the costs of compliance with all city, state, or federal regulations applicable to the operation of the pipelines in the event the repair or replacement to the pipeline exceeds $25,000, Joint Exh. 30;
>
> (5) Getty Realty agreed with the Eder Trustees to a Fourth Amendment to the 1975 Grant and Agreement, Joint Exh. 31;
>
> (6) The Eder Trustees consented to Getty's revocation of its tender of the pipelines, Joint Exh. 32.

From January 1, 1998, until March 2003, Getty Marketing used the Pier and made throughput payments to Capital Terminal pursuant to the 1997 Throughput Agreement. Trial Testimony of Paul Stendardi, 6/23/03. In January 1998, Getty Realty underwent a reorganization through which it became a wholly-owned subsidiary of Getty Realty (Md.), a Maryland corporation, and changed its name to Getty Properties.

## III. CONCLUSIONS OF LAW AND SUPPLEMENTAL FINDINGS OF FACT

### A. *Rule 52(c) Standard*

At the close of Plaintiff's case Defendant, pursuant to Fed. R. Civ. P. 52(c), moved for judgment as a matter of law on Counts II, III, and V. Rule 52(c) states, in pertinent part:

> If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim

> or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence.

Entering "[j]udgment on partial findings is appropriate when a party making a claim has either 1) Failed to prove one of the essential elements of its claim; or 2) Presented evidence that establishes an adverse party's defense to that claim." U.S. v. Davis, 20 F. Supp. 2d 326, 332 (D.R.I. 1998). For reasons described more fully below, the Court determined that Rule 52(c) required dismissal of Plaintiff's claim for injunctive relief contained in Count III of the complaint.

(i) Count III – Injunctive Relief

With one important exception, a party's entitlement to permanent injunctive relief demands the same quadripartite showing that is required for entry of a preliminary injunction. A party seeking a preliminary injunction must show "(1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996) (citation omitted). Where permanent injunctive relief is at issue, however, "the movant must show 'actual success' on the merits of the claim, rather than a mere likelihood of such success." K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 915 (1st Cir. 1989) (quoting Amoco Production Co. v. City of Gambell, 480 U.S. 531, 546 n.12 (1987)). The type of injunctive relief sought in this case adds an additional twist to the equation. Where, as here, a party seeks

affirmative relief, that is an order requiring some positive act, as opposed to an order merely preserving the status quo, "the burden on the moving party is . . . that much heavier." Aunyx Corp. v. Canon, U.S.A. Inc., No. Civ.A.86-2073MC, 1988 WL 82236, at *1 (D. Mass. July 21, 1988). It was with this standard firmly anchored in place that the Court set sail to evaluate the merits of Defendant's motion for judgment as a matter of law.

In Count III of the complaint Getty Properties alleges that erosion at the Pier is jeopardizing the safety of the pipelines, and that the Pier requires immediate repair. Plaintiff also contends that the installation of a waterline on the existing pipeline supports[6] on the Pier, without Getty Properties' knowledge or consent, violates the terms of the Grant and Agreement, as amended. Plaintiff alleges that the installation of the waterline, due to the additional stress it places on the existing pipeline supports, has also endangered the safety of the pipelines on the Pier. Getty Properties seeks an order of this Court directing the Defendant to remove the waterline from the Pier supports immediately and to repair the Pier in its entirety. Because of the nature of Plaintiff's claims, parts one and two in the injunction calculus (actual success on the merits and irreparable harm) are necessarily intertwined.

The Operating Agreement (For Use of Pipelines), attached as Exhibit A to the 1975 Grant and Agreement, allows the Defendant to add pipelines to the Pier so long as the additional lines do "not interfere with the continued safe operation of the existing pipelines," Joint Exh. 12, para. IV (emphasis added). Thus, with respect to removal of the waterline, the question of whether Getty Properties can succeed on its claim for injunctive relief, at least as to parts one and two of

[6] The waterline rests on the same pipeline supports as the existing petroleum pipelines.

the test, rises and falls on the determination of whether the installation of the waterline has jeopardized the safety of the existing petroleum pipelines. Similarly, because the Defendant avers that repairs must be made to remedy the erosion on the Pier, which it also contends is endangering the safety of the pipelines, evaluation of the success on the merits overlaps with the Court's inquiry into irreparable harm. The Court has already determined that Defendant has an obligation to make repairs on the Pier; as to Plaintiff's demand that the waterline be removed and the Pier be "repaired in its entirety," however, it is Plaintiff's burden to establish (1) Defendant's repair obligation, and (2) that a failure to remove the waterline and make repairs will result in irreparable harm. Obviously, if the Plaintiff fails to establish that the petroleum pipelines can not safely coexist with the waterline and/or what repairs on the Pier are necessary, its claim for a mandatory injunction dies on the vine. That, in fact, is exactly what happened and was the basis for this Court's grant of Defendant's motion for judgment as a matter of law on Count III.

In support of its claim for injunctive relief, Plaintiff offered the testimony of its expert, David Porter ("Porter"). Porter, a structural engineer who specializes in marine structures, testified that he performed various work on the Pier over a period of several years. Porter testified that on or about February 14, 2001, he was asked by two Getty Marketing employees, Paul Stendardi and Maria Gallo, to look at the pipeline support system on the Pier and to determine its relative condition. Upon a visual inspection of the pipeline support system, Porter reported that he observed some settlement and subsidence along the north side of the Pier. Specifically, Porter testified that erosion at the foundation of the pipe supports in this area had resulted in separation between *some* of the pipe supports and the product pipelines. Porter testified at trial that the separation between the pipeline supports and the pipelines that he

identified on February 14, 2001, could *possibly* result in fracture or failure of the pipeline and a resulting loss of petroleum product. Porter testified that he was concerned that the additional weight of the waterline could jeopardize the stability of the existing pipeline supports.

On cross-examination, Porter testified that the last time he had been on the Pier was during his inspection on February 14th, over two years ago. He also testified that he never conducted any tests on the pipeline supports themselves, such as a study that would determine the amount of weight the pipeline supports could bear (though one could have been done), and that he was unsure how many pipeline supports were present on the Pier. When asked how much the pipelines weighed, he stated that he did not know; Porter also stated that he did not know whether the pipelines were generally full or empty when not in use. At the time he observed the separation between the pipelines and the supports, Porter recommended that they be shimmed[7] where necessary.

Buoyed, perhaps, by the Court's earlier ruling that it is the Defendant's responsibility to repair the Pier, Plaintiff ignored its burden of establishing exactly what repairs, if any, are necessary. While Plaintiff would no doubt prefer that this Court issue it a blank check to make those repairs it deems necessary, such relief is not available. Rule 65 of the Federal Rules of Civil Procedure outlines the details that an order issuing an injunction must include and requires that the order be, inter alia, "specific in its terms." At the conclusion of Plaintiff's presentation of evidence on this issue, the record was completely devoid of any evidence that would assist this

---

[7] Shimming is a technique whereby a piece of metal is inserted into a gap that develops between the pipeline and its support in order to reestablish the supportive connection between the two elements.

Court in crafting an order for specific relief. Porter's testimony amounted to speculation about what *could* happen to the pipelines if gaps between the pipelines and the pipeline supports were not fixed, but he did not testify as to whether, in his opinion, the petroleum pipelines would fail if the waterline was not removed and what, if anything, needed to be done on the Pier to correct the erosion problem, i.e. what action, specifically, would be necessary to remedy the Pier's allegedly unsafe condition. To the contrary, the evidence established that the shimming Porter had recommended following his February 14, 2001, inspection of the Pier, was, and is, ongoing.

Accordingly, having determined that the evidence adduced at trial was insufficient, as a matter of law, to establish the elements of Plaintiff's claim for injunctive relief, the Court granted Defendant's Rule 52 motion as to that claim.

B. *Remaining Claims*

Three claims remain for this Court to decide on the merits. In Count II of its complaint Plaintiff, Getty Properties, seeks a declaratory judgment that (1) it does not have an obligation to install a fire suppression system or a waterline at the Wilkesbarre Pier; and (2) that it is not obligated to increase the diameter of the petroleum pipelines on the Pier to sixteen inches, as has been demanded by the Defendant, until such time as it is "necessary to do so." Count V of the complaint seeks a declaratory judgment confirming rights allegedly created by the 1941 deed, the 1975 grant, and the 1975 license giving Plaintiffs, Getty Properties and Getty Marketing, the right to use the north side of the Pier, its appurtenant facilities, and the petroleum pipelines located on the Pier. Defendant, in Count II of its counter-claim, seeks an order directing Getty Properties, at its sole cost and expense, to replace the petroleum pipeline on the Wilkesbarre Pier

with a sixteen-inch pipe.

(i) Count II – Declaratory Judgment/Counterclaim

(a) *Obligation to install fire suppression equipment on the Wilkesbarre Pier*

Getty Properties, in seeking a declaratory judgment that it has no obligation to install a fire suppression system or a waterline on the Wilkesbarre Pier, relies, in large part, on this Court's Memorandum and Order of December 20, 2002, granting Getty Properties' motion for judgment as a matter of law on the question of whether it was liable for monies spent by Capital Terminal for the installation of fire suppression equipment on the Wilkesbarre Pier, and argues that the issue has been settled. In its decision, the Court determined that Capital Terminal had failed to come forward with any evidence establishing that the installation of this equipment was required by city, state, or federal regulation, as would have to be the case for Getty Properties to have been responsible for those costs.[8] While that ruling effectively torpedoed Capital Terminal's claim for damages, it did not decide the claim on its merits.

Now before the Court is Getty Properties' claim seeking a declaration that it has no obligation to pay the past or future costs of installing or maintaining an adequate fire protection system on the Wilkesbarre Pier. Getty's reliance on this Court's prior ruling as support for its instant claim is misplaced. As the party seeking the declaratory judgment, Getty had an obligation to come forward with evidence that established, for instance, that the installation of the fire suppression equipment on the Wilkesbarre Pier is *not* required by city, state, or federal

---

[8] Pursuant an operating agreement covering use of the pipelines on the Pier, Getty Properties is required to bear the cost of compliance with all city, state, or federal regulations applicable to the operation of the pipelines.

regulation, or, in other words, that it has no obligation to install such equipment on the Pier. In this, it failed.[9] Accordingly, The Court denies Getty's request for a declaration in its favor on this question.[10]

(b) *Obligation to increase the diameter of the pipeline on the Pier from 14" to 16"*

Both parties, Getty Properties and Capital Terminal, brought claims seeking a resolution to the question of whether Getty Properties is required, at this time, to replace the existing fourteen-inch petroleum pipeline on the Pier with a larger sixteen-inch pipe. As the parties previously agreed that replacement of the pipeline was to be predicated on the necessity of such

---

[9] Similarly, Getty failed to establish that the cost of the fire suppression equipment is a "pier expense" as opposed to a "pipeline expense" for which it can not be held responsible. Although this theory is argued in its post-trial memorandum, it was not developed at trial and it is not supported in the record.

[10] Capital Terminal argues, somewhat belatedly, that this Court should reconsider its ruling granting Getty Properties motion under Rule 50 in the first trial, and order Getty Properties to pay certain costs relating to fire suppression on the Pier. As support for this argument, Defendant directs the Court to the Second Amended Complaint wherein Plaintiff states that

> [t]hrough its Fire Chief, the City of East Providence has recently indicated that there is inadequate fire protection on the Pier and has set forth certain minimum requirements for necessary improvements on the Pier or the Pier will be closed to use.

Defendant avers that since Plaintiff is responsible for "the cost of compliance with all City, State, or Federal regulations applicable to the operation of the pipelines" the above was an admission and establishes that element of its claim the Court found lacking, and which served as the basis for the Court's dismissal of that claim pursuant to Rule 50. This argument is off course. To the contrary, there is no indication in either the above cited language or in any of the evidence presented in either trial that the "minimum requirements" cited as necessary on the Pier are required by a City of East Providence regulation. Defendant apparently presumes that since the Fire Chief and/or the City of East Providence itself stated that certain improvements on the Pier be made, those improvements are required by regulation. To date, there has been no proof that that is the case.

action, resolution of this issue depends solely on whether, at this time, it is "necessary" to increase the diameter of the existing pipelines. See Joint Exh.18, 1977 Druckenmiller Letter Agreement.[11] Not surprisingly, there is some dispute over what the term "necessary" means in the context of this dispute. Getty Properties argues in its post-trial memorandum that the term was meant to connote "functional necessity," i.e. indispensable to continued operations on the Pier. Capital Terminal, on the other hand, argues that the term "necessary" means, simply, necessary for a purpose "useful" to Mr. Eder's business, i.e. economically beneficial. The Court finds that the agreement is indeed susceptible to different interpretations. Rather than drift aimlessly in this fog of ambiguity, however, the Court motors toward the beacon of well-established contract principles.

In interpreting a contract, the Court's "primary task . . . is to attempt to ascertain the intent of the parties." Woonsocket Teachers' Guild, Local 951 v. School Committee of City of Woonsocket, 367 A.2d 203, 205 (R.I. 1976) (citation omitted). In doing so, the Court looks at the agreement as a whole and, where the terms are ambiguous, the Court looks "to the construction placed upon such terms by the parties themselves as an aid in determining their intended meaning." Id. (citation omitted). To assist in this endeavor, the Court is free to consider the circumstances surrounding the execution of the contract. Id.

Robert Eder testified that postponing the installation of the sixteen-inch pipe on the Pier was done because, at the time, a larger pipeline would not have furthered the needs of his

---

[11] The Druckenmiller Letter Agreement was apparently entered into by Mr. Eder for no consideration. However, because Capital Terminal has not raised the issue of its validity, the Court presumes for the purposes of this case that it is a valid agreement.

business. He explained that in 1977, due to berth depth, the Pier could only accommodate barges with a relatively slow pumping capability, and that a larger pipeline would not have made a difference. This version of the events surrounding the execution of the 1977 Druckenmiller Letter Agreement was not disputed. The Court finds that the term "if and when necessary" was intended by the parties to refer to the needs of Mr. Eder's business.

Having now clarified the meaning of the phrase "if and when necessary" the Court turns its attention to the merits. Capital Terminal contends that increasing the diameter of the pipeline on the Pier will increase the flow of petroleum through the pipe, and, therefore, serve a useful business purpose. Getty Properties argues that (1) Capital has failed to establish that modification of the pipeline will increase the flow rate, and (2) even if it is assumed that the requested modification is employed, Getty argues that Capital has failed to establish that there is a valid business purpose for doing so.

At trial, Capital Terminal, consistent with its understanding of the parties' agreement, sought to establish that it had a valid business interest in having the pipeline on the Pier replaced with a sixteen-inch pipe. Robert Eder testified that the Pier was dredged to 40 feet in 1985, and that it can now accommodate ocean-going vessels. Eder testified that these vessels are able to pump product at a considerably faster rate than barges. Avery Noe ("Noe"), the president of Capital Terminal, testified that Capital Terminal has expanded its tank-farm to accommodate the volume of product being delivered by the ocean-going ships. Eder testified that in 1977, the storage capacity of the Capital Terminal facility was 189,000 barrels and that today the facility can house 502,000 barrels. Noe testified that Capital Terminal is in the process of further expanding and making improvements to its tank-farm and pipeline infrastructure. Specifically,

Noe testified that Capital Terminal has invested $100,000 in making improvements to its terminal to increase the rate of flow, including enlarging the nozzles on its storage tanks to sixteen inches. Noe also testified that Capital Terminal plans to enlarge two smaller pipes within its facility to sixteen inches and also add two eight-inch hoses to the unloading facilities on the Pier. Additionally, Noe testified that Capital Terminal has spent thousands of dollars preparing final engineering plans for these improvements that will result in a continuous sixteen-inch pipeline from the Pier to the tanks at Capital Terminal's facility. Capital Terminal also presented the expert testimony of Dennis Hoffman ("Hoffman"). Hoffman, a mechanical engineer, opined that the modifications Capital Terminal had made to its facilities along with the modifications it was planning to make, combined with the installation of a sixteen-inch pipeline on the Pier, would improve flow rate by between 6.2 percent and 12.7 percent. Testimony of Dennis Hoffman, 6/25/03; Def. Exh. GG. Hoffman constructed several mathematical models incorporating various diameters of pipe, along with the other improvements Capital Terminal told him it planned to implement on the Pier, in order to arrive at his opinions. Id. The Court finds the testimony of Noe, Eder, and Hoffman credible and persuasive.

Getty argues that the calculations performed by Hoffman do not establish the "necessity" of replacing the existing pipeline on the Pier. Getty avers that since Hoffman's calculations were not based solely on replacement of the existing fourteen-inch pipeline, but also assumed replacement and/or the upgrade of other various systems on the Pier, including certain hoses and pipes, Capital Terminal failed to meet its burden, as the critical inquiry is whether expansion of the existing pipeline, *by itself*, is "necessary"; that is, whether installation of the sixteen-inch pipeline, *alone*, will increase the flow of product through the pipe. This argument ignores the

clear import of what the parties had agreed to in the 1977 Druckenmiller Letter Agreement. Joint Exh. 18. If and when a legitimate business purpose for expanding the pipeline arose, it was Getty's responsibility to step up to the plate. Here, the record evidence establishes that the work currently being performed on the Pier's petroleum offloading system will increase the rate of petroleum flow through the system.

On the issue of business need, it was Noe's testimony that by increasing the diameter of the pipeline on the Pier to sixteen inches, the resulting increased rate of flow would decrease the amount of time it would take to offload petroleum from vessels berthed at the Pier, thereby improving the scheduling of vessels and the service to its customer, Global Companies LLC ("Global"). Testimony of Avery Noe, 6/25/03. Noe further testified that the improvements to the system would increase the value of Capital Terminal's terminal and its warehousing business. Id. On cross-examination of Noe on this issue, Getty Properties elicited from Noe that Capital Terminal has one customer, Global. Noe acknowledged that, while Global has recently requested that the diameter of the pipeline be increased, there is no provision in a ten-year contract the parties recently entered into (Global stores product in Capital Terminal's facility) which requires Capital Terminal to expand the diameter of the existing pipeline on the Pier. Id. Noe also testified that any costs associated with the extended offloading of petroleum on the Pier were, under the terms of their agreement, to be paid by Global, not Capital Terminal. Id. Getty Properties argues that because most, if not all, of Capital Terminal's revenue for the next ten years is not dependent on an expanded pipeline, and because there are no additional costs that are incurred by Capital in the event that ships on the Pier can not be unloaded as quickly with the existing pipeline, there is no apparent economic advantage that could be gained by installing the

larger pipe. The Court disagrees. Clearly, there are a number of benefits that will be recognized by improving the petroleum flow on the Wilkesbarre Pier, not the least of which will be Capital Terminal's ability to operate more efficiently and expediently, and the resulting value this will add to a company in the business of unloading and storing bulk petroleum.

For the foregoing reasons, the Court finds in favor of Defendant, Capital Terminal, on Count II and on its counterclaim. Getty Properties shall, at its sole cost and expense, take all steps and supply all necessary labor and material to replace the existing petroleum pipeline on the Wilkesbarre Pier with a sixteen-inch pipeline pursuant to the terms previously agreed upon by the parties in the 1975 Grant and Agreement and later reaffirmed in the 1977 Druckenmiller Letter Agreement.

(ii) Count V – Declaratory Judgment–Rights to the north side of the Wilkesbarre Pier

It is undisputed that Getty Properties (formerly Getty Realty), pursuant to a reservation of rights under the 1941 Deed and through a series of subsequent agreements, had an easement giving it the right to use the north side of the Wilkesbarre Pier up until, at least, 1997. Plaintiffs, Getty Properties and Getty Petroleum Marketing, seek a declaration that their rights to the north side of the Pier (Getty Marketing as a lessee) remain intact. Capital Terminal argues that rights reserved to Getty Properties under the 1941 Deed were lost due to abandonment, estoppel, and/or forfeiture. Capital Terminal also asserts that Getty Marketing does not have standing to assert its claim as a lessee.

(a) *Abandonment*

Capital Terminal first argues that Getty's tender of the pipelines pursuant to section 14 of

the 1975 Grant and Agreement, as amended, and its withdrawal from the 1991 Pier Operating Agreement constituted an abandonment of its rights to use the north side of the Pier. This argument misses the dock.

An easement will be considered abandoned when the easement holder exhibits an intent to abandon the easement and then, consistent with that intent, actually abandons. See Jackvony v. Poncelet, 584 A.2d 1112, 1114 (R.I. 1991); Nahabedian v. Jarcho, 510 A.2d 425, 427-28 (R.I. 1986). Here, as between Getty Realty and Capital Terminal, a dispute arose concerning the condition of the Wilkesbarre Pier. Following inspection of the Pier by an engineering firm retained by Getty Realty, Getty Realty, in accordance with its rights under the 1975 Grant and Agreement, made known its intent to tender the pipelines to the Eder Trustees, and advised that it would be withdrawing from the 1991 Pier Operating Agreement. Soon thereafter, however, the parties reached a resolution to their dispute, and entered into the 1997 Settlement Agreement. A cursory review of the Settlement Agreement reflects that it was the parties' intent to continue their relationship in connection with the Pier, not end it. Getty Realty withdrew its tender and the parties reached, presumably, what they believed would resolve those issues surrounding the instant and ongoing issue of repairs on the Pier—the very issue that prompted Getty to tender the pipelines in the first place. The Court's inquiry ends here. Getty never followed through with its initial decision to abandon operations on the Pier. As part of the Settlement Agreement, Getty secured the right for its tenant, Getty Marketing, to continue to use the Pier, and to fund repairs in accordance with the Throughput Agreement. Getty's decision to withdraw from the 1991 Pier

Operating Agreement does not, as argued by the Defendant,[12] evidence an intent to abandon its rights to use the Pier. Rather, the Court finds that the earlier 1991 Pier Operating Agreement was replaced by the Throughput Agreement in accordance with the parties' attempt to reach a resolution on the repair issue and in response to Getty Marketing's desire to have the cost of using the Pier be "known, certain, and predictable." Testimony of Paul Stendardi, 6/23/03.

(b) *Estoppel*

Unlike the doctrine of abandonment, which requires proof of the intent to abandon, termination of an easement by estoppel occurs when a party states its intention to abandon and another party relies on that statement to its detriment. See Nahabedian, 510 A.2d at 429. For the reasons stated above, the Court need not reach the merits of this argument as it is clear that the Defendant was or should have been aware that Getty Realty, by entering into the Settlement Agreement, fully intended to continue to exercise its rights to use the north side of the Pier.

(c) *Forfeiture*

Capital Terminal last argues that Getty Properties forfeited its rights to the Pier by failing to comply with certain conditions set forth in the 1941 Deed. Specifically, Capital Terminal contends that (1) Getty Properties forfeited its rights to use the Pier by failing to pay taxes on the

[12] Capital Terminal's argument that if Getty had not decided to abandon its rights to use the Wilkesbarre Pier it would not have withdrawn from the 1991 Operating Agreement cannot be reconciled with the 1997 Settlement Agreement, which clearly provides that Getty Realty would have a continuing interest in the Pier and the pipelines. See Joint Exhs. 28 (1997 Settlement Agreement); 29 (Throughput Agreement); 30 (First Amendment to the 1975 Pipeline Operating Agreement); 32 (Getty's revocation of its tender of the pipelines).

Pier as required under the 1941 Deed, and (2) Getty Properties has forfeited its rights to the Pier because the 1941 Deed conditioned those rights on Getty being in the "petroleum products business," a status Capital Terminal contends Getty voluntarily relinquished beginning in March 1997, when it spun-off its petroleum products business. The Court will address each of these arguments in turn.

Taxes

Under the 1941 Deed, P&W conveyed the land and the Pier to Colonial Beacon, its successors and assigns (Getty Properties), and expressly reserved the right to tear down the existing Pier and build a new one. If P&W ever exercised its reserved rights, Colonial Beacon, its successors and assigns, had the non-exclusive right to erect, maintain, and use the pipelines, and to berth vessels on the north side of the Pier, provided that:

> the Grantee, its successors and assigns, shall annually reimburse the Providence and Worcester Railroad Company, its successors and assigns, for the taxes assessed on said Pier to an amount equivalent to what the taxes would have been on the last assessed valuation of the pier owned by the Grantee, its successors and assigns, and removed for the construction of such pier constructed in the exercise of the right hereby reserved . . .

Joint Exh. 1. Capital Terminal contends that Getty Properties (formerly Getty Realty) has failed to pay taxes on the Pier since December 31, 1997, in violation of a condition subsequent contained in the 1941 Deed, and, as such, argues that Getty Properties forfeited its rights use the north side of the Wilkesbarre Pier. In response, Getty Properties argues that (1) since the original Pier was never torn down, it has no obligation to pay taxes, and (2) even if it has an obligation to pay taxes, that obligation was fulfilled by the payment of throughput fees, by its tenant Getty

Marketing, under the Throughput Agreement.

Until the Throughput Agreement took effect, taxes due on the Pier were paid by Pier users pursuant to the various pier operating agreements. See e.g., Joint Exh. 23, p.9, sec. IV (A)(2) (1991 Pier Operating Agreement). The 1997 Settlement Agreement provided for Getty Properties withdrawal from the 1991 Pier Operating Agreement, and Getty Properties paid Capital Terminal a lump sum to satisfy its accrued obligations under that agreement. As a required component of the Settlement Agreement, the Throughput Agreement was the agreement the parties decided would govern the use of the Pier facilities going forward, and, in addition to resolving the ongoing dispute over repair costs, the Throughput Agreement made the cost of using the Pier "known, certain, and predictable."[13] Testimony of Paul Stendardi, 6/23/03. Upon the Throughput Agreement taking effect, Getty Properties ceased making payments for taxes, maintenance, and insurance. Contrary to Capital Terminal's position that this bolsters its argument that Getty was in the process of abandoning the Pier, the Court finds that it compels the exact opposite conclusion. It is clear to this Court that the 1997 Settlement Agreement, of which the Throughput Agreement was an essential component, was entered into for the purpose of resolving the difficulties that had been encountered by the parties in assigning Pier usage costs. Consistent with that construct is that the fees paid pursuant to the Throughput Agreement were intended to satisfy the total cost of Getty's Pier usage, including its tax obligation.

Having concluded that Getty Properties' rights under the 1941 Deed remain intact, the

---

[13] What the parties apparently failed to anticipate was the fact that if Getty Marketing left the Pier there would not be a pier operating agreement in place governing the obligations that accompany Getty Realty's (now Getty Properties') rights to the Pier.

Court declines Capital Terminal's request to "declare the obligations that burden those rights" with respect to the parties joint usage of the Pier. See Defendant's Post-Trial Mem. at 20. It is unclear, at this point, whether there is actually a controversy for the Court to decide, as it appears that Getty Marketing is no longer using the Pier. Rather than plunge into this sea of uncertainty, the Court chooses to remain ashore.

"Petroleum products business"

Setting aside the issue of whether the 1941 Deed conditions Getty Properties' right to use the north side of the Wilkesbarre Pier on its being engaged in the "petroleum products business," which the Plaintiff hotly disputes, there is a more fundamental reason for rejecting this argument: Getty Properties is engaged in the petroleum products business, albeit as a landlord. It is undisputed that Getty Properties owns hundreds of gas stations and a number of terminals and other petroleum facilities throughout the northeast, including the Wilkesbarre Pier. Getty Properties derives a substantial portion, if not all, of its revenue from these operations, which are operated by its lessee, Getty Marketing. That Getty Properties is engaged in the "petroleum products business" could not be more clear—it owns and leases, and derives substantial revenue from, facilities used in the off-loading, warehousing, and distribution of petroleum products. Accordingly, the Court declines the Defendant's invitation to consider whether the 1941 Deed conditions Getty's usage of the Pier on being in the "petroleum products business."

V. POST-TRIAL MOTIONS REMAINING FROM THE JURY TRIAL

Two motions filed following the conclusion of the jury trial in this case remain pending. In Count IV of its complaint, Getty Marketing alleged that Capital Terminal had breached its

obligation to Getty Marketing under the Throughout Agreement to maintain the Pier in good repair and good working condition by failing to make certain agreed upon repairs. This Court, at an earlier stage of the case, ruled that the Throughput Agreement obligated Capital Terminal to repair and maintain the Wilkesbarre Pier, but that the agreement was ambiguous with regard to the specific scope of that obligation, presenting a question of fact for the jury. Following the conclusion of the trial, the Defendant renewed its motion for judgment as a matter of law as to that claim, pursuant to Fed. R. Civ. P. 50. At the time the motion was made during the jury trial, the Court took it under advisement and allowed the case to go to the jury. The jury returned a verdict for Plaintiff on the breach of contract claim in the amount of $100,000. Defendant's Rule 50 motion remains for decision. Additionally, Plaintiff, Getty Marketing seeks pre-judgment interest on the jury award.

A. *Renewed Rule 50 motion*

Rule 50 of the Federal Rules of Civil Procedure provides that:

> If during trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law.

Fed. R. Civ. P. 50. This Court may grant a motion for judgment as a matter of law if "the evidence, viewed from the perspective most favorable to the nonmovant, is so one-sided that the movant is plainly entitled to judgment, for reasonable minds could not differ as to the outcome." Gibson v. City of Cranston, 37 F.3d 731, 735 (1st Cir. 1994), quoted in Criado v. IBM Corp., 145 F.3d 437, 441 (1st Cir. 1998). In employing this standard, this Court does not "evaluate the

credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of evidence." Criado, 145 F.3d at 441 (internal quotation marks omitted). Where a reasonable jury could reach only one conclusion on an issue, the court must grant judgment as a matter of law. Invest Almaz v. Temple Inland Forest Prods. Corp., 243 F.3d 57, 76 (1st Cir. 2001). However, "[i]f 'fair minded' persons could draw different inferences, then the matter is for the jury." Transamerica Premier Ins. Co. v. Ober, 107 F.3d 925, 929 (1st Cir. 1997).

In the present case, Defendant argues that its motion should be granted for three reasons: (1) There could not have been a breach because the Throughput Agreement does not obligate Capital Terminal to make any specific repairs or to use any portion of the throughput fees to make repairs; (2) The parol evidence introduced by Getty Marketing failed as a matter of law to establish any such obligation; and (3) Getty Marketing failed to prove, and did not suffer, any damage as a result of the alleged breach.

At trial both parties presented evidence concerning their respective positions on the extent of Capital Terminal's repair obligation under the Throughput Agreement. This included evidence concerning the parties discussions over certain "priority repairs" that were considered essential, evidence that the Throughput Agreement was an integral part of the 1997 Settlement Agreement, which resolved the parties ongoing dispute over how repairs on the Pier were to be funded, and evidence that certain previously discussed repairs contained in the "priority repair list" had, at the time of trial, not been completed. In short, there was sufficient evidence from which a reasonable jury could have concluded that the Throughput Agreement obligated Capital Terminal to make certain specific repairs, and that by not performing those repairs after having collected money by way of throughput fees to do so, Capital Terminal breached that agreement.

Similarly, the jury could reasonably have concluded that, by Capital Terminal's failure to complete certain agreed upon repairs, Getty was deprived the benefit of its bargain, i.e money that it had understood would be earmarked for certain repairs was never spent. While it is undisputed that Getty never lost a day on the Pier due to it being in need of repair, the jury nonetheless could have concluded that by paying for something it never received, Getty's damages amounted to the money, or some portion thereof, that was never expended by Capital Terminal. In fact, that is exactly what the jury concluded: Getty asked for a refund, and the jury decided that a partial refund was in order. In light of the evidence presented, the Court cannot say that the jury's determination was unreasonable.

B. *Prejudgment Interest*

Getty Marketing seeks pre-judgment interest on the amount awarded it by the jury. Capital Terminal objects. Section 9-21-10 of the Rhode Island General Laws provides that

> in any civil action in which a verdict is rendered or a decision made for pecuniary damages there shall be added by the clerk of the court to the amount of damages interest at the rate of twelve percent (12%) per annum thereon from the date the cause of action accrued . . . .

In this case, Getty Marketing seeks interest on the award from the date it filed its complaint, August 2, 2000. Capital Terminal argues that, despite a favorable jury verdict, Getty Marketing cannot articulate with any certainty the date from which prejudgment interest should begin to run, because it argues, consistent with its Renewed Motion for Judgment as a Matter of Law, there was no breach of the Throughput Agreement and, even if there were a breach, Getty has not proven damages. In the alternative, Capital Terminal argues that since Getty Marketing did not even allege contract damages until it filed its Amended Complaint on May 25, 2001, that date, at

the very earliest, is the one that should be used to calculate pre-judgment interest. The Court agrees. The date from which pre-judgment interest shall be determined is the date that Getty first alleged it had been damaged, May 25, 2001.

## V. CONCLUSION

For the reasons discussed above, Getty Properties request for declaratory relief under Count II is DENIED. Capital Terminal's counterclaim seeking specific performance is GRANTED; Getty Properties is hereby ordered, at its sole cost and expense, to take all steps and to supply all necessary labor and material to replace the petroleum pipeline on the Wilkesbarre Pier with a sixteen-inch pipeline. Getty Properties' request for a declaratory judgment that it has no obligation to install a fire suppression system or a waterline on the Wilkesbarre Pier is DENIED. The Court GRANTS the relief sought by Plaintiffs Getty Properties and Getty Marketing, as lessee, on Count V and hereby issues a declaratory judgment affirming their rights arising under the 1941 Deed to use the north side of the Pier, its appurtenant facilities, and the petroleum pipelines located on the Pier.

Capital Terminal's renewed motion for judgment pursuant to Rule 50 is DENIED. Plaintiff Getty Marketing's request for prejudgment interest on the damages awarded in the jury trial is GRANTED. Prejudgment interest, to be calculated by the Clerk of the Court, shall run from May 25, 2001.

SO ORDERED:

Mary M. Lisi

Mary M. Lisi
United States District Judge
September 5, 2003