# EXHIBIT F

#19

3370 BOOK 343 PAGE 023

OPERATING AGREEMENT (FOR USE OF PIPELINES)

Operating Agreement (For Use of Pipelines) made this 19th day of September, 1977, between GETTY REFINING AND MARKETING COMPANY, a Delaware corporation (hereinafter called GRMC), ROBERT H. EDER residing at 4 Oak Lane, Scarsdale, New York (hereinafter called EDER), FUEL STORAGE CORPORATION, a New Hampshire corporation (hereinafter referred to as FUEL STORAGE).

W I T N E S S E T H:

WHEREAS, GRMC constructed and is the owner of two (2) product pipelines and related facilities, and is the owner of an easement serving its tank terminal located in East Providence, Rhode Island as set forth in a Grant and Agreement executed between GETTY OIL COMPANY (EASTERN OPERATIONS), INC. (predecessor in title to GRMC) and EDER recorded on August 7, 1975, in the Land Records of the City of East Providence in Book 302, Page 373; and

WHEREAS, GRMC has, by said agreement, extended to EDER the right to use and operate, in common with GRMC, said pipelines, related facilities, and easement to tank terminals in East Providence, for the receipt or discharge of middle distillates and motor gasolines received at or discharged from the Wilkesbarre Pier by tankers or barges; and

WHEREAS, said above mentioned agreement provides that neither GRMC nor EDER shall permit the use of said easement or pipelines by a third party without the written consent of the other; and

WHEREAS, FUEL STORAGE is desirous of using said pipelines for the conveyance of middle distillates and/or motor gasoline between Wilkesbarre Pier and the presently existing FUEL STORAGE tank terminal also located in East Providence, Rhode Island, and is also desirous of obtaining the right to construct two additional pipelines for the conveyance of heavy fuel oil and/or asphalt.

NOW, THEREFORE, in consideration of the within premises and for other good and valuable consideration, the parties hereto agree as follows:

I. Use of Pipeline

(A) GRMC and EDER hereby grant to FUEL STORAGE the necessary right of way for FUEL STORAGE to construct at its expense a manifold and pipeline connections at the northerly terminus of pipelines heretofore constructed by GRMC to connect with the presently existing pipelines owned by FUEL STORAGE. Any such manifold and pipeline connections will be constructed in a manner acceptable to GRMC and EDER. FUEL STORAGE shall be responsible for all maintenance and replacement of any such new manifold, pipeline connections, and also the presently existing pipelines owned by FUEL STORAGE.

(B) GRMC and EDER hereby grant to FUEL STORAGE the necessary right of way within the easement area described in said Grant and Agreement executed between GETTY OIL COMPANY (EASTERN OPERATIONS), INC. and EDER recorded on August 7, 1975, for FUEL STORAGE to construct at its sole cost and expense two additional pipelines and related pier and other facilities

for the conveyance of heavy fuel oil and/or asphalt between Wilkesbarre Pier and the presently existing FUEL STORAGE tank terminal located in East Providence, Rhode Island. Any such additional pipelines and related pier and other facilities will be constructed in a manner acceptable to GRMC and EDER which acceptance shall not be unreasonably withhold. Any such additional pipelines and related pier and other facilities will be owned by GRMC subject to the terms and conditions set forth in said Grant and Agreement executed between GETTY OIL COMPANY (EASTERN OPERATIONS), INC. and EDER recorded on August 7, 1975, and FUEL STORAGE will sign all necessary documents insuring said ownership of said additional pipelines and related pier and other facilities in GRMC. If GRMC and/or EDER desire to use said additional pipelines and related pier and other facilities, GRMC and/or EDER as the case may be, will be responsible for the necessary pipeline connections to service the terminals now or formerly owned by GRMC and/or INDEPENDENT OIL COMPANY. All costs associated with the use and maintenance of such additional pipelines and related pier and other facilities shall be shared among the users of same on a pro-rata basis in proportion to the annual number of gallons transmitted through said additional pipelines by each user as compared with the total annual gallonage transmitted through said additional pipelines by all users during the same period.

(C) In the event that FUEL STORAGE constructs and installs additional pipelines such construction and installation shall cause only minimum interference with the use and maintenance of existing pipelines, and the use of said additional

pipelines shall cause no interference with the use and maintenance of existing pipelines; provided, further, that FUEL STORAGE, shall never exercise its rights hereunder to such an extent or in such a manner as to prevent GRMC at any time in the future, from constructing and installing one additional pipeline over and above the two pipelines originally constructed and installed, the right of GRMC to construct and install one additional pipeline being recognized to be absolute.

(D) GRMC and EDER hereby agree that the easement area described in said Grant and Agreement executed between GETTY OIL COMPANY (EASTERN OPERATIONS), INC. and EDER recorded on August 7, 1975, will encompass that portion of the two presently existing pipelines owned by FUEL STORAGE which lie north of the northerly terminus of the pipelines heretofore constructed by GRMC.

(E) Subject to the terms of this agreement FUEL STORAGE shall have the right to use and operate, in common with GRMC and EDER, the above described pipelines (including any additional pipelines installed by FUEL STORAGE pursuant to paragraph (B) of this article) and related facilities for the conveyance of middle distillates and motor gasoline (and also for the conveyance of heavy fuel oil and/or asphalt should FUEL STORAGE elect to construct additional pipelines under the terms of paragraph (B) of this article) between Wilkesbarre Pier and the presently existing FUEL STORAGE tank terminal.

Wherever "pipeline" and/or "pipelines" are referred to in Article II through XII of this agreement they are intended to include any pipeline and related pier and other facilities constructed by FUEL STORAGE pursuant to paragraph (B) of this article.

II. Pipeline Operating Procedures

(A) Prior to receipt or discharge and immediately upon completion of receipt or discharge of product by any party hereto, representatives of any other party hereto may inspect the manifold valves, pipelines, and accessories to insure that the system is in proper order.

(B) Each of the parties hereto shall be responsible for the operation of the pipelines, including manifolds, during receipt or discharge of their respective products.

(C) One presently existing pipeline shall be designated by GRMC to be used exclusively for the transportation of motor gasoline and the other presently existing pipeline exclusively for the transportation of middle distillates unless otherwise specifically agreed upon by the parties hereto.

(D) The party receiving or discharging product shall insure that the pipelines are completely filled at the termination of its receipt or discharge operations and such pipeline fill shall be delivered to that party by the next party receiving or discharging product.

It is understood that GRMC shall have the right to reasonably allocate utilization of the pipelines among the users thereof under those conditions which would make such allocation necessary.

III. Product Losses

During receiving or discharging each party using the pipelines shall be responsible for its own product losses between the Wilkesbarre Pier and Tank Terminal.

IV. Indemnification

Each of the parties hereto agrees, with respect to its own acts or omissions, to indemnify and save harmless the other parties hereto from any and all claims, liability, cost and expense sustained by or asserted against such other parties for or in connection with injuries, death, loss, and damage of any kind or character to persons or property by whomsoever suffered or asserted resulting from or arising out of said acts or omissions on the part of said indemnifying party, its employees, agents or contractors.

V. Insurance

Each party hereto shall assume the risk of loss or damage by fire and extended coverage perils to its product received or discharged hereunder.

VI. Water Air Pollution Control

Any provision of this contract to the contrary notwithstanding, the parties hereto will comply with all laws, rules, and regulations applicable by their terms to a terminal operator relating to water or air pollution and will, in the case of an escape or discharge of middle distillates and/or motor gasolines from said pipelines (regardless of the cause), promptly take whatever measures are necessary to prevent pollution damage from thereby arising and to mitigate any such damage.

When escape or discharge of the products mentioned above occurs from said pipelines, GRMC may, at its option, and upon notice to the other users, undertake such measures as are reasonably necessary to prevent or mitigate resulting pollution damages, unless the user of the pipelines at the time of such occurrence promptly undertakes same. GRMC shall keep the other users advised of the nature of the measures intended to be taken by it. Any of the aforementioned measures actually taken by GRMC shall be at the expense of the user of the pipelines at the time of such occurrence (except to the extent that such escape or discharge was caused by the negligence of GRMC) provided that if said user considers said measures should be discontinued, user may so notify GRMC and, thereafter, GRMC shall have no right to continue said measures under the provisions of this Clause provided, however, if GRMC undertakes such measures without notice to the user, or continues such measures after notification from the user to discontinue, user agrees that it will not raise or plead as a defense to a claim for reimbursement for the expenses so incurred by GRMC that in undertaking or performing such measures, GRMC acted as a volunteer and any such defense of "volunteer" is hereby waived by user provided that user does not waive hereby any other defense user may have unless user is notified and permits said measures to be continued as aforesaid.

It is also understood that in the event any one of the parties hereto acts reasonably and unilaterally to take corrective action in the event of any such escape or discharge of product the other two parties to this agreement shall be deemed to have waived the defense of "volunteer".

The above provisions are not in derogation of such other right as any party hereto may have under this contract, or may otherwise have or acquire by law or any international convention.

Notwithstanding any other provision of this contract, the terms and provisions of this clause shall be applicable only between the parties to this agreement and shall not affect any liability of any said party to third parties or governments for pollution or other claims resulting from use of said pipelines.

VII. Termination

This agreement shall terminate on September 19, 1987 unless extended by FUEL STORAGE pursuant to the following paragraph.

VIII. Optional Right of FUEL STORAGE

FUEL STORAGE shall have the option to extend this agreement for an additional term of ten (10) years upon giving GRHC and EDER written notice by certified mail of its intention to do so at least one (1) year prior to the expiration date of this agreement as stated in Clause VII. The terms of this clause shall be strictly interpreted, and FUEL STORAGE will hold GRHC and EDER harmless and indemnify GRHC and EDER from any suits by itself or by third parties holding under FUEL STORAGE resulting from GRHC's and/or EDER's refusal to allow continued use of the pipelines except as specifically provided for herein.

BOOK 343 PAGE 031

IX. <u>Minimum Throuput Requirements</u>

(A) The minimum quantity of product to be conveyed by FUEL STORAGE through the pipelines shall be 3,000,000 barrels annually for each contract year of this agreement and any renewal thereof. Whenever used in this agreement, the term "barrel" shall be interpreted as being the equivalent of 42 gallons. All quantities of product conveyed through said pipelines shall be corrected to a base temperature of 60° Fahrenheit. Adjustments and corrections of volume for temperature variations shall be made in accordance with Table 6 of the ASTM-IP Petroleum Measurement Tables (ASTM designation: D-1250-IP designation: 200).

(B) It is understood that the minimum payment to be made by FUEL STORAGE during each yearly period hereof for the right to use said pipelines shall be equal to the amount that would be due hereunder had said minimum quantity been transmitted through the pipelines for each such year. In the event the total of FUEL STORAGE's payments at the rate hereinafter specified shall in any contract year be less than said minimum payment then FUEL STORAGE shall, not later than the 20th day after the end of any such yearly period, pay to GRMC the deficiency.

X. <u>Cessation of Operation</u>

If for any reason, other than lack of anticipated and routine maintenance, a pipeline becomes inoperable so as to require a substantial expenditure in order to re-build or repair

said line, GRMC shall have the right to terminate this agreement upon 30 days written notice to the other two parties unless within said 30 day period FUEL STORAGE notifies GRMC in writing its election to repair said pipeline(s) at its own expense and said repairs are in fact made by FUEL STORAGE within a reasonable time. If GRMC does rebuild or repair the line within two years from the cessation of operation, then the term of this agreement shall be extended for a period of time equal to the period during which the pipeline was out of service.

XI. Terms of Payment

FUEL STORAGE shall pay six ($.06) cents per barrel for each barrel of petroleum products delivered through the pipelines for the first 3,000,000 barrels annually and three ($.03) cents per barrel thereafter. This charge shall be adjusted annually (August being the base month) to reflect changes in the Consumer Price Index for Urban Wage Earners and Clerical Workers U.S. City Average - All Items Series A (1967 = 100) as determined by the Bureau of Labor Statistics of the United States Department of Labor. It is intended that this calculated charge for use of the pipelines by FUEL STORAGE shall represent the amount of six ($.06) cents or three ($.03) cents per barrel, as the case may be, as of August, 1975 adjusted upward or downward in accordance with the movement of said Consumer Price Index as shown in the next most recent publication thereof prior to each such anniversary date. Such adjustments shall be carried out to four significant decimal places.

Invoices shall be issued by GRMC to FUEL STORAGE monthly and shall be payable to GRMC by FUEL STORAGE upon receipt. GRMC shall account to EDER for his one-half share of said revenue.

In addition, for the initial term of this agreement as well as any additional contract years that this agreement may be in effect, any tax or other charge levied by any governmental authority and imposed upon or attributable directly or indirectly to the use of the pier, pier facilities, pipelines or the thruput of product shall be the responsibility of FUEL STORAGE. The extent of FUEL STORAGE's responsibility for any such tax imposed shall be based upon the number of actual barrels received and discharged at said pier during a particular contract year. GRMC shall invoice FUEL STORAGE accordingly at the end of each of any such contract year and said invoice shall be paid promptly by FUEL STORAGE. Any such payment shall not be considered toward the satisfaction of any minimum payment due under Clause IX(B) but shall be in addition to said minimum payment.

All terms and conditions contained in the August 6, 1975 agreements between GETTY OIL COMPANY (EASTERN OPERATIONS), INC. and EDER shall remain in full force and effect except as otherwise modified herein.

XII. Assignability

The covenants and provisions of this agreement shall extend to and be binding upon the parties hereto, their heirs, successors and assigns. However, no assignment of this agreement shall be made by FUEL STORAGE without the written consent

of both EDER and GRMC which consent shall not be unreasonably withheld; however, no assignment shall be made by FUEL STORAGE unless made in connection with a conveyance of the entire parcel of land acquired by FUEL STORAGE from EXXON CORPORATION by deed dated May 20, 1977, effective May 24, 1977, and recorded in the land records of the City of East Providence in Book 333, Page 230. Notwithstanding the foregoing, FUEL STORAGE may assign this agreement to Northeast Petroleum Corporation of Rhode Island without the written consent of GRMC and EDER for the duration of the agreement and lease executed or to be executed by and between FUEL STORAGE and Northeast Petroleum Corporation of Rhode Island covering the premises referred to above.

The covenants, provisions, benefits and burdens of this agreement as they affect the FUEL STORAGE tank terminal, meaning and intending to refer to the land and improvements conveyed to FUEL STORAGE by EXXON CORPORATION on May 20, 1977, effective May 24, 1977 (Book 333, Page 230) shall run with such land and shall inure to the benefit of and shall bind all successors in title of FUEL STORAGE in such land. No assignment of the benefits and burdens of this agreement shall be valid if made separate and apart from a conveyance of all the land described in Book 333, Page 230. Any successor in title of FUEL STORAGE to less than all of the land described in Book 333, Page 230 shall be entitled to the benefits of this agreement, but shall also be liable for the performance of all of the obligations and burdens hereunder jointly and severally

with FUEL STORAGE, even though such successor in title does not elect to enjoy such benefits under this agreement.

It is understood that this instrument represents the entire understanding of the parties hereto relating to the subject matter of this agreement and that no addition, alteration or modification of the terms contained herein (based upon verbal statements or otherwise) shall be valid unless in writing and signed by the party to be charged.

IN WITNESS WHEREOF this agreement has been duly executed the day and year aforesaid.

WITNESS:

Assistant Secretary

GETTY REFINING AND MARKETING COMPANY

BY President

WITNESS:

ROBERT H. EDEN

WITNESS:

FUEL STORAGE CORPORATION

BY

BOOK 343 PAGE 038

STATE OF Oklahoma

COUNTY OF Tulsa

In Tulsa, Oklahoma on the 15th day of September, 1977, before me personally appeared Jack D. Jones, of Getty Refining and Marketing Company, to me known and known by me to be the party executing the foregoing instrument, and he acknowledged said instrument by him executed to be his free act and deed, and the free act and deed of Getty Refining and Marketing Company.

My commission expires: 7-24-79

Notary Public

STATE OF New York

COUNTY OF Westchester

In Greenburgh on the 20 day of SEPT, 1977, before me personally appeared Robert H. Eder, to me known and known by me to be the party executing the foregoing instrument, and he acknowledged said instrument by him executed to be his free act and deed.

My commission expires:

Notary Public.

STATE OF MASS.

COUNTY OF MIDDLESEX

in CAMB., MASS. on the 19TH day of SEPTEMBER, 1977, before me personally appeared [illegible] of Fuel Storage Corporation, to me known and known by me to be the party executing the foregoing instrument, and he acknowledged said instrument by him executed to be his free act and deed, and the free act and deed of Fuel Storage Corporation.

My commission expires: 8-1-80

Notary Public

RECORDED

-14-

SEP 22 9 16 AM '77

EAST PROVIDENCE, R.I.
JAMES H. BEELEY JR.
CITY CLERK