# EXHIBIT K

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

DUNELLEN, LLC

VS. C.A. NO.:06-014 ML

GETTY PROPERTIES CORP.,

DEPOSITION OF AVERY NOE, witness in the above-entitled cause, taken on behalf of the Defendant, pursuant to notice, before Sally Brassard, CSR, a Notary Public in and for the State of Rhode Island and Providence Plantations, at the office of Partridge Snow & Hahn LLP, 180 South Main Street, Providence, Rhode Island, on February 7, 2007, at 9:00 a.m.

APPEARANCES:

FOR THE PLAINTIFF: HINCKLEY ALLEN & SNYDER, LLP
BY: MITCHELL R. EDWARDS, ESQUIRE
FOR THE DEFENDANT: PARTRIDGE SNOW & HAHN LLP
BY: ROBERT K. TAYLOR, ESQUIRE

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RI 02920
(401) 946-5500

own the pier?
A. Yes.
Q. So, it's the case that Capital Terminal Company transferred its interest in the Wilkesbarre Pier to Dunellen; correct?
MR. EDWARDS: Objection.
A. Yes.
MR. TAYLOR: Would you mark that as 1, please.
(Defendant's Exhibit 1 marked for ID.)
Q. I'm showing you what's been marked as Exhibit 1 to your deposition, Mr. Noe. Have you seen this document before?
MR. EDWARDS: Take your time to look at it.
A. Yes, I have.
Q. And when have you seen this document?
A. Based on this document that I signed, it appears that it was in May of 2003.
Q. Is that your signature on page 3 of this document?
A. Yes, it is.
Q. And you signed as president of Capital Terminal Company; correct?
A. Yes, I did.
Q. Now, is this the document by which Capital

Terminal Company transferred its ownership interest in the pier to Dunellen, LLC?

MR. EDWARDS: Objection.

A. Yes.

Q. And to your knowledge, does Dunellen, LLC still have the ownership interest that's reflected in this Exhibit 1?

A. Yes.

Q. And since the date of Exhibit 1, has Dunellen, LLC received any additional interests in the pier other than what's reflected in Exhibit 1, to your knowledge?

MR. EDWARDS: Objection.

A. Not to my knowledge.

Q. So, as far as you know, this is an operative deed, this Exhibit 1; correct?

MR. EDWARDS: Objection.

A. Yes.

Q. This is the document that you would look to or that you would point to, to demonstrate Dunellen, LLC's interest in Wilkesbarre Pier; correct?

MR. EDWARDS: Objection.

A. Yes.

Q. Now, if you look at page 2 of this document, if you look in the middle of the page, there's a

sentence that says: The conveyance of the Pier, is subject to all rights, restrictions and encumbrances as may of record appear, and to the following reservation of rights and easements. Do you see where I am?

A. Yes.

Q. And then it continues: The permanent right, privilege and easements of P&W to utilize the Pier, rights-of-way as aforesaid, and any other rights and easements as may of record appear pertaining thereto, for all business purposes, including, but not limited to, the handling of petroleum products; and then it continues on from there. Do you see that?

A. I see that.

Q. Is it your understanding that Providence and Worcester Railroad Company has the right to utilize the Wilkesbarre Pier?

MR. EDWARDS: Objection. You're asking him really a legal conclusion.

THE WITNESS: That's a question I cannot answer.

Q. You don't know one way or the other at this point in time?

A. That's correct.

Q. To your knowledge, has Providence and Worcester Railroad Company transferred any right to utilize the Wilkesbarre Pier to any other entity since May of 2003?
A. Not to my knowledge.
Q. Since May of 2003, have you discussed with any person, other than your attorneys, whether or not Providence and Worcester Railroad Company has the rights to use the Wilkesbarre Pier?
A. I have not discussed that with anyone, including attorneys.
Q. Okay. Since 2003, to your knowledge, has Providence and Worcester Railroad, in fact, utilized the pier in any way?
A. To my knowledge, they have not.
Q. What is the South Key?
A. That is forty-five acres of property south of the pier.
Q. And some of that area has been filled over time; is that correct?
A. That is correct, yes.
Q. Who owns that property, to your knowledge?
MR. EDWARDS: Objection.
A. P&W Railroad.
Q. As far as you know, that area is owned by P&W

Railroad; is that correct?
A. That's correct.
Q. Was there a period of time that P&W Railroad was using the Wilkesbarre Pier in connection with filling the South Key?
MR. EDWARDS: Objection.
A. I don't know for certain.
Q. Well, over the many years that you've been familiar with the Wilkesbarre Pier, have you ever seen any instance where equipment has been used to fill the South Key?
A. Yes, I have seen equipment fill the South Key.
Q. And during what period of time have you seen that?
A. I'm not sure of the years.
Q. Within the last year?
MR. EDWARDS: Objection.
A. No.
Q. Since you've been an officer of Capital Terminal Company?
MR. EDWARDS: Objection.
A. I have seen some equipment on the South Key after 1996.
Q. And have you seen, after 1996, any instance where equipment was placed on the Wilkesbarre Pier in connection with filling the South Key?

A. No, I have not.

MR. TAYLOR: Could we mark this as 2, please.

(Defendant's Exhibit 2 marked for ID.)

Q. I'm showing you what's been marked as Exhibit 2 to your deposition, Mr. Noe. Have you see this document before?

MR. EDWARDS: Take your time to look at it, Avery.

A. I have seen this document, correct.

Q. And can you identify what this document is?

A. It's a deed from Providence Worcester Railroad to Capital Terminal.

Q. And does this --

A. It's a deed from Providence Worcester Railroad to Capital Terminal Company of the Wilkesbarre Pier.

Q. And what's the date of this document?

A. January 1, 1998.

Q. So, is it your understanding that Providence and Worcester Railroad Company deeded the ownership of the pier to Capital Terminal in 1998 pursuant to Exhibit 2?

MR. EDWARDS: Objection.

A. Yes.

Q. And then subsequent to that, Capital Terminal Company deeded the ownership of the Wilkesbarre Pier to Dunellen in 2003 pursuant to what we've already looked at, Exhibit 1; correct?

MR. EDWARDS: Objection.

A. Yes.

Q. And looking at page 2 of Exhibit 2, again, about halfway down the page, does this document also reserve to Providence and Worcester the right to use the pier?

MR. EDWARDS: Objection.

A. I cannot answer that question.

Q. Well, do you see the language in the middle of the page?

A. I see the language and I can read it.

Q. Do you agree with me that in the middle of the page on Exhibit 2 there is a statement that says: P&W reserves for itself, its successors and assigns the permanent right, privilege and easement to utilize the Pier, and it continues from there. Do you agree that it says that?

MR. EDWARDS: Objection. That's not what it says.

A. I agree that it says that.

Q. Do you recall having any discussions around the

time of Exhibit 2, in 1998, with anyone from P&W regarding whether P&W had the right to use the pier?
A. No.
Q. And do you recall any discussions around that period of time regarding whether Providence and Worcester would, in fact, use the pier in some way?
A. No.
Q. And since 1998, can you recall anyone ever telling you that Providence and Worcester Railroad has a right to use the pier?
MR. EDWARDS: Objection.
A. No.
Q. You don't recall any discussion where that question has ever come up?
MR. EDWARDS: Objection.
A. I can't recall that it has.
MR. TAYLOR: Mark this as 3, please.
(Defendant's Exhibit 3 marked for ID.)
Q. I'm showing you what's been marked as Exhibit 3 to your deposition, can you identify this document? Actually, it's a pair of documents, two pages.
MR. EDWARDS: You want him to identify each page?

Q. And does Capital Terminal Company have any plans today to build additional storage tanks at the East Providence terminal facility?
A. No.
Q. Is there space at the facility to build more tanks?
A. No, or permits.
Q. Would it be possible to demolish any of the existing tanks and reconstruct a larger tank?
MR. EDWARDS: Objection.
A. It would be possible.
Q. Would it be cost effective?
MR. EDWARDS: Objection.
A. I believe not.
Q. And if I were to add up all of the capacities of the petroleum product storage tanks that we've just been discussing, that would add up to a total capacity of around a million barrels; is that correct?
A. That's correct.
Q. Do you recall what the capacity of the Capital Terminal Company storage facility was when you joined Capital Terminal in 1996?
A. Yes, I do.
Q. What was it then?

A. 339,000 barrels.
Q. So, since 1996, the storage capacity at that facility has increased from roughly 300,000 barrels to roughly a million barrels; correct?
MR. EDWARDS: Objection.
A. Correct.
Q. In 1996, were you familiar with the capacity of the Getty storage facility in East Providence?
A. Yes, I was.
Q. And what was the capacity of that facility, roughly?
A. Roughly the same.
Q. In the range of 300,000 barrels?
A. Yes.
Q. Do you recall how many tanks Getty had at its tank farm in 1996 when you started with Capital Terminal Company?
A. Yes, I do.
Q. How many was that?
A. Twelve.
Q. And what sorts of product was being stored in the Getty facility at that point in time?
A. Gasoline, diesel, home heating oil and ethenol.
Q. To your knowledge, since 1996, have any additional

tanks been built at the Getty facility?
A. No.
Q. To your knowledge, has the storage capacity of the Getty facility increased since 1996?
A. No.
Q. Going back to the period between 1991 and 1997 --
A. I'm sorry, what period?
Q. Going back to the period between 1991 and 1997, was there an agreement in effect during that period of time among the users of the pier?
MR. EDWARD: Objection.
A. Between 1991 and October 1, 1996, Coastal had an agreement to use the pier.
Q. Was there a Pier Operating Agreement that you can recall from that period of time?
A. There was a Pier Operating Agreement in effect during that time.
Q. There was a Pier Operating Agreement that was entered into in 1991; correct?
MR. EDWARDS: Objection.
A. Yes.
Q. And you are familiar with that Operating Agreement in your capacity as the terminal manager for Coastal, and then beginning in 1996, for Capital Terminal; correct?

A. Yes, I did.

MR. TAYLOR: Let's go off the record for a second.

(Discussion was held off the record.)

MR. TAYLOR: Let's go back on.

Q. Mr. Noe, I'm going to show you a transcript of the December 12th, 2002 proceedings in Civil Action Number 00-381 in the U.S. District Court for the District of Rhode Island, and ask you, in particular, to look at the testimony on page 85 of that transcript. I'll ask you if that refreshes your recollection as to the amount of money that Capital Terminal spent on the pier in the period between January 1, 1998 and December of 2002?

MR. EDWARDS: I'll object because he hasn't had time to really look at the transcript but, if it refreshes your recollection, you can answer that question.

A. It does refresh my recollection, and that is the numbers that we provided to the court.

Q. The expenses that for -- let me start that question again. The amount of money that Capital Terminal Company spent on pier repairs and maintenance between January of 1998 and December of 2002, excluding fire suppression costs and work

related to dock damage caused by vessels was in the range of 300 to $350,000; is that correct?

MR. EDWARDS: I'm just going to object to the form of the question but you can answer it.

A. That's my understanding, yes.

Q. Okay. And your testimony in December of 2002 was based on your review of Capital Terminal's records; is that right?

MR. EDWARDS: Objection.

A. That is correct.

Q. And you believe in December 2002 that that was an accurate number?

A. Yes, I do.

MR. TAYLOR: Do you want to take a break?

MR. EDWARDS: I can still go but we've been going for over an hour. Do you want a break?

THE WITNESS: I'm fine.

Q. Let me draw your attention back to the Throughput Agreement, which is part of Exhibit 4 to your deposition, and on the second page of that agreement there's a schedule of minimum annual fees. Do you see where I am?

A. Yes, I do.

Q. Did Getty Petroleum Marketing pay those minimum annual fees in the years indicated?

A. Yes, they did.
Q. And did they actually pay a little bit more than that amount of money in the years indicated?
MR. EDWARDS: Objection.
A. Yes, they did.
Q. And why was that?
A. There was -- at least one time there was an overage on the gallons or barrels, whichever, that came through the pier that they paid more than this amount.
Q. All right. During the period 1998 through 2003 -- I'm sorry, through the end of December 2002, did Capital Terminal Company ask Getty Properties Corp. to contribute to the costs of pier maintenance?
A. Not that I can remember.
Q. And do you remember ever considering, during that period of time, whether Capital Terminal Company should make a request to Getty Properties Corp. for a portion of the costs of the pier's repairs and maintenance?
MR. EDWARDS: Objection.
A. Not that I can remember.
Q. When did Capital Terminal Company first enter into a storage agreement with Global?

A. 1998.
Q. And were you involved in negotiating the terms of that agreement?
A. Yes, I was.
Q. Who else was involved in that process?
A. There was me, Bill Davidson, Ed Faneuil from Global, and a lawyer from Hinckley Allen, which I believe his name was Rubin?
Q. Anybody else?
A. That's all I can remember.
Q. And who is Mr. Davidson?
A. Bill Davidson presently is a senior vice-president of Global Companies. In 1998, he was product manager of Global.
Q. How did you first come into contact with Global around that point in time?
A. After I became president of Capital Terminal Company in 1996, we had no throughputter in the terminal. We're not an oil company. So, I was out soliciting business for the Terminal and Global was one of the people that I was calling on.
Q. Did you first contact Global in 1996 or thereabouts?
A. Yes, I did.

Q. And who did you contact?
A. Joe DeStefano.
Q. And what was his relationship to Global?
A. He was the marketing director.
Q. What is the nature of the agreement between Capital Terminal Company and Global that was arrived at in 1998?
A. That they would lease -- they would do a Throughput Agreement with three tanks based on their tank capacity.
Q. And how much capacity did that add up to?
A. Approximately 300,000 barrels.
Q. And they compensated CTC, Capital Terminal Company, for that storage capacity?
A. Yes, they did.
Q. How was the compensation set at?
A. It was based upon the capacity of three of the four tanks, and it was .18 a barrel.
Q. When you say .18 cents a barrel, do you mean .18 for every barrel off-loaded at the Wilkesbarre Pier and stored in the tanks?
MR. EDWARDS: Objection.
A. No, I do not mean that.
Q. Explain to me what you meant then?
A. The arrangement was that I, Capital Terminal

Company, have three tanks that has approximately 3,000 barrels.
Q. 300,000?
A. 300,000, thank you. And I will lease that storage capacity to you at .18 a barrel per month.
Q. So, the deal was that there was essentially a fixed monthly rental based on .18 per barrel capacity?
A. That is correct, that was the agreement.
Q. And that didn't depend on whether or not Global was actually using the capacity?
A. It did not.
Q. How long did that agreement remain in effect?
A. Approximately four to five months.
Q. Okay. And then what happened?
A. We entered into another agreement and we picked up the other tank that they -- that was not covered under the original agreement.
Q. And at that point in time, that was all of Capital Terminal Company's storage capacity in East Providence?
MR. EDWARDS: Objection.
A. After they picked up that other tank, yes.
Q. And did the terms of the agreement between Global and Capital Terminal Company change in any other

way at that point in time?
A. No, the terms of the agreement stayed the same.
Q. You were still paying .18 per barrel, per month, for the storage capacity?
A. Yes.
Q. And how long did that arrangement stay in effect?
A. I can't remember.
Q. Did the nature of the agreement between Global and Capital Terminal Company change in some way after the modification that you've just described?
A. Yes.
Q. And how did it change?
A. It changed in that we added more tanks, more storage capacity.
Q. And when you added more storage capacity, what happened?
A. Each time that we added more storage capacity, Global committed to that storage capacity, and that would create a new agreement or an amendment to the agreement.
Q. Is Global currently using all of the storage capacity at the Capital Terminal Company facility in East Providence?
A. Yes, they are.

Q. Now, back in 1998, did the agreement between Capital Terminal Company and Global require Capital Terminal Company to provide any services?

MR. EDWARDS: Objection. You can answer.

A. Yes.

Q. Okay. What sorts of things was Capital Terminal Company supposed to do?

A. We provided storage capacity, of course. We provided personnel to run the facility, to receive the product, to oversee the storing of the product, the inventory, and all administrative duties that would be involved in storing product -- receiving product, storing product and distributing product.

Q. Now, when you were in the process of entering into an agreement with Global for the first time, did you have any discussions with any of the Global representatives about the condition of the Wilkesbarre Pier?

A. Not that I can remember.

Q. Do you recall, at the beginning of the relationship in 1998/1999, Global making any requests for specific repairs or maintenance at the Wilkesbarre Pier?

A. What was that time period?

Q. Towards the beginning of the relationship.
A. No, not that I can remember, no.
Q. Did there come a point in time when Global did make a request for specific repairs and maintenance at the pier?
A. There did come a time that they made a request.
Q. Okay. And when was that?
A. I remember the request but I don't remember the date.
Q. Okay. What was the request then?
A. Their request was that the 14-inch line on the pier be changed to 16-inch so that it would speed up the receipt of product from a vessel to the tank farm.
Q. Other than that request, were there any other specific requests that you can recall from Global relating to improvements at the pier?
A. Time frame?
Q. Up to that point in time.
A. Up to that point in time?
MR. EDWARDS: Objection.
Q. Yeah. Up to the point in time when they asked about the pipeline.
A. Not that I can recall.

A. I believe that's incorrect because I think you said in the beginning of 1998.

Q. Okay. Beginning of 1998 --

MR. EDWARDS: Objection.

Q. -- global started to bring petroleum products to the pier and store them in Capital Terminal Company's facility?

MR. EDWARDS: Objection.

A. No.

Q. What's incorrect about that statement?

A. It was May of 1998.

Q. All right. So, at the beginning of May of 1998, Global started using the facility?

A. Yes.

Q. And in 1998, Getty Petroleum Marketing was also using the Wilkesbarre Pier; correct?

A. Yes.

Q. And Getty Petroleum Marketing continued to use the Wilkesbarre Pier through the end of 2002; correct?

A. Yes.

Q. And then Getty Petroleum Marketing, thereafter, stopped using the Wilkesbarre Pier; correct?

A. They stopped using the pier in March of 2003.

Q. Okay. Now, around that time, did you participate in any discussions with Getty Petroleum Marketing

about having them continue to use the pier?
A. Yes.
Q. Okay. And who were those discussions with?
A. Paul Stendardi and a lawyer that worked for the firm, Natasha Knoll. I'm not sure about that last name.
Q. Anybody else?
A. I believe those were the two people that we had the discussion with.
Q. An who initiated those discussions?
A. I'm not sure at this time.
Q. And what do you recall about the substance of those discussions?
A. We had two or three phone calls, then we had a sit-down discussion with them. We were trying to extend the Throughput Agreement and we never could come to terms.
Q. You say you were trying to extend the Throughput Agreement, what sort of extension were you suggesting, was Capital Terminal Company's suggesting?
A. I believe it was open-ended.
Q. Okay. And was -- did Capital Terminal Company's suggest any sort of financial terms for the extension of the Throughput Agreement?

A. Yes, we did.
Q. Okay. And what were those?
A. I can't remember these terms. I didn't review all of that for this deposition.
Q. Okay. And what do you recall about Getty Petroleum Marketing's side of those discussions? What were they saying?
A. It was a long discussion that was going back and forth. But I really don't remember exactly who said what, but I know in the end, we could not come to terms.
Q. Okay. I mean, were there particular points of disagreements that you can recall, sitting here today?
A. I just can't remember now what's the breakdown on those discussions.
Q. Do you recall whether there were disagreements over the fee that Capital Terminal Company was asking to continue the Throughput Agreement?
MR. EDWARDS: Objection.
A. I know we presented to them some terms but I don't remember what the objection was, but I know that they did not accept the terms, the negotiations burned out.
MR. TAYLOR: Mark this as 5, please.

A. The company is a new company and it was formed in what year, I'm not sure of, as we said here this morning, but as soon as they became a company, they've been working for us.
Q. And did some of the principals of RT Group, did they formerly work for another company that also did work for Capital Terminal Company?
A. Yes.
Q. So, some of the individuals involved formed a new company and continued working for Capital Terminal Company?
A. Yes.
Q. What is this Exhibit 5?
A. It's a letter from RT Group addressed to me, and the subject of it is potential improvement projects for the Wilkesbarre Pier.
Q. Did you ask RT Group to prepare this?
A. Yes, I did.
Q. Why was that?
A. I was in negotiation with Global on a new agreement that did take place in June of 2003, and part of my negotiation was to point out to Global that we need to extend the life of the pier, that I would like to do some improvements.
We had an -- in the past, we've had a number

of vessels that damaged the pier for which the responsible party paid for that damage. I was looking at this situation to reduce vessel damage to the pier and to extend the life of the pier, because of the fact that I'd improved my facility and I wanted to be sure that that pier would be available for long-term use.

Q. Okay. Let's look at some of these projects and I want to ask you some questions about them.

A. Okay.

Q. The first one is pipeline support repairs.

A. Yes.

Q. And since 2003, has there been work done on the pipeline supports?

A. There was.

Q. Okay. Let me start it this way, actually. Prior to 2003, had Capital Terminal Company had any discussions with these engineers about pipeline support repairs?

A. When you say, this company, we're talking about RT Group?

Q. Yeah.

A. Yes.

Q. And had those discussions gone back several years?

MR. EDWARDS: Objection.

A. Those discussions went back at least two years.

Q. Okay. When did you first, you, personally, first come to believe that the pipeline supports needed some repair?

A. There's a process called shimming and that was, sort of, like ongoing. So, I'm familiar with this for a number of years.

Q. Had Capital Terminal Company done shimming to the pipeline supports in the past?

A. No.

Q. Had somebody else done shimming to the pipeline supports in the past?

A. Yes.

Q. And that was Getty?

A. Yes.

Q. There had been shimming of the pipeline supports back in the 1990s; correct?

MR. EDWARDS: Objection.

A. Yes.

Q. And that was as a result of a gap formed between the pipeline and the pipeline support; correct?

MR. EDWARDS: Objection.

A. Correct.

Q. And those gaps had formed periodically over quite

a number of years; correct?

MR. EDWARDS: Objection.

A. Yes.

Q. Now, in your discussions with Global in the beginning of 2003, did you have a discussion with them about the pipeline supports?

A. No.

Q. Did you share Exhibit 5 with anyone from Global?

A. No.

Q. This is more for you to use internally to help you understand what sorts of improvements would be needed to extend the life of the pier; is that right?

MR. EDWARDS: Objection.

A. Yes.

Q. Looking at number 2 on Exhibit 5, Stone Wall Erosion, is that also a condition that had existed for some time prior to January of 2003?

MR. EDWARDS: Objection.

A. It existed before 2003 but I can't tell you the date, because part of this was when they installed the tie-backs, they created that by not putting back the storm, but I don't remember what date that was that they did this.

Q. Was erosion a noticeable condition when you were

managing the terminal for Coastal?
A. It was not a problem at that time.
Q. How about when you were managing it, when you were president of Capital Terminal Company?
A. In the beginning it was not, it became a problem sometime thereafter.
Q. Number 3 is Timber Pile Cluster Dolphin; correct?
A. Correct.
Q. What was the -- was this work ever done?
A. This work was never done.
Q. And why not?
A. What happened, instead of a timber pile cluster dolphin, we installed a mini dolphin in that area. And the mini dolphin, the difference in it is that it was not timber but it was a rubber bumper system that would be more durable, more long lasting, and could handle the impact of a vessel.
Q. Well, what was the purpose of the mini dolphin?
A. The purpose of the mini dolphin is to add support to the vessel as he pulls up and docks at the pier. He's pushed against the pier, and the more points that he leans up against, it takes the strain off of the various dolphins.
Q. So, the mini dolphin is an improvement to the

pier's fendering system?
MR. EDWARDS: Objection.
A. Yes, it is.
Q. 4 is, Soldier Pile and Panel Retaining Wall. Do you see that?
A. Yes.
Q. And this was also a problem that dated back several years; correct?
A. When we say a problem dated back several years, it's -- this is a problem of the element of salt water for the soldier pile and, in time, you either have to replace the soldier pile or you have to repair it, and this has been -- the soldier pile -- piles, have been repaired, but there's been no work at this point on the panel retaining wall.
Q. And is work planned on the panel retaining work?
A. At this point, it's not in the -- it's not being planned.
Q. 5 is, Middle Dolphin Repairs. Do you see that?
A. Yes.
Q. What is the middle dolphin?
A. The middle dolphin -- there are three dolphins; one, middle, mini dolphin, and a loading platform. The middle dolphin, as well as the

other dolphins, they serve to hold the vessel in place when it comes in and docks at the pier.

Q. Does the function of the middle dolphin depend on the size of the vessel?

A. Well, not just the middle dolphin but all the dolphins.

Q. Is the middle dolphin performing it's function regardless of the size of the vessel that comes to the Wilkesbarre Pier?

A. It wasn't until we made improvements.

Q. So, as improved today, every vessel that comes to the Wilkesbarre Pier uses the middle dolphin?

A. Yes.

Q. Are there some dolphins at the Wilkesbarre Pier that don't serve every vessel?

A. This is one.

Q. Okay. Which one is that?

A. We call it the West Dolphin.

Q. All right.

A. And the reason it doesn't serve every vessel is that some of the barges are not long enough to reach that dolphin. Otherwise, if it was long enough, it would be served.

Q. Okay.

THE WITNESS: May we take a bathroom

A. No.

Q. Let me direct you to --

A. Well, let me correct that, please. Dunellen is 100 Dexter Road.

Q. They don't have a separate office?

A. They don't have a separate office, no.

Q. Let me direct you to page 3 of Exhibit Number 6. In particular, the chart at the bottom of page 3. Do you see that?

A. Are we referring to the Gallons Thru-Put at Wilkesbarre Pier?

Q. Yes. Can you explain to me what that chart reflects.

A. Yes, I can. This represents the number of gallons that Capital Terminal Company received through the Wilkesbarre Pier for the years 1998 through July 2006.

Q. And when you say, received, received where?

A. Received at 100 Dexter Road, East Providence.

Q. Was all of this product delivered to the Wilkesbarre Pier?

A. Yes.

Q. And then transported through the single pipeline to the Capital Terminal's facility, Dexter Road?

A. Yes.

Q. Now, in addition to the Gallons Thru-Put that are reflected in this chart on page 3, there were additional deliveries to the Wilkesbarre Pier during some of these years; correct?
A. Correct.
Q. This chart doesn't reflect any petroleum products that were delivered to the pier by Getty Petroleum Marketing; correct?
A, That's correct.
Q. Is all of the oil of petroleum products, which is stored at Capital Terminal Company's facility, delivered to the Wilkesbarre Pier?
A. I'm not sure I understand your question.
Q. Well, I mean, does all the oil come into the pier and then get pipes to the tank farm or are there also deliveries to the tank farm by some other method?
MR. EDWARDS: Objection.
A. No, with just a very few exceptions, and I would like to give you an example of those exceptions so that you'll know what I'm talking about.
There is an occasion where a truck will come in and fill his tanker, he will go somewhere and the customer can't take it all. Say, he has

10,000 gallons and the customer can take seven, but he needs to empty his truck for another job, we would pump that back. Other than that, the answer is all the products come in through the Wilkesbarre Pier.

Q. Now, the number in this interrogatory answer for 2006 is a part year number; correct?

A. That's January through July.

Q. Can you tell me whether or not the 2006 year-end number is larger than the 2005 number?

A. Without looking at my report, I can't tell you with certainty.

Q. You don't know, sitting here today, whether in 2006 more barrels were throughput from the pier in 2006 than were in 2005?

A. I do not know without looking at that record.

Q. Do you know whether there were substantially fewer barrels with throughput in 2006 than in 2005?

MR. EDWARDS: Objection.

A. I know that it would not be -- it would not be substantially less by any means.

Q. Is there capacity for Global to throughput more barrels?

A. I'm afraid I don't understand the question.

Q. Is there some sort of structural limit on the

before?
A. Yes, I have.
Q. What is this document?
A. It's an Amended and Reinstated (sic) Lease Agreement between Dunellen, LLC and Global Companies, LLC, dated, June 9th, 2003.
Q. Did you participate in the negotiation of this agreement?
A. Yes, I did.
Q. And did you participate in the drafting of this agreement?
A. I'm sorry?
Q. Did you participate in the drafting of this agreement?
A. Yes, I did.
Q. You reviewed drafts before the final version?
A. Yes.
Q. Who else was involved in negotiations regarding Exhibit 7?
A. Myself, Bill Davidson, Ed Faneuil, Bob Eder, and to a small degree, Eric Slifka, who's the CEO of Global Companies.
Q. Now, prior to the date of Exhibit 7, the arrangement between Global and -- well, let me -- actually, this is a different question. Prior to

the execution of Exhibit 7, did Global have an agreement with Dunellen?
A. Prior to this agreement, the agreement was with CTC.
Q. And was the agreement with CTC the same agreement that you've already described in your testimony earlier today?
A. Yes.
Q. Giving Global the right to use CTC's tanks and pay .18 per barrel per capacity?
MR. EDWARDS: Objection.
A. Yes.
Q. What led to this Amended and Restated Lease Agreement?
A. Global asked for a longer agreement, and the prior agreement was running out. So, we decided to sit down and negotiate out a new agreement with a longer term at Global's request.
Q. And did Global ever indicate to you why they wanted a longer term?
A. Yes.
Q. And what did they say?
A. Global said that they're building a business in this marketplace and they wanted to be here long-term.

structural or otherwise, and then it continues on. My question is, has Global requested any improvements, additions, alterations or changes to the premises as defined in this agreement?

A. Yes.

Q. And what have they requested?

A. There have been a number -- there's been gate pack system put on the loading rack that would allow you to insert additives into the product. They requested that we put in a new computer system that would be compatible to theirs. They requested that we put in the -- what we call home heating oil plus additive tank. Those come to mind, and we have made those improvements upon the request.

Q. Okay. How about improvements, additions, alterations and changes to the pier, have any of those been requested?

A. The request was made on the 16-inch line. I believe that's the only request that was ever made concerning the pier.

Q. Does Global have an option to purchase the Terminal?

A. Yes, they do.

Q. And the pier?

A. Yes.
Q. And presumably the right to use the pipelines between -- the pipeline between the pier and the Terminal?
A. Yes.
Q. Have you ever had any discussions with anyone at Global about whether or not they intend to exercise that option?
A. Yes.
Q. Okay. When have you had those discussions?
A. We discussed it during negotiation of the Amended and Restated Lease Agreement and prior to June 2003.
Q. You haven't had any discussions with them since that time about the option to purchase?
A. No.
Q. What was the nature of the discussion you had with them back in 2003 about the option?
A. During negotiation, they brought up the fact that they would like to have an option to purchase, and we negotiated out the terms of that option and it became part of this agreement, or maybe a separate agreement, but it was all during that period of time that it was negotiated out.
Q. Were you involved in negotiating the terms of the

option agreement?
A. The concept of it I negotiated out with Bill Davidson and agreed to, but the actual terms of it, and composing it, was done by Bob Eder and Ed Faneuil.
Q. And have you reviewed the terms of the Final Option Agreement?
A. Yes.
Q. Have you seen a copy of it?
A. Yes, yes.
Q. Are you familiar with that agreement?
A. Yes.
MR. TAYLOR: Mark that as Exhibit 8.
(Defendant's Exhibit 8 marked for ID.)
Q. I'm showing you what's been marked as Exhibit 8 and I'm directing you to the material starting on the second page where it says, Recitals?
A. Second page?
Q. Yes.
A. Okay. Recitals.
Q. And then going back from there, does this appear to you to be the Option Agreement?
A. You know, I have to read this.
Q. Yeah, please go ahead. And let me just explain, I don't have a copy from Dunellen in this litigation

with Bill Davidson. I cannot think of anyone else that was involved in this.

Q. Who decided what improvements should be included on this Exhibit 10?

A. Myself and Todd Turcotte. But, even as it was presented to Bill Davidson during this period of June 2003, this was only a worksheet that we would put on the table for discussion. We had no obligation to follow it and he understood that but, I guess the answer to your question, mainly myself and Todd Turcotte.

Q. How did you decide what to include on the schedule?

A. From my knowledge of the pier and from some engineering work that was prepared for me by Todd, and us discussing the various items and determining that Davidson needed to see something that he could look at and follow.

Q. Did Global request that any items be added to the schedule that's marked as Exhibit 10?

A. The mooring improvement, even though it came from the Northeast Pilots Association, a recommendation, they recommended that to us and Global because it's Global that brings in the vessels. So -- and maybe in an indirect way, that

was on there through discussions with the Pilots Association and Global. And to my recollection, that's the only one that was recommended by an outside party.

Q. Is Dunellen obligated to make any of the repairs reflected on Exhibit 10?

A. They are not.

Q. Have some of the improvements reflected on Exhibit 10 been completed?

A. Yes, they have.

Q. I'll show you Exhibit 11.

(Defendant's Exhibit 11 marked for ID.)

A. Yes.

Q. Have you seen this document before?

A. Yes.

Q. Did you prepare it?

A. Yes.

Q. Can you identify it for us, please?

A. Yes, this is a memorandum from Avery Noe to Bill Davidson dated, Wednesday, May 24, 2006, and the subject is dock improvements.

Q. Okay. And does this exhibit reflect completed pier improvement projects since 2003?

A. Not all. There was one after this memo that was completed.

Q. Let me rephrase that question. Does this Exhibit 11 refer -- let me start that again. Does Exhibit 11 reflect all the dock improvements that were made between January of 2003 and May of 2006?

A. I believe that to be correct.

Q. And were you responsible for gathering the expense information that's reflected on this document?

A. Yes, I was.

Q. So, it's your belief that the total cost of those repairs that are identified on Exhibit 11 was approximately $971,000?

MR. EDWARDS: Objection.

THE WITNESS: Could you restate that question?

Q. Is it your belief that the total cost of the repairs identified on Exhibit 11 was approximately $971,000?

MR. EDWARDS: Objection.

A. Yes.

Q. Okay. And of that amount, Global has reimbursed Dunellen for half; correct?

A. Yes.

Q. Now, since May of 2006, have there been additional improvements to the pier?

A. Yes.

Q. And what have those been?
A. The reinforcement of the East Dolphin.
Q. Anything else?
A. I believe that to be all.
Q. And has that project been completed?
A. The reinforcement, yes.
Q. Okay. And when was that completed?
A. Fall.
Q. Of 2006?
A. Of 2006.
Q. And what was the cost of that project?
A. I have an idea but I don't have the exact number.
Q. Ballpark figure?
A. 200,000.
Q. And is Global going to reimburse Dunellen for half of that amount, as well?
A. Has.
Q. Are there any other improvement projects that are currently in the planning phase?
A. Yes.
Q. What are those?
A. We have reinforced the East Dolphin and now we want to upgrade the bumper system like we did with the middle dolphin and the mini dolphin to make it

conform to those two improvements.

Q. Anything else?

A. Yes. There would be others in the future that may be on this list.

THE WITNESS: Do you want me to look at it? I'll tell you.

MR. TAYLOR: Sure. That will give me an idea of what's really likely to happen.

A. That solder power retaining wall, we would probably get back to that retaining wall sometime in the future.

Q. Does Global have the right to terminate the Amended Lease Agreement?

MR. EDWARDS: Objection.

A. Yes, they do.

Q. Prior to today, have you ever had any discussions with Global in which they gave any indication that they had an intention to terminate the agreement?

A. No, I haven't.

THE WITNESS: Do you mind if I take another bathroom break?

MR. TAYLOR: No, I'm just looking over my notes.

(A short recess was taken.)

Q. (By Mr. Taylor): Have you ever had any

(Defendant's Exhibit 12 marked for ID.)
Q. Are you aware of any claim by Chevron that has the right to use Wilkesbarre Pier?
MR. EDWARDS: Objection.
A. I am not.
Q. Have you ever seen what's been marked as Exhibit 12 before?
A. I must have. It's just that I don't remember.
Q. Sitting here today, you don't recall seeing this document?
A. I can't recall, but I'm sure I have.
Q. Okay. Drawing your attention to the second paragraph of this letter, it states that: The deed by Unocal acquired ownership of our property in East Providence gives us the right to use the pier, and it continues on from there. Do you recall whether Capital Terminal Company ever responded to this letter from Unocal?
MR. EDWARDS: Objection.
A. I do not.
Q. Did you ever respond in any fashion to this letter from you Unocal?
MR. EDWARDS: Objection. Asked and answered.
A. Not that I can remember.

Q. Have you ever had any conversations with Lois Hague?
A. Yes.
Q. When was the last time you spoke with her?
A. Many years ago.
Q. Since August 10, 1999, have you had any discussions with anyone from Unocal relating to whether or not Unocal has the right to use the pier?
A. No, I have not.
Q. And are you aware of any such discussions between Unocal and anyone representing Capital Terminal or Dunellen?
A. I am not aware.
Q. If it were the case that Unocal has a right to use the pier, would Dunellen consider that they were responsible for a portion of the costs of maintaining the pier?
MR. EDWARDS: Objection.
A. Too many if's. I don't know.
MR. TAYLOR: That's all I have for today, thank you.
THE WITNESS: Thank you.
MR. EDWARDS: The witness will read and sign.

Federal Rules of Civil Procedure, original transcripts shall not be filed in court; therefore, the original is delivered and retained by Defendant's attorney.

I have enclosed with a copy of the deposition a correction and signature page, which must be signed before a Notary Public.

IN WITNESS WHEREOF, I have hereunto set my hand this 10th day of February, 2007.

Sally Brassard RPR/CSR · Notary Public

SALLY BRASSARD, NOTARY PUBLIC/CSR-RPR
(MY COMMISSION EXPIRES JANUARY 16, 2009)