#20

BOOK 351/187

0214 387

OPERATING AGREEMENT
(FOR USE OF WILKESBARRE PIER)

OPERATING AGREEMENT made this 8th day of November, 1977, between Getty Refining and Marketing Company, a Delaware corporation (hereinafter called "GRMC"), Union Oil Company of California, a California corporation, for its American Mineral Spirits Division (hereinafter called "Union"), Fuel Storage Corporation, a New Hampshire corporation (hereinafter called "FSC"), and Providence and Worcester Company, a Delaware corporation (hereinafter called "P&W").

WHEREAS, P&W is the owner of a pier and berthing facilities in the Seekonk River in the City of East Providence, Rhode Island, otherwise known as Wilkesbarre Pier, (hereinafter called "pier"); and

WHEREAS, pursuant to a deed and agreement dated August 28, 1941 between Providence and Worcester Railroad Company (predecessor in interest to P&W) and Colonial Beacon Oil Company (predecessor in interest to GRMC, Union and FSC), GRMC, Union and FSC have the right to use the northerly side of the pier "for the delivery of petroleum products and other merchandise used in connection with its or their petroleum products business"; and

WHEREAS, P&W will use the pier in furtherance of its business; and

WHEREAS, the parties desire to provide for the orderly use and operation of the pier.

NOW THEREFORE, the parties agree as follows:

I. Scheduling of Vessels

GRMC, Union, FSC, and P&W will cooperate with respect to the scheduling of vessel arrivals at the pier so as to assure as far as possible, that no party will be subjected to expense or inconvenience arising from delay of any kind.

Rec'd Jan. 19, 1978 at 3:31

351 188

On the 15th of each month, each party will supply the other three parties with its tentative vessel schedule for the succeeding month and shall thereafter advise each other party of any change of estimated time of arrival. When vessels are nominated and arrival dates established, ten (10) days' written notice of the same shall be given together with the expected length of time of berth occupancy for each vessel. Revisions in the scheduled arrival of vessels may be given verbally on shorter notice if such revision is not in conflict with the ten (10) days' notice given by another party. In case of substantially simultaneous arrival of two or more vessels, priority in berthing shall always be given to the vessel whose arrival date and time is in closest agreement with their ten (10) days' notice or alternatively, in the event two or more vessels have the same arrival date based on their ten (10) days' notice, the vessel which first arrives at the Brenton Reef Pilot Station.

Should any party fail to schedule a vessel which arrives at the pier, or fail to vacate the berth at the time stated in its schedule with respect to a particular vessel, such party will save the other parties harmless from any cost or expense which such other parties incur or are forced to pay as a result of such failure.

II. Operating Procedures

A. Pier Operation

(1) Each party will arrange for pilots, tugs, and other requirements to move its vessels into and out of berth.

(2) Tankers may not dock or undock under their own power but must be assisted by tugboats in approaching and leaving the pier except under extraordinary conditions when tugboats are not available.

(3) Each party will arrange for personnel needed to handle lines for tying up its vessel to pier and when applicable, to hook up hoses on the pier for discharge or receipt of cargo, to strip and disconnect hoses and lines on the pier following discharge or receipt of cargo.

(4) When applicable, each party, will furnish personnel for performing the following functions in connection with loading or unloading its vessels:

(a) Establish order of pumping in discharge or receipt of cargo.

(b) Gauging and sampling of vessel tanks and checking water bottoms.

(c) Analysis of samples.

(d) Ascertain that vessel is physically ready to discharge or receive cargo, checking sea cocks, hose connections, shore valves and related equipment.

(e) Provide dock watch during entire loading or unloading operation, and take line samples and maintain records in accordance with normal industry practices employed by GRMC, Union and FSC.

(f) Test and check line samples at half hour intervals and at change of compartments on vessel and immediately after completion of pumping, to make certain that the correct products are being pumped and that product quality is being maintained.

(5) Each party shall reimburse Union on a quarterly basis for Union's cost of any water supplied to vessels delivering or receiving product via the pier. Union will, on request, furnish said other parties with documentation as to any particular billing. GRMC, Union, FSC and PGW shall share on a pro-rata basis in the cost of repairing, maintaining and replacing the existing water lines serving the pier.

(6) Except for losses due to acts or omissions of another party hereto, or those of its agents, employees or contractors, each party during loading or unloading will be responsible for its product losses between pier and tank terminal.

(7) Each party will prepare and handle all vessel and cargo documents and attend to all other paper work required in connection with vessel loadings and unloadings.

(8) Each company will be responsible for compliance with all applicable laws and regulations relating to its own operations.

(9) In each month that electricity is supplied to the pier and facilities thereon, the total cost of the electricity for that month will

be paid in equal amounts by each party hereto that made use of the pier and facilities during that month.

III. <u>Taxes, Maintenance</u>

It shall be the responsibility of each party to use the pier in such manner as to maintain it in good working order. P&W shall be advised immediately when repairs are needed and P&W will secure a contractor to make such repairs as are reasonably necessary, obtaining consent of the other parties prior to making any repairs exceeding Five Thousand ($5,000) Dollars, such consent not to be unreasonably withheld. P&W shall also be responsible for administering the overall maintenance of the pier and GRMC, Union and FSC shall reimburse P&W on a proportionate use basis, as hereinafter provided, for all pier maintenance costs. "Pier maintenance costs" as the term is used herein shall be defined as, and limited to, those costs necessary to promote the safe orderly, convenient and lawful loading and unloading of petroleum products over the Wilkesbarre pier. Said costs shall include but will not be limited to the following:

A. Repair and/or replacement of any part of the existing pier structure.

B. Real estate taxes and other fees applicable to the existing pier and/or the operation of same.

C. Dredging for the full length of the northerly side of the pier as required to maintain depth of 30 feet at the berth at mean low water.

D. The cost of compliance with all City, State, or Federal regulations applicable to the operation of the existing pier.

E. The cost of insurance, if P&W desires to carry same, to protect against the risk of loss by fire, extended coverage perils, and other perils.

On December 31, 1977, and at the end of each calendar year thereafter, the total pier maintenance costs, as defined above, will be calculated by P&W and a unit charge determined by dividing such total pier maintenance costs by the total hours all vessels were berthed at the dock during such calendar year. The hours berthed at the dock shall include the period between the time when a vessel is all secured at the dock until all shore lines are disconnected upon departure. GRMC, Union and FSC shall be invoiced by P&W at the determined unit charge times the total hours berthed at the dock by each company during said period. Such invoices shall be paid by GRMC, Union and FSC within thirty (30) days after date of billing.

It is understood, however, that no party hereto shall be liable for any cost which may be incurred if such cost is necessitated by and continues to be attributable solely to another's particular or special manner of operation or use of the pier.

IV. Additions, Enlargements or Improvements

In the event that any of the parties require additions, enlargements or improvements, including dredging to a depth in excess of 30 feet, to the pier and/or vessel berth not desired or required by the other party or parties, the party or parties desiring and requiring such work may make such additions, enlargements or improvements, provided such work does not interfere with the operations of any party under this agreement, and shall bear the entire cost of the same as well as any