BOOK 576 PAGE 272

02994

WILKESBARRE PIER

OPERATING AGREEMENT

OPERATING AGREEMENT made this 12th day of June, 1985, between Texaco Refining and Marketing, Inc., a Delaware corporation, formerly known as Getty Refining and Marketing Company (hereinafter called "Getty"), Union Oil Company of California, a California corporation, for its Union Chemicals Division (hereinafter called "Union"), Northeast Petroleum Corporation, a Massachusetts corporation (hereinafter called "Northeast", being the successor in interest ~~to Northeast~~ Petroleum Corporation of Rhode Island, a Rhode Island corporation), Capital Properties, Inc., a Rhode Island corporation (hereinafter called "CPI"), and Providence and Worcester Railroad Company, a Rhode Island corporation (hereinafter called "P&W").

WHEREAS, P&W is the owner of a pier and berthing facilities in the Seekonk River in the City of East Providence, Rhode Island, otherwise known as the Wilkesbarre Pier, (hereinafter called the the "pier"); and

WHEREAS, pursuant to a deed and agreement dated August 28, 1941 (the "Deed and Agreement") between Providence and Worcester Railroad Company (predecessor in interest to the present P&W) and Colonial Beacon Oil Company (predecessor in interest to Getty, Union and Northeast), Getty, Union, and Northeast have the right to the free and uninterrupted use of the berth on the northerly side of the pier "for the delivery of petroleum products and other merchandise used in connection with its or their petroleum products business"; and

WHEREAS, the parties desire to grant like rights to CPI; and

Recorded June 17, 1985

WHEREAS, such petroleum products and other merchandise are to be delivered from the pier (a) to Union's terminal adjacent to the pier, (b) to Getty's terminal on the easterly side of Dexter Road, through pipelines owned by Getty (c) to CPI's terminal on the westerly side of Dexter Road, through said pipelines by virtue of a Grant and Agreement by and between Getty and Robert H. Eder ("Eder") dated August 6, 1975, as amended (the latest amendment thereto being the Third Amendment to Grant and Agreement dated AS OF JANUARY 29, 1985 by and between Getty and Edgar M. Masinter and Linda Eder, Trustees, successors to Eder's entire interest in said Grant and Agreement), and (d) to Northeast's terminal on Dexter Road, through said pipelines by virtue of an operating agreement between Getty, said Trustees and Northeast; and

WHEREAS, Getty desires to confirm and establish that vessels which deliver such petroleum products and other merchandise to the pier for or on the account of said Trustees, CPI, Northeast, Union, P & W, or any person claiming by, through or under any of them, are not in any way attributable to Getty; and

WHEREAS, P&W will use the pier in furtherance of its business; and

WHEREAS, the parties desire to provide for the orderly use and operation of the pier; and

WHEREAS, the parties (other than CPI) entered into an agreement dated May 28, 1982, entitled WILKESBARRE PIER OPERATING AGREEMENT which agreement the parties desire to terminate and replace by this new agreement.

NOW, THEREFORE, the parties agree as follows:

I. EFFECTIVE DATE

A. The agreement dated May 28, 1982, entitled WILKESBARRE PIER OPERATING AGREEMENT recorded at Book 468, Page 187, is terminated as of December 31, 1984. All payments accrued under said agreement shall be settled under the terms of said agreement.

B. This agreement shall be effective as of January 1, 1985.

C. The rights of Getty, Union and Northeast as successors in interest to Colonial Beacon Oil Company under the Deed and Agreement are hereby confirmed as being in full force and effect; and like rights are hereby granted to CPI; provided, however, nothing herein is intended to preclude CPI from acquiring from P&W and exercising rights which P&W may lawfully grant to CPI for use of the pier for purposes other than the delivery of petroleum products.

II. SCHEDULING OF VESSELS

A. Each party will cooperate with each other party in connection with scheduling of vessel arrivals at the berth on the northerly side of the pier so as to assure as far as possible that no party will be subjected to expense or inconvenience arising from delay of any kind.

(1) No later than the 15th of each month, each party will supply the other parties hereto with written notice of its tentative vessel schedule for the succeeding month and shall thereafter advise each other party of any change of estimated time of arrival.

(2) When vessels are nominated and arrival dates established, each party shall give each other party ten (10) days' telex or telephone notice in advance of each anticipated vessel arrival which shall include a reference to the draft of the vessel and an estimate of the number of hours required for the vessel to complete the loading or discharge of its cargo. Each party may, and is encouraged to, revise and update each scheduled arrival of vessels for which such party has given notice.

(3) In case of substantially simultaneous arrival of two or more scheduled vessels, priority in berthing shall always be given to the vessel whose arrival date and time is in closest agreement with its ten (10) days' notice, or alternatively, in the event two or more vessels have the same arrival date based on their ten (10) days' notice, the vessel which first arrives at the Brenton Reef Pilot Station shall be given priority.

(4) The determination of a vessel's priority is subject to the requirement that such vessel and its associated shore facilities are ready in all respects to commence and complete expeditious

loading or discharging (referred to hereafter collectively as "transferring" or "transfer") of its cargo. In the event of ~~any inability to~~ transfer cargo, any waiting scheduled vessel may proceed to berth. If a vessel has berthed and either it or its associated ~~shore~~ facilities ~~are~~ unable to commence expeditious transfer of its cargo, such vessel shall vacate the berth provided that a waiting scheduled vessel and ~~its~~ associated shore facilities are ready in all respects to commence expeditious transfer of its cargo.

(5) P&W and its designees may not schedule two (2) consecutive vessel arrivals if such arrivals interfere with another party's use of the berth, without the prior written consent of such other party, such consent not to be unreasonably withheld.

B. If a party's scheduled vessel arrives within 24 hours of the date and time, nominated by ten (10) days' notice as provided under subparagraph A(2) of this Section, then the vessel shall remain at the berth no longer than seventy-two (72) hours maximum (measured from the completion of all lines fast) if there is a scheduled vessel of another party waiting to transfer its cargo.

C. A scheduled vessel which arrives more than 24 hours after the date and time, nominated by ten (10) days' notice as provided under subparagraph A(2) of this Section, shall be treated as an unscheduled vessel.

D. Unscheduled vessels may berth so long as there is no waiting, scheduled vessel. Upon arrival of a scheduled vessel, the unscheduled vessel then must vacate the berth.

E. Any party which fails to abide by any of the above provisions shall hold each other party harmless and indemnify each other party from and against any loss, cost, damage, expense, liability, judgment, award or decision which results from or which is incurred in connection with any such failure.

III. PIER OPERATING PROCEDURE

A. Each party will cooperate with each other party in connection with the conduct of operations at the pier so as to assure as far as possible that no party will be subjected to expense or inconvenience arising from delay of any kind.

B. Each party will arrange for pilots, tugs, and other requirements to move its vessels into and out of berth.

C. Tankers or other vessels which in accordance with industry practice require tugboat assistance may not dock or undock under their own power but must be assisted by tugboats in approaching and leaving the pier except under extraordinary conditions when tugboats are not available.

D. Each party will arrange for personnel needed to handle lines for tying up its vessel to the pier and when applicable, to hook up hoses on the pier for

576 278 discharge or receipt of cargo, and to strip and disconnect hoses and lines on the pier following discharge or receipt of cargo.

E. When applicable, each party will furnish personnel for performing the following functions in connection with loading or unloading its vessels:

(1) Establish order of pumping in discharge or receipt of cargo.

(2) Gauging and sampling of vessel tanks and checking water bottoms.

(3) Analysis of samples.

(4) Ascertain that vessel is physically ready to discharge or receive cargo, checking sea cocks, hose connections, shore valves and related equipment.

(5) Provide dock watch during entire loading or unloading operation, and take line samples and maintain records in accordance with normal industry practices employed by Getty, Union, Northeast, Red Bridge and P&H.

F. Except for losses due to acts or omissions of another party hereto, or those of its agents, employees or contractors, each party during loading or unloading will be responsible for its product losses in connection with the transport of its products between pier and tank terminal.

G. Each party will prepare and handle all vessel and cargo documents and attend to all other paper work required in connection with vessel loadings and unloadings.

H. Each party will be responsible for compliance with all applicable laws and regulations relating to its own operations.

I. Without accepting any liability for its failure to do so, Union agrees to use its best efforts to repair, maintain and replace the existing water lines, electrical lines and equipment, and to supply the pier and ships with the quantities of water and electricity necessary to conduct the operations heretofore conducted at the pier.

(1) Union will invoice P&W, as expenses occur, for the cost of repairing, maintaining and replacing existing water lines, electrical lines and equipment. P&W will bill the using parties equally for this cost.

(2) Union will invoice P&W, on a quarterly basis, for the cost of any water supplied to vessels delivering or receiving product via the pier. P&W will bill the party-user for this cost.

(3) Union will invoice P&W, on a monthly basis, for the cost of the electricity supplied to the pier and facilities thereon. Subject to the following subparagraph I(4), P&W will bill all parties equally for this cost.

(4) Any party using the pier for purposes other than the delivery of petroleum products and ~~other~~ merchandise used in connection with its petroleum products business shall be solely responsible for all costs and expenses for water and electricity consumed by it for such other purposes. In addition, any party using the pier for such other purposes shall be responsible for any and all costs that may be incurred for additional water lines, electrical lines and equipment required to serve the pier and for the cost of repairing and/or replacing any part of the pier that is damaged as a result of use of the pier for such other purposes.

J. It shall be the responsibility of each party to use the pier in such manner as to maintain it in good working order. In the event damage is done to the pier as a result of a particular party's use of same, P&W shall, as soon as possible after obtaining knowledge of such damage, inspect the damage and provide written notice to the party allegedly causing the damage, including a report of such inspection and an estimate of the cost of the repairs necessary to correct such damage. The party so notified shall have five (5) business days to notify P&W whether it will promptly pursue such repairs to completion; ~~in~~ the event the party chooses to effect such repairs, it shall immediately commence such repairs and complete same expeditiously. In the event the party does not agree to expeditiously effect such repairs, P&W shall effect such repairs and bill the party for the total cost of such repairs. In the event the party does not agree that its use caused the damage, P&W shall effect

such repairs and the cause of the damage will be arbitrated pursuant to Section X of this agreement.

IV. MAINTENANCE

A. "Pier maintenance costs" as the term is used herein shall be defined as, and limited to, those costs necessary to promote the safe, orderly, convenient and lawful loading and unloading of petroleum products and other merchandise used in connection with the petroleum products businesses of the parties over the Wilkesbarre Pier (except as provided in sub-section D(3) hereof). Said costs shall include but will not be limited to the following:

(1) Repair and/or replacement of any part of the existing pier structure to the extent such repair is necessitated by use of the northerly berth of the pier for delivery of petroleum products and other merchandise used in connection with the petroleum products businesses of the parties.

(2) Real estate taxes and other fees applicable to the existing pier and/or the operation of same for delivery of petroleum products and other merchandise used in connection with the petroleum products businesses of the parties.

(3) Dredging for the full length of the northerly side of the pier as required to maintain depth of -30' (thirty) feet MLW.

(4) The cost of compliance with all City, State or Federal regulations applicable to the

operation of the existing pier in connection with delivery of petroleum products and other merchandise used in connection with the petroleum products businesses of the parties.

(5) The cost of insurande to protect against the risk of loss by fire, extended coverage perils, and other perils, to the extent arising in connection with delivery of petroleum products and other merchandise used in connection with the petroleum products businesses of the parties.

(6) All expenses incurred by P&W pursuant to its pier management responsibilities assumed under Sections III I and J, Section IV and Section X hereof; provided, however, that such expenses do not include expenses incurred by P&W or anyone claiming through or under it as a user of the pier or any overhead expenses not directly related to the management of the pier by P&W. Expenses of P&W in connection with arbitration brought by P&W for the purpose of determination of pier maintenance costs shall be included as pier maintenance costs unless P&W is determined to be solely responsible for the pier maintenance costs which are the subject of such arbitration, in which case such expenses shall be borne solely by P&W. To the extent the party or parties against whom such arbitration is brought are determined not to be liable for the pier maintenance costs which were the subject of such arbitration, such party's or parties' expenses of arbitration shall be included in the pier maintenance costs in the year when such arbitration is concluded. P & W shall reimburse such arbitration expense promptly after collection thereof.

B. P&W shall be responsible for administering the overall maintenance of the pier.

C. P&W shall be advised immediately when repair and/or replacement of any part of the existing pier structure is needed, and, except as otherwise provided in Section III J hereof, P&W will secure a contractor to make such repairs and/or replacements as are reasonably necessary. P&W must notify all operative members of this agreement of the proposed repairs and/or replacement and its estimated cost. Prior to making any such repair and/or replacement exceeding Ten Thousand Dollars ($10,000), three (3) operative members of the Agreement, one of which must be a major user for the previous year (other than P&W), must consent, such consent not to be unreasonably withheld. Any party may seek Arbitration, pursuant to Section X hereto, of the need for and/or cost of such repair and/or replacement.

D. Getty, Union, Northeast and CPI shall reimburse P&W on a proportionate use basis, as hereinafter provided, for all pier maintenance costs.

(1) At the end of each calendar year, the total pier maintenance costs, as defined above, will be calculated by P&W and a unit charge determined by dividing such total pier maintenance costs by the total hours all vessels were berthed at the pier during such calendar year. The hours berthed at the pier shall include the period between the time when a vessel is all secured at the pier until all shore lines are disconnected upon departure. Getty, Union,

Northeast and CPI shall be invoiced ~~by P&W at~~ the determined unit charge times the total hours berthed at the pier by each party during said period. Such invoices shall be paid by Getty, Union, Northeast and CPI within thirty (30) days after date of billing.

(2) P&W agrees (a) to keep complete and correct records with respect to the determination and allocation of pier maintenance costs pursuant to this agreement, (b) to retain such records for a period of not less than two years after the end of the calendar year to which such records pertain, and (c) to make such records available to Getty, Northeast, Union, CPI or their authorized representatives for inspection, copying and audit thereof at reasonable times and intervals.

(3) It is understood, however, that no party hereto shall be liable for any part of any cost which may be incurred if such cost is necessitated by or attributable solely to another party's particular or special manner of operation or use of the pier.

E. Without accepting any liability for its failure to do so, P&W agrees to use its best efforts to obtain insurance to protect the pier against any and all risk of loss by fire, extended coverage perils, and other perils which may be appropriate in view of the parties' use of the pier; this coverage will be in amounts necessary to cover the full insurable value of the pier (after taking into consideration customary

co-insurance provisions). P&W will provide reasonable notice to the other signatory parties as to what insurance it has obtained; if P&W fails to either provide this notice or fails to obtain the requisite insurance, any other signatory party may obtain the requisite insurance and invoice P&W for the cost of said insurance. Any proceeds from an insurance claim shall be used to repair the pier.

V. ADDITIONS, ENLARGEMENTS OR IMPROVEMENTS

A. Dredging to depths in excess of -30 feet MLW.

(1) Notwithstanding anything to the contrary in this agreement, all dredging, whether as maintenance or as an enlargement, to a depth in excess of -30 (thirty) feet MLW shall be pursuant to this sub-section.

(2) In the event that any party and/or parties desires and/or requires dredging, whether as maintenance or as an enlargement, to a depth in excess of -30 (thirty) feet MLW to the vessel berth, the party or parties desiring and/or requiring such dredging shall perform such dredging, provided such dredging does not unreasonably interfere with the operations of any party under this agreement, and shall bear the cost of the same (subject to later reimbursement as set forth below).

(3) A party hereto who subsequently thereto becomes a "new user" of said dredging made by another party or parties hereto, and who derives