additional economic or other benefit from the use of the new dredged-depth as compared with a pre-existing dredged-depth and who, but for the new dredging, could not have utilized the berth, will be obligated, by reason of such use, to notify the party or parties which dredged and/or previously used such dredging and to pay to such other party or parties its share of the cost thereof calculated as follows:

The cost thereof less depreciation at the rate of 10% per annum from date of completion of said dredging divided by the number of parties theretofore using said dredging provided, however, that such payment shall be finally adjusted between the parties using such new dredging at the end of a two-year term from such party's first use of such new dredging based upon each party's proportionate use of said new dredging during said two-year period. [As an example, if a party performs dredging costing $1,000,000 and three years later, another party becomes a user, the original cost ($1,000,000) will be depreciated by 30% (10% per annum) or $300,000. If in the two years subsequent to this new party's first use of the improvement, the new party's proportionate use of the improvement compared to the use by all other parties is 40%, the new party will pay to the party or parties who have already paid for the improvement $280,000 ($1,000,000 less $300,000 times 40%).]

(4) The parties acknowledge that the vessel berth was dredged to -35 (thirty-five) feet MLW by Northeast under separate agreement and that no party to this agreement has any obligation to reimburse Northeast for any costs incurred in initially dredging the berth to a depth of -35 (thirty-five) feet MLW.

(5) The parties acknowledge that (a) the present depth of the vessel berth is -40 (forty) feet MLW, (b) such dredging was performed by P&W, (c) Getty has reimbursed P&W for such expenses pursuant to a separate agreement, (d) by virtue of such reimbursement Getty has the right to use the depth of -40 (forty) feet MLW without further payment to any other party hereto, (e) any "new user" using the vessel berth in excess of -35 (thirty-five) feet MLW within the ten year period commencing on the date of the completion of such dredging shall pay its proportionate share of the cost of the dredging as provided in Section V.A(3) hereof.

(6) For purposes of the preceding Section V.A(5) the term "new user" shall mean and include the following: A. P&W; B. Union; C. Northeast; D. CPI, either (i) if and to the extent that the use by CPI is for purposes other than for petroleum products, or (ii) if and to the extent that the use by CPI is for purposes of petroleum products delivered to or stored for P&W, Union or Northeast, or (iii) if and to the extent that the use by CPI is for purposes of petroleum products delivered to or stored in the terminal now owned

by Northeast, whether or not said terminal has been acquired by or leased to CPI, provided, however, that the delivery to and storage at the existing Northeast terminal premises of not more than 75,000 barrels of petroleum products at any one time by CPI incidental to its use of its own terminal shall be excluded from the operation of this clause; and further provided that nothing in this Section V.A(6) shall limit the liability of CPI for reimbursement as provided in Section V.A(3) for use of dredging of the vessel berth in excess of -40(forty) feet MLW.

B. All other additions, enlargements or improvements.

(1) In the event that any party and/or parties desires and/or requires any other additions, enlargements or improvements, to the pier and/or vessel berth not desired or required by the other party or parties, the party or parties desiring and/or requiring such work may make such additions, enlargements or improvements, provided such work does not interfere with the operations of any party under this agreement, and shall bear the entire cost of the same as well as any increase in annual maintenance costs caused thereby including any additional tax assessments, insurance costs, utility costs and any other increased costs resulting from the additions, enlargements or improvements.

(2) A party hereto who subsequently thereto becomes a new user of said addition, enlargement or improvement made by another party or parties

hereto, and who derives additional economic or other benefit from the use of the new facility as compared with a pre-existing facility replaced or altered thereby will be obligated, by reason of such use, to notify the party or parties which constructed and/or previously used such addition, enlargement or improvement and to pay such other party or parties its share of the cost thereof calculated as follows:

The cost thereof less depreciation at the rate of 5% per annum from date of installation divided by the number of parties theretofore using said addition, enlargement or improvement provided, however, that such payment shall be adjusted between the parties using such new facilities at the end of a two-year term from such party's first use of such new facility based upon each party's proportionate use thereof during said two-year period. (As an example, if a party makes an improvement costing $1,000,000, and three years later, another party becomes a user, the original cost ($1,000,000) will be depreciated by 15% (5% per annum) or $150,000. If in the two years subsequent to this new party's first use of the improvement, the new party's proportionate use of the improvement compared to the use by all other parties is 40%, the new party will pay to the party or parties who have already paid for the improvement $340,000 ($1,000,000 less $150,000 times 40%).]

Thereafter each such user party shall bear and pay a share of the increased annual pier maintenance costs attributed to said addition, enlargement or improvement in proportion to the party's use of same.

(3) Title to said facilities shall vest in each of the owners referred to herein in proportion to their investment in the said addition, enlargement or improvement.

(4) Any "new user" using said addition, enlargement or improvement within the twenty year period commencing on the date the completion of the addition, enlargement or improvement shall pay its proportionate share of the cost of the addition, enlargement or improvement as provided in Section V. B(2) hereof.

(5) A party hereto which otherwise has a right to and in fact installs additional loading and unloading facilities and additional pipelines shall receive and discharge products over said pier in accordance with the terms of this agreement.

VI. INDEMNIFICATION

Each of the parties hereto agrees with respect to its own acts or omissions to defend, indemnify and save harmless each of the other parties hereto from any and all claims, suits, liabilities, losses, costs and expenses sustained by or asserted against such other parties for or in connection with:

(a.) fines or penalties imposed by any governmental authorities, as well as damages to any third parties not signatories to this agreement (whether private or public), resulting from spills into or other contaminations of the water at the dock,

(b.) injuries, death, loss and damage of any kind or character to persons or property by whomsoever suffered or asserted,

resulting from or arising out of said acts or omissions on the part of said indemnifying party, its employees, agents, or contractors.

VII. WATER/AIR POLLUTION CONTROL

Each party will comply with all laws, rules, and regulations relating to water or air pollution and will, in the case of an escape or discharge of products or materials from on or around the pier or land contiguous to the pier while such party is making use of the pier, promptly take whatever measures are necessary to prevent pollution damage from thereby arising and to mitigate any such damage.

VIII. INSURANCE

Except as otherwise provided herein, each party will assume the risk of loss or damage by fire or extended coverage perils to its facilities and cargo located on the pier.

IX. ASSIGNMENTS, WITHDRAWALS AND TERM

A. It is the intention and purpose of the parties hereto (the parties signing this agreement being hereinafter referred to as "operative members") that there will be no more than five (5) operative members under this agreement. The parties hereto agree, however, that an operative member may permit other persons or entities to use the facilities covered in this agreement provided. ~~in any such case the operative member~~ shall give prompt written notice of such use to every other operative member. In any such case, the operative member assumes all liability for any failures caused by any person or entity claiming through or under the operative member. If pursuant to this Section other persons or entities use the pier, the operative member at its sole discretion may permit one such other person or entity to do its own scheduling of vessels pursuant to Section II above, and have all the rights, privileges and obligations of said Section II as if a party thereto.

B. Any party hereto has the right to withdraw from this agreement upon six (6) months' written notice to the other parties hereto, provided they have retired any accrued obligations as covered by this agreement. If a party so withdrawing has the legal right to continue using the pier, such party will continue to be obligated to the provisions of Section V of this agreement, irrespective of any purported notice to the contrary.

C. This agreement will remain in full force and effect so long as there are two or more parties bound to this agreement.

D. In the event that Getty sells or leases its terminal on Massasoit Avenue, and/or Union sells or leases its terminal contiguous to the Wilkebarre Pier, and/or Northeast sells or leases its terminal on Dexter Road, and/or CPI sells or leases its terminal on Dexter Road, in any such case to a financially responsible bona fide purchaser or lessee for value, the selling or leasing party shall cause such purchaser or lessee to assume in writing the rights and responsibilities hereunder of the party so selling or leasing and shall promptly acknowledge such assumption by written communication to the other operative members. Notwithstanding any failure by such purchaser or lessee to make such written assumption, such purchaser or lessee shall by its use of such terminal be deemed to have accepted the rights and responsibilities hereunder of the party so selling or leasing the terminal. The party so selling or leasing its terminal shall be released and discharged from all obligations set forth in this agreement accruing after such sale or lease (except the obligation to cause written assumption as set forth in this paragraph D) upon written assumption of its rights and responsibilities by the purchaser or lessee of its terminal or upon such purchaser's or lessee's use of the terminal as hereinabove provided. In such an event where a lease is involved, the lessee shall cease to be an operative member of this agreement upon termination of its lease and the party leasing shall once again become the operative member, and shall provide written notice of such event to the other parties hereto.

E. The parties hereto agree that this agreement shall inure to and be binding upon their respective successors and assigns. The purchaser of Getty's terminal on the easterly side of the Dexter Road shall be deemed a successor of Getty for purposes hereof.

X. ARBITRATION

A. Any controversy or claim arising out of or relating to this agreement or the breach thereof may be settled by the submission of the issue to a panel of three arbitrators for determination. This determination shall be made in accordance with the Rules of the American Arbitration Association, and judgment upon the award rendered may be entered in any court having jurisdiction thereof.

The arbitrators will be selected from a list of arbitrators obtained from the American Arbitration Association. Each party or parties on opposite sides of the controversy or claim will appoint an arbitrator, and these two arbitrators shall select a third, impartial arbitrator. Failing such selection within three (3) working days, either party or parties involved in the controversy may apply to the American Arbitration Association for appointment of a third arbitrator.

The award shall be by at least two of the three arbitrators. Except as herein otherwise provided each party shall bear the expenses of its own witnesses and of the arbitrator it designates. Other costs and expenses of the arbitration, including the compensation of a third, impartial arbitrator and

stenographic expenses, if any, shall be borne equally by the party or parties on opposite sides of the controversy or claim.

B. Any party to a proposed arbitration proceeding shall have the right to designate New York City as the site for the proceeding, provided that such designation is communicated to the other party or parties involved prior to the selection of the third, impartial arbitrator.

C. It is understood and agreed, however, that proposals to add to or subtract from or change this agreement shall not be arbitrable and that no proposal to modify, amend or terminate this agreement, as well as any matter or subject arising out of and in connection with such proposals, may be referred for arbitration under this Section.

IN WITNESS WHEREOF this agreement has been duly executed the day and year aforesaid.

| | |
|---|---|
| WITNESS | TEXACO REFINING AND MARKETING INC. |
| ______________________ | BY: [signature] Its Vice-President |
| WITNESS: | UNION OIL COMPANY OF CALIFORNIA |
| ______________________ | BY: [signature] Its [illegible] |
| WITNESS: | NORTHEAST PETROLEUM CORPORATION |
| [signature] | BY: [signature] Its President |

BOOK 576 PAGE 296

WITNESS:

PROVIDENCE AND WORCESTER RAILROAD COMPANY

BY: Robert H. Eder
Its Chairman

WITNESS:

CAPITAL PROPERTIES, INC.

BY: Joseph R. DiStefano
Its PRESIDENT

STATE OF Oklahoma

COUNTY OF Tulsa SS:

Before me on January 28, 1985 personally appeared T. A. Differ, V.P. of TEXACO REFINING AND MARKETING INC., signer and sealer of the foregoing instrument, who, being duly authorized, acknowledged the same to be his free act and deed and the free act and deed of said TEXACO REFINING AND MARKETING INC.

Notary Public
My commission expires: 8/15-1985

STATE OF ILLINOIS

COUNTY OF Cook SS:

Before me on June 12, 1985, personally appeared W. M. Tapley of UNION OIL COMPANY OF CALIFORNIA, signer and sealer of the foregoing instrument, who, being duly authorized, acknowledged the same to be his free act and deed and the free act and deed of said UNION OIL COMPANY OF CALIFORNIA.

Notary Public
My commission expires: 8/28/85

STATE OF MASS.

COUNTY OF SUFFOLK SS:

Before me on JUNE 3, 1985 personally appeared ROBERT H TAHOMIAN PRESIDENT of NORTHEAST PETROLEUM CORPORATION, signer and sealer of the foregoing instrument, who, being duly authorized, acknowledged the same to be his free act and deed and the free act and deed of said NORTHEAST PETROLEUM CORPORATION.

Notary Public
My commission expires:

STATE OF RHODE ISLAND

COUNTY OF PROVIDENCE SS:

Before me on January 29, 1985, personally appeared Robert H. Eder, Chairman of PROVIDENCE AND WORCESTER RAILROAD COMPANY, signer and sealer of the foregoing instrument, who, being duly authorized, acknowledged the same to be his free act and deed and the free act and deed of said PROVIDENCE AND WORCESTER RAILROAD COMPANY.

Marguerite F. Woods
Notary Public
My commission expires:

MARGUERITE F. WOODS
My Commission Expires June 30, 1986

STATE OF RHODE ISLAND

COUNTY OF PROVIDENCE SS:

Before me on January 29, 1985, personally appeared Joseph R. DiStefano, President, of CAPITAL PROPERTIES, INC., signer and sealer of the foregoing instrument, who, being duly authorized, acknowledged the same to be his free act and deed and the free act and deed of said CAPITAL PROPERTIES, INC.

Marguerite F. Woods
Notary Public
My commission expires:

MARGUERITE F. WOODS
My Commission Expires June 30, 1988

RECORDED
1985 JUN 19 AM 9:05
EAST PROVIDENCE, R.I.
JAMES H. GEELEY JR.
CITY CLERK