# EXHIBIT Q

SETTLEMENT AGREEMENT

**THIS AGREEMENT** made the 15th day of December 1997 by and between Providence and Worcester Railroad Company, a Rhode Island corporation (hereinafter "P&W") and Getty Realty Corp. (formerly Getty Petroleum Corporation), a Delaware corporation (hereinafter "Getty").

**WHEREAS,** P&W, Getty, Union Oil Company of California (hereinafter "Unocal") and Capital Properties, Inc. (hereinafter "CPI") are parties to that certain agreement entitled "Amended and Restated Wilkesbarre Pier Operating Agreement" dated as of January 1, 1991 (hereinafter "Agreement"); and

**WHEREAS,** a dispute has arisen regarding the nature and extent of repairs required to be done to the Wilkesbarre Pier; and

**WHEREAS,** P&W started arbitration proceedings in accordance with the Agreement to resolve such dispute; and

**WHEREAS,** by letter dated October 1, 1997 Getty tendered notice of withdrawal from the Agreement to be effective April 1, 1998; and

**WHEREAS,** the parties have agreed to resolve the dispute by the execution of a Throughput Agreement between P&W and Getty Petroleum Marketing, Inc., a Maryland corporation, and the payment by Getty of its share of 1997 pier maintenance costs; and

**WHEREAS,** upon the payment of the grand total as set forth in paragraph 3 of this Settlement Agreement and the execution of the Throughput Agreement, as between P&W and Getty, Getty's withdrawal from the Agreement will be effective as of January 1, 1998; and

**WHEREAS,** Getty's October 1, 1997 notice also states that Getty will tender (hereinafter "Notification of Tender") to the trustees of the Eder Trust so-called ("Trust") a Quit Claim Deed and Bill of Sale transferring all of Getty's interest in the pipelines and easements which are the subject of the Grant and Agreement as amended between the Trust and Getty and the Operating Agreement (For Use of Pipelines) between the Trust and Getty; and

**WHEREAS,** Getty desires to withdraw its Notification of Tender upon execution of certain amendments to the Operating Agreement (For Use of Pipelines) and Grant of Agreement between the Trust and Getty.

PENGAD-Bayonne, N.J.
JOINT EXHIBIT
28

**NOW THEREFORE,** P&W and Getty intending to be legally bound agree as follows:

1. Throughput Agreement

P&W and Getty Petroleum Marketing, Inc. shall execute simultaneously with this Settlement Agreement the Throughput Agreement attached hereto as Exhibit A.

2. Pipelines

Getty simultaneously with the execution of this Settlement Agreement will execute the First Amendment to Operating Agreement ("For Use of Pipelines") attached hereto as Exhibit B and the Fourth Amendment to Grant and Agreement attached hereto as Exhibit C. The effectiveness of said First Amendment to Operating Agreement and Fourth Amendment to Grant and Agreement will be contingent upon the execution thereof by Michael I. Frankel and Linda Eder, trustees under agreement dated June 22, 1982, as well as the execution by the trustees of a letter from Getty indicating its withdrawal of its Notification of Tender as set forth in Exhibit D.

3. 1997 Pier Maintenance Costs

By December 31, 1997 Getty shall pay the following sums to P&W:

A. Arbitration Expenses - $ 93,613 (85% of the following expenses):

a. Tofel, Berelson, Saxl and Partners, P.C. - $75,000
b. Pare Engineering - $21,633
c. William Zoino, expert witness - $7,500
d. American Arbitration Association Fees - $6,000

These amounts include arbitration expenses through December 15, 1997. No additional expenses pertaining to the present arbitration will be incurred upon execution of this Settlement Agreement.

B. Dredging Expenses - $125,800

85% of the costs of the dredging project after reduction of $35,000 to be paid by Unocal, and exclusive of standby time charged to P&W by the dredging contractor.

C. Electrical Usage - $11,584

For electrical usage of the Wilkesbarre Pier from January 1, 1991 to September 4, 1997.

D. Other Pier Maintenance - $67,532 (estimated, through December 15, 1997)

85% of 1997 pier operating expenses minus payments made by Getty for such 1997 expenses.

Grand Total owed by Getty for items A-D to be paid on or prior to December 31, 1997 = $298,529.

E. Additional Expenses

An adjustment of the final 1997 expenses for Pier Maintenance Costs, , will be calculated immediately upon the information becoming available to reflect the total hours of vessels berthed by Getty and CPI respectively for 1997 and final bills being tendered for any standby time charged to P&W by the dredging contractor as a result of Getty's use of the Pier and any other ordinary course pier maintenance costs. Any adjustments to Getty's payments will be billed by P&W and paid by Getty or P&W as the case may be within thirty (30) days after the date of billing notwithstanding the earlier effective date of Getty's withdrawal from the Agreement.

4. Transportation Contract

P&W and Getty Petroleum Marketing, Inc. will execute a Confidential Transportation Contract for a per car rebate to Getty Petroleum Marketing, Inc. of $100.00 per loaded rail car for shipments by rail to Getty's East Providence petroleum terminal. Such contract will include customary and standard provisions relating to evidence of paid invoices for freight service prior to payment of the rebate. The contract shall be effective January 1, 1998 and will be co-terminus with the initial term of the Throughput Agreement executed this date between P&W and Getty Petroleum Marketing, Inc. Most of the shipments by rail to Getty's East Providence Petroleum Terminal will be made by third parties and Getty Petroleum Marketing, Inc. will not be obligated to make shipments by rail.

IN WITNESS WHEREOF, intending to be legally bound, P&W and Getty set forth their respective hands and seals by their duly authorized representatives as of the date first above written.

WITNESS:

GETTY REALTY CORP.

By: ______________________
President

WITNESS:

PROVIDENCE AND WORCESTER RAILROAD COMPANY

By: ______________________

Agreed to this 15th day of December 1997:

Getty Petroleum Marketing, Inc.

By: ______________________
Vice President

EXHIBIT A

THROUGHPUT AGREEMENT

This Agreement entered into this 19th day of December 1997 between Providence and Worcester Railroad Company, a Rhode Island Corporation ("P&W") and Getty Petroleum Marketing Inc., a Maryland corporation ("Getty").

RECITAL

1. P&W owns, operates and maintains a pier located in East Providence, Rhode Island, which is known as the Wilkesbarre Pier (the "Pier"). Getty's subsidiary, Getty Terminals Corp., leases and operates a terminal in East Providence, which is connected to the Pier by Getty's pipelines. Getty desires to use the Pier to transport petroleum products from vessels docked at the Pier, through the pipelines to its terminal ("throughput") and P&W is willing to permit Getty to throughput, all on the terms and conditions set forth below.

NOW THEREFORE, in consideration for the mutual covenants set forth herein, P&W and Getty agree as follows:

1. Term. Except as provided in paragraph 10 hereof, the term of this Agreement shall be from January 1, 1998 through December 31, 2002, and shall thereafter be extended for successive one year renewal terms (each a "renewal term") unless notice of termination is given by one of the parties to the other parties not less than 6 months prior to the expiration of the initial term or each successive term, as applicable.

2. Throughput Rights. (a) Getty shall have the right to bring vessels to the Pier and to throughput petroleum products through the Pier and pipelines, in the manner provided in Paragraphs 3 and 4 hereof which provisions P&W agrees will be contained in any throughput or similar agreement P&W may enter into with third party(s). The parties acknowledge that the current users

are those (other than Getty) who are referred to in the Amended and Restated Wilkesbarre Dock Operating Agreement dated January 1, 1991 the ("Wilkesbarre Agreement"), which contains provisions substantially the same as Paragraphs 4, 5, 6 and 7 hereof.

(b) For its throughput rights hereunder, Getty shall pay to P&W a throughput fee equal to five cents ($.05) per barrel of petroleum products throughputted from the Pier through the pipelines to Getty's terminal and/or from Getty's terminal to the Pier, and shall pay as minimum throughput fees the following minimum amounts for each of the five years of the initial term even if the actual barrels throughputted generates a smaller amounts of fees and even if Getty does not utilize the Pier to throughput any petroleum products for reasons other than events of force majeure affecting the physical availability of the Pier to receive and/or ship petroleum products. The minimum throughput fees and the terms of payment follows:

| YEAR | MINIMUM ANNUAL FEE | MINIMUM MONTHLY PAYMENT |
|---|---|---|
| 1998 | $185,000 | $15,417 |
| 1999 | $235,000 | $19,583 (plus $50,000 in December) |
| 2000 | $235,000 | $19,583 (plus $50,000 in December) |
| 2001 | $185,000 | $15,417 |
| 2002 | $185,000 | $15,417 |

The foregoing minimum monthly payments shall commence on January 15, 1998 and shall be due and payable on the 15th day of each month thereafter. Commencing on January 31, 1999 and on each January 31 thereafter (including January 31, 2003), Getty shall provide to P&W an accounting, with supporting documents, of the barrels throughput for the previous calendar year. If the annual throughput times $.05 cents per barrel for such year exceeds the minimum annual throughput fee for such year, not later than February 15, 1999 and February 15 of each subsequent year through February 15, 2003, Getty shall pay to P&W the amount, if any, by which the annual throughput fee exceeds the minimum annual throughput fee for the previous year. The amount of additional throughput fee paid shall be credited toward Getty's minimum annual throughput fee obligation for the year in which payment is made but only toward years 1999 and 2000 in which the $50,000 payments are due. (For example, if an additional throughput fee of $5,000 for 1998 is paid in

February 1999, the $5,000 would be credited against Getty's 1999 minimum annual throughput fee obligation of $235,000 and the minimum monthly payment due in December, 1999 would be reduced from $69,583 to $64,583.)

(c) The throughput fees payable by Getty hereunder shall not be reduced by any other fees P&W may receive from third parties nor shall any amounts be refundable at the end of the initial term. Throughput fees are to be based on actual throughput and there shall be no maximum limit.

(d) There shall be no minimum throughput fees during any renewal term and throughput fees shall be paid on the 15th of the month based on actual throughput for the previous month. Commencing on January 1 of each renewal term the per barrel throughput fee will be adjusted by the following formula: The Calendar Year Annual average of the Consumer Price Index for Urban Consumers Non-Seasonally Adjusted ("CPIU") for the calendar year for which the computation is being performed using the latest value of this index available on January 1 of the new term, divided by the Calendar Year Annual Average of the CPIU for the year preceding where 1982-84 = 100%. Such adjusted fee shall be payable monthly as set forth above.

4. SCHEDULING OF VESSELS. (a) P&W will from time to time provide to Getty the names, addresses and telephone numbers of each Pier user (Getty and the other users each a "user"). Each user will cooperate with each other user in connection with scheduling of vessel arrivals at the berth on the northerly side of the Pier so as to assure as far as possible that no user will be subjected to expense or inconvenience arising from delay of any kind. "Vessel," as used herein shall mean vessels or barges.

(1) Not later than the 15th of each month, each user will supply the other users with written notice of its tentative vessel schedule for the succeeding month and shall thereafter advise each other user of any change of estimated time of arrival.

(2) When vessels are nominated and arrival dates established, each user shall

give each other user ten (10) days telex, telecopier or telephone notice in advance of each anticipated vessel which shall include a reference to the draft of the vessel and an estimate of the number of hours required for the vessel to complete the loading or discharge of its cargo. Each user may, and is encouraged to, revise and update each scheduled arrival of vessels for which such user has given notice.

(3) In case of the substantially simultaneous arrival of two or more scheduled vessels, priority in berthing shall always be given to the vessel whose arrival date and time is in closest agreement with its ten (10) days' notice, or alternatively, in the event two or more vessels have the same arrival date based on their ten (10) days' notice, the vessel which first arrives at the Brenton Reef Pilot Station shall be given priority.

(4) The determination of a vessel's priority is subject to the requirement that such vessel and its associated shore facilities are ready in all respects to commence and complete expeditious loading or discharging (referred to hereafter collectively as "transferring" or "transfer") of its cargo. In the event of any inability to transfer cargo, any waiting scheduled vessel may proceed to berth. If a vessel has berthed and either it or its associated shore facilities are unable to commence expeditious transfer of its cargo, such vessel shall vacate the berth provided that a waiting scheduled vessel and its associated shore facilities are ready in all respects to commence expeditious transfer of its cargo.

(5) (a) P&W and its designees may not schedule two (2) consecutive vessel arrivals if such arrivals interfere with another user's use of the berth, without the prior written consent of such other party, such consent not to be unreasonably withheld.

(b) If a user's scheduled vessel arrives within 24 hours of the date and time, nominated by ten (10) days' notice as provided under subParagraph (a) (2) of this Paragraph 4, then the vessel shall remain at the berth no longer than seventy-two (72) hours maximum (measured from the completion of all lines fast) if there is a scheduled vessel of another user waiting to transfer its

cargo.

(c) A scheduled vessel which arrives more than 24 hours after the date and time, nominated by ten (10) days' notice as provided under subParagraph (a) (2) of this Paragraph 4, shall be treated as an unscheduled vessel.

(d) Unscheduled vessels may berth so long as there is no waiting, scheduled vessel. Upon arrival of a scheduled vessel, the unscheduled vessel then must vacate the berth.

(e) Any user which fails to abide by any of the above provisions shall hold each other party harmless and indemnify each other party and other user from and against any loss, cost, damage, expense, liability, judgment, award or decision which results from or which is incurred in connection with any such failure.

5. <u>PIER OPERATING PROCEDURE</u>. (a) Each user will cooperate with each other in connection with the conduct of operations at the Pier so as to assure as far as possible that no user will be subjected to expense or inconvenience arising from delay of any kind.

(b) Each user will arrange for pilots, tugs, and other requirements to move its vessels into and out of berth. Each user agrees to abide by such maximum berthing velocities and other speed limitations as may be required at any time due to circumstances at the Pier.

(c) Tankers or other vessel which in accordance with industry practice require tugboat assistance may not dock or undock under their own power but must be assisted by tugboats in approaching and leaving the Pier except under extraordinary conditions when tugboats are not available.

(d) Each user will arrange for personnel needed to handle lines for tying up its vessel to the Pier and when applicable, to hook up hoses on the Pier for discharge or receipt of cargo, and to strip and disconnect hoses and lines on the Pier following discharge or receipt of cargo.

(e) When applicable, each user will furnish personnel for performing the following

functions in connection with loading or unloading its vessels:

(1) Establish order of pumping in discharge or receipt of cargo.

(2) Gauging and sampling of vessel tanks and checking water bottoms.

(3) Analysis of samples.

(4) Ascertain that the vessel is physically ready to discharge cargo, checking sea cocks, hose connections, shore valves and related equipment.

(5) Provide dock watch during entire loading or unloading operation, and take line samples and maintain records in accordance with normal industry practices.

(f) Except for losses due to acts or omissions of another user, or those of such other users' agents, employees or contractors, each user during loading or unloading will be responsible for its product losses.

(g) Each user will prepare and handle all vessel and cargo documents and attend to all other paper work required in connection with vessel loadings and unloadings.

(h) Each user will be responsible for compliance with all applicable laws and regulations relating to its own operations.

(i) It shall be the responsibility of each user to use the Pier in such manner as not to cause damage other than normal wear and tear. In the event damage is done to the Pier as a result of a particular user's use of same, P&W shall, as soon as possible after obtaining knowledge of such damage, inspect the damage and provide written notice to the user allegedly causing the damage, including a report of such inspection and an estimate of the cost of the repairs necessary to correct such damage. The user so notified shall have five (5) business days to notify P&W whether it will promptly pursue such repairs to completion; in the event the user chooses to effect such repairs, it shall immediately commence such repairs and complete same expeditiously. In the

event the user does not agree to expeditiously effect such repairs, P&W shall effect such repairs and bill the user for the total cost of such repairs. In the event the user does not agree that its use caused the damage, P&W shall effect such repairs and the cause of the damage will be arbitrated pursuant to Paragraph 17 of this Agreement or in accordance with the provisions of the Wilkesbarre Agreement or any other agreement applicable to the other users. Except for a user's obligation as determined under this subParagraph as between Getty and P&W and subject to the provisions of Paragraph 10 hereof, P&W will be responsible for the repair and maintenance of the Pier and Getty shall have no such obligation.

6. INDEMNIFICATION. Getty agrees with respect to its own acts or omissions and those of its employees, agents or contractors to defend, indemnify and hold harmless P&W from any and all claims, suits, liabilities, losses, costs and expenses sustained by or asserted against such other parties for or in connection with:

(a) fines or penalties imposed by any governmental authorities, as well as damages to any third parties not signatories to this Agreement (whether private or public), resulting from spills into or other contaminations of the water, groundwater, or soil at the Pier; or

(b) Injuries, death, loss and damage of any kind or character to persons or property by whomsoever suffered or asserted, including Getty's employees, agents or contractors

resulting from or arising out of said acts or omissions of Getty, its employees, agents, or contractors or suffered or asserted by Getty's employees, agents or contractors as a result of the condition of the Pier, Getty shall defend, indemnify and hold harmless P&W from any and all claims, suits, liabilities, losses, costs and expenses sustained by or asserted against P&W for or in connection with any loss of, or damage to vessels, their equipment, cargo, freight and other interest on board; loss of or damage to any other property of others incurred at the Pier; liability occasioned by the

discharge, dispersal, release, or escape of smoke, vapors, soot, fumes, alkalis, toxic chemicals, liquids or gases, waste materials, oil or other petroleum substances or derivative (including any oil refuse or oil mixed wastes), or other irritants, contaminants or pollutions into or upon land, the atmosphere, or any water course or body of water, which such claims, suits, liabilities, losses, costs or expense are occasioned by Getty's use of the Pier, and regardless of the cause of such loss, damage, injury or liability.

7. WATER/AIR POLLUTION CONTROL. Each user will comply with all laws, rules, and regulations relating to water or air pollution and will, in the case of an escape or discharge of products or materials from on or around the Pier or land contiguous to the Pier while such user is making use of the Pier, promptly take whatever measures are necessary to prevent pollution damage from thereby arising and to mitigate any such damage. Each user experiencing such escape or discharge shall notify P&W and the other users immediately of such escape or discharge but in no event shall such notice be delivered later than forty-eight (48) hours from the first indication of any escape or discharge of products or materials. P&W agrees that this provision will be contained in any throughput or similar agreement with any third party(s).

8. INSURANCE. During the term of this Agreement, the parties shall, each at its own expense, carry comprehensive general liability insurance, and Getty will also carry a Marine Terminal Insurance Policy, including, without limitation, coverage for contractual liability, and sudden and accidental pollution liability insurance policy for its terminal, with an endorsement for Wharfinger's coverage to protect against the risk of loss or damage to vessels, other equipment, cargo, freight and other interests on board; the property of others, liability to others for personal injury or property damages; and liability occasioned by the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, alkalis, chemicals, liquids or gases, waste materials, oil or other petroleum substances or derivatives (including any oil refuse or oil mixed waste), or other irritants, contaminants or pollutants into or upon land, the atmosphere, or any water course or body of water. Such coverage

shall insure each party and name the other parties as additional insureds for injury and death to persons and damage to property arising out of the operations of each hereunder. Such coverage shall be in an amount not less than Five Million Dollars ($5,000,000) combined single limit per occurrence, except for coverage for pollution liability, which shall be in an amount not less than Ten Million Dollars ($10,000,000) combined single limit per occurrence. Prior to the inception of this Agreement, or any renewal hereof, each party shall provide the other parties with certificates of insurance evidencing the issuance of the required policies and stating that they are in force and that such policies will not be canceled or materially changed without thirty (30) days' prior written notice to the other parties. Such insurance policies shall be obtained from companies reasonably satisfactory to the parties with an a.m. Best rating of A or better. As between Getty and P&W, P&W shall bear the cost of property insurance and any other insurance which it may elect to carry.

9. <u>ASSIGNABILITY</u>. This Agreement will be binding upon and shall inure to the benefit of the successors and assigns of the parties hereto. No party will assign its interest in this Agreement or any of its rights or obligations hereunder without the prior written consent of the other party; provided, however, that notwithstanding any other provision in this Paragraph 9 to the contrary, a party may assign this Agreement without consent to (a) its parent corporation or to one or more of its own corporate affiliates, (b) the successor of all or substantially all of its business and assets, or (c) a corporation which either party may merge into or be consolidated with; and further provided, however, that such assignment (including assignments under subParagraphs (a), (b) or (c) above) will not relieve the assignor of any of its obligations hereunder. Notwithstanding the foregoing, either party may assign its interest hereunder to its successor in interest, in the case of P&W, to the Pier, and in the case of Getty, to its terminal, provided that such successor assumes all of the assignor's obligations hereunder. Any attempted assignment prohibited by this Paragraph 9 will be void and without effect and will be grounds for termination of this Agreement.

10. FORCE MAJEURE. No party will be responsible for damages caused by delay or failure to perform its obligations in whole or in part hereunder if such delay or failure is attributable to a storm, flood, or other act of God; strike, lockout or other labor dispute; riot; civil disorder; explosion; fire; act of or compliance with an order or rule or regulation of any governmental authority; sabotage; accident; breakdown; delay in transportation; or other cause beyond the control of the affected party whether or not similar to those enumerated above, or in the case of P&W, a failure in any component of the Pier structure, all of which will be considered events of force majeure. Any of the foregoing shall apply to events occurring at the Pier, the pipelines, or at Getty's terminal. It is understood and agreed that the settlement of any strike, lockout, or other labor dispute will be entirely within the discretion of the party involved in such dispute. P&W and Getty will make all reasonable efforts to remove the event of force majeure or mitigate its effect provided that P&W shall not be obligated to repair a failure of a component of the Pier, and the term of the Agreement will be extended for a period of time equal to the length of the interruption caused by the event of force majeure; however, in no event will such period of extension be for more than six (6) months. If an event of force majeure continues for a period of more than six (6) consecutive months or in the event P&W has given Getty notice of the failure of a component of the Pier and its intentions not to repair such component within a reasonable time frame, any party shall have the right to terminate this Agreement on ninety (90) day's prior written notice. Getty shall only be relieved of its obligation to make minimum monthly throughput payments (or prorated portion thereof), during force majeure period as a result of which the Pier is physically unavailable or incapable of loading or unloading of Getty's petroleum products, and the annual minimum throughput fee shall be reduced accordingly. Getty shall not otherwise be relieved of its obligation to make minimum monthly throughput payments. During a force majeure period where storage and/or throughput capability is inadequate, P&W shall allocate capacity equitably among all users but Getty shall have preference over any users who did not have contract rights on the date hereof.

11. NOTICE. Except as otherwise specifically provided above, any notice, demand or other communication required or permitted to be sent to P&W and Eder under the terms and conditions of this Agreement, will be sufficient if personally served or if posted by certified United States mail addressed to:

Providence & Worcester Railroad Company
75 Hammond Street
Worcester, Massachusetts 01610;
Attention: Vice President

or to such substitute address as may from time-to-time be designated in writing. Any notice, demand or other communication required or permitted to be sent to Getty under the terms and conditions of this Agreement will be sufficient if personally served or if posted by certified United States mail, addressed to:

GETTY TERMINALS CORP.
125 Jericho Turnpike
Jericho, New York 11753
Attn: Mr. Paul J. Stendardi

or to such substitute address as may from time-to-time be designated in writing.

All notices served pursuant to this section will be deemed received upon personal service or 96 hours after posting.

12. WAIVER. No waiver by Getty or P&W of any default of the other and no delay in exercising any right or remedy under this Agreement will operate as a waiver of any future default whether of like or different character or preclude any future exercise of such right or remedy.

13. DEFAULT AND TERMINATION. The following will constitute events of default hereunder:

A. Failure to comply fully with any of the terms or conditions hereof;

B. Any breach of a representation or warranty hereunder; or

C. Adjudication of insolvency or bankruptcy under any insolvency or bankruptcy law or an assignment for the benefit of credits or appointment of receiver of

a party or of its assets.

Except for payment default which shall occur on the tenth (10th) day after nonpayment from receipt of invoice and notice of default, the defaulting party will have thirty (30) days to cure a default under clause A. or B. following receipt of written notice from the nondefaulting party. If such default is not cured within said thirty (30) day period, the nondefaulting party will have the right to terminate this Agreement by written notice; provided, however, that any such termination by P&W due to Getty's default shall not relieve Getty of its obligations to make all the minimum payments set forth in Paragraph 2 hereof, it being the intention of P&W and Getty that Getty will be obligated hereby for such payments regardless of its actual use of the Pier, except in the event of applicable force majeure provisions of Paragraph 10 hereof. Unpaid amounts shall bear interest at the prime rate in effect at the time of the payment default.

14. WHOLE AGREEMENT. This Agreement, including all attachments, embodies the whole Agreement of the parties and supersedes any and all previous written or oral agreements between the parties and their predecessors in interest.

15. GOVERNING LAW. This Agreement shall be governed by the laws of the State of Rhode Island.

16. MODIFICATION. This Agreement may be amended or supplemented only by a writing signed by all of the parties hereto.

17. ARBITRATION. (a) Any controversy or claim arising out of or relating to this Agreement or the breach thereof may be settled by the submission of the issue to a panel of three arbitrators for determination. This determination shall be made in accordance with the Rules of the American Arbitration Association, and judgment upon the award rendered may be entered in any court having jurisdiction thereof.

The arbitrators will be selected from a list of arbitrators obtained from the American Arbitration Association. Each party or parties on opposite sides of the controversy or claim will

appoint an arbitrator, and these two arbitrators shall select a third, impartial arbitrator. Failing such selection within three (3) working days, either party or parties involved in the controversy may apply to the American Arbitration Association for appointment of a third arbitrator.

The award shall be by at least two of the three arbitrators. Except as herein otherwise provided each party shall bear the expenses of its own witnesses and of the arbitrator it designates. Other costs and expenses of the arbitrator, including the compensation of a third, impartial arbitrator and stenographic expenses, if any, shall be borne equally by the party or parties on opposite sides of the controversy or claim.

(b) Any party (e.g., Getty) to a proposed arbitration proceeding shall have the right to designate New York City as the site for the proceeding, provided that such designation is communicated to the other party or parties involved prior to the selection of the third, impartial arbitrator.

(c) It is understood and agreed, however, that proposals to add to or subtract from or change this Agreement shall not be arbitrable and that no proposal to modify, amend or terminate this Agreement, as well as any matter or subject arising out of and in connection with such proposals, may be referred for arbitration under this Section.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

PROVIDENCE AND WORCESTER RAILROAD COMPANY

ATTEST:

Heidi J. Eddins

By: ~~By~~ Orville R. Harrold
President

DATE: 12/19/97

ATTEST:

[signature]

Vice President and Secretary

DATE: 12/15/97

GETTY PETROLEUM MARKETING INC.

By: ____________________

By: [signature]

VINCENT DE LAURENTIS President

EXHIBIT B
FIRST AMENDMENT
TO
OPERATING AGREEMENT (FOR USE OF PIPELINES)

First Amendment to Operating Agreement (For Use Of Pipelines) made this 5th day of December, 1997, between Getty Realty Corp., a Delaware corporation, [hereinafter called "Getty Realty"] and Michael I. Frankel and Linda Eder, Trustees under Agreement dated 6/22/82 [hereinafter called Trustees"].

W I T N E S S E T H:

WHEREAS, Getty Oil Company (Eastern Operations), Inc. [hereinafter called "Getty Oil (Eastern)"] and Robert H. Eder [hereinafter called "Eder"] on August 6, 1975 entered into an agreement entitled "Operating Agreement (For Use Of Pipelines)" [hereinafter called "Operating Agreement"]; and

WHEREAS, Getty Realty and the Trustees desire to amend the Operating Agreement; and

WHEREAS, Getty Realty is successor in interest to Getty Oil (Eastern), Getty Refining and Marketing Company, and Texaco Refining and Marketing, Inc. in and to the Operating Agreement; and

WHEREAS the Trustees are successors in interest to Eder.

NOW, THEREFORE, in consideration of the mutual agreements set out hereinafter, and for other good and valuable consideration, Getty Realty and the Trustees agree that said Operating Agreement be amended as follows:

1. Wherever in the Operating Agreement the term "Getty Oil (Eastern)" is used, "Getty Realty" will be substituted in lieu thereof.

2. Wherever in the Operating Agreement the term "Eder" is used, "Trustees" will be substituted in lieu thereof.

3. Article "III. Taxes, Maintenance" is deleted in its entirety and in lieu thereof will be replaced by the following:

"III. Taxes, Maintenance

It shall be the responsibility of Getty Realty to maintain said pipelines and related facilities in good order and repair and pay the costs thereof. Getty Realty shall be advised immediately when repairs are needed and Getty Realty will secure a contractor to make such repairs as are required. Getty Realty shall also be responsible for administering the over all maintenance of the pipelines. Pipeline maintenance shall include:

(1) Repair and/or replacement in kind of any part or all of the original pipeline system.

(2) Repair and maintenance of the Cathodic Protection System.

(3) Real Estate and all other taxes applicable to the pipelines and/or to the operation of same.

(4) Utility charges for operation of the Cathodic Protection equipment or any other equipment required for the maintenance and operation of the pipelines.

(5) The cost of compliance with all City, State, or Federal regulations applicable to the operation of the pipelines.

(6) Any other charges reasonably incurred in order to maintain the pipelines in good working order.

Provided, however, that if a repair or replacement to the pipeline system is required and such repair or replacement has a cost in excess of $25,000 (in 1997 dollars), as adjusted annually hereafter by changes in the Consumer Price Index for Urban Wage Earners and Clerical workers (CPI-W), all items index, (1982-84=100), then Trustees shall reimburse Getty Realty on a proportionate use bases for such repair or replacement costs based on the proportionate usage of Getty Realty and Trustee measured by the total volumes in the pipelines (in barrels) in the calendar year preceding the year in which the repair or replacement is required.

The covenants and provisions of this Fourth Amendment to the Grant and Agreement shall extend to and be binding upon the parties hereto and their heirs, successors and assigns.

WITNESS:

GETTY REALTY CORP.

By: ______ President

WITNESS:

MICHAEL I. FRANKEL AND LINDA EDER,

MICHAEL I. FRANKEL

LINDA EDER

STATE OF NEW YORK )
) SS.
COUNTY OF Nassau )

On this 15th day of December, 1997, before me personally appeared Leo Liebowitz, to me personally known, who being by me duly sworn says that such person is President of Getty Realty Corp., that the foregoing instrument was signed on behalf of said corporation by authority of its board of directors, and such person acknowledged that the execution of the foregoing instrument was the free act and deed of said corporation.

Notary Public

My commission expires:

CHRISTINE FITTER
Notary Public, State of New York
No. 4948579
Qualified in Suffolk County
Certified in Nassau County
Commission Expires March 20, 1999

STATE OF NEW YORK )
) SS.
COUNTY OF NEW YORK)

On this _____ day of December, 1997, before me personally appeared Michael I. Frankel, to me personally known, who being by me duly sworn says that he is a Trustee u/a dated June 22, 1982, that the foregoing instrument was signed on behalf of said Trust and that the execution of the foregoing instrument was the free act and deed of said Trust.

_______________________
Notary Public

My commission expires:

STATE OF FLORIDA )
) SS.
COUNTY OF MARTIN )

On this 22nd day of December, 1997, before me personally appeared Linda Eder, to me personally known, who being by me duly sworn says that she is a Trustee u/a dated June 22, 1982, that the foregoing instrument was signed on behalf of said Trust and that the execution of the foregoing instrument was the free act and deed of said Trust.

Helen Fernandez
Notary Public

My commission expires:

NOTARY PUBLIC STATE OF FLORIDA
HELEN FERNANDEZ
My Comm Exp. 6/07/98
Bonded By Service Ins
No. CC379998
[✓] Personally Known [ ] Other I.D.

EXHIBIT C
FOURTH AMENDMENT
TO
GRANT AND AGREEMENT

Fourth Amendment to Grant and Agreement made this 5th day of December, 1997 between Getty Realty Corp., a Delaware corporation, [hereinafter called "Getty Realty"] and Michael I. Frankel and Linda Eder, Trustees under Agreement dated 6/22/82 [hereinafter called "Trustees"].

WITNESSETH

WHEREAS, Getty Oil Company (Eastern Operations), Inc. [hereinafter called "Getty Oil (Eastern)"] and Robert H. Eder[hereinafter called "Eder"] on August 6, 1975 entered into an agreement entitled "Grant and Agreement", recorded in Land Evidence Records of the City of East Providence, Rhode Island in Book 302, Page 373; and

WHEREAS, said agreement was amended on June 9, 1976 by "Amendment to Grant and Agreement" , recorded in said Land Evidence Records in Book 312, Page 122; and

WHEREAS, said agreement was further amended on November 6, 1980 by "Second Amendment to Grant and Agreement", recorded in said Land Evidence Records in Book 429, Page 154; and

WHEREAS; said agreement was further amended on January 29, 1985 by "Third Amendment to Grant and Agreement", recorded in said Land Evidence Records in Book 560, Page 183; and

WHEREAS, Getty Realty and the Trustees desire to further amend said agreement.

NOW, THEREFORE, in consideration of the mutual agreements set out hereinafter, and for other good and valuable consideration, Getty Realty and the Trustees agree that said Grant and Agreement shall be and is hereby further amended by the following:

1. Whenever in the Grant and Agreement, as amended, the terms "Getty", "Getty Oil (Eastern)", and "GRMC" are used, "Getty Realty" will be substituted in lieu thereof.

2. Whenever in the Grant and Agreement, as amended, the term "Eder" is used, "Trustees" will be substituted in lieu thereof.

3. Sections 5 and 13 of the Grant and Agreement are deleted in their entirety.

4. A new paragraph is added at the end of Section 14 of the Grant and Agreement to read as follows:

> "This right of Getty Realty to convey to the Trustees will also include the right to convey only one of the two existing pipelines, instead of both of the existing pipelines. Any such partial conveyance of a single pipeline must include that portion of the interest of Getty Realty in the easement and easement area necessary for the Trustees to use, repair and maintain said single pipeline. Any such partial conveyance shall be in accordance with and under the terms and conditions of the first paragraph of this Section 14".

5. Under Section 15 of the Grant and Agreement notices shall be addressed as follows:

To Getty Realty: Getty Realty Corp.
125 Jericho Turnpike
Jericho, NY 11753
ATTN: ____________________

To the Trustees: Michael I. Frankel and
Linda Eder, Trustees
3601 SE Ocean Blvd.,
Suite 203
Stuart, FL 34996

The covenants and provisions of this First Amendment to the Operating Agreement shall extend to and be binding upon the parties hereto and their heirs, successors and assigns.

WITNESS:

GETTY REALTY CORP.

By: ______________________
Leo Liebowitz, President

WITNESS:

MICHAEL I. FRANKEL AND LINDA EDER
Trustees under Agreement
dated June 22, 1982

______________________
MICHAEL I. FRANKEL

______________________
LINDA EDER

STATE OF NEW YORK )
) SS.
COUNTY OF Nassau )

On this 15th day of December, 1997, before me personally appeared Leo Liebowitz, to me personally known, who being by me duly sworn says that such person is President of Getty Realty Corp., that the foregoing instrument was signed on behalf of said corporation by authority of its board of directors, and such person acknowledged that the execution of the foregoing instrument was the free act and deed of said corporation.

______________________
Notary Public

My commission expires:

CHRISTINE FITTER
Notary Public, State of New York
No. 4948579
Qualified in Suffolk County
Certified in Nassau County
Commission Expires March 20, 1999

STATE OF NEW YORK )
) SS.
COUNTY OF NEW YORK)

On this _____ day of December, 1997, before me personally appeared Michael I. Frankel, to me personally known, who being by me duly sworn says that he is a Trustee u/a dated June 22, 1982, that the foregoing instrument was signed on behalf of said Trust and that the execution of the foregoing instrument was the free act and deed of said Trust.

______________________
Notary Public

My commission expires:

STATE OF FLORIDA )
) SS.
COUNTY OF MARTIN )

On this 22nd day of December, 1997, before me personally appeared Linda Eder, to me personally known, who being by me duly sworn says that she is a Trustee u/a dated June 22, 1982, that the foregoing instrument was signed on behalf of said Trust and that the execution of the foregoing instrument was the free act and deed of said Trust.

Helen Fernandez
Notary Public

My commission expires:

NOTARY PUBLIC STATE OF FLORIDA
HELEN FERNANDEZ
My Comm Exp. 6/07/98
Bonded By Service Ins
No. CC379998
[✓] Personally Known [ ] Other I.D.

Getty

EXHIBIT D

GETTY REALTY CORP. • 125 JERICHO TURNPIKE • JERICHO, NY 11753 • (516) 338-6000

Via Certified Mail
Return Receipt Requested

December 15, 1997

Michael I. Frankel and Linda Eder, Trustees
under Agreement dated 6/22/82
c/o Helen Fernandez (the "Eder Trust")
Suite 203
3601 S. E. Ocean Boulevard
Stuart, Florida 34996

Re: Pipelines and Easement

Dear Ms. Fernandez:

By letter dated October 1, 1997 Getty Realty Corp. ("Getty") gave notice to the Trustees of the Eder Trust that Getty would transfer all of its interest in the pipelines and easement to the Trustees on or prior to its withdrawal from the Amended and Restated Wilkesbarre Pier Operating Agreement dated January 1, 1991.

By letter dated October 6, 1997 you agreed to accept Getty's interest in the pipelines and easement pursuant to paragraph 14 of the Grant and Agreement dated August 6, 1975 ("Grant").

Getty now desires to withdraw its notice of tender and we understand that the Trustees are agreeable to such withdrawal. Therefore, Getty hereby rescinds its notice to transfer its interest in the pipelines and easements to the Trustees.

Please be further advised that Getty will not assert a claim pursuant to the Grant for reimbursement for property taxes or repair and maintenance costs incurred prior to the date hereof.

Very truly yours,
GETTY REALTY CORP.

LEO LIEBOWITZ
President

Agreed to and accepted
as of this 22 day of
December, 1997

Michael I. Frankel and Linda Eder, Trustees
under Agreement dated 6/22/82

By: Helen Fernandez
Helen Fernandez, Duly Authorized Agent