# EXHIBIT S

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

GETTY PETROLEUM MARKETING INC.
and GETTY PROPERTIES CORP.,
Plaintiffs,

v.

CAPITAL TERMINAL COMPANY,
Defendant.

C.A. No. 00-381 ML

## SECOND AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

This is an action seeking injunctive relief and a declaration from the court of the parties' rights and obligations under certain agreements entered into as a result of the fraudulent misrepresentations of the agent of Defendant's predecessor-in-interest.

## THE PARTIES

1. Getty Properties Corp. ("Getty Properties") is a corporation duly organized under the laws of Delaware with its principal place of business at 125 Jericho Turnpike, Jericho, New York and is, by changes in name, a successor-in-interest to Getty Petroleum Corp. and Getty Realty Corp. (Del). Getty Properties is a wholly owned subsidiary of Getty Realty Corp., a Maryland corporation which is listed on the New York Stock Exchange and is in the business of owning and leasing real estate.

2. Getty Petroleum Marketing Inc. ("Getty Petroleum Marketing") is a corporation duly organized under the laws of Maryland, with its principal place of business at 1500 Hempstead Turnpike, East Meadow, New York. Getty Petroleum Marketing is in the business of leasing and operating terminals and service stations in thirteen (13) states including Rhode

RECEIVED
AUG 2 2 2002
By________

Island. Getty Petroleum Marketing leases the majority of its terminals from Getty Properties including a terminal located in East Providence, Rhode Island.

3. Capital Terminal Company ("Capital Terminal") is a corporation duly organized under the laws of the State of Rhode Island, with its principal place of business located at 100 Dexter Road, East Providence, Rhode Island. Upon information and belief Capital Terminal is in the business of owning and operating petroleum storage facilities in the City of East Providence, Rhode Island and is a wholly owned subsidiary of Capital Properties, Inc., a publicly-owned corporation ("Capital Properties"). Upon information and belief, Capital Terminal is a successor-in-interest to certain rights and interests of the Providence and Worcester Railroad Company ("P&W"), another publicly held corporation, including all rights affecting the Wilkesbarre Pier and all those rights at issue in this lawsuit.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 32(a)(1) in that there is diversity of citizenship between the parties and the amount in controversy exceeds the sum of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

5. Venue is proper in this district pursuant to 28 U.S.C. § 3191(a)(2) in that the Defendant is incorporated in this jurisdiction and a substantial portion of the events giving rise to the claims asserted herein including the location of the property in question occurred in this jurisdiction.

## DESCRIPTION OF FACTS GIVING RISE TO THESE CLAIMS

6. The subject of this dispute is the rights and obligations of the Parties with respect to a pier and berthing facility located in the Seekonk River in the city of East Providence, Rhode Island, otherwise known as the Wilkesbarre Pier (the "Pier"). The Parties and their predecessors-

in-interest have owned, had interest in, and/or utilized the Pier since approximately 1941. Getty Properties acquired its terminal and the right to use the Pier in 1985 from Texaco Inc. The Pier is presently owned and operated by Capital Terminal subject to property rights vested in other parties.

7. Getty Petroleum Marketing and Capital Terminal operate terminals for the receiving and distribution of petroleum products within several miles of the Pier. The terminals are connected to the Pier by two (2) pipelines (the "Petroleum Pipelines"). One pipeline is dedicated to transporting distillates and the other gasoline.

8. In 1975 Getty Properties' predecessor-in-interest conveyed to P&W its 2/5 ownership in the Pier pursuant to an Agreement dated August 6, 1975 and a Deed and Conveyance (hereinafter collectively referred to as the "1975 Agreement and Deed of Conveyance"). A copy of the 1975 Agreement and Deed of Conveyance is attached hereto as Exhibit A. The 1975 Agreement and Deed of Conveyance explicitly provides that Getty Properties' predecessor-in-interest reserves to itself in the Deed and Conveyance "the right to erect, replace, use and maintain its pipelines and equipment appurtenant thereto on the northerly side of said Wilkesbarre Pier ... and the right to have the free and uninterrupted use of the berth on the northerly side of said pier for the delivery of petroleum products and other merchandise used in connection with its petroleum products business. Pursuant to another agreement signed at that time (the "1975 Pipeline Operating Agreement") Robert H. Eder ("Eder"), as owner, assumed responsibility for the overall maintenance of the Pier and Getty Properties reserved the right to erect and use Petroleum Pipelines on and running from the Pier. Getty Properties' predecessor-in-interest agreed to maintain such Petroleum Pipelines in good working order and to assume the cost of expenses associated with the Petroleum Pipelines including the cost of

compliance with all City, State and Federal regulations. (Section III, 5). In this Agreement Eder agreed to pay a proportionate share of all pipeline maintenance expenses. A copy of the 1975 Pipeline Operating Agreement is attached as Exhibit B.

9. Also in 1975 Getty Properties' predecessor-in-interest and Eder executed a Grant and Agreement with respect to the Pier and the construction of the Petroleum Pipelines (the "1975 Grant and Agreement"). In the 1975 Grant and Agreement, Getty Properties' predecessor-in-interest agreed to build two sixteen inch (16") Petroleum Pipelines running from terminals in Phillipsdale, Rhode Island to the Pier. A copy of the 1975 Grant and Agreement is attached as Exhibit C.

10. On June 1, 1977, a representative of Getty Properties' predecessor-in-interest wrote to Eder and noted that while the Petroleum Pipelines had been constructed the pipelines located on the Pier itself had not yet been replaced. Getty Properties' predecessor-in-interest therein agreed to repair and/or replace said pipelines located on the Wilkesbarre Pier with 16" pipelines "if and when necessary at our sole cost expense." (emphasis added) A copy of the letter of G.W. Druckenmiller to Robert H. Eder, dated June 1, 1977 which was subsequently appended to the Second Amendment of the Grant and Agreement as described below, is attached as Exhibit D.

11. The 1975 Grant and Agreement was subsequently amended on four separate occasions. The First Amendment of the Grant and Agreement took place on June 9, 1976 (the "First Amendment to Grant and Agreement"). The First Amendment to Grant and Agreement is attached as Exhibit E. The Second Amendment to the Grant and Agreement took place on November 6, 1980 (the "Second Amendment to Grant and Agreement") with a copy of the letter of G.W. Druckenmiller to Robert H. Eder, dated June 1, 1977 appended. A copy of the Second

Amendment to Grant and Agreement is attached as Exhibit F. The Third Amendment to the Grant and Agreement took place on January 29, 1985 (the "Third Amendment to Grant and Agreement"). A copy of the Third Amendment to Grant and Agreement is attached as Exhibit G. The Fourth Amendment to the Grant and Agreement took place on December 15, 1997 (the "Fourth Amendment to Grant and Agreement"). A copy of the Fourth Amendment to Grant and Agreement is attached as Exhibit H.

12. In January of 1991, Getty Properties' predecessor in interest, Union Oil Company ("Unocal"), Capital Properties and P&W entered into an Amended and Restated Operating Agreement (the "1991 Pier Operating Agreement") with respect to the Pier. A copy of the 1991 Pier Operating Agreement is attached as Exhibit I. The 1991 Pier Operating Agreement amended and restated an earlier agreement dated June 12, 1985 (the "1985 Pier Operating Agreement").

13. The 1991 Pier Operating Agreement provided that P&W was responsible for administering the overall maintenance of the Pier and that the other parties to the 1991 Agreement would pay for the repairs on a pro-rata basis determined by actual usage.

14. In September of 1996, P&W sent a report prepared at P&W's request by the Pare Engineering firm to each of the parties to the 1991 Pier Operating Agreement. This report contained a list of Priority Repair Items which identified more than $1,000,000 worth of repairs that needed to be done to the Pier (the "Priority Repair List"). P&W said they "would like to commence the agreed upon repairs as soon as possible." In this letter P&W also announced that "we intend to commence with Item 6, maintenance dredging of the berth and Item 9, individual repairs under $10,000 each." A true copy of the Priority Repair List is attached as Exhibit J. At

the time, Getty Properties' predecessor in interest was the primary user of the Pier and therefore responsible for the greatest proportion of repair costs.

15. Instead of repairing the Pier itself, P&W began to perform other work, such as dredging. Dredging was not necessary for the operations of Getty Properties predecessor in interest at the Pier because Getty Petroleum Marketing and its predecessor in interest relied entirely on barges for the delivery of its petroleum products. Barges do not draw as much water as oil tankers and therefore do not need as deep a channel to dock at the Pier.

16. Although dredging was done solely for the benefit of other prospective parties who <u>might</u> contract with P&W to use the Pier to unload their petroleum products and who <u>might</u> need a deeper channel, P&W insisted that Getty Petroleum Marketing, as the principal user of the Pier after March of 1997, pay the cost of this work.

17. By letter of Paul J. Stendardi, dated June 17, 1997, Getty Petroleum Marketing complained that, as the principal user of the Pier, Getty Petroleum Marketing had no need to dredge and that it was being unfairly taken advantage of by P&W who proposed incurring dredging costs and passing them on to Getty Petroleum Marketing while other Priority Repair Items were not being addressed. Getty Petroleum Marketing refused to consent to the proposed dredging operations or to pay for work which would not in any way benefit Getty Petroleum Marketing. A true copy of the letter of Paul J. Stendardi dated June 17, 1997 is attached as <u>Exhibit K</u>.

18. In 1997 P&W filed a claim with the American Arbitration Association claiming that Getty Properties' predecessor in interest had breached the 1991 Pier Operating Agreement by refusing to pay for necessary repairs. In that proceeding, to support its claim that certain repairs were "imminently necessary," P&W submitted with its brief the 1996 Priority Repair List

(Exhibit J) and argued that the Pier needed major maintenance and repairs immediately. Getty Properties contended that the Pier was beyond its useful life and incapable of being repaired, and tendered a notice of withdrawal from the 1991 Pier Operating Agreement.

19. On October 1, 1997 Getty Properties gave notice that Getty Properties would transfer all of its interest in the Petroleum Pipelines and easement on the Pier to P&W prior to the effective date of the withdrawal from the 1991 Wilkesbarre Pier Operating Agreement.

20. On October 31, 1997, P&W's counsel, Heidi J. Eddins ("Ms. Eddins"), submitted to Getty Properties a detailed, long-term rehabilitation program for the Pier (the "P&W Rehabilitation Program"). The P&W Rehabilitation Program was a 10 year work plan including the very same repairs as outlined the September 1996 Priority Repair List. The total estimated cost of the repairs exceeded $1.6 million.

21. In her October 31, 1995 letter Ms. Eddins reiterated that "it is P&W's position that all priority repairs need to be accomplished now." (emphasis added) A copy of Ms. Eddins' October 31, 1995 letter is attached hereto and marked as Exhibit L.

22. On November 19, 1997, Ms. Eddins sent Getty Petroleum Marketing a detailed Maintenance Agreement and Work Plan. The Maintenance Agreement and Work Plan included all of the priority repairs that had been listed on the Priority Repair List and the October 31, 1997 P&W Rehabilitation Program, but provided that they would be completed even more quickly. The November 19, 1997 Plan provided for completion in five years. A true copy of the Heidi Eddins letter of November 19, 1997 with the proposed Maintenance Agreement is attached hereto as Exhibit M.

23. Eddins' November 19, 1997 letter also proposed that, to pay for the specified repairs, Getty Petroleum Marketing agree to pay a fee of five cents ($.05) for every barrel of

petroleum product it unloaded at the Pier during the five year period of the proposed maintenance plan. Eddins proposed minimum and monthly payments as follows:

| Year | | Minimum Annual Payment | Minimum Monthly Payment |
|---|---|---|---|
| 1998 | - | $185,000 | $15,417 |
| 1999 | - | $235,000 (includes a $50,000 additional assessment ("Additional Assessment") | $19,583 |
| 2000 | - | $235,000 (including a $50,000 Additional Assessment) | $19,583 |
| 2001 | - | $185,000 | $15,417 |
| 2002 | - | $185,000 | $15,417 |

24. Between November 19, 1997 and December 1997 Getty Properties, Getty Petroleum Marketing and P&W discussed settlement of the priority repair issues and the pending arbitration. Getty Properties was willing to retract its tender of the Pier pipelines to P&W, but wanted certainty about the repair costs that it would be assessed for using the Pier in the future. P&W stood by Eddins' November 19, 1997 letter as its statement of the repairs that would have to be made over the next five years and the estimated cost to complete them. Neither Eddins, Eder, nor any other representative of P&W indicated that P&W no longer believed immediate repairs to the Pier were needed. Getty Properties and Getty Petroleum Marketing relied on the many representations of P&W regarding its intention to implement the P&W Rehabilitation Program to make the repairs that P&W had described as "imminently necessary" and ones that "need to be accomplished now." The earlier concerns of Getty Properties and Getty Petroleum Marketing were satisfied regarding the long-term use of the Pier.

25. On December15, 1997 Getty Properties, Getty Petroleum Marketing and P&W entered into a settlement agreement resolving the arbitration ("the 1997 Settlement Agreement"). The 1997 Settlement Agreement recited that "a dispute has arisen regarding the nature and extent

of repairs required to be done at the Wilkesbarre Pier" and that "P&W started arbitration proceedings in accordance with the ... Agreement to resolve such dispute." The 1997 Settlement Agreement further stated "... the parties have agreed to resolve the dispute by the execution of a Throughput Agreement between P&W and Getty Petroleum Marketing Inc. ... and by payment of its share of the 1997 pier maintenance costs." A copy of the 1997 Settlement Agreement, with attachments, is attached hereto as Exhibit N.

26. The Throughput Agreement between P&W and Getty Petroleum Marketing (the "Throughput Agreement") established a payment of five cents ($.05) for every barrel of petroleum product unloaded by Getty Petroleum Marketing at the Pier. The Throughput Agreement also imposed minimum annual fees and monthly payments identical to those outlined in P&W's November 19, 1997 proposal (Exhibit M) as follows:

| Year | | Minimum Annual Fee | Minimum Monthly Payment |
|---|---|---|---|
| 1998 | - | $185,000 | $15,417 |
| 1999 | - | $235,000 | $19,583 (plus $50,000 in December) |
| 2000 | - | $235,000 | $19,583 (plus $50,000 in December) |
| 2001 | - | $185,000 | $15,417 |
| 2002 | - | $185,000 | $15,417 |

A true copy of the Throughput Agreement is attached as Exhibit O. Getty Petroleum Marketing believed, based on the representations of P&W that P&W had agreed to and intended to make, the "imminently necessary" repairs which P&W had previously identified. The Throughput Agreement expressly provided that P&W would be responsible for the "repair and maintenance of the Pier" and relieved Getty of any such obligation.

27. On January 27, 1998, six weeks after the Settlement Agreement, Eder, a principal of both P&W and Capital Properties reported to the Capital Properties' Board of Directors that

the dispute with the Getty entities had been settled and that, pursuant to the settlement agreement, "Getty had withdrawn from the Wilkesbarre Pier Operating Agreement, but was obligated over the next five (5) years to make a stream of minimum payments against a gallonage charge for use on the Pier facilities." Eder further told the Board that "the Providence and Worcester Railroad Company was under no obligation to effect repairs to the Pier and that in his opinion the pier could still be operated without substantial repair costs." A true copy of the Redacted Minutes of the meeting of the Board of Directors of Capital Properties, Inc. on January 27, 1998 is attached as Exhibit P.

28. Between January of 1998 and the date of this Amended Complaint, Getty Petroleum Marketing has paid all fees due under the Throughput Agreement, totaling in excess of Nine Hundred Thousand Dollars.

29. Meanwhile, Capital Terminal, despite the clear language of the Throughput Agreement in which it states that "P&W will be responsible for the repair and maintenance of the Pier and Getty will have no such obligation", has failed to make the repairs it asserted were imminently necessary in 1997 and has claimed to have no obligation whatsoever for repair and maintenance at the Pier in violation of the plain language of the Throughput Agreement.

30. As part of the 1997 Settlement Agreement, Getty Properties withdrew the notice of tender of the Petroleum Pipelines. Also, at the same time, Getty Properties entered into the First Amendment to the original 1975 Pipeline Operating Agreement with Eder's successor Trustees (the "1997 Amended Pipeline Operating Agreement") regarding the use and maintenance of the Petroleum Pipelines. Again, just as it had in the 1975 Pipeline Operating Agreement, Getty Properties agreed to maintain the Petroleum Pipelines in good working order and to assume the cost of expenses associated with the maintenance of the Petroleum Pipelines,

including the cost of compliance with all City, State and Federal regulations pertaining to the Petroleum Pipelines. Getty Properties' obligations with respect to tine Petroleum Pipelines extended only to those repairs, which were less than $25,000. It was agreed by the parties that those repairs which exceeded $25,000 would be shared on a proportionate basis. A copy of the 1997 Amended Pipeline Agreement is attached as Exhibit Q.

31. Effective January 1, 1998, the Providence and Worcester Railroad Company deeded to Capital Terminal all of its right, title and interest in the Pier.

32. On or about July 25, 2000 Capital Terminal., through its President, Avery L. Noe, acknowledged that since January 1, 1998 Capital Terminal has incurred repair and maintenance expenses of only One Hundred and Thirty-Six Thousand, Two Hundred and Thirty-Eight dollars ($136,238) while throughput fees from Getty Petroleum Marketing and others at that time totaled Seven Hundred Eighty-Two Thousand Eighty-One dollars ($782,081) and have now increased to more than Nine Hundred Thousand Dollars. Attached as Exhibit R is a copy of Mr. Noe's letter of July. 25, 2000.

33. Through its Fire Chief, the City of East Providence indicated that there is inadequate fire protection on the Pier and has set forth certain minimum requirements for necessary improvements to the Pier or else the Pier will be closed to use. Capital Terminal, although itself the successor in interest to Unocal who had previously agreed to provide water necessary to conduct operations to the Pier, has now demanded that Getty Properties pay one hundred percent (100%) of expenses with regard to installing a fire suppression system and a water pipeline to the Pier. A copy of the letter dated May 17, 2000 from Fire Chief Gerald A. Bessette is attached as Exhibit S.

34. Effective December 31, 1997, by deed dated March 6, 1998 Unocal transferred its 20% interest in the Pier to the Providence and Worcester Railroad Company.

35. Capital Terminal has further demanded, pursuant to the Second Amendment to the Grant and Agreement, as amended, that Getty Properties increase the diameter of the pipelines on the Pier from 12 and 14 inches to 16 inches. Said demand is without good cause and unwarranted because the existing pipelines are in good working order and more than adequate to meet the needs of these parties and others who use the Pier and, therefore, they are not "necessary."

36. Getty Properties does not own the Pier and has not agreed to share in any expenses other them those described above which relate solely to the repair and maintenance of the Petroleum Pipelines.

37. Getty Properties and Getty Petroleum Marketing justifiably relied upon the representations of the Defendant's predecessor-in-interest, as part of the 1997 Settlement Agreement, when it executed the 1997 Amended Pipeline Operating Agreement, the Fourth Amendment to the Grant and Agreement, and the Throughput Agreement, expecting Capital Terminal to assume full responsibility for the maintenance and operation of the Pier as stated in the letters outlining P&W's Rehabilitation Program and as stated in the Throughput Agreement.

38. Upon information and belief, on or about February 14, 2001, Defendant began the installation of a 10" water pipeline (the "Waterline") at the Pier. Without Getty Properties' knowledge or permission and in violation of Getty Properties' rights under the Grant and Agreement, as amended, this Waterline has been affixed to the pipeline supports on the Pier.

39. The installation of the Waterline, affixed to the pipeline supports on the Pier, interferes with the quiet enjoyment of the easement of Getty Properties under the Grant and Agreement, as amended, and all appurtenant rights running therefrom.

40. Because of the deteriorated condition of the Pier, the additional weight of the Waterline, particularly when full, and the sudden surge of pressure when the line is charged, will alter the response and possible configuration of the petroleum product pipeline supports and thereby interferes with, and endangers, the safety of the Petroleum Pipelines themselves.

41. Due to the deteriorated condition of the Pier there has been settling of the land area on which the pipeline supports have been constructed and, as a result, Getty Properties has been forced to expend money to make emergency repairs which would not have had to have been made had the land under the supports not settled.

**COUNT I - FRAUD/MISREPRESENTATION**

(Getty Properties and Getty Petroleum Marketing v. Capital Terminal)

42. Getty Properties and Getty Petroleum Marketing repeat and reallege paragraphs 1 through 41 of the Complaint as if fully set forth herein.

43. Getty Properties and Getty Petroleum Marketing relied upon the representations of the agents and employees of Defendants' predecessor-in-interest that Capital Terminal would assume the responsibility for the maintenance and repair of the Pier.

44. In the fall of 1997, P&W made statements and representations to Getty Properties and Getty Petroleum Marketing in order to dissuade Getty Properties from withdrawing from the 1991 Wilksbarre Pier Operating Agreement as it had already announced its intention to do.

45. P&W presented an extensive, long-term rehabilitation program for the Pier to Getty Properties and Getty Petroleum Marketing which set forth specific work to be performed in accordance with P&W's own Priority Repair List.

46. P&W's proposed throughput fees and minimum annual and monthly payments were identical to those made part of the Throughput Agreement and therefore it is clear that payments made pursuant to the Throughput Agreement were for the repairs.

47. Prior to the December15, 1997 Settlement Agreement, P&W misrepresented that it believed extensive repairs to the Pier were imminently necessary, when in fact P&W did not have that belief as evidenced by the minutes of the January 27, 1998 meeting of the Capital Properties Board of Directors (Exhibit P). P&W further misrepresented that amounts paid by Getty Petroleum Marketing under the Throughput Agreement would be used for the repairs identified in the November 19 Maintenance Plan, the estimated costs of which were identical to the minimum payments Getty agreed to make in the Throughput Agreement.

48. As demonstrated by the representation of P&W President Eder at the January 27, 1998 Board Meeting of Capital Properties, P&W did not actually believe any of the priority repairs were necessary, and had no intention in December, 1997 of using money paid by Getty Petroleum Marketing under that Throughput Agreement for the purpose of making the priority repairs.

49. P&W's representations were false, material and were knowingly made by P&W, Capital Terminal's predecessor-in-interest, with intent to induce Getty Properties and Getty Petroleum Marketing to enter into said Settlement Agreement and the related Throughput Agreement.

50. The actions by Capital Terminal's predecessor-in-interest constitute fraud and misrepresentation under the common law of the State of Rhode Island.

51. Getty Properties and Getty Petroleum Marketing justifiably relied on the false statements of Capital Terminal's predecessor-in-interest in entering into the 1997 Amended

Pipeline Operating Agreement, the Fourth Amendment to the Grant and Agreement, and the Throughput Agreement and have been damaged thereby.

**COUNT II – DECLARATORY JUDGMENT**
(Getty Properties and Getty Petroleum Marketing v. Capital Terminal)

52. Getty Properties and Getty Petroleum Marketing repeat and reallege paragraphs 1 through 51 of the Complaint as if each had been more fully set forth herein.

53. Whether or not the 1997 Amended Pipeline Operating Agreement, the Fourth Amendment to the Grant and Agreement and the Throughput Agreement are found to be valid and enforceable, neither Getty Properties nor Getty Petroleum Marketing have any obligation to install a fire suppression system and a water pipeline to the Pier. Capital Terminal's demand that Getty Properties do so is not in any way associated with Getty Properties' obligation to repair and maintain the Petroleum Pipelines under the 1975 Grant and Agreement, as amended, which has never changed. Moreover, neither Getty Properties nor Getty Petroleum Marketing are obligated to increase the diameter of the Pipeline to sixteen inches as demanded by Capital Terminal until such time as it is necessary to do so.

**COUNT III – INJUNCTIVE RELIEF**
(Getty Properties and Getty Petroleum Marketing v. Capital Terminal)

54. Getty Properties and Getty Petroleum Marketing repeats and realleges paragraphs 1 through 53 of the Complaint as if each had been more fully set forth herein.

55. The actions of the Defendant by installing a Waterline without Getty Properties' knowledge or permission or legal authority, as aforesaid constitute a violation of the terms of the Grant and Agreement, as amended, and have thereby endangered the safety of the pipelines on the Pier.

56. It is not the obligation of Getty Properties or Getty Petroleum Marketing to repair the Pier yet Getty Properties, to avoid any mishap, has undertaken to perform certain temporary repairs. Due to the deteriorated condition of the Pier, the temporary repairs which have been undertaken are short term solutions and will not have a long lasting effect.

57. Getty Properties and Getty Petroleum Marketing are without an adequate remedy at law. The only adequate remedy is for the Defendant to bring in fill and repair the Pier in its entirety.

58. The Waterline should be removed from the pipeline supports immediately.

**COUNT IV – BREACH OF CONTRACT**
(Getty Petroleum Marketing v. Capital Terminal)

59. Getty Petroleum Marketing repeats and realleges paragraphs 1 through 58 of the Complaint as if each had been more fully set forth herein.

60. When the Throughput Agreement attached hereto as Exhibit O was executed, as part of the overall Settlement Agreement attached hereto as Exhibit N, it was understood and agreed by and between all parties that P&W (including its successors) would continue to maintain the Pier in good repair and in good working condition. Therefore, paragraph 5 of the Throughput Agreement expressly provides that "P&W will be responsible for the repair and maintenance of the Pier and Getty [Petroleum] shall have no such obligation."

61. When the parties executed the Throughput Agreement, it was also understood and agreed, in light of various issues then in dispute, that P&W (including its successors) would make a substantial investment in addressing the deteriorating condition of the Pier, and would continue to maintain the Pier in proper working order. P&W had made certain representations in this regard in its Rehabilitation Program, attached hereto as Exhibit L. Prior to the receipt of that Rehabilitation Program, Getty entities using the Pier and adjacent facilities had indicated their

intent to withdraw from existing operating agreements, as set forth in Exhibit I hereto, and had cited the deteriorating condition of the Pier as a reason for their position in this regard.

62. Therefore, when the Settlement Agreement was executed along with other documents, including the Throughput Agreement, it was understood by all parties that Getty Petroleum Marketing was entering into a new set of contractual obligations that it was not otherwise obligated to undertake, and that the Throughput Agreement would generate revenue that P&W (including its successors) would direct, at least in significant part, to the necessary rehabilitation of the Pier, and to ongoing repair and maintenance. To that end, P&W reiterated its contractual obligation to maintain the Pier in the Throughput Agreement, as set forth above. Absent this express undertaking by P&W, Getty Petroleum Marketing would not have entered into the Throughput Agreement, and the parties would not have reached the overall settlement reflected in the various documents executed in mid-December 1997.

63. Capital Terminal, the Defendant herein, is a successor in interest to P&W with respect to the contractual obligations arising out of the Throughput Agreement.

64. To date, the Throughput Agreement has generated revenue in excess of $900,000.00 in the form of payments made by Getty Petroleum Marketing to Capital Terminal, as P&W's successor in interest. However, as illustrated in the letter from Capital Terminal attached hereto as Exhibit R, a minor portion of those funds has been directed to necessary repairs, maintenance or rehabilitation.

65. The Pier continues to be in need of further repairs, rehabilitation and maintenance. Current problems at the Pier include the need to remove and replace the middle breasting dolphin (formerly called the west breasting dolphin); the need to reconstruct the fender system at the east breasting dolphin; the need to reinforce the east breasting dolphin with four steel pilings and

support framework; the need to repair supports under the loading dock; the need to restore the steel framing wall and rub railing(s) between the middle dolphin and the loading dock; the need to restore the steel frame wall and rub railing(s) east of the east dolphin; the need to install a new seven-pile cluster at the east corner of the loading dock, and reinforce the existing three-pile cluster at the west corner of the loading dock; among many others.

66. Despite numerous demands to date, and despite the considerable revenue generated by the Throughput Agreement, Capital Terminal has failed and refused to address numerous pressing needs for rehabilitation, repair and ongoing maintenance at the Pier, and has directed an insufficient amount of funds and attention to such needs at the Pier.

67. These failures on the part of Capital Terminal, as successor in interest to P&W, constitute a breach of Capital Terminal's obligations to maintain the Pier pursuant to the express language on the Throughput Agreement, as set forth herein.

68. As a direct and proximate result thereof, Getty Petroleum Marketing has suffered pecuniary and other harm, and will continue to suffer such harm absent remedial action by this Court.

**COUNT V – DECLARATORY JUDGMENT**

(Getty Properties and Getty Petroleum Marketing v. Capital Terminal)

69. Getty Properties and Getty Petroleum Marketing repeat and reallege paragraphs 1 through 68 of the Complaint as if each had been more fully set forth herein.

70. An actual controversy exists between the Plaintiffs, Getty Properties and Getty Petroleum Marketing, and the Defendant, Capital Terminal, concerning the Plaintiffs' rights to use the north side of the Pier, its appurtenant facilities and the Petroleum Pipelines. This controversy is the result of, among other things, a letter from Robert L. Tofel, counsel for Capital Terminal, to Paul Stendardi, Director of Terminals and Transportation at Getty Petroleum

Marketing, dated April 27, 2000 (hereinafter referred to as the "4/27/00 Letter"), in which Capital Terminal informed Getty Petroleum Marketing that, when the Throughput Agreement expires on December 31, 2001, Capital Terminal is going to evict the Plaintiffs from the Pier. A copy of this letter is attached hereto as Exhibit T. The intent of this eviction is not only to bar the Plaintiffs from using the Pier but, also, to effectively prohibit them from using the Petroleum Pipelines, which run from the Pier to a tank terminal owned by Getty Properties and leased by Getty Petroleum Marketing located in Phillipsdale, East Providence (hereinafter referred to as the "Tank Terminal").

71. Certain legal instruments, including a deed and agreement, a grant, a license and several agreements executed between the parties (hereinafter collectively referred to as the "legal instruments") dictate and reflect that the Plaintiffs have rights to the Pier, its appurtenant facilities and the Petroleum Pipelines and, as a result, Capital Terminal's promised eviction will have no effect on the Plaintiffs' use of the same.

72. By virtue of a deed and agreement dated August 28, 1941 (hereinafter referred to as the "1941 Deed"), which is recorded in the East Providence Land Records, a predecessor of P&W gave a predecessor of Getty Properties the right to the free and uninterrupted use of the north side of the Pier and the appurtenant facilities, including the ship berth serving that side of the Pier, for the delivery of petroleum products. This right is confirmed in agreements between predecessors of Getty, Eder and P&W, including the 1975 Agreement and Deed of Conveyance (Exhibit A), 1975 Grant and Agreement (Exhibit C) and the 1991 Wilkesbarre Pier Operating Agreement (Exhibit I).

73. Under a grant dated August 6, 1975 (hereinafter referred to as the "Grant"), which is recorded in the East Providence Land Records, Seekonk Realty Corporation gave a

predecessor of Getty Properties certain rights, privileges and easements through a strip of land that runs approximately from the Pier to the Tank Terminal (hereinafter referred to as the "easement area"). Specifically, this Grant allowed Getty Properties' predecessor to install and operate pipelines and related equipment for the transmission of petroleum products from the Pier to the Tank Terminal. This Grant, and its purpose, are referred to in agreements between predecessors of Getty Properties and Eder, including the 1975 Grant and Agreement (Exhibit C), the 1975 Pipeline Operating Agreement (Exhibit B) and the First Amendment to Grant and Agreement (1976) (Exhibit E).

74. Pursuant to a license dated September 26, 1975 (hereinafter referred to as the "License"), which is also recorded in the East Providence Land Records, Trustees of the Property of Penn Central Transportation Company gave a predecessor of Getty Properties the right to use a segment of its land adjacent to the easement area (hereinafter the "license area") for the installation and operation of pipelines, which would be connected to the pipelines in the easement area and used with said pipelines to transport petroleum products from the Pier to the Tank Terminal. This License is referred to and incorporated in the First Amendment Grant and Agreement (Exhibit E).

75. Subsequent to the execution of the Grant and License and in accordance with the 1975 Grant and Agreement (Exhibit C), a predecessor of Getty Properties installed the Petroleum Pipelines that run from the Pier to the Tank Terminal. Getty Properties and its predecessors' ownership of the Petroleum Pipelines is confirmed in agreements between predecessors of Getty and Eder, including the 1975 Grant and Agreement (Exhibit C), the 1975 Pipeline Operating Agreement (Exhibit B) and the First Amendment to Grant and Agreement (Exhibit E). Moreover, by a letter dated February 14, 2001 from Avery L. Noe, President of Capital

Terminal, to Leo Liebowitz, President of Getty Properties, Noe acknowledged that the pipelines on the Pier are presently owned by Getty Properties. A copy of this letter is attached hereto as Exhibit U.

76. Nothing in subsequent agreements between Getty Properties', Eder, P&W, Capital Terminal, or any of the foregoing entities predecessors or related entities, altered, eliminated or otherwise changed Getty Properties' rights established by the legal instruments, specifically, the 1941 Deed, the Grant and the License.

77. Declaratory relief confirming Plaintiffs' rights created by the 1941 Deed, the Grant and the License to use the north side of the Pier and the Petroleum Pipelines will terminate the dispute between the parties.

**COUNT VI – THIRD PARTY BENEFICIARY BREACH OF CONTRACT**
(Getty Properties v. Capital Terminal)

78. Getty Properties repeats and realleges paragraphs 1 through 77 of the Complaint as if each had been more fully set forth herein.

79. Getty Properties and Getty Petroleum Marketing operate a comprehensive business of petroleum distribution in Phillipsdale, East Providence. The Pier, specifically the north side, is an integral part of this business. Barges dock at a berth on the north side of the Pier and off-load petroleum products which run through two pipelines on the Pier that connect to the Petroleum Pipelines. The petroleum products are then run though the Petroleum Pipelines to the Tank Terminal. Capital Terminal, Eder and P&W are aware of both the interrelationship between Getty Properties and Getty Petroleum Marketing and the essential function that the Pier serves in the overall operation of the Plaintiffs' petroleum distribution business.

80. From 1991 until 1997, under the 1991 Wilkesbarre Pier Operating Agreement (Exhibit I), P&W was obligated to maintain the Pier and the users of the Pier, including a

predecessor of Getty Properties, were obligated to pay for such maintenance on a proportionate use basis.

81. In 1997, a dispute arose between P&W and a predecessor of Getty Properties due to the dilapidated condition of the Pier. To resolve this dispute, P&W, a predecessor of Getty Properties and others entered into the 1997 Settlement Agreement (Exhibit N), which included the Throughput Agreement (Exhibit O).

82. The Throughput Agreement replaced the 1991 Wilkesbarre Pier Operating Agreement and contained substantially the same provisions of the 1991 Wilkesbarre Pier Operating Agreement with respect to the scheduling of vessels at the Pier, the operation of the Pier, indemnification and water/air pollution control. Regarding maintenance of the Pier, however, the parties agreed. in the Throughput Agreement that "P &W will be responsible for the repair and maintenance of the Pier and Getty Petroleum Marketing shall have no such obligation."

83. Both Getty Petroleum Marketing, the signatory to the Throughput Agreement, and a predecessor of Getty Properties, a long-time user of the Pier, were intended beneficiaries of P&W's promise to maintain the Pier.

84. In reliance on P&W's promise to maintain the Pier, a predecessor of Getty Properties eliminated Eder's successor's obligation under the 1975 Grant and Agreement, as amended, and the 1975 Operating Agreement, as amended, to pay its share of maintenance costs for the Petroleum Pipelines.

85. As set forth herein, Capital Terminal, as successor in interest to P&W, has failed and refused to address numerous pressing needs for rehabilitation, repair and ongoing

maintenance at the pier and has directed an insufficient amount of funds generated by the Throughput Agreement and attention to such needs at the Pier.

86. Also as set forth herein, these failures on the part of Capital Terminal, as successor in interest to P&W, constitute a breach of Capital Terminal's obligation to maintain the Pier pursuant to the express language of the Throughput Agreement.

87. As a direct and proximate result of Capital Terminal's nonfeasance, Getty Properties, an intended beneficiary of the Throughput Agreement, has suffered pecuniary and other harm and will continue to suffer such harm absent remedial action by this Court.

WHEREFORE, Plaintiffs, Getty Properties and Getty Petroleum Marketing, respectfully request that this Honorable Court enter judgment in their favor against Capital Terminal as follows:

A judgment against Defendant declaring that Plaintiffs are not obligated to install a water line or a fire suppression system for the Pier.

A judgment against Defendant declaring that Plaintiffs are not obligated to increase the diameter of the Petroleum Pipelines at the Pier.

Order and Declare that the Waterline recently affixed to the Petroleum Pipelines supports on the Pier be removed immediately and transferred to some other location at the Pier.

Order and Declare that the Pier be repaired to stop the erosion and that new fill be deposited immediately to stop the collapse of the Petroleum Pipeline supports.

Damages be awarded to Plaintiffs in an amount adequate to compensate for their harm, including the refund of money paid under the Throughput Agreement and reimbursement for the costs the Plaintiffs have incurred in repairing the Petroleum Pipeline supports and such other damages as may be awarded to Plaintiffs.

Order and Declare that, under the 1941 Deed, Getty

Properties has a legal right to the free and uninterrupted use of the north side of the Pier and the appurtenant facilities, including the pipelines located thereon and the ship berth serving that side of the Pier; that, pursuant to the Grant and License, Getty Properties has legal interests, specifically easements and a license, in the land running from the Pier to Getty Properties' Tank Terminal located in Phillipsdale, East Providence; that, under the 1975 Grant and Agreement, as amended, Getty Properties owns the Petroleum Pipelines that run from the Pier to the Tank Terminal, and that, given these legal rights, Capital Terminal has no power or standing to evict the Plaintiffs from the Pier and, effectively, the Petroleum Pipelines.

A judgment against Capital Terminal for breach of the Throughput Agreement and for the damages caused to Getty Properties and Getty Petroleum as a result thereof; along with interest and costs.

Plaintiffs be awarded their costs, expenses, and disbursements arising out of this action, including reasonable attorneys' fees.

Such other relief as to the Court seems meet and just.

GETTY PETROLEUM MARKETING INC.

By Its Attorneys,

EDWARDS & ANGELL, LLP

Mark W. Freel (JWR)

Mark W. Freel (#4003)
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200
(401) 276-6611 FAX

GETTY PROPERTIES CORP.

By Its Attorneys,

PARTRIDGE SNOW & HAHN LLP

James W. Ryan (#4042)
180 South Main Street
Providence, RI 02903
(401) 861-8200
(401) 861-8210 FAX

DATED: August 22, 2002

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing SECOND AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF was delivered on this 22 day of August, 2002 to:

**Via Hand Delivery**

Craig M. Scott, Esq.
Robert M. Duffy, Esq.
Duffy & Sweeney, Ltd.
300 Turks Head Building
Providence, RI 02903

**Via Federal Express**

Robert L. Tofel, Esq.
Tofel, Karan & Partners, P.C.
780 Third Ave
New York, NY 10017

James W. Ryan

647488_1/2900-2