# EXHIBIT V

Table of Contents

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, DC 20549**

# FORM 10-KSB

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2005**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from __________ to __________**

**Commission File Number 0-9380**

# CAPITAL PROPERTIES, INC.
(Name of small business issuer in its charter)

| | |
|---|---|
| **Rhode Island**<br>(State or other jurisdiction of incorporation or organization) | **05-0386287**<br>(IRS Employer Identification No.) |

**100 Dexter Road**
**East Providence, Rhode Island 02914**
(Address of principal executive offices) (ZipCode)

**(401) 435-7171**
(Company's telephone number, including area code)

Securities registered under Section 12(b) of the Exchange Act:
**Class A Common Stock, $.01 par value**
**American Stock Exchange**

Securities registered under Section 12(g) of the Exchange Act:
NONE

Check whether the issuer is not required to file reports pursuant to Section 13 or 15(d) of the Exchange Act. ☐

Check whether the Company: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the past 12 months (or for such shorter period that the Company was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Check if there is no disclosure of delinquent filers in response to Item 405 of Regulation S-B contained in this form, and no disclosure will be contained, to the best of Company's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-KSB or any amendment to this Form 10-KSB. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☑

For the year ended December 31, 2005, the Company's revenues and other income totaled $6,463,000.

As of March 1, 2006, the aggregate market value of the Class A voting stock held by non-affiliates of the Company was $41,438,000, which excludes voting stock held by directors, executive officers and holders of 5 percent or more of the voting power of the Company's common stock (without conceding that such persons are "affiliates" of the Company for purposes of federal securities laws.) The Company has no outstanding non-voting common equity.

As of March 1, 2006, the Company had 3,299,956 shares of Class A Common Stock outstanding.

DOCUMENTS INCORPORATED BY REFERENCE

Portions of the Company's Proxy Statement for the 2006 Annual Meeting of Shareholders to be held on April 25, 2006, is incorporated by reference into Part III of this Form 10-KSB.

Transitional Small Business Disclosure Format. Yes ☐ No ☑

## TABLE OF CONTENTS

PART I
- Item 1. Description of Business
- Item 2. — Description of Property
- Item 3. Legal Proceedings
- Item 4. Submission of Matters to a Vote of Security Holders

PART II
- Item 5. Market for Common Equity, Related Stockholder Matters and Small Business Issuer Purchases of Equity Securities
- Item 6. Management's Discussion and Analysis or Plan of Operations
- Item 7. Consolidated Financial Statements
- Item 8. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure

PART III
- Item 8A. Controls and Procedures
- Item 9. Directors, Executive Officers, Promoters and Control Persons of the Issuer
- Item 10. Executive Compensation
- Item 11. Security Ownership of Certain Beneficial Owners and Management
- Item 12. Certain Relationships and Related Transactions
- Item 13. Exhibits and Reports on Form 8-K
- Item 14. Principal Accountant Fees and Services

SIGNATURE
EX-20.1 Map of Company's Parcels in Downtown
EX-20.2 Map of Petroleum Storage Facility
EX-21 Capital Properties, Inc. and Subsidiaries
EX-31.1 Section 302 Certification of PEO
EX-31.2 Section 302 Certification of PFO
EX-32.1 Section 906 Certification of PEO
EX-32.2 Section 906 Certification of PFO

---

Table of Contents

In 1998, the Company purchased the Wilkesbarre Pier in the Port of Providence and its deep-water berth for receiving petroleum products by ocean-going vessels. In 1998, the Company also purchased the perpetual right to transport petroleum products from the Pier to its terminal property through pipelines owned by a third party.

The Petroleum Facility is the only independent petroleum storage facility with deep-water access in the market area. All of the petroleum storage tanks, buildings and pier are owned by the Company.

In 1998, the Company entered into a short-term arrangement with Global under which the Company operates the entire Petroleum Facility for Global. In 1999, the Company entered into an agreement with Global extending the arrangement for an additional three years and in 2000, the agreement was further extended to April 30, 2004. In June 2003, the agreement was further amended (Amended Agreement) and will now expire April 30, 2013; however, the Amended Agreement will continue thereafter on a year-to-year basis unless terminated by either party upon ninety days' written notice. Global may terminate the Amended Agreement on or after April 30, 2008, upon one year's written notice. Global was also granted the option to purchase the Petroleum Facility at any time during the term of the Amended Agreement under certain terms and conditions set forth in an option agreement.

The following schedule sets forth certain information on the federal income tax basis of that portion of the Petroleum Facility which is depreciable:

| | Land Improvements | Buildings | Tanks | Equipment |
|---|---|---|---|---|
| Federal income tax basis (cost) | $1,898,620 | $126,562 | $7,805,219 | $2,732,152 |
| Rate per year | 6.67% | 2.56% | 20% | 20% |
| Method | 150% DB | S/L | 200% DB | 200% DB |
| Life (Years) | 15 | 39 | 5 | 5 |

The 2005 real estate taxes are $89,281 for the Petroleum Facility and $5,748 for the Wilkesbarre Pier at a $20.61 per thousand dollars of assessed valuation tax rate.

In 2005, the Company constructed a 152,000 barrel tank. In November 2005, the Company entered into a contract to build a 175,000 barrel tank and construction will commence in March 2006. This will conclude the development of the land currently owned by the Company at the Petroleum Facility.

**Item 3. Legal Proceedings**

None.

**Item 4. Submission of Matters to a Vote of Security Holders**

No matters were submitted to a vote of the Company's security holders during the fourth quarter of fiscal year 2005.

Table of Contents

*Petroleum storage facility:*

The Company, through a wholly-owned subsidiary, owns a petroleum storage facility (the Petroleum Facility) located in East Providence, Rhode Island with a current capacity of 835,000 barrels. The Petroleum Facility utilizes the Company's Wilkesbarre Pier and a pipeline connecting the Wilkesbarre Pier to the Petroleum Facility. The Company (through this wholly-owned subsidiary) and Global Companies, LLC (Global) are parties to an agreement whereby the Company (through another wholly-owned subsidiary) operates the entire Petroleum Facility for Global at a fixed monthly fee which is subject to annual cost-of-living adjustments. The agreement expires April 30, 2013, but will continue thereafter on a year-to-year basis unless terminated by either party upon ninety days' written notice. Global may terminate the agreement on or after April 30, 2008, upon one year's written notice. The agreement includes provisions for additional payments based upon throughput in any twelve-month period beginning on May 1 of each year and ending on April 30 of the subsequent year and for certain increases in real property taxes. The Company bears all of the operating costs with respect to the Petroleum Facility, including real estate taxes and insurance. In addition, Global was granted an option to purchase the Petroleum Facility at any time during the term of the agreement under the terms and conditions set forth in an option agreement.

As described in Note 5 of Notes to Consolidated Financial Statements in Item 7 hereof, the Company was in litigation (Wilkesbarre Pier litigation) with Getty Petroleum Marketing, Inc. and Getty Properties Corp. over the rights of others to utilize the Wilkesbarre Pier. During 2003, the Company settled all litigation with Getty Petroleum Marketing, Inc. In October 2003, the Company appealed to the U. S. Court of Appeals for the First Circuit the inconsistent judgments concerning whether the Company or Getty Properties Corp. was responsible for the cost of the fire suppression equipment at the Pier. In December 2004, the Company's appeal was denied.

In 1994, a leak was discovered in a 25,000 barrel storage tank at the Petroleum Facility which allowed the escape of a small amount of fuel oil. All required notices were made to the State of Rhode Island Department of Environmental Management (RIDEM). In 2000, the tank was demolished and testing of the groundwater indicated that there was no large pooling of contaminants. In 2001, RIDEM approved a plan whereby the Company installed a passive system consisting of three wells and commenced monitoring the wells.

In 2003, RIDEM decided that the passive monitoring system previously approved was not sufficient and required the Company to design an active remediation system for the removal of product from the contaminated site. The Company and its consulting engineers began the pre-design testing of the site in the fourth quarter of 2004, and the Company continues to work with RIDEM to design an acceptable system. The consulting engineers estimated a total cost of $200,000 to design, install and operate the system, which the Company reported as an expense in 2004. Through December 31, 2005, the Company has expended $90,000. The Company expects the system to be installed during the second quarter of 2006. The system will pump out the contaminants which will be disposed of in compliance with applicable regulations. After a period of time, the groundwater will be tested to determine if sufficient contaminants have been removed. The Company anticipates that the remediation process will be completed by the second quarter of 2007. While the Company and its consulting engineers believe that the proposed active remediation system will correct the situation, it is possible that RIDEM could require the Company to expand remediation efforts, which could result in the Company incurring additional costs.

In 2002, during testing of monitoring wells at the Petroleum Facility, the Company's consultant discovered free floating phase product in a groundwater monitoring well located on that portion of the Petroleum Facility purchased in 2000. Preliminary laboratory analysis indicated that the product was gasoline, which is not a product the Company ever stored at its Petroleum Facility. However, in the 1950's gasoline was stored on the Company's property by a predecessor owner.

Table of Contents

resulting in a gain of $1,057,000, and in July 2005 the Company sold a billboard permit, resulting in a gain of $100,000.

In 1997, the City of Providence revalued certain of the Company's properties within the Capital Center area, reaching back six years to assess over $13,000,000 in back taxes, interest and penalties based upon a retroactive increase in the assessed values. The Company contended that this action by the City was both unprecedented and illegal. In another action, the City claimed that the Company was not the owner of a certain parcel in the Capital Center and also attempted to condemn that parcel. The Company contested both of the City's actions. In 1999, after prevailing on the merits in both actions, the Company made claim against the City for attorneys fees. In 2000, the Company was awarded attorneys fees of $258,000. The City filed an appeal in the Rhode Island Supreme Court which affirmed the judgment against the City, and the Company received the payment from the City in 2004. No interest was awarded on the judgment.

Exclusive of the $1,057,000 gain on the sale of the parking garage and the $100,000 gain from the sale of the billboard permit in 2005 and the $258,000 for the attorneys fee judgment in 2004, revenues and other income from leasing for 2005 decreased $386,000 from 2004. Prior to the commencement of the long-term land leases in 2004 and 2005, the Company was receiving option payments and revenue from a short-term surface parking lease but was paying all real property taxes. Upon commencement of the leases, the Company receives an annual rental which is lower during the construction and lease-up periods (approximately five years) but the tenant directly pays the real property taxes, resulting in a decrease in real property tax expense for 2005 of $752,000 from 2004. The net effect of the above is the principal reason for the increase to income before income taxes of the leasing segment for the year ended December 31, 2005.

*Petroleum storage facility segment:*

Revenue from the petroleum storage facility for 2005 increased $475,000 from 2004 due principally to fees for the new 152,000 barrel tank effective October 2004 and higher monthly fees resulting from the annual cost-of-living adjustment.

In 2004, the Company recorded $200,000 of remediation costs associated with the 1994 leak. No additional remediation costs were recorded in 2005 and legal fees were lower in connection with the Wilkesbarre Pier litigation. These decreases were offset by higher depreciation expense related principally to the tank constructed in 2004 and higher payroll and related costs, resulting in an overall decrease in expenses applicable to petroleum storage facility of $163,000 in 2005 from 2004.

*General:*

As described in Note 3 of Notes to Consolidated Financial Statements in Item 7, certain of the Company's property adjacent to Amtrak's Northeast Corridor in Providence, Rhode Island was condemned by Amtrak in 1999 and 2001. The Company believed that the amounts paid by Amtrak were inadequate and made a claim for additional condemnation proceeds. In 2002, the U. S. District Court for the District of Rhode Island awarded the Company additional damages of $1,378,000 plus interest. In 2003, Amtrak appealed the decision to the U. S. Court of Appeals for the First Circuit. The First Circuit affirmed the judgment of the U. S. District Court and in 2004, the Company received a payment of $1,622,000.

Interest income for 2005 increased $72,000 from 2004 resulting from higher levels of cash available for short-term investments.

Table of Contents

Company will be required to reinvest the condemnation proceeds in qualifying assets by December 31, 2007, or then pay the income tax on the unexpended proceeds. In 2004, the Company purchased qualifying assets totaling $216,000.

In 2004, the Company constructed a 152,000 barrel tank at a total cost of $1,226,000 paid for in cash. Effective October 15, 2004, Global commenced using the tank at a monthly fee of $35,000, subject to annual cost-of-living adjustments. The Company painted the tank in September 2005 at a cost of $92,000. In 2005, the Company constructed a 152,000 barrel tank at a total cost of $1,688,000 paid for in cash. Effective December 15, 2005, Global commenced using the tank at a monthly fee of $36,000, resulting in a current total monthly fee of $227,000, subject to annual cost-of-living adjustments. In November 2005, the Company entered into a contract to construct a 175,000 barrel tank at an estimated remaining cost of $2,000,000. Construction will commence in March 2006 and the tank is expected to be completed in the third quarter of 2006. The Company presently intends to pay for the tank from available cash. When completed, Global will include this new tank under the existing Amended Agreement at a monthly fee of approximately $42,000, subject to annual cost-of-living adjustments.

Regulations of the Department of Homeland Security required the Company to secure the Petroleum Facility (including the Wilkesbarre Pier) against possible threats by the installation of fences, barricades and similar items in 2004. The Company cannot predict what additional expenses it may incur in the future to maintain required security levels.

As discussed in Note 5 of Notes to Consolidated Financial Statements in Item 7, in 2003, the remaining non-jury claims in the litigation with Getty were tried and the Court ordered Getty Properties Corp. to install a new sixteen-inch pipeline on the Pier for the Company's use and benefit. Pursuant to an agreement with Getty Properties Corp. in the fall of 2004, the Company installed the pipeline at a cost of $394,000. The Company received payment from Getty Properties Corp. in February 2005.

Other than the 175,000 barrel tank to be constructed in 2006 and the painting of two tanks in 2007 at an estimated cost of $225,000, remaining commitments for the purchase of properties and equipment are immaterial.

In March 2006, the Company anticipates a cash outlay for 2005 federal and state income taxes of approximately $682,000 plus the first estimated installment on 2006 federal and state income taxes of approximately $300,000.

In 2004, the Company paid a dividend of $99,000 each quarter to holders of Class A and Class B Common Stock at the rate of $.03 per share per quarter. In addition, in December 2004, the Company paid a special dividend of $594,000 to holders of Class A and Class B Common Stock at the rate of $.18 per share. In January 2005, the Company paid a quarterly dividend of $99,000 to holders of both classes of stock. On April 1, 2005, Class B Common Stock was converted into Class A Common Stock. In May, August and November 2005, the Company paid a quarterly dividend of $99,000 to holders of its Class A Common Stock. The declaration of future dividends and the amount thereof will depend on the Company's future earnings, financial factors and other events.

In management's opinion, the Company should be able to generate adequate amounts of cash to meet all of its anticipated obligations. In the event temporary additional liquidity is required, the Company believes that a line of credit or other arrangements could be obtained by pledging some or all of its unencumbered assets as collateral.

Table of Contents

**CAPITAL PROPERTIES, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF INCOME AND RETAINED EARNINGS**
**YEARS ENDED DECEMBER 31, 2005 AND 2004**

| | 2005 | 2004 |
|---|---|---|
| Revenues and other income: | | |
| Revenues: | | |
| Leasing | $2,663,000 | $3,049,000 |
| Petroleum storage facility | 2,549,000 | 2,074,000 |
| | 5,212,000 | 5,123,000 |
| Other income: | | |
| Gain on sale of parking garage | 1,057,000 | — |
| Gain on sale of billboard permit | 100,000 | — |
| Attorneys fee judgment | — | 258,000 |
| Condemnation proceeds, including interest of $244,000 | — | 1,672,000 |
| Interest | 94,000 | 22,000 |
| | 6,463,000 | 7,075,000 |
| Expenses: | | |
| Expenses applicable to: | | |
| Leasing | 778,000 | 1,590,000 |
| Petroleum storage facility | 1,713,000 | 1,876,000 |
| General and administrative | 1,216,000 | 1,038,000 |
| | 3,707,000 | 4,504,000 |
| Income before income taxes | 2,756,000 | 2,571,000 |
| Income tax expense: | | |
| Current | 976,000 | 149,000 |
| Deferred | 117,000 | 861,000 |
| | 1,093,000 | 1,010,000 |
| Net income | 1,663,000 | 1,561,000 |
| Retained earnings, beginning | 2,065,000 | 1,494,000 |
| Dividends on common stock ($.12 and $.30 per share in 2005 and 2004, respectively) | (396,000) | (990,000) |
| Retained earnings, ending | $3,332,000 | $2,065,000 |
| Basic income per share | $ .50 | $ .47 |

See notes to consolidated financial statements.