# EXHIBIT Z

UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

DUNELLEN, LLC

VS. C.A. NO.:06-014 ML

GETTY PROPERTIES CORP.,

DEPOSITION OF TODD TURCOTTE, witness in the above-entitled cause, taken on behalf of the Defendant, pursuant to notice, before Sally Brassard, CSR, a Notary Public in and for the State of Rhode Island and Providence Plantations, at the office of Partridge Snow & Hahn LLP, 180 South Main Street, Providence, Rhode Island, on February 12, 2007, at 2:00 p.m.

APPEARANCES:

FOR THE PLAINTIFF: HINCKLEY ALLEN & SNYDER, LLP
BY: MITCHELL R. EDWARDS, ESQUIRE

FOR THE DEFENDANT: PARTRIDGE SNOW & HAHN LLP
BY: ROBERT K. TAYLOR, ESQUIRE

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RI 02920
(401) 946-5500

Page 30

A. No, I did not have an understanding.
Q. Between 1998 and 2003, did anyone ever tell you that Getty Petroleum Marketing was contributing to the costs of repairs and maintenance of the pier?
A. No.
MR. EDWARDS: Objection.
A. No.
Q. Did anyone ever tell you, during that time period, that Getty's Petroleum Marketing was making payments on a regular basis to Capital Terminal Company?
A. Yes.
Q. Who told you that?
A. I believe Ernie Rabideau.
Q. And what do you remember him telling you about that arrangement?
MR. EDWARDS: Objection.
A. It was a payment for use of the facility.
Q. Okay. Anything else that you can remember?
A. No.
Q. Were you ever involved in preparing cost estimates for any of the repairs and improvements that Pare was considering in 1998 through 2003?
A. Yes.
Q. How did you go about doing those cost estimates?

Page 31

A. Would -- I would estimate the quantity of work to be done; materials, labor, and use standard practices to put dollar amounts to that, but I also worked with contractors to obtain budget numbers for that work.
Q. And in that time period, were you ever given any parameters that you were told you had to work within, cost parameters?
MR. EDWARDS: Objection.
A. No.
Q. Did anyone from Capital Terminal Company ever tell you, in that time period, that whatever repairs and maintenance and improvements were going to be done, the cost had to be within a certain range?
MR. EDWARDS: Objection.
A. No.
Q. Did anyone from Capital Terminal Company in that time period ever give you any understanding that they had a certain amount of money to work with for any particular period to fund repairs and improvements?
MR. EDWARDS: Objection.
A. No.
MR. TAYLOR: Mark this, please.
(Defendant's Exhibit 14 marked for ID.)

Page 32

Q. Mr. Turcotte, I'm showing you what's been marked as Exhibit 14. Can you identify this document?
A. Yes.
Q. What is it?
A. It is a letter prepared by myself to Mr. Noe summarizing potential capital improvements projects at the Wilkesbarre Pier.
Q. Is that your signature on the last page?
A. Yes, it is.
Q. At this point in time, January 26, 2003, how long had RT Group been doing work for Capital Terminal Company?
A. Twelve months.
Q. Did you start doing work for Capital Terminal Company as a member of RT Group immediately upon the formation of RT Group?
A. Yes.
Q. And at that point in time, did Pare continue to do work for Capital Terminal Group?
A. No.
MR. EDWARDS: Objection.
Q. As far as you know, they stopped doing work for Capital Terminal Company at the same time that RT Group started doing work?
A. Yes.

Page 33

Q. Was Mr. Russell also an employee of Pare?
A. Yes.
Q. Why did you prepare this Exhibit 14?
A. I was requested -- RT Group was requested by Mr. Noe to prepare it.
Q. And how did that come about?
MR. EDWARDS: Objection.
A. To my knowledge, it was just asked of -- they had wanted to look at capital improvement projects in a 10-year plan. That's what I was asked to do.
Q. Mr. Noe called you up one day?
MR. EDWARDS: Objection.
A. I don't recall.
Q. Do you recall anything more specific about what Mr. Noe asked you to do in preparing Exhibit 14?
A. Yes.
Q. Okay. And what was that?
A. We had discussed it at a meeting and had done a walk-through of the pier and looked at the facility to think together as far as what projects might be performed over the next ten years to continue the use of the pier and improve its facility.
Q. You said there was a meeting, when did the meeting take place in relation to this letter?

Page 34

A. According to the letter, it occurred on January 14th.
Q. And who attended that meeting?
A. I don't recall exact members.
Q. Was there somebody representing Capital Terminal Company other than Mr. Noe?
A. Not to my recollection.
Q. How big a meeting was it?
A. It wasn't very large at all. It was basically myself and Avery, as I recall. It is the best I can remember.
Q. Where did that meeting take place?
A. I'm going back four years. It occurred at the pier -- was part of the meeting -- we did a walk-through at the pier.
Q. At that point in time, did Mr. Noe tell you anything about why he was asking for a 10-year plan?
MR. EDWARDS: Objection.
A. Not at the time of the meeting, no.
Q. So, after the meeting, did he explain to you why he was looking for a 10-year plan?
A. No, he never explained why a 10-year plan.
Q. Well, what about not a 10-year plan but some long-term capital improvements plan?

Page 35

MR. EDWARDS: Objection.
A. He explained -- they wanted a long-term plan to maintain the facility and make improvements to it over a period of time. Ten years was what they had picked.
Q. And did he explain to you why they were looking into that at that particular time?
MR. EDWARDS: Objection. I think it's been asked and answered.
A. No.
Q. Did he have any discussions with you around this time about what person or persons might be using the pier over the next few years?
MR. EDWARDS: Objection.
A. Can you ask the question, specifically, again, please?
Q. Do you recall having any discussions with Mr. Noe around that point in time, early 2003, about who might be using the pier over the next few years?
A. Yes.
Q. What do you recall about that?
A. I recall that Global Petroleum was the current user of the pier. That's all I knew at the time. I didn't know how long they were going to be at the pier. Other than that, that's who was at the

Page 36

pier now.
Q. Were you aware in early 2003 that Getty Petroleum Marketing had been using the pier?
MR. EDWARDS: Objection.
A. Yes, I was aware.
Q. And how were you aware of that?
A. That they were still using the pier. I was responsible for dealing with repair damage that would occur at the pier.
Q. Was it ever your responsibility to visit the pier to inspect after the arrival of a Getty vessel in the periods between 1998 and 2003?
A. 1998 and 2003?
Q. Yes.
A. Yes.
Q. How about in 2002, were you still doing those sorts of inspections in 2002?
A. Yes.
Q. So, you were aware in 2002 that Getty vessels were coming into the pier and unloading petroleum; correct?
MR. EDWARDS: Objection.
A. Yes.
Q. During 2002, did anyone ever tell you that Getty was contemplating stopping its use of the pier?

Page 37

MR. EDWARDS: Objection.
A. Yes.
Q. And who told you that?
A. Avery.
Q. What did he tell you about that?
A. That Getty was considering mothballing (phonetic) their East Providence terminal.
Q. At the time of Exhibit 14, did you have an understanding as to whether or not Getty was going to be using the pier in the future?
A. No.
Q. No one told you at that point in time whether or not Getty would be using the pier in the future; is that right?
MR. EDWARDS: Objection.
A. No.
Q. During your meeting with Mr. Noe and the site visit in 2003, early 2003, did Mr. Noe point out to you certain projects that he wanted you to consider on the capital improvements project list?
MR. EDWARDS: Objection.
A. Yes.
Q. Okay. And did those things that he pointed out end up in Exhibit 14?
A. To some extent, yes.

Q. What I'm trying to understand is how much of Exhibit 14 were things that Mr. Noe pointed out to you and how much of it are things that you or someone else from RT Group independently said, hey, this is something you need to consider.
MR. EDWARDS: Objection.
A. This was a compilation of efforts over the years, for me, being at the facility. Since 1997, there had been ongoing discussions of areas of improvements and/or repair that were continuations that occurred in 2003. So, to say that there were areas that Mr. Noe wanted in there is not -- that I wasn't supporting or also recommending is not an accurate statement.
There are areas that I completely initiated certain aspects to improve in areas that would be best repaired that Mr. Noe was not recommending, but everything that's been -- that was in here, came from my years of experience at the pier. Some of which had been discussed with Mr. Noe prior to this meeting.
Q. Okay. Well, which of the items in Exhibit 14 had you discussed with Mr. Noe prior to January 2003?
MR. EDWARDS: Take your time to go through it.



A. I'll go through each one.
Q. Sure.
A. Item Number 1, Pipeline Support Repairs was a discussion that prior to this meeting -- that came in. The stone wall erosion.
Item number 2 was Stone Wall Erosion. That was also discussed prior to and included into this.
Item number 3, a Timber Pile Cluster Dolphin was discussed prior to 2003 and included in.
Item number 4, Soldier Pile and Panel Retaining Wall. This was something, again -- this isn't -- I'll skip it, I'm sorry. Dolphin repairs.
Item number 6, Loading Platform Repairs was something that had been discussed prior to with Mr. Noe and was included in.
Item number 7, Erosion Area Between Middle and West Dolphins was discussed prior to and included in. I believe that is it.
Q. So, the ones that are items in Exhibit 14 that you did not mention on this list were items that you were putting in in early 2003 without having had prior discussions with Mr. Noe about those items?
A. Right. They were discussed either at that



meeting or as a result of this.
Q. In preparing Exhibit 14, did you go back and look at early reports about the pier? Do you want to add to your prior answer?
A. Yeah, I'm sorry. I'm going back to, if I remember, the line handling guides, but that was something requested -- outside of Mr. Noe, that was requested by the line handlers themselves.
Q. Now, let me ask again, did you refer to prior reports in the course of preparing Exhibit 14?
MR. EDWARDS: Objection.
A. Can you rephrase the way that you asked that?
Q. Sure. When you were preparing Exhibit 14, did you look at old reports or documents relating to the pier to help you in identifying projects?
A. Yes.
Q. Okay. And what sorts of things did you look at?
A. Reports prepared by myself in 2002. I looked at inspection reports that were done -- that I had done previously with Pare prior to 2002.
Q. Are those reports included in the materials that you brought with you here today?
MR. EDWARDS: Objection. I think your request only started from 2003 forward.
Q. So the answer is, no?



A. Correct.
Q. This Exhibit 14 refers to a Table 1. Do you see that?
A. Uh-hum.
Q. And did you prepare Table 1 to go with this document?
A. That would be, yes. I'm not sure whether it --
MR. TAYLOR: I don't think I've got a copy of it.
Q. As far as you know, it was prepared?
A. It was prepared. It should be a part of this.
MR. EDWARDS: Could we go off the record for one second?
MR. TAYLOR: Yes.
(Discussion held off the record.)
Q. I'm showing you what's been marked as Exhibit 15.
(Defendant's Exhibit 15 marked for ID.)
Q. Is this the document that's referred to in Exhibit 14 as Table 1?
A. I don't believe it is. It is not Table 1, no, it's not.
Q. And then on the front page of Exhibit 14 under, Project Descriptions, do you see there's a reference to Figure 1. My question is, is that

Page 46

frequently, was an order to stop the bleeding, to stop the constant damage repairs at the pier. That's where this came into discussion.

So, there were meetings in regard to damages, summarizing it, how we got to this point in history, this point in time with all these damages. And the next step, as to the safe use of the facility.

Q. So, Exhibit 15 was a representation of the next step with respect to the facility?

MR. EDWARDS: Objection.

A. Yes.

Q. Are there items on Exhibit 15 that were requested by Global?

MR. EDWARDS: Objection.

A. Not requested by Global directly, no.

Q. Are there items that are on Exhibit 15 that were things that Global expressed an interest in seeing happen?

MR. EDWARDS: Objection. You can answer.

A. Yes.

Q. Which items were those?

A. Those were items in reference to areas of protecting the -- preventing the damage from occurring, continuing to occur. Improving an

Page 47

older fendering system into something that was standardized across the industry as far as -- that would survive and continue to survive the facility and the use of the facility.

Q. Okay. Can you identify the specific items in Exhibit 15 that related to that concern?

MR. EDWARDS: Objection.

A. Yes. The barge fendering, mooring improvements.

Q. That's item number 11 on the first page?

A. Item number 11, yes. Portions of the East Dolphin. Improvements, which would have been items 20, 21, 22 and 23. That would be it.

Q. What about the -- what is referred to as the New Forward Dolphin on the bottom of the first page?

A. That would be for larger ships, tankers.

Q. And does Global use larger ships to bring petroleum product to the pier?

A. Yes.

Q. Was that an item that Global was interested in seeing added to the list of improvements?

MR. EDWARDS: Objection.

A. That was an item that I personally added to the projects due to analyses of looking at the fendering systems and optimizing the facility for

Page 48

the range of ships that are used at the facility.

Q. Is this the current version of the cost allocation schedule, meaning Exhibit 15?

A. Current as of 2003?

Q. No, current as of today. Has Exhibit 15 been updated or modified in any way?

A. No, there has not.

Q. There's been no recent version of Exhibit 15?

A. Not to my knowledge.

Q. Have some of the projects listed on Exhibit 15 been undertaken?

A. Yes.

Q. Can you point out for me which ones those are?

A. They're on different forms possibly than this but the barge fendering has been done.

Q. Which item is that?

A. Item 11, and the subsequent subtitles are 12 and 13.

Item 14, what's called a West Dolphin Barge Fender, and the Middle Dolphin, a variation of that has been implemented. The general engineering facility evaluations, burning capacities, boring programs have been implemented as part of this work.

Q. Let's -- so the record is clear --

Page 49

A. Sorry, 2, 3, 4 and 5 --

Q. Have been completed?

A. -- have been completed. Middle Dolphin, 6, 7, 8, 9 and 10. Some of those are iterations therein have been done.

Item 29, Loading Platform, portions of that main project have been done.

Items 30, 31.

Item 48, mooring improvements, a portion of them have been done or a variation thereon.

Maintenance dredging, the baseline Bathymetric survey has been done.

Q. What line item is that?

A. 52. The baseline Bathymetric survey is item 53, and part of the engineering design and permitting for 54 has been done.

The miscellaneous maintenance repairs, annual facility monitoring.

Item 64 has been done annually.

Item 66, Middle Dolphin Walkway Repairs, a variation therein has been done.

Monitoring the soldier pile retaining wall, annual monitoring. Item 70 has been done periodically.

Item 71, Pier Erosion.

Item 72, that specifically leaves the stone wall erosion, East Dolphin.

Item 78, New Security Fence and Gate has been installed.

Q. In addition to the improvements listed on Exhibit 15, which you've just told us about, are there other improvements that have been done at the pier since 2003?

A. Improvements and/or repairs or just improvements?

Q. The question is improvements.

A. There was a -- yes, a variation of one that was on here, it was an interim. It was a project that was done last summer, some reinforcement to the East Dolphin was installed.

Q. Since 2003, has there also been work done at the pier that you would characterize as repair work?

MR. EDWARDS: Objection.

A. Yes.

Q. And what sort of work are you aware of that you would characterize as repair work?

A. There was some interim support repairs that were done as part of a project that -- I mean, that was done in 2004 but was actually paid for by Getty. It was the pipeline project, 16-inch



distillate pipeline that was put on the pier.

As part of that, there was repair to the pipe supports, interim supports were put in. Annually -- bi-annually, actually, spring and fall, there are pothole repairs that are done in the paved area.

There has been ongoing -- monitoring has been occurring of monitoring the loading platform for movement. Some walkway repair/improvements to access over the pipelines.

I guess those would be considered more improvements, just to make the use of it easier. That should be it from my recollection.

Q. You mentioned something about loading platform and monitoring, what does that involve?

A. There are -- we install gauges on the loading platform areas that were cracked to just see if there is any movement occurring and targets.

Q. By movement, you mean, movement in what direction?

A. That's what we're trying to ascertain; up, down, backwards, forward. We're trying to figure out why the cracks are getting larger.

Q. And have you reached any conclusions in that regard?

A. As of now, no.



Q. Are there any Wilkesbarre Pier improvement projects that are currently in the planning stage?

A. Yes.

Q. What is that?

A. New fendering system, adjusting the burning plane. There's a new fendering system that is being proposed for the East Dolphin and the West Dolphin, which would require moving out the improvements that have already been done and moving that fendering line out a few feet to accommodate the new style fenders that would be installed on the East and West Dolphins.

Q. And what's the purpose of that improvement?

MR. EDWARDS: Objection.

A. The purpose is to continue the current capacity of the facility to accommodate the different types of vessels that are used at the facility or certified to be used at the facility.

The existing timber and fendering system is antiquated and in constant repair and, basically, is outdated.

New fendering, energy absorption system, which are more effective and more safer for the facility as far as barges or ships coming in to use it that are being installed, more state-of-the-art



fendering systems.

Q. And will that increase the number of vessels that can -- number of types of vessels that can use the pier?

A. Would it increase, no, it would not increase.

Q. It basically improves the effectiveness of the pier protection for the kinds of vessels that are using the pier today.

MR. EDWARDS: Objection.

A. Can you repeat that please, for me?

Q. Is it the case that the purpose of those fendering improvements are to increase the effectiveness of the protection of the pier against damage from the kinds of vessels they're using on the pier today?

MR. EDWARDS: Objection.

A. No.

Q. I just need to ask you to explain to me, again, what the purpose of that improvement is then.

A. Okay. The pier is identified with agencies and with local port authorities, Coast Guard, pilots, certified to be used by certain size and certain range vessels; whether they're brought into the pier or not, they're certified to be able to accommodate that type of vessel.

That certification comes to you, that by

Terminal Company, did you have any discussions with Mr. Noe about this project?
A. Yes.
Q. What do you recall about those discussions?
A. I recall that it did not seem feasible or cost effective to perform these improvements dredging for a deeper ship berth for the cost to improve the facility.
Q. Well, when you say it did not seem feasible, do you mean it was not technically feasible?
A. No, it was not cost effective. The rate of return on investment was not worth the deeper ship berth.
Q. And has this project been completed?
MR. EDWARDS: Objection.
A. No.
Q. On page 3 of this document, the paragraph under Alternatives, there's a statement that says: At this time we have not considered reconstructing the pier with new steel sheeting as a desirable alternative based on the initial construction cost and the future land development plans along the East Providence waterfront. Do you see that?
A. Yeah.
Q. What was it about future development plans along



the East Providence waterfront that you were referring to?
A. The City of East Providence has a new waterfront commission, development commission, that is looking at improving the entire waterfront in East Providence within the Providence River and the Seekonk River.
There are design and construction phases of different variations of the waterfront drive project, which would change the makeup of the waterfront or their desire. It is unknown right -- at the time of this letter, it was unknown whether or not the City of East Providence would maintain the use of this area as a throughput for petroleum product, or look at more of a condo business-type development, non-heavy industrial use, more of a commercial/residential use.
Q. And how did that affect your recommendations?
A. The initial cost -- again, the initial cost to provide a bulkheaded pier, steel sheet wall, bulkhead pier for the entire facility would be a high -- would be at a very expensive initial capital investment for the possibility of it being condemned and taken away in a very short period of time.



Q. Have you had any discussions with Mr. Noe about East Providence plans for waterfront development since the date of this letter?
A. Not since the date of this letter.
Q. Could you go back, please, and look at Exhibit 14. I'm going to ask a few more questions about these categories.
Exhibit 1, Pipeline Support Repairs. Has the project described as Number 1 on Exhibit 14 been completed?
A. The interim repairs has been completed as described, yes.
Q. So, the repair to two pipe support foundations?
A. Yes.
Q. And was that a repair that had been outstanding for some time before 2003?
MR. EDWARDS: Objection.
A. Not to my -- that specific repair, no.
Q. Were you aware that -- I believe in your earlier testimony you were aware that there had been other pipeline support repairs prior to 2003 though; right?
A. Yes.
Q. Item 2, Stone Wall Erosion. Has that repair work been done?



A. Yes.
Q. And in Exhibit 14 your letter indicates that the erosion of these two areas was caused by the installation of the existing tie-back system several years ago; correct?
MR. EDWARDS: Objection.
Q. Do you see where it says that?
A. Yes.
Q. And I believe you indicated earlier today that that erosion was something that existed in 1997 or 1998 when you first started visiting the pier?
MR. EDWARDS: Objection.
A. That particular stone wall area, I don't know if it started in '97. The repairs of the tie-backs were done in '98. So, the timing of it, I don't believe it was in '97, but the erosion would have started in '98 or '99.
Q. Number 3, the Timber Pile Cluster Dolphin.
A. Yes.
Q. Has that been constructed?
A. No.
Q. Is it on one of the other exhibits that we looked at this afternoon as a proposed project?
A. Are you referring to Exhibit 16?
MR. EDWARDS: It's 15.

Page 70

Q. Is it on 15?
A. No.
Q. Okay. Number 4, Soldier Pile and Panel Retaining Wall, has that work been performed?
A. The coping channel was replaced.
Q. When did that take place?
A. During different projects but has just been completed in 2006.
Q. And are there other parts of the work described, generally, under item 4 on Exhibit 14, which are listed on Exhibit 15?
MR. EDWARDS: Objection.
A. Can you ask the question one more time?
Q. Are there other portions of the work described in item 4 of Exhibit 14 which are identified also on Exhibit 15?
A. Yes.
Q. And what are those?
A. Those are the coverplate repairs, bracing repairs, and that is the extent of what is stated in item Number 4 on Exhibit 14. That's also stated in Exhibit 15.
Q. And which line items in 15 are those?
A. Line item 37 and line item 38.
Q. Please go back to number 3 on Exhibit 14 for a

Page 71

minute. You indicated a moment ago that the timber pile cluster dolphin described there has not been completed; correct?
A. Correct.
Q. Is there some other work that's been done in lieu of the timber pile cluster dolphin?
A. Yes.
Q. What's that?
A. That is the barge fendering/mooring improvements, item number 11 on Exhibit 15.
Q. And what about the mini dolphin, is that the same thing?
A. Same thing. The mini dolphin is considered the barge fendering.
Q. So, it's referred to in 3 as the cluster dolphin has been completed, but is being called the mini dolphin?
A. It's -- no.
Q. Okay.
A. The timber pile cluster dolphin was proposed at the time to match a similar dolphin that was at the loading platform on the other end. After preparing this report and investigating further and performing more analyses in regards of that effectiveness of this item, it was determined that

Page 72

it wasn't going to benefit the facility the way we intended it to, and the other timber pile cluster was actually removed and the new mini dolphin was installed.
Q. And was the new mini dolphin installed in the northeast or the northwest corner of the loading platform?
A. Northeast corner, and the one proposed west of the loading dolphin actually was installed on the middle dolphin as part of middle dolphin improvements.
Q. Number 5 on Exhibit 14, middle dolphin repairs. Has that been performed?
A. Portions of it, yes.
Q. Okay. And what categories on Exhibit 15?
A. The steel reinforcing H-piles. The exact number, I am not clear on as to how many were actually installed, if there was eight. I'm not 100 percent sure.
The fendering system has been improved but it does not match the East Dolphin, it matches the mini dolphin, the barge fendering dolphin. And the timber walkway was not replaced, so that did not occur.
Q. Item 6, Loading Platform Repairs?

Page 73

A. Yes.
Q. Those have been done?
A. It's just a slightly different extent of what was proposed under item number 6.
Q. What loading platform repairs have actually been completed?
A. The fendering system has been repaired. The timber chocks were not just repaired, they were replaced in the steel support, cross beams were removed and a new steel and rubber fendering system was installed.
Q. And the loading platform is the area where RT Group has installed monitors to check for movement; correct?
A. Correct.
Q. What are the potential causes of the movement that you're monitoring?
MR. EDWARDS: Objection.
A. I don't have an answer at this time.
Q. Number 7 is the Erosion Area between Middle and West Dolphins. My question is, has that work been performed?
A. No.
Q. Is that an erosion area that existed in 1997 or early 1998 when you first started visiting the

Page 74

pier?
A. Yes.
Q. Number 8, West Dolphin Steel Reinforcing H-Piles. Have those been done?
A. No.
Q. Number 9, East Walkway Access Stairs, has that been done?
A. Yes, to some -- not to the exact degree that they had stated in here.
Q. And number 10?
A. Yes. No, that has not been performed, sorry.
Q. Have the line handling guides been installed?
A. No.
Q. Has RT Group made any recommendations to Dunellen, other than the ones that we've looked at today, in the various documents regarding pier improvements?
MR. EDWARDS: Objection.
A. No.
Q. Do you recall any discussions with Mr. Noe about pier improvements in areas other than the areas that we've covered in the documents today?
A. No.
Q. What about pier repairs, discussions with Mr. Noe about pier repairs, other than the types of repairs that are covered in the documents we've

Page 75

looked at today?
A. No.
Q. Have you had any discussions with Mr. Noe, or anyone else, about whether or not the priority of repairs that's reflected on Exhibit 15 should be altered in some way?
A. I need you to ask that again to make sure --
Q. I'm trying to get a sense, whether going forward from today, you know it's been completed?
A. Yeah.
Q. There are a number of other projects that are listed on Exhibit 15. So, my question is, have you had any discussions with Mr. Noe about the schedule for completing items on Exhibit 15 that have not yet been completed?
A. Yes.
Q. What discussions have you had with him about that?
A. We've discussed what would be the next project, which we discussed the fendering system would be the next project. And, as far as when that would be completed for budgeting purposes, that's based on cash flow and capital expenditures that would be utilized to fund the projects.
Q. Has Mr. Noe given you an understanding of Dunellen's annual ability to fund capital

Page 76

improvements to the pier?
MR. EDWARDS: Objection.
A. No.
Q. Has he given you a sense of annual budget parameters?
A. Yes.
Q. What has he told you about that?
A. Typically, he's requested that it stay within around $300,000 was the number that was being used, budget.
Q. On an annual basis?
A. On an annual basis.
Q. And did he tell you any reason why that was the budget range?
A. Yes.
Q. What was that?
A. It was a -- the reason for it was to spread the cost over the ten years of trying to keep that within reason for the first several years. That was the number that was agreed to between Dunellen and Global.
Q. It's your understanding that that budget was based, at least, in part on an expectation of a contribution through Global in a certain range?
MR. EDWARDS: Objection.

Page 77

A. Yes.
MR. TAYLOR: All right. I have no more questions at this time. I do want to see those exhibits. I'll reserve the right to recall you if for some reason there's something there that I see, but I wouldn't really expect that.
MR. EDWARDS: I will ask Todd to go back to the office, look for those, and I will get them to you as soon as he gets them to me. The witness will read and sign.
(Deposition concluded at 4:21 p.m.)

C-E-R-T-I-F-I-C-A-T-E

I, SALLY BRASSARD, a Notary Public in and for the State of Rhode Island, duly commissioned and qualified to administer oaths, do hereby certify that the foregoing deposition of TODD TURCOTTE, the witness in the above-entitled cause, was taken before me on behalf of the Defendant at the offices of Partridge Snow & Hahn, LLP, 180 South Main Street, Providence, Rhode Island, on February 12th, 2007, at 2:00 P.M., that previous to examination of said witness, who was of lawful age, he was first sworn by me and duly cautioned and sworn to testify the truth, the whole truth, and nothing but the truth, and that he thereupon testified as in the foregoing manner as set out in the aforesaid transcript.

I further certify that the foregoing deposition was taken down by me in machine shorthand and was later transcribed by computer and that the foregoing deposition is a true and accurate record of the testimony of said witness.

Pursuant to Rule 5 (d) and 30 (f) of the Federal Rules of Civil Procedure, original transcripts shall not be filed in court; therefore, the original is delivered and retained by Defendant's attorney.

I have enclosed with a copy of the deposition a correction and signature page, which must be signed before a Notary Public.

IN WITNESS WHEREOF, I have hereunto set my hand this 13th day of February, 2007.

SALLY BRASSARD, NOTARY PUBLIC/CSR-RPR
(MY COMMISSION EXPIRES JANUARY 16, 2009)