**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| DUNELLEN LLC,<br><br>Plaintiff,<br><br>v.<br><br>GETTY PROPERTIES CORP.,<br><br>Defendant. | C.A. No. 06-014-ML |

**GETTY PROPERTIES CORP.'S OBJECTION TO DUNELLEN LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Getty Properties Corp. ("Getty"), through counsel, submits the following objection to Dunellen LLC's ("Dunellen") motion for summary judgment. In addition to the reasons for denying Dunellen's motion for partial summary judgment set forth below, Getty incorporates by reference the arguments made in its February 27, 2007 cross-motion for partial summary judgment based on *res judicata*, accord and satisfaction, and common law, and the statement of facts supporting that cross-motion. *See* Getty Memorandum in Support of Motion for Partial Summary Judgment ("Getty Mem.") at pp. 3-14, and the accompanying Getty Statement of Undisputed Facts ("GSUF") and exhibits.

## I. ARGUMENT

### A. Equity And The Law Of Easements Precludes Summary Judgment.

The fundamental premise of Dunellen's motion is that it is inequitable to have the active users of the Wilkesbarre Pier (the "Pier") pay for Pier maintenance and expenses, because Getty was granted the right to use the Pier and may decide to exercise that right again at some point in the future. Dunellen Mem. at 9. This supposedly inequitable arrangement was in fact

the arrangement voluntarily agreed to among the Pier owner and users for decades. GSUF ¶ 5.[1] Dunellen still has an active Pier user paying hundreds of thousands of dollars in rent, plus contributing handsomely to Pier improvement costs. GSUF ¶¶ 14-15. Equity does not call for Getty to pay hundreds of thousands of dollars more to Dunellen for Pier repairs and improvements benefiting Dunellen and its tenant Global Companies LLC that Getty didn't ask for, wasn't consulted about, hasn't used, and may never use.

Equity also does not call for Getty to pay half of all Dunellen's Pier expenses (including the expenses for which it has already been reimbursed by Global Companies, *see* GSUF ¶ 16), when there are at least three other entities holding similar rights to use the Pier. Providence & Worcester Railroad Co. ("P&W"), has reserved the right to use the Pier by deed. GSUF ¶ 3. Unocal or its successor likewise has that right. GSUF ¶ 4. Dunellen itself has the right to use the Pier as assignee of Robert Eder's rights under the 1975 Grant and Agreement and Operating Agreement (For Use Of Pipelines). GSUF ¶ 1. Dunellen's claim against Getty is not based in equity, but is an arbitrary attempt to reap a windfall from a disfavored party.

As set forth in Getty's cross-motion, Getty's right to use the Wilkesbarre Pier is a right, not an easement. Getty Mem. at 11. Unlike easement cases, which involve the use of real property, the Rhode Island Supreme Court has determined that the Pier is personalty. *Providence & Worcester Railroad Co. v. Exxon Corp.*, GSUF Ex. H at 26. Dunellen's predecessor granted Getty the right to use the Pier in the 1975 Agreement, which incorporates an earlier reservation of Pier rights from 1941. GSUF Ex. C. The 1975 Agreement does not impose on Getty the obligation to pay half of all Pier maintenance and repair expenses regardless of

[1] As set forth in Getty's cross-motion for partial summary judgment, Pier users have entered into a series of operating agreements regarding the Pier and pipelines, all of which provided that one Pier user could not burden another user (or a non-user) with the cost of unwanted and unused Pier improvements. Getty. Mem. at 8-11. Further, in the event that one Pier user withdrew from the operating agreement, routine Pier maintenance and operating costs would be divided up among the remaining users regardless of whether the withdrawing member had the right to continue using the Pier. Getty Mem. at 9-10, and related exhibits.

whether it is using the Pier, and easement cases involving use of real property do not support rewriting the 1975 Agreement to create that obligation as to Dunellen's personalty – the Pier -- for the first time.

Even assuming that easement law can be applied by analogy, however, Dunellen's own case authorities demonstrate that Dunellen, which owns and controls the Pier, is responsible for repairs and maintenance. In *Friends of Sakonnet v. Dutra*, 749 F. Supp. 381 (D.R.I. 1990), developers built a septic system on a lot adjoining a housing development, allowing purchasers of houses in the development to tie into the system. When the septic system failed, the developers alleged that the homeowners, as beneficiaries of easements allowing them to use the septic system, were responsible for the cost of replacing the system. The parties agreed that the homeowners had "an implicit easement to deposit their waste waters into the sewerage system," 749 F. Supp. at 389. Finding that the terms of the implied easements were ambiguous, the court reviewed the evidence of the course of dealing of the developers and homeowners. Based on this evidence, the court concluded that the developers had always intended to retain control over the septic system, and that in light of such control, the homeowners had no obligation to pay to replace the system. The court agreed that the developers could have charged a user fee for processing the homeowners' waste water, but held that no fees were due because the waste water was not being processed and thus the homeowners had "not received anything for free." *Id*. at 393.

Similarly, it is clear that Dunellen owns and exercises control over the Pier. Getty's right to use Dunellen's Pier does not obligate Getty to repair, replace or maintain it. Like the homeowners in *Dutra*, Getty has "not received anything for free" because it has not used the Pier since 1997, and has no obligation to pay any sort of user fee. 749 F. Supp. at 393. Indeed, Dunellen is the party hoping to get something for nothing by continuing to use Getty's pipelines

to offload petroleum at the Pier, generating substantial revenues for Dunellen, while at the same time shifting Pier costs that were always allocated based on Pier use to Getty, a non-user of the Pier.

Dunellen also cites *Lake Lookover v. Olsen*, 348 N.J. Super. 53, 65, 791 A.2d 270 (2002). In *Lake Lookover*, the owners of approximately 100 house lots surrounding a man-made lake all had easements giving them the right to use the lake. A development company built and owned the dam which formed the lake in the 1920's, as well as four of the house lots around the lake. In the 1980's, New Jersey officials determined that the dam was unsafe, and began to press for repairs. When that failed to produce results, the state filed suit in 1994 against both the development company and the association of lot owners. The state's complaint alleged that

> while the Development Company "as owner, had primary responsibility for the dam, . . . that the Association through its unauthorized modifications to and exercise of control over the dam, was also a responsible party." In the complaint, the DEP described the Association as "an organization comprised of property owners who live adjacent to and possess lake rights to Lake Lookover." It also traced a pattern of what it claimed was the Association's exertion of "control over the dam by making repairs to the dam without a permit or approval from the DEP." The complaint also referred to various representations by the Association, dating from in or about 1990, that it intended to undertake necessary engineering studies and repairs to the dam in order to address the DEP's concerns.

*Lake Lookover*, 348 N.J. Super. at 56.

The state's lawsuit was settled in 1998 with a consent order. The settlement provided,

> in essence, that the costs of the project would be "borne on a pro rata basis" by all the Lake Lookover property owners who had "lake rights." It also said that, "The Association shall have the right and responsibility to bill each benefited property owner on a monthly, quarterly or other regular schedule for all such fees and costs, and the failure by any such property owner to make timely payment in accordance therewith shall constitute good cause for the Association to notify the court of such failure, and such failure may constitute a contempt of court or occasion any other remedy as the court may deem fit in its discretion."

*Id*. at 60.

When certain property owners failed to pay assessments for repairs to the dam, the association filed suit in 2000 seeking to enforce the consent order issued and approved by the court in 1998. The trial court held on the basis of the 1998 order and New Jersey law[2] that the association, as owner of the lake, had the authority to assess the property owners for the costs of needed repairs to the dam. The trial court also held, however, that the association had erred in simply imposing an identical assessment on each property owner without taking into account "such factors as the size of an individual property, its proximity to the lake, and whether it had been developed" – all factors relating to the property owners' implied use of the dam. *Id*. at 64-65.

The appellate court affirmed. The appellate court further rejected the property owners' argument that they could avoid contributing to repair costs by abandoning their easement to use the lake. The court in essence held that after enjoying the use of the lake for decades for free, it would be inequitable to allow a lake front property owner to avoid contributing to the cost of repairing the dam without which the lake would not exist.

---

[2] *Lake Lookover* relied on another New Jersey case, *Island Improvement Association v. Ford*, 155 N.J. Super. 571 (1978). In *Island Improvement*, a homeowners' association sought to impose the cost of maintaining a private road on the homeowners using the road. The court held that the users must share the cost, because the easement was solely for their benefit. *Id*. at 574-575. *Island Improvement* is distinguishable because the homeowners were actually using the road, and the dominant estate was not. Here, Getty is not using the Pier, while Dunellen is.

*Lake Lookover* also cited to *Ingling v. Public Service Electric & Gas Co*. In that case, the court held that an easement holder had a duty of care to the injured plaintiff to maintain property in the easement area owned by the easement holder. There, a utility company with an easement to anchor a guy wire to a house was sued for negligently failing to properly maintain the wire and anchor located on the servient estate. "[T]he defendants were under an affirmative duty to make reasonable inspections of their easement upon plaintiff's property and to use due care to keep the guy wires and [protective covering] in good repair . . . . [S]ince it was their property, theirs was the duty of examination and repair and as owners of the dominant estate they had a right of access to and could enter upon the servient estate for th[at] purpose." *Ingling v. Public Service Electric & Gas Co*., 10 N.J. Super. 1, 10-11 (App. Div. 1950). *Ingling* is distinguishable because it involved the duty to maintain property owned by the easement holder. Here, the Pier is owned by Dunellen.

*Lake Lookover* is easily distinguished from the present case. First, there was a settlement and consent order already in place that established an obligation to contribute to dam repairs. In Getty's case, there is the 1997 Settlement Agreement that establishes that Getty does not have an obligation to contribute to Pier expenses. *See* Getty Mem. at 6-7; GSUF ¶ 8. Second, the *Lake Lookover* property owners had enjoyed the lake for years without paying anything for the dam; in contrast, Getty contributed to Pier repairs and maintenance throughout the years it used the Pier, and satisfied all of its remaining obligations arising from that use through the 1997 Settlement Agreement. *Id*. Third, the association that owned the dam was not using it for its own commercial benefit and deriving hundreds of thousands of dollars in annual income from it, as is Dunellen. GSUF ¶¶ 14-16. Fourth, the lake front property owners would as a practical matter continue to benefit from and in all likelihood use the lake on a daily basis even if they purportedly abandoned their easement. In contrast, Getty has not used the Pier since 1997. GSUF ¶ 9. Fifth, in *Lake Lookover*, the court held that the association could not simply assess each easement holder pro rata, but should consider the use and benefits conferred on each easement holder is deciding how to allocate the repair costs. Dunellen wants to use the pro rata approach that the *Lake Lookover* case rejected.[3]

Getty's right to use the Pier and to contribute to Pier expenses based on use is consistent with the law of wharfage. Wharfage "is a charge for the use of a wharf, made by the proprietor thereof by way of rent or compensation." 79 Am. Jur. 2d § 29. Wharfage agreements may be either express or implied, but in either case the pier owner is compensated based on use. As Getty has not exercised its right to use the Pier since 1997, and settled all of its outstanding

[3] *Moran v. Edman*, also cited by Dunellen, held that the plaintiff had a acquired a prescriptive easement to use a road across the defendant's land. Not surprisingly, the court also held that the prescriptive easement holder, not the landowner, was responsible for maintaining its easement. 194 W. Va. 342, 348, 460 S.E.2d 477 (1995). The case did not involve any kind of structure, or use of the road by the landowner.

Pier-related obligations at that time, Dunellen is not entitled to payment of half of its Pier expenses.

**B. <u>Fact Issues Preclude Summary Judgment.</u>**

Dunellen's motion must also be denied because, even if the Court concludes that Getty is responsible for some portion of Pier repairs and maintenance, there are countless factual issues about what repair and maintenance costs are ratable. Dunellen is asking that Getty pay for half of every conceivable Pier-related expense, right down to the cost of gloves and a "HARDHAT W/ NFL LOGO NEW ENGLAND PATRIOTS." Getty Statement of Disputed Facts, Ex. F. Most if not all of Dunellen's expenses are attributable to the fact that Dunellen is using the Pier for its own benefit to unload petroleum products, and is upgrading the Pier to suit its own business interests. These expenses would not be incurred by Dunellen but for its own use of the Pier, and should not be charged to Getty.

Pier expenses depend on whether the Pier is used, and if so, how much. If the Pier receives fewer vessels or none at all, expenses for routine maintenance caused by daily wear and tear from ships and shore crews, utilities, security, oil pollution protection, snow plowing, wharfinger's liability insurance, engineering for improvements, and construction of improvements can all be reduced or eliminated. Dunellen's own witnesses confirm this. According to Mr. Noe, Dunellen's president, the damage being caused by heavy use of the Pier after 2003 (as Dunellen tripled its storage capacity in East Providence to over one million barrels, and Dunellen's tenant Global Companies increased its throughput to over 7 million barrels, GSUF ¶ 14) led him to decide that certain Pier improvements were necessary:

> But what initiated it was that we were having a number of vessel damage incidents to the pier. I needed to look at this to see, could I improve upon this pier to cut down on this damage and to extend the life of this pier for future years. And due to the fact that we have upgraded our facility, we definitely want to have a pier that is usable, long-term.

Getty Statement of Disputed Facts Ex. B (Noe Depo. at 72); *id*. at 77 ("we talked about capital improvements and, again, it goes back to trying to prevent accidents to the pier, trying to extend the life of the pier."); *id*. at 78 ("we needed to find a way to prevent this damage that it was incurring, and to improve upon the durability of these breasting dolphins by improving the bumper system"). Global Companies, having leased a terminal from Dunellen that is now three times the size of Getty's East Providence terminal, is a much heavier user of the Pier than Getty ever was. Global's heavy use of the Pier is expected to continue; according to Mr. Noe, "Global said that they're building a business in this marketplace and they wanted to be here long term." Getty Statement of Disputed Facts Ex. B (Noe Depo. at 76). Indeed, Global has an option to purchase Dunellen's terminal and the Pier. *Id*. at 82.

Mr. Noe conceded during his deposition that only "some" maintenance items would reoccur whether the Pier was used or not. *Id*. at 70. In fact, in his affidavit submitted in support of Dunellen's motion for partial summary judgment, Mr. Noe identifies only three expenses that he contends would be incurred regardless of Pier use: electricity for minimum safety and security purposes (not unloading operations); engineering "so that the Pier's functionality can be evaluated"; and property insurance. Mr. Turcotte, Dunellen's outside engineer, also agreed during his deposition that "[v]essel activity causes wear and tear to the berthing components of the facility." Getty Statement of Disputed Facts Ex. C (Turcotte Depo. at 63).

Examination of the expenses Dunellen identifies in its brief demonstrates that they are all tied to Pier use. For example, Dunellen wants Getty to pay for half of the costs incurred by Dunellen after "the Department of Homeland Security propounded rules and regulations for facilities that receive petroleum to secure their facilities." Dunellen Mem. at 9. The cited regulations apply to a facility that "receives vessels." 33 C.F.R. § 105.105(a). The

only reason that the Pier "receives vessels" is that Dunellen is using it for that purpose. Getty, which is not using the Pier, is not responsible for security costs attributable to Dunellen's voluntary and profit-making petroleum operations there.

Similarly, Getty is not responsible for half the cost of the emergency oil spill response crew Dunellen keeps on 24 hour call, which Dunellen has included in its damages claim but chosen not to mention to the Court. Getty Statement of Disputed Facts Ex. D. If Dunellen were not using the Pier to unload petroleum products, an expensive 24 hour emergency oil spill response crew would not be needed.

Dunellen wants Getty to pay for a new fendering system for the East Dolphin and the West Dolphin "because the certification from the Rhode Island Coastal Resources Management Council mandates that the Pier be able to accommodate a certain range of vessels." Dunellen Mem. at 9. Dunellen has not produced this purported "certification" in discovery, and the suggestion that it "mandates" a new fendering system is contradicted by Dunellen's deposition testimony. The existing fendering system accommodates the right range of vessels but is "antiquated and in constant repair." Getty Statement of Disputed Facts, Ex. C (Turcotte Depo. at 52). Dunellen wants to "upgrade the bumper system like we did with the middle dolphin and the mini dolphin to make it conform to those two improvements." Getty Statement of Disputed Facts, Ex. B (Noe Depo. at 94-95). Again, expenditures arising out of Dunellen's self-interested decision to upgrade the Pier for its own benefit should not be charged to Getty.

Dunellen wants Getty to pay for half of "[c]ertain repairs and maintenance [which] needs to be done regardless of use." Dunellen Mem. at 10. The only specific example is clearing storm debris. Dunellen provides no support for its assertion that this must be done "regardless of use," and it seems likely that but for Dunellen's continued use of the Pier, such expenses could be reduced if not eliminated.

Dunellen wants Getty to pay half of the real estate taxes on the Pier. *Id*. This ignores the undisputed fact that Dunellen owns the Pier. GSUF ¶ 1. Even accepting Dunellen's argument that Getty's right to use the Pier should be treated as an easement, Dunellen offers no legal authority supporting the proposition that an easement holder must contribute to the servient landowner's taxes, because that is not the law. Nor is there any other basis for imposing such an obligation on Getty.

Dunellen argues that "insurance must be paid for the Pier, regardless of its use." Dunellen Mem. at 10. In fact, Dunellen is seeking reimbursement for primary and excess wharfinger's liability policies that name Capital Properties as the named insured. Getty Statement of Disputed Facts, Ex. E. Getty is not an insured under the insurance policies, and should not have to pay for liability coverage for Dunellen's activities at the Pier. Similarly, Getty should not be held responsible for the electricity used at the Pier to unload Dunellen's vessels, or the engineering costs for Pier projects desired by Dunellen, but of no use to Getty, or the cost of hardhats and gloves for Dunellen's workers. Getty Statement of Disputed Facts, Ex. F.

Dunellen's itemization of reimbursable costs leaves out the biggest single cost of all: Pier improvements that Getty has not benefited from and may never benefit from. In *Renaissance v. Universal Properties Group*, 821 A.2d 233, 237 (R.I. 2003), the Rhode Island Supreme Court made clear that a joint user of property has no right to burden another user with unwanted repairs and improvements. It would be inequitable to give Dunellen carte blanche to charge Getty for half of any and all expenses Dunellen chooses to incur to suit Dunellen's business convenience, regardless of their utility to Getty. Issues of fact regarding the nature of the expenses Dunellen is seeking to recover, and whether they would be incurred but for

Dunellen's continued use of the Pier, require that Dunellen's motion for summary judgment be denied.

GETTY PROPERTIES CORP.

By Its Attorneys,

PARTRIDGE SNOW & HAHN LLP

/s/ Robert K. Taylor
James W. Ryan (#4042)
Robert K. Taylor (#6514)
180 South Main Street
Providence, RI 02903
(401) 861-8200
(401) 861-8210 FAX
jwr@psh.com
rkt@psh.com

DATED: March 16, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing GETTY PROPERTIES CORP.'B OBJECTION TO DUNELLEN LLC'S MOTION FOR SUMMARY JUDGMENT was filed with the Clerk of the United States District Court for the District of Rhode Island this 16th day of March, 2007 and is available for viewing and downloading to the following ECF registered counsel of record:

Gerald J. Petros, Esq. / Hinckley, Allen & Snyder LLP
Mitchell R. Edwards, Esq. / Hinckley, Allen & Snyder LLP

/s/ Robert K. Taylor

906452_1/2900-7