# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

DUNELLEN LLC,

Plaintiff,

v.

GETTY PROPERTIES CORP.,

Defendant.

C.A. No. 06-014-ML

## GETTY PROPERTIES CORP.'S STATEMENT OF DISPUTED FACTS

Getty Properties Corp. ("Getty"), through counsel, submits the following Statement of Disputed Facts pursuant to Local Rule 56. The paragraph numbers below correspond to the paragraph numbers of Dunellen's Statement of Undisputed Facts.

14. The Court issued its September 2003 Decision based on the law, the evidence presented at trial, and the pleadings and other filings submitted by the parties, not "at Getty Properties' request."

19. There is no pier operating agreement in effect, but it is undisputed that the 1975 Agreement between Providence & Worcester Railroad Company ("P&W") and Getty is still in effect. *See* September 5, 2003 Memorandum and Decision at 6; 1975 Agreement (Ex. C to Getty Statement of Undisputed Facts ("GSUF") submitted in support of its February 27, 2007 cross motion for partial summary judgment ("Getty Mem.")). The 1975 Agreement does not obligate Getty to pay Pier expenses regardless of use. Getty Mem. at 8-11. In addition, the 1997 Settlement Agreement resolved all claims against Getty based on its use of the Pier up to that time, so that Getty would no longer be responsible for Pier-related expenses. Getty Mem. at 6-7;

Deposition of Andrew Smith ("Smith Depo.") at 41 (attached to Dunellen Statement of Undisputed Facts as Ex. 3).

20. There is no pier operating agreement in effect, but it is undisputed that the 1975 Agreement between P&W and Getty is still in effect. *See* September 5, 2003 Memorandum and Decision at 6; GSUF Ex. C. The 1975 Agreement does not obligate Getty to pay Pier expenses regardless of use. Getty Mem. at 8-11. In addition, the 1997 Settlement Agreement resolved all claims against Getty based on its use of the Pier up to that time, so that Getty would no longer be responsible for Pier-related expenses. Getty Mem. at 6-7; Smith Depo. at 41.

24. The testimony cited by Dunellen actually states:

> I'll answer it this way. At the time that the settlement agreement was entered into and the through-put agreement was entered into with Getty Petroleum Marketing, it was Getty Properties' understanding that it would no longer be responsible for any pier related expenses, that it wasn't a – ever going to use the pier because it's not an operator, it's a landlord; its tenant had entered into a through-put agreement. So it wasn't a question of not being responsible for expenses until it resumed use or used. As far as it was concerned, it could never be and would never be a user itself because it was not in that business. It was a landlord. It would always lease the premises for use by others.

Smith Depo. at 41.

25. Getty has no knowledge of whether Getty Petroleum Marketing has a present intention to use the Pier. <u>Ex. A</u> (Smith Depo. at 24) ("Q: Do you know if Getty Petroleum Marketing Inc. has any plans to use the Getty terminal? A: I wouldn't know.").

27. From January 1, 2003 through May 24, 2006, Global Companies LLC reimbursed Dunellen $485,875 for Pier expenses. GSUF Ex. X (Deposition of Avery Noe ("Noe Depo."), Ex. 11); <u>Ex. B</u> (Noe Depo. at 92-94). This amount should be deducted from Dunellen's calculation of its Pier expenses. During the same period, Dunellen also benefited from the use of approximately two miles of pipeline owned and maintained by Getty connecting the Pier and

Dunellen's petroleum storage terminal. GSUF ¶ 1; Getty Mem. at 9-10. Dunellen currently pays nothing to use the pipeline.

29. Pier expenses depend on whether and how much the Pier is used. If the Pier receives fewer vessels or none at all, expenses for routine maintenance caused by daily wear and tear from ships and shore crews, utilities, security, oil pollution protection, snow plowing, wharfinger's liability insurance, engineering for improvements, and construction of improvements can all be reduced or eliminated. According to Mr. Noe, Dunellen's president, the damage being caused by heavy use of the Pier after 2003 (as Dunellen tripled its storage capacity in East Providence to over one million barrels, and Dunellen's tenant Global Companies increased its throughput to over 7 million barrels, GSUF ¶ 14) led him to decide that certain Pier improvements were necessary:

> But what initiated it was that we were having a number of vessel damage incidents to the pier. I needed to look at this to see, could I improve upon this pier to cut down on this damage and to extend the life of this pier for future years. And due to the fact that we have upgraded our facility, we definitely want to have a pier that is usable, long-term.

Ex. B (Noe Depo. at 72); *id*. at 77 ("we talked about capital improvements and, again, it goes back to trying to prevent accidents to the pier, trying to extend the life of the pier."); *id*. at 78 ("we needed to find a way to prevent this damage that it was incurring, and to improve upon the durability of these breasting dolphins by improving the bumper system"). Global Companies, having leased a terminal from Dunellen that is now three times the size of Getty's East Providence terminal, is a much heavier user of the Pier than Getty ever was. Global's heavy use of the Pier is expected to continue; according to Mr. Noe, "Global said that they're building a business in this marketplace and they wanted to be here long term." Ex. B (Noe Depo. at 76). Indeed, Global has an option to purchase Dunellen's terminal and the Pier. *Id*. at 82.

Mr. Noe conceded during his deposition that only "some" maintenance items would reoccur whether the Pier was used or not. *Id*. at 70. In fact, in his affidavit submitted in support of Dunellen's motion for partial summary judgment, Mr. Noe identifies only three expenses that he contends would be incurred regardless of Pier use: electricity for minimum safety and security purposes (not unloading operations); engineering "so that the Pier's functionality can be evaluated"; and property insurance.

Mr. Turcotte, Dunellen's outside engineer, also agreed during his deposition that "[v]essel activity causes wear and tear to the berthing components of the facility." Ex. C (Turcotte Depo. at 63).

Dunellen wants Getty to pay for half of the costs incurred by Dunellen after "the Department of Homeland Security propounded rules and regulations for facilities that receive petroleum to secure their facilities." Dunellen Mem. at 9. The cited regulations apply to a facility that "receives vessels." 33 C.F.R. § 105.105(a). The only reason that the Pier "receives vessels" is that Dunellen is using it for that purpose.

Similarly, Getty is not responsible for half the cost of the emergency oil spill response crew Dunellen keeps on 24 hour call, which Dunellen has included in its damages claim but chosen not to mention to the Court. Ex. D (oil spill response crew invoices). If Dunellen were not using the Pier to unload petroleum products, an emergency oil spill response crew would not be needed.

Dunellen wants Getty to pay for a new fendering system for the East Dolphin and the West Dolphin "because the certification from the Rhode Island Coastal Resources Management Council mandates that the Pier be able to accommodate a certain range of vessels." Dunellen Mem. at 9. Dunellen has not produced this purported "certification" in discovery, and the suggestion that it "mandates" a new fendering system is contradicted by Dunellen's

deposition testimony. The existing fendering system accommodates the right range of vessels but is "antiquated and in constant repair." Ex. C (Turcotte Depo. at 52). Dunellen wants to "upgrade the bumper system like we did with the middle dolphin and the mini dolphin to make it conform to those two improvements." Ex. B (Noe Depo. at 94-95).

Dunellen argues that "insurance must be paid for the Pier, regardless of its use." Dunellen Mem. at 10. In fact, Dunellen is seeking reimbursement for primary and excess wharfinger's liability policies that name Capital Properties as the named insured. Ex. E (invoices).

Dunellen's Pier expenses that it wants Getty to pay include the costs of gloves and a hardhat for Dunellen's workers. Ex. F (invoice).

GETTY PROPERTIES CORP.

By Its Attorneys,

PARTRIDGE SNOW & HAHN LLP

/s/ Robert K. Taylor
James W. Ryan (#4042)
Robert K. Taylor (#6514)
180 South Main Street
Providence, RI 02903
(401) 861-8200
(401) 861-8210 FAX
jwr@psh.com
rkt@psh.com

DATED: March 16, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing GETTY PROPERTIES CORP.'S STATEMENT OF DISPUTED FACTS was filed with the Clerk of the United States District Court for the District of Rhode Island this 16th day of March, 2007 and is available for viewing and downloading to the following ECF registered counsel of record:

Gerald J. Petros, Esq. / Hinckley, Allen & Snyder LLP
Mitchell R. Edwards, Esq. / Hinckley, Allen & Snyder LLP

/s/ Robert K. Taylor

907008_1/2900-7