# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

DUNELLEN, LLC
VS. C.A. NO.:06-014 ML
GETTY PROPERTIES CORP.,

DEPOSITION OF AVERY NOE, witness in the above-entitled cause, taken on behalf of the Defendant, pursuant to notice, before Sally Brassard, CSR, a Notary Public in and for the State of Rhode Island and Providence Plantations, at the office of Partridge Snow & Hahn LLP, 180 South Main Street, Providence, Rhode Island, on February 7, 2007, at 9:00 a.m.

APPEARANCES:

FOR THE PLAINTIFF: HINCKLEY ALLEN & SNYDER, LLP
BY: MITCHELL R. EDWARDS, ESQUIRE
FOR THE DEFENDANT: PARTRIDGE SNOW & HAHN LLP
BY: ROBERT K. TAYLOR, ESQUIRE

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RI 02920
(401) 946-5500

Q. Well, but do some of them reoccur because of the use of the pier?

A. Maybe some others would happen whether you use the pier or not.

Q. Does repair and maintenance include things like, snowplowing?

A. Yes.

Q. And that's something that needs to happen because the pier is in use; correct?

MR. EDWARDS: Objection.

A. It would have to happen whether the pier was in use or not, and I will explain why, it's because I have to expect a pier every day under Homeland Security Regulations.

Q. Does snowplowing on the pier ever damage the pier?

A. There's no evidence that it has.

Q. Next category down under 2003 is Pier Security Improvements. What is that category related to?

A. It relates to the new Homeland Security Regulations that state that you have to be a secured facility. We have installed electronic gates, card readers where we can maintain control on who comes and goes. That's also why we have to have security guards when vessels are in.

Q. There's specific regulations that apply?

category?
A. Yes, I am.
Q. And how did you decide what expenses should go in the pier improvements category?
A. I took a look at the pier and, in fact, that's one of the reasons I asked RT Group to take a look at it also. But what initiated it was that we were having a number of vessel damage incidents to the pier. I needed to look at this to see, could I improve upon this pier to cut down on this damage and to extend the life of this pier for future years? And due to the fact that we have upgraded our facility, we definitely want to have a pier that is useable, long-term.
Q. When you say, we have upgraded our facility, you mean, Capital Terminal Company has upgraded its terminal facility?
MR. EDWARDS: Objection.
A. Yes.
Q. And by upgrading, you're referring to the expansion of the capacity primarily?
A. Yes.
Q. Have there been other upgrades to the facility other than what you've mentioned already today?
A. When you say facility, are you talking about

the execution of Exhibit 7, did Global have an agreement with Dunellen?

A. Prior to this agreement, the agreement was with CTC.

Q. And was the agreement with CTC the same agreement that you've already described in your testimony earlier today?

A. Yes.

Q. Giving Global the right to use CTC's tanks and pay .18 per barrel per capacity?

MR. EDWARDS: Objection.

A. Yes.

Q. What led to this Amended and Restated Lease Agreement?

A. Global asked for a longer agreement, and the prior agreement was running out. So, we decided to sit down and negotiate out a new agreement with a longer term at Global's request.

Q. And did Global ever indicate to you why they wanted a longer term?

A. Yes.

Q. And what did they say?

A. Global said that they're building a business in this marketplace and they wanted to be here long-term.

Q. During the negotiations over the Amended and Restated Lease Agreement, was there any discussion about the condition of the Wilkesbarre Pier?
A. Yes.
Q. What was the nature of those discussions?
A. During this negotiation, we talked about Capital improvements and, again, it goes back to trying to prevent accidents to the pier, trying to extend the life of the pier. I asked in these negotiations that Global help pay for some of these improvements.
Q. And were they amenable to that?
A. They were, and we did come to an agreement.
Q. During the negotiations leading up to Exhibit 7, did Global request that any particular improvements be made to the pier?
MR. EDWARDS: Objection.
A. I don't think it was a request, it was a discussion on the type of improvements that we may do.
Q. Were there particular things that you discussed prior to Exhibit 7 that Global was interested in having done to the pier?
A. Definitely the improvements on the bumper systems of the dolphins, and then there was

another item that the New England Pilots Association requested; that we put in a mooring dolphin that has a bollard on it where you could tie up the ship. So, that was included in these improvements.

Q. Is the bollard for ships or for barges?

A. It can be used for either. It would not be used for a small barge but the larger barges would use it.

Q. What was it about the fendering system that Global was asking to have changed?

MR. EDWARDS: Objection.

A. It's not that they were asking, it's just that my discussion was that we needed to find a way to prevent this damage that it was incurring, and to improve upon the durability of these breasting dolphins by improving the bumper system, which they agreed.

Q. Directing your attention to the first page of Exhibit 7. In the first recital it talks about Dunellen being the owner of a petroleum product storage facility and also the owner of the pier and associated vessel berth, which is subject to the rights of others to use. Do you see that?

A. Yes, I do.

structural or otherwise, and then it continues on. My question is, has Global requested any improvements, additions, alterations or changes to the premises as defined in this agreement?

A. Yes.

Q. And what have they requested?

A. There have been a number -- there's been gate pack system put on the loading rack that would allow you to insert additives into the product. They requested that we put in a new computer system that would be compatible to theirs. They requested that we put in the -- what we call home heating oil plus additive tank. Those come to mind, and we have made those improvements upon the request.

Q. Okay. How about improvements, additions, alterations and changes to the pier, have any of those been requested?

A. The request was made on the 16-inch line. I believe that's the only request that was ever made concerning the pier.

Q. Does Global have an option to purchase the Terminal?

A. Yes, they do.

Q. And the pier?

was on there through discussions with the Pilots Association and Global. And to my recollection, that's the only one that was recommended by an outside party.

Q. Is Dunellen obligated to make any of the repairs reflected on Exhibit 10?

A. They are not.

Q. Have some of the improvements reflected on Exhibit 10 been completed?

A. Yes, they have.

Q. I'll show you Exhibit 11.

(Defendant's Exhibit 11 marked for ID.)

A. Yes.

Q. Have you seen this document before?

A. Yes.

Q. Did you prepare it?

A. Yes.

Q. Can you identify it for us, please?

A. Yes, this is a memorandum from Avery Noe to Bill Davidson dated, Wednesday, May 24, 2006, and the subject is dock improvements.

Q. Okay. And does this exhibit reflect completed pier improvement projects since 2003?

A. Not all. There was one after this memo that was completed.

Q. Let me rephrase that question. Does this Exhibit 11 refer -- let me start that again. Does Exhibit 11 reflect all the dock improvements that were made between January of 2003 and May of 2006?
A. I believe that to be correct.
Q. And were you responsible for gathering the expense information that's reflected on this document?
A. Yes, I was.
Q. So, it's your belief that the total cost of those repairs that are identified on Exhibit 11 was approximately $971,000?
MR. EDWARDS: Objection.
THE WITNESS: Could you restate that question?
Q. Is it your belief that the total cost of the repairs identified on Exhibit 11 was approximately $971,000?
MR. EDWARDS: Objection.
A. Yes.
Q. Okay. And of that amount, Global has reimbursed Dunellen for half; correct?
A. Yes.
Q. Now, since May of 2006, have there been additional improvements to the pier?
A. Yes.

Q. And what have those been?
A. The reinforcement of the East Dolphin.
Q. Anything else?
A. I believe that to be all.
Q. And has that project been completed?
A. The reinforcement, yes.
Q. Okay. And when was that completed?
A. Fall.
Q. Of 2006?
A. Of 2006.
Q. And what was the cost of that project?
A. I have an idea but I don't have the exact number.
Q. Ballpark figure?
A. 200,000.
Q. And is Global going to reimburse Dunellen for half of that amount, as well?
A. Has.
Q. Are there any other improvement projects that are currently in the planning phase?
A. Yes.
Q. What are those?
A. We have reinforced the East Dolphin and now we want to upgrade the bumper system like we did with the middle dolphin and the mini dolphin to make it

conform to those two improvements.
Q. Anything else?
A. Yes. There would be others in the future that may be on this list.
THE WITNESS: Do you want me to look at it? I'll tell you.
MR. TAYLOR: Sure. That will give me an idea of what's really likely to happen.
A. That solder power retaining wall, we would probably get back to that retaining wall sometime in the future.
Q. Does Global have the right to terminate the Amended Lease Agreement?
MR. EDWARDS: Objection.
A. Yes, they do.
Q. Prior to today, have you ever had any discussions with Global in which they gave any indication that they had an intention to terminate the agreement?
A. No, I haven't.
THE WITNESS: Do you mind if I take another bathroom break?
MR. TAYLOR: No, I'm just looking over my notes.
(A short recess was taken.)
Q. (By Mr. Taylor): Have you ever had any

C-E-R-T-I-F-I-C-A-T-E

I, SALLY BRASSARD, a Notary Public in and for the State of Rhode Island, duly commissioned and qualified to administer oaths, do hereby certify that the foregoing deposition of AVERY NOE, the witness in the above-entitled cause, was taken before me on behalf of the Defendant at the offices of Partridge Snow & Hahn, LLP, 180 South Main Street, Providence, Rhode Island, on February 7, 2007, at 9:00 A.M., that previous to examination of said witness, who was of lawful age, he was first sworn by me and duly cautioned and sworn to testify the truth, the whole truth, and nothing but the truth, and that he thereupon testified as in the foregoing manner as set out in the aforesaid transcript.

I further certify that the foregoing deposition was taken down by me in machine shorthand and was later transcribed by computer and that the foregoing deposition is a true and accurate record of the testimony of said witness.

Pursuant to Rule 5 (d) and 30 (f) of the

Federal Rules of Civil Procedure, original transcripts shall not be filed in court; therefore, the original is delivered and retained by Defendant's attorney.

I have enclosed with a copy of the deposition a correction and signature page, which must be signed before a Notary Public.

IN WITNESS WHEREOF, I have hereunto set my hand this 10th day of February, 2007.

Sally Brassard RPR/CSR Notary Public

SALLY BRASSARD, NOTARY PUBLIC/CSR-RPR
(MY COMMISSION EXPIRES JANUARY 16, 2009)