# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

DUNELLEN, LLC
VS. C.A. NO.:06-014 ML
GETTY PROPERTIES CORP.,

DEPOSITION OF TODD TURCOTTE, witness in the above-entitled cause, taken on behalf of the Defendant, pursuant to notice, before Sally Brassard, CSR, a Notary Public in and for the State of Rhode Island and Providence Plantations, at the office of Partridge Snow & Hahn LLP, 180 South Main Street, Providence, Rhode Island, on February 12, 2007, at 2:00 p.m.

APPEARANCES:

FOR THE PLAINTIFF: HINCKLEY ALLEN & SNYDER, LLP
BY: MITCHELL R. EDWARDS, ESQUIRE

FOR THE DEFENDANT: PARTRIDGE SNOW & HAHN LLP
BY: ROBERT K. TAYLOR, ESQUIRE

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RI 02920
(401) 946-5500

Item 72, that specifically leaves the stone wall erosion, East Dolphin.
Item 78, New Security Fence and Gate has been installed.
Q. In addition to the improvements listed on Exhibit 15, which you've just told us about, are there other improvements that have been done at the pier since 2003?
A. Improvements and/or repairs or just improvements?
Q. The question is improvements.
A. There was a -- yes, a variation of one that was on here, it was an interim. It was a project that was done last summer, some reinforcement to the East Dolphin was installed.
Q. Since 2003, has there also been work done at the pier that you would characterize as repair work?
MR. EDWARDS: Objection.
A. Yes.
Q. And what sort of work are you aware of that you would characterize as repair work?
A. There was some interim support repairs that were done as part of a project that -- I mean, that was done in 2004 but was actually paid for by Getty. It was the pipeline project, 16-inch



distillate pipeline that was put on the pier.
As part of that, there was repair to the pipe supports, interim supports were put in. Annually -- bi-annually, actually, spring and fall, there are pothole repairs that are done in the paved area.
There has been ongoing -- monitoring has been occurring of monitoring the loading platform for movement. Some walkway repair/improvements to access over the pipelines.
I guess those would be considered more improvements, just to make the use of it easier. That should be it from my recollection.
Q. You mentioned something about loading platform and monitoring, what does that involve?
A. There are -- we install gauges on the loading platform areas that were cracked to just see if there is any movement occurring and targets.
Q. By movement, you mean, movement in what direction?
A. That's what we're trying to ascertain; up, down, backwards, forward. We're trying to figure out why the cracks are getting larger.
Q. And have you reached any conclusions in that regard?
A. As of now, no.



Q. Are there any Wilkesbarre Pier improvement projects that are currently in the planning stage?
A. Yes.
Q. What is that?
A. New fendering system, adjusting the burning plane. There's a new fendering system that is being proposed for the East Dolphin and the West Dolphin, which would require moving out the improvements that have already been done and moving that fendering line out a few feet to accommodate the new style fenders that would be installed on the East and West Dolphins.
Q. And what's the purpose of that improvement?
MR. EDWARDS: Objection.
A. The purpose is to continue the current capacity of the facility to accommodate the different types of vessels that are used at the facility or certified to be used at the facility.
The existing timber and fendering system is antiquated and in constant repair and, basically, is outdated.
New fendering, energy absorption system, which are more effective and more safer for the facility as far as barges or ships coming in to use it that are being installed, more state-of-the-art



fendering systems.
Q. And will that increase the number of vessels that can -- number of types of vessels that can use the pier?
A. Would it increase, no, it would not increase.
Q. It basically improves the effectiveness of the pier protection for the kinds of vessels that are using the pier today.
MR. EDWARDS: Objection.
A. Can you repeat that please, for me?
Q. Is it the case that the purpose of those fendering improvements are to increase the effectiveness of the protection of the pier against damage from the kinds of vessels they're using on the pier today?
MR. EDWARDS: Objection.
A. No.
Q. I just need to ask you to explain to me, again, what the purpose of that improvement is then.
A. Okay. The pier is identified with agencies and with local port authorities, Coast Guard, pilots, certified to be used by certain size and certain range vessels; whether they're brought into the pier or not, they're certified to be able to accommodate that type of vessel.
That certification comes to you, that by

deterioration of the timber deck?
A. No.
Q. Were there potholes on the Wilkesbarre Pier when you first started going to the pier in 1997?
A. Yes.
Q. And is it your belief that the potholes back then were caused by the same reason?
MR. EDWARDS: Objection.
A. I do not. I have not observed any change in condition from '97 to now as to the cause of it.
Q. Does use of the pier for Dunellen's operations cause wear and tear to the pier?
MR. EDWARDS: Objection.
A. Can you repeat that, please, because it's --
Q. Sure. Does use of the pier for Dunellen's operations cause wear and tear at the pier?
MR. EDWARDS: Objection. You can answer.
A. I kind of have to ask you a question.
MR. TAYLOR: Sure. I'll clarify it if I can.
A. What components of the pier?
Q. I was thinking of the pier as a whole.
MR. EDWARDS: Objection.
Q. Would it help you to point to specific parts of the pier?



A. Since we're talking about the pavement in this letter in Exhibit 17, you're asking me their use of the -- or their operations of the pier does not cause wear and tear to the effectiveness of this pavement.
Q. How about -- does it cause wear and tear to other elements of the pier?
MR. EDWARDS: Objection.
A. Yes.
Q. Okay. What are those?
A. The operation of the valves, opening and closing the valves that causes wear and tear to the facility. Vessel activity causes wear and tear to the berthing components of the facility. Use of the hoses for ship activities causes wear and tear to the hoses.
Q. Are there ever vehicles on the pier?
A. Yes.
Q. And what sorts of vehicles are there on the pier from time to time?
MR. EDWARDS: Objection.
A. Typically, when I'm present on the pier, it's typically passenger vehicles.
Q. Are any -- have you ever seen any types of vehicles on the pier?



A. Yes. Periodically there are small delivery trucks for cargo for the vessels.
Q. Anything else?
A. It's project specific, but if there are different projects, there will be delivery trucks that are limited to certain areas of the pier.
Q. The top of page 2 of Exhibit 17, towards the end of that paragraph there's a reference to maintenance activities, such as snow plowing.
A. Yes.
Q. Do maintenance activities, such as snow plowing at the pier, have an effect on the pier?
A. Yes.
Q. What sort of affect do they have?
A. Well, the pickup truck used, personal plowing, has a standard snow plow on it and the impact of the plow as it hits different cracks or different variations in the pavement will cause vibrations through the pier through the underlying soil on top of the timber deck.
Q. And what's the affect of that, potential effect of that?
MR. EDWARDS: Objection.
A. The potential effect is vibration and loosening up soils, and if there are voids



underneath the pavement that are not realized at the surface, could cause them to be larger and realized at the surface.
Q. Are there other activities that occur on the pier that could have the same effect?
A. Not to my knowledge.
MR. TAYLOR: Mark this, please.
(Defendant's Exhibit 18 marked for ID.)
Q. Mr. Turcotte, I'll show you what's been marked as Exhibit 18. Have you seen this document before?
A. Yes.
Q. What is it?
A. It is a Soldier Pile and Concrete Panel Retaining Wall Evaluation in regard to Ship Berth Improvements Dredging.
Q. Did you participate in the preparation of this document?
A. Yes, I did.
Q. What was the nature of your participation?
A. Evaluating the depths that could be -- the ship berth could be dredged to. Evaluating the existing structural components that make up the ship berth. Preparing the document and also looking at the breasting structures.
Q. After this letter was submitted to Capital

C-E-R-T-I-F-I-C-A-T-E

I, SALLY BRASSARD, a Notary Public in and for the State of Rhode Island, duly commissioned and qualified to administer oaths, do hereby certify that the foregoing deposition of TODD TURCOTTE, the witness in the above-entitled cause, was taken before me on behalf of the Defendant at the offices of Partridge Snow & Hahn, LLP, 180 South Main Street, Providence, Rhode Island, on February 12th, 2007, at 2:00 P.M., that previous to examination of said witness, who was of lawful age, he was first sworn by me and duly cautioned and sworn to testify the truth, the whole truth, and nothing but the truth, and that he thereupon testified as in the foregoing manner as set out in the aforesaid transcript.

I further certify that the foregoing deposition was taken down by me in machine shorthand and was later transcribed by computer and that the foregoing deposition is a true and accurate record of the testimony of said witness.

Pursuant to Rule 5 (d) and 30 (f) of the Federal Rules of Civil Procedure, original transcripts shall not be filed in court; therefore, the original is delivered and retained by Defendant's attorney.

I have enclosed with a copy of the deposition a correction and signature page, which must be signed before a Notary Public.

IN WITNESS WHEREOF, I have hereunto set my hand this 13th day of February, 2007.

SALLY BRASSARD, NOTARY PUBLIC/CSR-RPR
(MY COMMISSION EXPIRES JANUARY 16, 2009)