# EXHIBIT 11

UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

DUNELLEN, LLC

VS. C.A. NO.:06-014 ML

GETTY PROPERTIES CORP.,

DEPOSITION OF AVERY NOE, witness in the above-entitled cause, taken on behalf of the Defendant, pursuant to notice, before Sally Brassard, CSR, a Notary Public in and for the State of Rhode Island and Providence Plantations, at the office of Partridge Snow & Hahn LLP, 180 South Main Street, Providence, Rhode Island, on February 7, 2007, at 9:00 a.m.

APPEARANCES:

FOR THE PLAINTIFF: HINCKLEY ALLEN & SNYDER, LLP
BY: MITCHELL R. EDWARDS, ESQUIRE

FOR THE DEFENDANT: PARTRIDGE SNOW & HAHN LLP
BY: ROBERT K. TAYLOR, ESQUIRE

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RI 02920
(401) 946-5500

a number of years; correct?
MR. EDWARDS: Objection.
A. Yes.
Q. Now, in your discussions with Global in the beginning of 2003, did you have a discussion with them about the pipeline supports?
A. No.
Q. Did you share Exhibit 5 with anyone from Global?
A. No.
Q. This is more for you to use internally to help you understand what sorts of improvements would be needed to extend the life of the pier; is that right?
MR. EDWARDS: Objection.
A. Yes.
Q. Looking at number 2 on Exhibit 5, Stone Wall Erosion, is that also a condition that had existed for some time prior to January of 2003?
MR. EDWARDS: Objection.
A. It existed before 2003 but I can't tell you the date, because part of this was when they installed the tie-backs, they created that by not putting back the storm, but I don't remember what date that was that they did this.
Q. Was erosion a noticeable condition when you were

Q. Now, in addition to the Gallons Thru-Put that are reflected in this chart on page 3, there were additional deliveries to the Wilkesbarre Pier during some of these years; correct?
A. Correct.
Q. This chart doesn't reflect any petroleum products that were delivered to the pier by Getty Petroleum Marketing; correct?
A. That's correct.
Q. Is all of the oil of petroleum products, which is stored at Capital Terminal Company's facility, delivered to the Wilkesbarre Pier?
A. I'm not sure I understand your question.
Q. Well, I mean, does all the oil come into the pier and then get pipes to the tank farm or are there also deliveries to the tank farm by some other method?
MR. EDWARDS: Objection.
A. No, with just a very few exceptions, and I would like to give you an example of those exceptions so that you'll know what I'm talking about.
There is an occasion where a truck will come in and fill his tanker, he will go somewhere and the customer can't take it all. Say, he has

10,000 gallons and the customer can take seven, but he needs to empty his truck for another job, we would pump that back. Other than that, the answer is all the products come in through the Wilkesbarre Pier.

Q. Now, the number in this interrogatory answer for 2006 is a part year number; correct?

A. That's January through July.

Q. Can you tell me whether or not the 2006 year-end number is larger than the 2005 number?

A. Without looking at my report, I can't tell you with certainty.

Q. You don't know, sitting here today, whether in 2006 more barrels were throughput from the pier in 2006 than were in 2005?

A. I do not know without looking at that record.

Q. Do you know whether there were substantially fewer barrels with throughput in 2006 than in 2005?

MR. EDWARDS: Objection.

A. I know that it would not be -- it would not be substantially less by any means.

Q. Is there capacity for Global to throughput more barrels?

A. I'm afraid I don't understand the question.

Q. Is there some sort of structural limit on the

with Bill Davidson. I cannot think of anyone else that was involved in this.

Q. Who decided what improvements should be included on this Exhibit 10?

A. Myself and Todd Turcotte. But, even as it was presented to Bill Davidson during this period of June 2003, this was only a worksheet that we would put on the table for discussion. We had no obligation to follow it and he understood that but, I guess the answer to your question, mainly myself and Todd Turcotte.

Q. How did you decide what to include on the schedule?

A. From my knowledge of the pier and from some engineering work that was prepared for me by Todd, and us discussing the various items and determining that Davidson needed to see something that he could look at and follow.

Q. Did Global request that any items be added to the schedule that's marked as Exhibit 10?

A. The mooring improvement, even though it came from the Northeast Pilots Association, a recommendation, they recommended that to us and Global because it's Global that brings in the vessels. So -- and maybe in an indirect way, that

was on there through discussions with the Pilots Association and Global. And to my recollection, that's the only one that was recommended by an outside party.

Q. Is Dunellen obligated to make any of the repairs reflected on Exhibit 10?

A. They are not.

Q. Have some of the improvements reflected on Exhibit 10 been completed?

A. Yes, they have.

Q. I'll show you Exhibit 11.

(Defendant's Exhibit 11 marked for ID.)

A. Yes.

Q. Have you seen this document before?

A. Yes.

Q. Did you prepare it?

A. Yes.

Q. Can you identify it for us, please?

A. Yes, this is a memorandum from Avery Noe to Bill Davidson dated, Wednesday, May 24, 2006, and the subject is dock improvements.

Q. Okay. And does this exhibit reflect completed pier improvement projects since 2003?

A. Not all. There was one after this memo that was completed.

Federal Rules of Civil Procedure, original transcripts shall not be filed in court; therefore, the original is delivered and retained by Defendant's attorney.

I have enclosed with a copy of the deposition a correction and signature page, which must be signed before a Notary Public.

IN WITNESS WHEREOF, I have hereunto set my hand this 10th day of February, 2007.

Sally Brassard RPR/CSR Notary Public

SALLY BRASSARD, NOTARY PUBLIC/CSR-RPR
(MY COMMISSION EXPIRES JANUARY 16, 2009)