# EXHIBIT 12

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **GETTY PETROLEUM MARKETING INC. and GETTY PROPERTIES CORP.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**CAPITAL TERMINAL COMPANY and DUNELLEN LLC,**<br><br>**Defendants.** | **C.A. No. 00-381 ML** |

**POST-TRIAL MEMORANDUM OF GETTY PROPERTIES CORP.**

Getty Properties Corp. ("Getty Properties") submits the following post-trial memorandum addressing its claims in Counts II and V of the Second Amended Complaint, as well as the Counterclaim of Capital Terminal Company ("Capital Terminal"). Count II seeks a declaration that Getty Properties does not have any obligation to install and maintain a fire suppression system and water pipeline to the Wilkesbarre Pier (the "Pier") and a declaration that neither Getty Properties nor Getty Petroleum Marketing Inc. ("Getty Petroleum Marketing") are obligated to increase the diameter of the distillate pipeline on the Pier to sixteen inches. Count V seeks a declaration that Getty Properties has the right to use the north side of the Pier and that it owns certain pipelines and equipment located on the Pier. In Count II of its Counterclaim Capital Terminal seeks specific performance with regard to the replacement of the distillate pipeline.

## FACTUAL BACKGROUND

This portion of the case involves certain rights and obligations of the parties relating to the Wilkesbarre Pier in East Providence, Rhode Island. Since the 1940's, the Pier has been used to unload petroleum products that are then transported by pipeline to storage facilities further up the Seekonk River.

The Pier itself is now owned by Dunellen LLC, a recent successor to Capital Terminal.[1] Capital Terminal was the successor in interest to the Providence & Worcester Railroad Company ("P&W"). Getty Properties and its predecessors-in-interest have enjoyed and used the right to free and uninterrupted access to the northerly side of the Pier for more than twenty-five years. Getty Properties also owns two petroleum pipelines and various unloading facilities located on the Pier (the "Pier Facilities"). Getty Properties has contractually assigned its right to use the Pier and Pier Facilities to the other plaintiff in this lawsuit, Getty Petroleum Marketing, through a long term lease.

## ARGUMENT

### I. A 16" Distillate Pipeline Is Not Necessary At This Time, And Thus Getty Properties Has No Obligation To Replace The Existing 14" Pipeline.

Count II seeks a declaration that Getty Properties is not required to install a sixteen inch distillate pipeline on the Pier at this time. Capital Terminal's Counterclaim seeks specific performance of that alleged obligation.

[1] On May 30, 2003 Capital Terminal Company assigned its rights under the 1975 Grant and Agreement, as amended, and the Operating Agreement (For Use of Pipelines) to Dunellen LLC and deeded to Dunellen LLC its interest in the Pier, recorded at Book 2011, Page 203 of the East Providence Land Records.

By the Grant and Agreement of August 6, 1975, the parties' predecessors in interest agreed that sixteen inch pipelines would be installed by Getty Properties' predecessor all the way from the berthing facilities at the Pier to the storage facilities in Phillipsdale, more than two miles up the Seekonk River. Joint Exhibit 12. At that point in time the existing pipelines connecting the Pier and the storage facilities had been closed by the City of East Providence. Joint Exhibit 17 at 11; Testimony of Robert H. Eder, 6/25/2003. It was therefore necessary to replace these pipelines in order to have a functioning pipeline system.

In June of 1977, the Grant and Agreement was amended by a letter agreement between Robert H. Eder ("Eder") and George W. Druckenmiller (the "Druckenmiller Letter"). Joint Exhibit 12. The Druckenmiller Letter later became an exhibit to the Second Amendment to the Grant and Agreement dated November 6, 1980. Joint Exhibit 19.

In the Druckenmiller Letter Eder agreed with Getty Properties' predecessor that it would "serve no useful purpose" to increase the diameter of the petroleum pipelines on the Pier at that time. The pipelines from the Pier to Phillipsdale had been replaced, and the pipelines on the Pier were functioning as intended. Testimony of Robert H. Eder, 6/25/2003. In the Druckenmiller Letter it was agreed that the pipelines on the Pier would be replaced by Getty's predecessor "if and when necessary." Joint Exhibit 18.

Getty Properties, as successor to Getty Refining and Marketing Company, has lived up to the terms of the original Grant and Agreement as amended by the Druckenmiller Letter. Getty Properties has continued to repair and maintain the pipelines located on the Pier, but has not replaced those pipelines because replacement was not necessary. "Necessary" is a

commonly used and well understood word that means "of an inevitable nature;" "logically unavoidable;" "determined or produced by the previous condition of things;" or "absolutely needed." Webster's Ninth New Collegiate Dictionary (1984). As the existing pipelines have at all times been functional, the plain meaning of the Druckenmiller Letter supports a finding in favor of Getty Properties.

Recognizing that it can not show a functional necessity for replacing the 14" distillate pipeline on the Pier at this time, Capital Terminal has argued that the parties to the Druckenmiller Letter intended "necessary" to mean "economically necessary." However, Capital Terminal presented no evidence to demonstrate that there was a meeting of the minds on this point. Indeed, the introduction of evidence purporting to vary the unambiguous language of the Druckenmiller Letter would violate the parol evidence rule.

Even if the proper inquiry under the Druckenmiller Letter is whether a new pipeline is economically necessary, Capital Terminal has not proven that this is the case. Avery L. Noe, the President of Capital Terminal, testified that his company recently signed a ten year agreement with its existing customer, Global, for Global to continue storing its product in Capital Terminal's terminal facility. Testimony of Avery L. Noe, June 25, 2003. Mr. Noe testified that Global had agreed to pay substantial minimum storage charges over the life of the ten year contract, plus additional amounts if Global exceeded stated minimum throughput amounts (as it reportedly did last year). Id. The size of the distillate pipeline was plainly of little consequence to Global: Mr. Noe testified that a larger distillate pipeline was not a condition of the contract. Id. There was no competent evidence presented that installing a larger distillate pipeline would

generate greater revenues for Capital Terminal from Global or anyone else. Mr. Noe also confirmed that any demurrage resulting from longer unloading times at the Pier would be paid by Global, not by Capital Terminal. Id.

Mr. Noe speculated that a new pipeline would produce cost savings for Capital Terminal because it would purportedly increase the flow rate in the pipeline and reduce the amount of time Capital Terminal employees spend at the Pier. Id. Mr. Noe failed to provide any quantification of the amount that would allegedly be saved, however, or any evidence to show that Capital Terminal's existing labor arrangements would allow savings to be realized. There was no evidence of how many vessels berth at the Pier or how much longer it would take to off-load petroleum product, with a16" pipeline as opposed to the existing 14" pipeline. Mr. Noe's vague and unsubstantiated claim of unknown cost savings does not establish economic necessity.

Furthermore, Mr. Noe's testimony regarding increased flow rates was based on the testimony of Mr. Hoffman that a 16" pipeline on the Pier would increase flow rates by 6.2%. Mr. Hoffman admitted on cross-examination, however, that his calculations were based on information provided by Capital Terminal, that he had not verified the information himself, and that he had simply prepared a mathematical model of an assumed pipeline system leading to only one of Capital Terminal's tanks. Mr. Hoffman also admitted that his calculations assumed replacement not only of the existing 14" distillate line on the Pier, but also certain other pipes and hoses. Mr. Hoffman's testimony is entitled to little or no weight in light of its fundamentally speculative nature.

That the economic "necessity" asserted by Capital Terminal was not the "necessity" contemplated by the parties to the Druckenmiller Letter is clear, since such economic "necessity" – a possible marginal decrease in costs resulting from a very slight assumed increase in flow rates -- has in fact existed since 1977. Capital Terminal and its predecessors would have benefited in cost savings from marginally increased flow rates then and every year since the Druckenmiller letter was signed, yet never before claimed that installing a 16" pipeline was "necessary" for this reason. Capital Terminal has therefore failed to demonstrate any real "necessity" of the type contemplated by the parties for the replacement of the existing 14" distillate pipeline with a 16" pipeline at this time.

## II. Future Maintenance Of The Fire Suppression System At The Pier Is Not Getty Properties' Responsibility.

Capital Terminal has attempted to reopen the previously determined fire suppression issues by requesting -- without basis -- that the court revisit its earlier ruling as set forth in the Memorandum and Order of December 20, 2002. Capital Terminal suggests that the Court now find that Getty Properties must pay for the installation of the fire suppression system as Capital Terminal had alleged in its Counterclaim. For the reasons set forth in the Court's Memorandum and Order of December 20, 2002 there is absolutely no legal, factual, or other basis for the Court to revisit that issue.

Capital Terminal also argues that the Court should rule that Getty Properties, even if not responsible for the cost of installation, is nonetheless responsible for future maintenance of the fire suppression system as part of its obligation to maintain the petroleum pipelines pursuant to the Operating Agreement (For Use of Pipelines). Joint Exhibit 30. To prevail on this

argument, Capital Terminal must prove that fire suppression is a "pipeline expense" (for which Getty Properties is responsible under its pipeline operating agreement), as opposed to a "Pier expense" (for which Capital Terminal is responsible). Capital Terminal must also prove that costs relating to fire suppression resulted from the application of a city, state or federal regulation. Capital Terminal has not met its burden of proof on either of these points.

i. <u>Fire Suppression Is A Pier Expense, Not A Pipeline Expense</u>.

Under the 1975 Operating Agreement (For Use Of Pipelines), as amended, Getty Properties is responsible for "pipeline maintenance costs." These costs include "[t]he cost of compliance with all City, State or Federal regulations applicable to the operation (but not the construction) of the pipelines." <u>Joint Exhibit 11</u>, section III(4). Capital Terminal suggests that merely because there are petroleum pipelines on the Pier, fire suppression on the Pier is a pipeline related expense.

To the contrary, fire suppression is clearly a Pier-related expense. Fire Chief Bessette's letter to Capital Terminal by its own terms addresses inadequate fire protection on the Pier; the letter does not refer to pipelines or the use of pipelines. Exhibit L. The cost of compliance with city, state or federal regulations applicable to the operation of the Pier in connection with delivery of petroleum has always been a cost shared by all users who were parties to the various Pier operating agreements. For example, the 1991 Pier Operating Agreement provides as follows:

> IV. A. "Pier maintenance costs" as the term is used herein, shall be defined as, and limited to, those costs necessary to promote <u>the safe, orderly, convenient and lawful loading and unloading of petroleum products and other merchandise used in connection with</u>

> the petroleum products businesses of the parties over the Wilkesbarre Pier ... Said costs shall include but will not be limited to the following:
>
> (4) The costs of compliance with all City, State or Federal regulations applicable to the operation of the existing pier in connection with delivery of petroleum products and other merchandise used in connection with the petroleum products businesses of the parties.

Joint Exhibit 23; see also 1985 Wilkesbarre Pier Operating Agreement, Section IV I(A)(4), Exhibit 79.

Of course, when the 1985 and 1991 Pier Operating Agreements were executed, the 1975 Operating Agreement (For Use of Pipelines) was in full force and effect. Joint Exhibit 11. Under the 1975 Operating Agreement (For Use of Pipelines) the predecessors of Getty Properties had the same responsibility for the maintenance of the petroleum pipelines as exists today pursuant to the First Amendment to the Operating Agreement (For Use of Pipelines).[2] Joint Exhibit 30. Thus, compliance with City, State and Federal regulations as they relate to the Pier, was never a pipeline maintenance expense.

Further evidence of the intent of the parties to these agreements is that the provision of water to the Pier has also historically been a Pier expense. Union Oil Company, as a party to the 1985 and 1991 Operating Agreements, agreed to use its best efforts to "repair, maintain and replace the existing water lines." The agreed procedure was that Union would then invoice P&W for these expenses and P&W would then bill the using parties for these expenses. 1991 Wilkesbarre Pier Operating Agreement, Section III (I), Joint Exhibit 23; 1985 Wilkesbarre

[2] The 1997 First Amendment to the Operating Agreement (For Use of Pipelines) merely changed the formula for paying for pipeline maintenance expenses, with Getty Realty agreeing to pay a larger amount and the Eder Trustees agreeing to less financial exposure.

Pier Operating Agreement, Section III (I), Exhibit 79. Thus, the newly installed water line on the Pier is also a Pier expense, not a pipeline expense attributable solely to Getty Properties.

Effective December 31,1997, Getty Realty Corp. withdrew from the 1991 Pier Operating Agreement and was followed soon thereafter by Capital Terminal's parent company, Capital Properties Inc. and P&W. At the same time, Union Oil conveyed its interest in the Pier to P&W effective December 31, 1997. Joint Exhibit 33. It was only after this conveyance - and only after the formula for reimbursement of pipeline maintenance expenses had been changed to reduce the exposure of the Eder Trustees to such expenses in the First Amendment to Operating Agreement (For Use Of Pipelines) (Joint Exhibit 30) - that Capital Terminal decided that providing water to the Pier should be considered a pipeline maintenance expense and thus attributable to Getty Properties.

Although it is not an issue before the court at this time, it is indeed ironic that Capital Terminal now alleges that Getty Properties has failed to live up to its contractual obligations under the Operating Agreement (For Use of Pipelines as amended). Joint Exhibits 11, 30. The testimony of Avery Noe clearly established that the first notification from Capital Terminal to Getty Properties to the effect that Capital Terminal expected Getty Properties to pay for the new fire suppression system was contained in the letter from Robert L. Tofel to Leo Liebowitz of Getty Realty Corp. dated May 12, 2000, and that the planning for this project by Capital Terminal had begun in December of 1997. Joint Exhibit 39.

If fire suppression is a "pipeline" maintenance expense then Capital Terminal clearly ignored the plain language of the Operating Agreement (For Use of Pipelines). Exhibit

11. This agreement sets forth the procedure for issues of pipeline maintenance and requires immediate notice to Getty Realty "when repairs are needed." Upon receipt of such notice it is the obligation of Getty Realty to "secure a contractor to make such repairs as are required." The record is clear that Capital Terminal did not follow this procedure, but instead acted unilaterally and then told Getty Properties to pay the expense.

ii. Capital Terminal Has Again Failed To Demonstrate Any Connection Between Chief Bessette's Letter And Any Existing Regulation.

Despite the Memorandum and Order of the Court dated December 20, 2002, Capital Terminal persists in its efforts to make Getty Properties bear the full costs and expense of the fire suppression system and water line. However, the prior ruling is the law of the case and Capital Terminal has not offered any reason why the court should reconsider it. Indeed, there is every reason to believe that it was correct. The issue of whether or not the fire suppression requirements set forth in Chief Bessette's May 17, 2000 letter (Exhibit L) constituted or rested on a "regulation" was squarely framed in December 2002. Capital Terminal failed then and has again failed to demonstrate any link between the items listed in Chief Bessette's letter and any corresponding regulation that would trigger Getty Properties' obligation to pay under the Operating Agreement (For Use Of Pipelines). Once again, that failure is a fatal weakness in Capital Terminal's position.

While Capital Terminal generally cites certain statutes and local ordinances it has offered none in evidence and has made absolutely no effort, either at trial or in its post trial memorandum, to relate the letter of Chief Bessette to any of them.

Instead Capital Terminal argues that Getty Properties has failed to meet its burden of proof that Getty Properties is not obligated to pay past and future costs of installing and maintaining the fire suppression system. This argument conveniently omits any mention of the history of this controversy and ignores the fact that it is Capital Terminal who has the burden of proof, since it seeks to force Getty Properties to pay for the fire suppression system in its counterclaim. It is a well-established rule that the allocation of the burden of proof must be determined by reference to the nature of the complaint.

## III. Getty Properties Has A Continuing Right To Use The Pier's North Side and the Pier Facilities.

### i. Getty Properties' Right To Use the North Side of the Pier.

Getty Properties' right to use the north side of the Pier originated in recorded agreements dating back to 1941. A deed from P&W to Colonial Beacon dated August 28, 1941, transferred the parcel of land on which the Pier was located (referred to as Parcel 1), reserving to P&W the right to "construct and maintain a pier" on that parcel, provided that any construction

> shall be done in such manner as not to interfere with the use hereinafter provided for by the Grantee, its successors or assigns, of the northerly side of a pier within said area and that any pier constructed or extended at any time in the exercise of said right shall be so constructed or extended as to permit along the northerly side thereof the convenient erection, use and maintenance of such pipe lines and equipment appurtenant thereto as shall be required by the Grantee, its successors or assigns, in the regular conduct of its or their petroleum products business.

Joint Exhibit 1 (1941 Deed) at 4. The 1941 deed also gave to the Grantee (Colonial Beacon) and its successors "the right to erect, replace, use and maintain its pipelines and equipment appurtenant thereto on the northerly side of any pier constructed in the exercise of the right

hereby reserved and the right to have the free and uninterrupted use of the berth on the northerly side of said pier for the delivery of petroleum products and other merchandise . . . " Id. at 4.

In 1972, litigation arose over the meaning of the 1941 Deed. P&W argued that notwithstanding the fact that the 1941 Deed conveyed a fee interest in the Pier and surrounding lands to Colonial Beacon, P&W "retained a right to immediate possession of the Pier under the reservation of rights." *Providence & Worcester Company v. Exxon Corp.*, 116 R.I. 470, 359 A.2d 329, 336 (1976). Colonial Beacon's successors, Exxon and Getty, argued that P&W had no ownership rights unless and until a new Pier was constructed. The Superior Court agreed with P&W, holding that "plaintiffs are the owners of the existing pier and are entitled to immediate use of the pier including the vessel berth on the northerly side thereof, subject only to the rights reserved in defendants by the 1941 deed." *Id.* The Rhode Island Supreme Court affirmed this aspect of the Superior Court's ruling:

> We believe that plaintiffs correctly perceived the meaning of the trial justice's order as requiring defendants to give plaintiffs a fee simple to personalty, that is, a conveyance of the totality of interests in the existing pier *save for defendants' right to use the north side of said pier.*

*Id.* at 341 (emphasis added). Thus, both the Superior Court and Supreme Court held that although P&W owned the Pier, Getty Properties' predecessor-in-interest had the right to use the north side of the Pier for the delivery of petroleum products.

While the Superior Court ruling was on appeal, and before the Supreme Court had issued its ruling, Getty settled with P&W. As part of the settlement, Getty and P&W entered into an agreement whereby Getty promised to execute and deliver to P&W

> a confirmatory conveyance of all right, title and interest in and to the Wilkesbarre Pier . . . including also all right, title and interest in and to said pier as Getty Oil (Eastern) may have acquired by virtue of the Grant of even date herewith from Seekonk Realty Corp., reserving to itself in said deed of conveyance, the right to erect, replace, use and maintain its pipelines and equipment appurtenant thereto on the northerly side of said Wilkesbarre Pier or any pier hereafter constructed in place of said Wilkesbarre Pier and the right to have free and uninterrupted use of the berth on the northerly side of said pier for the delivery of petroleum products and other merchandise . . .

Joint Exhibit 9 (August 6, 1975 P&W/Getty Agreement), ¶ 1. A deed of conveyance embodying these terms was executed the same day. Joint Exhibit 10 (August 6, 1975 Deed of Conveyance from Getty to P&W).

Also on August 6, 1975, Getty and Robert Eder, P&W's president, entered into a separate Grant and Agreement. The Grant and Agreement recites that

> Getty has the right to use the north side of said Wilkesbarre Pier, including the unloading platform and other appurtenances thereto for the construction and operation of pipelines, unloading hoses and related facilities, apparatus and equipment required for the convenient unloading of petroleum products from ships and barges, together with the right to have such ships and barges use the berth serving said north side of the pier.

Joint Exhibit 12 (Grant and Agreement), p. 1. The Grant and Agreement further provided that Eder would have the permanent right to use

> All unloading facilities, apparatus and utilities located on or used in conjunction with the north side of the pier or the vessel berth, which Getty uses in the process of unloading petroleum products from ships and barges berthing at Wilkesbarre Pier.

*Id.*, p. 3.

Getty's right to use the northerly side of the Pier has been repeatedly and expressly reconfirmed. For example, the 1991 Pier Operating Agreement among P&W, GRMC,

Unocal and CPI recites that, pursuant to the 1941 Deed, "Getty, and Union, have the right of free and uninterrupted use of the berth on the northerly side of the pier 'for the delivery of petroleum products and other merchandise used in connection with its or their petroleum products business." Joint Exhibit 23. The parties also agreed that

> the rights of Getty and Union as successors in interest to Colonial Beacon Oil Company under the Deed and Agreement *are hereby confirmed as being in full force and effect*, as are the like rights granted to CPI by the 1985 Agreement. The parties agree that any other entity or person using the pier through any party to this Agreement... shall be bound by the terms and conditions of this Agreement...

Joint Exhibit 23 (1991 Amended and Restated Pier Operating Agreement), Section I.C. (emphasis added). *See also* Exhibit 79 (1985 Wilkesbarre Pier Operating Agreement), p. 1 ("Getty, Union and Northeast have the right to the free and uninterrupted use of the berth on the northerly side of the pier") and p. 3, section I.C (Getty's rights as successor Colonial Beacon are "confirmed as being in full force and effect").

ii. Getty Properties Has Not Abandoned Its Rights.

Capital Terminal asserts that Getty Properties abandoned its right to use the north side of the Pier in late 1997. Capital Terminal's principal evidence of an intention to abandon is the October 1, 1997 letter which served notice of Getty Realty's intent to withdraw from the 1991 Amended and Restated Wilkesbarre Pier Operating Agreement and stated that Getty Realty "will tender . . . a quitclaim deed and bill of sale" to the Eder Trustees. Joint Exhibit 25. On its face, this was notice of an intention to tender in the future. Getty Realty thereafter withdrew its notice of intention to tender and entered into the Settlement Agreement. Joint Exhibits 28, 32. The

Eder Trustees acknowledged in writing Getty Realty's withdrawal of its notice of intention to tender. Joint Exhibit 32. No documents of conveyance, quitclaim deed, or bill of sale were ever signed or delivered. Testimony of Robert H. Eder, June 25, 2003.

Capital Terminal argues that although Getty Realty reversed its notice of intention to tender, it never reversed its withdrawal from the 1991 Pier Operating Agreement, thereby abandoning the Pier. Getty Realty's withdrawal from the 1991 Pier Operating Agreement, however, is not evidence of an intention to abandon the Pier because all the parties to that agreement recognized that their rights to use the Pier flowed from the 1941 Deed and subsequent title documents. The 1991 Pier Operating Agreement and its predecessors dealt with common issues among pier users such as the scheduling of vessels and the sharing of "pier maintenance costs." These agreements did not purport to convey any property interests. Indeed, Section IX(B) of the 1991 Agreement specifically provided for the consequences when a withdrawing user had "the legal right to continue using the pier." Joint Exhibit 23. Thus, the parties all knew and agreed that withdrawal from the 1991 Pier Operating Agreement was not sufficient to end their deeded rights to use the Pier.

Furthermore, Getty Realty's withdrawal of its notice of intention to tender shows that it did not intend to abandon any rights. The October 1, 1997 notice was given pursuant to paragraph 14 of the August 1975 Grant and Agreement. Joint Exhibit 12. Paragraph 14 provides:

> At any time after Getty shall have constructed and installed the pipelines as hereinabove provided, Getty shall have the right, in its own and sole discretion, to convey the said pipelines including any additional pipelines and its interest in the easement, easement area,

> pier and vessel berth to Eder . . . . In the event Getty exercises its right under this paragraph, Getty shall have no further rights or interest in the said pipelines, easement, easement area, pier and vessel berth and shall have no further obligations under this Grant and Agreement or with respect to the said pipelines, easement, easement area, pier and vessel berth.

Thus, paragraph 14 makes it clear that the October 1, 1997 notice of tender, if carried out, would have included a tender of Getty's rights to use the north side of the Pier. By withdrawing that notice, Getty affirmatively demonstrated that it intended to keep all of the rights that would have been tendered, including the right to use the Pier. This act is also inconsistent with abandonment.

The December 1997 Settlement Agreement also demonstrates that Getty Realty did not abandon its rights to the Pier. The Settlement Agreement sets forth binding obligations including the obligation to enter into the Fourth Amendment to the 1976 Grant and Agreement. Joint Exhibit 28. The Fourth Amendment substituted Getty Realty and the Eder Trustees where their predecessors had been named; deleted two paragraphs of the Grant and Agreement pertaining to the allocation of pipeline maintenance expenses; and amended paragraph 14 by giving Getty Realty the right to convey only one of its two pipelines. The latter amendment provided that "[a]ny such partial conveyance of a single pipeline must include that portion of the interest of Getty Realty in the easement and easement area necessary for the Trustees to use, repair and replace said single pipeline." Joint Exhibit 31. Neither the Fourth Amendment nor the Settlement Agreement makes any reference to Getty Realty's alleged contemporaneous abandonment of its right to use the Pier. Instead, the Fourth Amendment makes clear that both parties understood Getty Realty to still have such rights.

In December 1997, Getty Realty also demonstrated that it did not intend to abandon the Pier by agreeing to take on additional responsibilities relating to maintenance of the pipelines both on and off the Pier. Joint Exhibit 30. Prior to this amendment, pipeline maintenance costs were administered by Getty Properties' predecessor but then divided between Eder and Getty on a pro-rata basis. Joint Exhibit 11. In the First Amendment, Getty Realty agreed that the Eder Trustees would no longer have any liability for maintenance of the Cathodic Protection System, real estate taxes on the pipelines, the cost of compliance with City, State and Federal regulations applicable to the operation of the pipelines and other related expenses. The Eder Trustees would be responsible on a pro-rata basis for costs associated with the repair and replacement costs or the original pipeline system but only after those costs exceeded $25,000. Joint Exhibit 30.

Capital Terminal's abandonment argument defies common sense. Getty Properties continues to own a terminal facility in East Providence. Getty Properties also continues to own the pipelines and equipment both on and off the Pier that serve the terminal. The terminal, pipelines and equipment are part of an integrated petroleum delivery and storage system: each part of the system has relatively little value unless the system is operated and maintained as a whole. Getty Properties' integrated East Providence terminal and pipeline system also has little value without access to that system over the Pier. No rational business would decide to keep a petroleum terminal and pipeline system while simultaneously cutting that system off from the ships that would deliver petroleum to the system in the first place. Getty Realty did not abandon its right to use the Pier in December 1997 because that would have

materially impaired the integrated petroleum delivery and storage system that it wanted to keep intact, withdrawing its notice of intention to tender and entering into the Settlement Agreement.

Getty Properties' facility, pipelines, equipment and rights appurtenant thereto were all contractually assigned to Getty Marketing through a lease beginning in February 1997. Joint Exhibit 24.[3] The lease to Getty Marketing, which was amended and restated in 2000, runs until 2015 with provisions for extension. Joint Exhibit 40, p.21-22. There is no factual basis for Capital Terminal's argument that Getty Realty abandoned its right to use the Pier when it and its successor, Getty Properties, (a) have continued to lease that right to Getty Marketing,[4] (b) had every reason to maintain that right in order to avoid a future blockade of their East Providence terminal by the Pier owner, and (c) Getty Marketing continued to use the Pier. Capital Terminal had actual and constructive notice of Getty Properties' relationship with Getty Marketing and of Getty Marketing's continued use of the Pier.

The Rhode Island Supreme Court has characterized the Pier as "personalty" subject to a "right to use the north side of said pier." *Providence & Worcester Railroad Co. v. Exxon*, 116 R.I. at 491. Capital Terminal appears to agree that it is appropriate to look to the law

---

[3] Both the original and amended leases conveyed the Land, as defined by the lease, and "the appurtenances and all the estate and right to the Land." Joint Exhibits 24 and 40, p. 1, ¶ A. An "appurtenance" is "[s]omething annexed to another thing more worthy as principal, and which passes as incident to it, as a right of way or other easement to land . . . . A thing is deemed to be incidental or appurtenant to land when it is by right used with the land for its benefit, as in the case of a way, or watercourse, or of a passage for light, air, or heat from or across the land of another." Black's Law Dictionary (6th ed. 1990). Both the original and amended leases identify Getty's Dexter Road, East Providence terminal as among the hundreds of properties being leased. 1997 Lease, Exhibit A, p. 20; 2000 Lease, Exhibit B-2, last page. Given the number of properties involved in the transaction, it is not surprising that the leases do not identify all of the appurtenances to each property in detail.

[4] Although the November 2000 Amended and Restated Lease had a schedule of abandoned properties, each of which were demised under the original February 1997 lease but not demised under the amended lease, that schedule does not identify the Pier or any rights related to the Pier. Joint Exhibit 40, p. 2, ¶ 1.2 and Schedule 1.

applicable to easements to determine whether Getty Properties' right to cross Defendants' personalty has been abandoned. Defendant's Post-Trial Brief at 10. Capital Terminal therefore bears the burden of showing acts manifesting Getty's clear intention to abandon the Pier. *Nahabedian v. Jarcho*, 510 A.2d 425, 428 (R.I. 1986); *Spangler v. Schaus*, 106 R.I. 795, 806, 264 A.2d 161, 170 (1970) (question of abandonment is one of intention that must be determined from the facts of each case). "In order to establish an abandonment of an easement, it is necessary to prove that the holder of the easement acted voluntarily and in such a decisive manner as to show an unequivocal intention to abandon the easement." *Nahabedian*, 510 A.2d at 428 (citing *Steere v. Tiffany*, 13 R.I. 568, 571 (1882); *O'Reilly v. Town of Glocester*, 621 A.2d 697 (R.I. 1993); *Jackvony v. Poncelet*, 584 A.2d 1112 (R.I. 1991).

Capital Terminal has not met its burden of showing a "decisive" intent to abandon as required by law. To the contrary, Getty Realty's actions in December 1997 and thereafter (including the prosecution of this lawsuit)[5] demonstrate a continuing commitment to maintaining its right to use the Pier.

iii. Getty Properties Is Not Estopped From Using The Pier.

Capital Terminal argues in the alternative that Getty Properties is estopped from asserting its right to use the Pier. Defendant's Post-Trial Brief at 15. To succeed on this argument, Capital Terminal must show: "(1) [C]onduct on the part of the dominant owner

[5] Capital Terminal suggests that certain of Getty Properties' interrogatory answers evidence an intention to abandon the Pier because they do not refer to the 1941 Deed as a source of rights. Defendant's Post-Trial Brief at 13-14. Plaintiffs' pleadings, however, did refer to the 1941 Deed. The August 2000 original complaint alleged that "[t]he parties and their predecessors-in-interest have owned, had interest in, and/or utilized the Pier since 1941." Complaint ¶ 6. The May 2001 Amended Complaint alleged that Getty Properties had the right to use the Pier "[b]y virtue of a deed and agreement dated August 28, 1941." Amended Complaint ¶¶ 61-62.

reasonably causing the servient owner to believe that the easement is no longer desired; plus (2) conduct on the part of the servient owner in reliance upon the above described appearances, under such circumstances that a continuance of the easement would be seriously harmful to the servient owner." *See Nahabedian*, 510 A.2d at 429 (quoting 3 Powell, ¶ 425 at 34-267).

As described above, Getty Realty withdrew its notice of an intention to tender and entered into the Settlement Agreement in December 1997. The Eder Trustees acknowledged the withdrawal of the tender notice. Joint Exhibit 32. There was no reference in the Settlement Agreement or any of the related documents to a purported abandonment of the Pier, and abandonment of the Pier would have been irrational in the context of Getty Realty's clear determination at the time to keep its integrated East Providence petroleum delivery and storage system intact. Thus, any reliance by Capital Terminal on an alleged abandonment could not be reasonable.

Moreover, even if Capital Terminal believed that Getty Properties had abandoned the Pier, it suffered no serious detriment as a consequence. Capital Terminal voluntarily entered into the Throughput Agreement, pursuant to which it received a very substantial stream of revenue from Getty Properties' lessee until March of this year. As established at trial in December 2002, this revenue far exceeded Capital Terminal's expenditures on repairs, and was available to pay taxes, insurance and other Pier expenses as well. There is no evidence in the record that Capital Terminal would have acted any differently in December 1997 or thereafter had it been told expressly what it doubtless knew anyway -- that Getty Properties was not abandoning its deeded right to use the Pier.

iv. Getty Properties Has Not Forfeited Its Right To Use The Pier.

After the close of the Plaintiffs' case, Capital Terminal raised for the first time the argument that Getty Properties had forfeited its right to use the Pier by failing to comply with alleged conditions in the 1941 Deed. As this forfeiture claim was not pleaded as a defense or otherwise raised by Capital Terminal prior to trial, it has been waived. Fed. R. Civ. P. 8(c); *Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*, 15 F.3d 1222, 1226 (1st Cir. 1994); *Amcel Corporation v. International Executive Sales, Inc.*, 170 F.3d 32 (1st Cir. 1999). It would be unfair Getty Properties to add this new defense to the case so late in the proceedings.

Capital Terminal's forfeiture defense, even if timely raised, is defective. First, Capital Terminal asserts that Getty Properties is required by the 1941 Deed to pay taxes on the Pier. The language relied on by Capital Terminal is as follows:

> (3) the Grantee, its successors or assigns, shall annually reimburse the Providence and Worcester Railroad Company, its successors and assigns, for the taxes assessed on said pier to an amount equivalent to what the taxes would have been on the last assessed valuation of the pier owned by the Grantee, its successors or assigns, <u>and removed for the construction of such pier constructed in the exercise of the right hereby reserved</u>, apart from any pipe lines and equipment on the pier so removed . . .

<u>Joint Exhibit 1</u>, p. 4 (emphasis added). Thus, the 1941 Deed contemplates that Getty Properties, as successor to the Grantee, would make a contribution toward the taxes due on a newly constructed Pier (which would require less maintenance). However, no new Pier has ever been constructed. Instead, Capital Terminal's predecessor in interest, P&W, ousted the Grantee's successor from its ownership position through the litigation ending with the 1976 Rhode Island Supreme Court decision. There is no "newly constructed" Pier, and Getty Properties does not

own the existing Pier. Therefore, Getty Properties has no obligation under the 1941 Deed to contribute to taxes on the Pier.[6]

Even if Getty Properties did have an obligation to contribute to Pier taxes under the 1941 Deed (which it does not), it has not breached that obligation. Until 1998, all taxes on the Pier were paid by the Pier users under the various Pier operating agreements. Joint Exhibit 23 (1991 Pier Operating Agreement), p. 9, section IV(A)(2); Exhibit 79 (1985 Pier Operating Agreement), p. 10, section IV(A)(2). From January 1, 1998 until March 2003, Getty Properties' tenant, Getty Marketing, paid hundreds of thousands of dollars in throughput fees, of which only a small fraction was used to make repairs. There is no evidence that these throughput fees, paid by Getty Properties' assignee under a lease, did not fully reimburse Capital Terminal for any Pier taxes that it paid.

Capital Terminal also misreads the 1941 Deed when it asserts that Getty Properties has forfeited its rights because it is not in the "petroleum products business." Defendant's Post-Trial Brief at 17-18. The 1941 Deed does not condition the right to use the Pier on the Grantee, its successors and assigns being in the petroleum products business: it merely uses that phrase to define and limit the "other merchandise" -- other than petroleum products – which can be delivered over the Pier. Joint Exhibit 1, p. 4.[7] The parties to the 1941 Deed simply wanted to make clear that the north side of the Pier could not be used to unload

[6] Indeed, interpreting the 1941 Deed to require the Grantee and its successors to contribute to taxes on the old Pier, when they also paid and may pay again in the future substantial repair and maintenance expenses that would be avoided if there were a new Pier, would result in a windfall to Capital Terminal.

[7] The 1941 Deed gives the Grantee and its successors and assigns the right to use the north side of the Pier "for the delivery of petroleum products and other merchandise used in connection with its or their petroleum products business." Joint Exhibit 1, p. 4.

cars, or coal, or products other than petroleum and related items. Getty Properties has an absolute right to deliver petroleum products over the Pier, regardless of how its business is defined.

In any event, the idea that Getty Properties and its assignee under a lease, Getty Marketing, are not in the petroleum products business for purposes of the 1941 Deed is spurious. It is undisputed that Getty Properties owns hundreds of gas stations and numerous terminals and other petroleum facilities in the Northeast, including the East Providence facilities served by the Pier. It is undisputed that Getty Properties derives substantial revenue from those gas stations and terminals, which are managed and operated by its contractual assign, Getty Marketing. It is undisputed that Getty Marketing is in the petroleum products business, operating not only the gas stations and terminals it leases from Getty Properties, but other gas stations and terminals as well. It is also undisputed that Getty Properties and its tenant have used the Pier in exactly the same way that it was being used before 1997 – to unload petroleum products. The benefits of the 1941 Deed run to both Getty Properties and its assigns, and it is clear that both Getty Properties and Getty Marketing are in the petroleum products business for purposes of the 1941 Deed provisions.

Capital Terminal relies on *Knowles v. South County Hospital*, 87 R.I. 303, 140 A.2d 499 (1958), and several earlier decisions, to support its forfeiture argument. These cases are no longer apposite because there were decided before the General Assembly enacted a general bar to claims against fee interests based upon an alleged right of entry for a broken condition in deeds created prior to May 11, 1953. R.I.G.L. § 34-4-24 provides in pertinent part:

> (a)(1) No proceeding based upon any right of entry for condition broken or possibility of reverter to which a fee simple or fee simple determinable in land is subject, created before May 11, 1953, shall be maintained in any court After December 31, 1987, unless on or before December 31, 1987:
>
> (i) The condition has been broken or the reverter has occurred, and a person or persons having the right of entry or reverter shall have taken possession of the land, or;
>
> (ii) A person or persons having the right of entry . . . [shall] have filed in the town or city clerk's office or recorder of deeds office . . . a statement in writing, duly sworn to, describing the land, the nature of the right, the deed or other instrument creating it, and where it may be found, and naming the person or persons appearing of record to own the fee subject to the right or possibility.

While this statute expressly applies to fee interests, it reflects the desire of the General Assembly to prevent forfeitures of absolute grants of right contained in deeds predating 1953, unless a later notice of the possibility of a forfeiture has been recorded. The right Capital Terminal is contending has been forfeited is similar to the rights the General Assembly sought to protect in § 34-4-24, and should be construed to be within the scope of the statute. Capital Terminal's eleventh hour assertion of this defense, not raised in its pleadings, should be rejected.

## IV. Getty Properties' Responsibility For Future Pier Costs, If Any, Is Not Before The Court.

Capital Terminal invites the Court to issue a declaration apportioning future Pier taxes, insurance, maintenance and repairs "50-50 between the parties." Defendant's Post-Trial Brief at 22. Apportionment of all Pier expenses was not raised in any of the pleadings, in Defendant's pretrial memorandum, or at trial. This issue is not currently before the court, and should not be decided based on the scant factual and legal assertions first made by Defendant's new counsel after trial.

## V. Getty Properties Owns the Pier Facilities.

The pipelines, tanker unloading equipment, and related facilities located on the Pier (the "Pier Facilities") were originally installed by Colonial Beacon after it entered into the 1941 Deed with P&W. Prior to 1941, Colonial Beacon had used shallow draft barges to transport oil up the Seekonk River to the petroleum storage facilities it owned in the Phillipsdale section of East Providence, but this inefficient process placed it at a competitive disadvantage. *Providence & Worcester Company v. Exxon Co.*, 116 R.I. 470, 475, 359 A.2d 329, 333 (1976). "Colonial desired, therefore, to install a pipeline extending from the deep water vessel berth at the pier to its Phillipsdale depot by way of a right-of-way which belonged to P&W and [the New York, New Haven and Hartford Railroad Company] and which followed that very route. *Id.* It entered into the 1941 Deed with P&W to achieve this goal. *Id.*

In 1962, Colonial Beacon's successor, Humble Oil, granted Getty's predecessor an undivided 2/5 interest in the parcel of land on which the Pier is situated, "[t]ogether with an undivided two-fifths ownership interest in the pier, berthing facilities, two product pipelines, valves, equipment and associated appurtenances located on said land...."[8] Joint Exhibit 2. In June 1976, Getty acquired Humble's (by then known as Exxon) remaining 3/5 interest in "all the unloading facilities and associated appurtenances (consisting of platform, frames, dolphins, piping, unloading hoses, valves, manifolds and related facilities, apparatus and equipment of every nature) located on the Wilkesbarre Pier, which facilities are required for the convenient

[8] *See also Providence & Worcester Company v. Exxon Co.*, 359 A.2d 329, 335 at n. 4 ("In 1972 the pipelines belonging to Getty and Exxon caught fire and were declared unsafe. Their use has been prohibited by the city of East Providence since that time.").

unloading of petroleum products from ships and barges." Exhibit 54. Getty Properties' predecessor paid Exxon $10,650.00 for Exxon's ownership interest in these facilities. Id. Thus, by 1976, Getty Properties' predecessor owned 100% of the Pier facilities.

Capital Terminal is now claiming that Getty conveyed a 2/5 ownership of the Pier Facilities to Capital Terminal's predecessor, P&W, in August 1975. To the contrary, Getty's August 6, 1975 Deed of Conveyance to P&W transferred only its undivided 2/5 ownership interest in "that tract and parcel of land" acquired from Humble in 1962, "[t]ogether with its undivided two-fifths ownership interest and all of its other right, title and interest in and to the pier and berthing facilities." The pipelines and equipment that are expressly conveyed in the 1962 deed from Humble to Getty are not conveyed in the 1975 conveyance from Getty to P&W. Indeed, the Deed of Conveyance expressly reserved Getty's right to "erect, replace, use and maintain its pipelines and equipment appurtenant thereto on the northerly side of the presently-existing Wilkesbarre Pier or any pier hereafter constructed . . ." Emphasis added. Similar language was inserted into another document executed the same day, the August 6, 1975 P&W/Getty Agreement. Joint Exhibit 9. Paragraph 1 of that Agreement says that Getty promises to execute and deliver to P&W "a confirmatory conveyance of all right, title and interest in and to the Wilkesbarre Pier . . . including also all right, title and interest in and to said pier as Getty Oil (Eastern) may have acquired by virtue of the Grant of even date herewith from Seekonk Realty Corp., reserving to itself in said deed of conveyance, the right to erect, replace, use and maintain its pipelines and equipment appurtenant thereto on the northerly side of said Wilkesbarre Pier or any pier hereafter constructed in place of said Wilkesbarre Pier and the right

to have free and uninterrupted use of the berth on the northerly side of said pier for the delivery of petroleum products and other merchandise . . ." Emphasis added. Plainly, Getty did not transfer any interest in "its" Pier Facilities to P&W (Capital Terminal's predecessor) in 1975.

The context of the August 1975 Deed of Conveyance further demonstrates that the parties understood that Getty was conveying only its interest in the Pier, and not the Pier Facilities, to P&W. In 1974, the Rhode Island Superior Court had ruled that the Wilkesbarre Pier – and only the Pier -- was personalty owned by P&W, and that ruling was upheld by the Supreme Court in 1976. *Providence & Worcester Co. v. Exxon, et al.,* 116 RI 470, at 490-91 (1976). Neither the 1974 nor the 1976 decisions addressed the ownership of the Pier Facilities. The August 1975 Deed of Conveyance from Getty to P&W did nothing more than confirm P&W's judicially determined ownership of the Pier as personalty, without affecting Getty's ownership of "its" Pier Facilities.

Moreover, the 1975 agreements between Getty and P&W and Getty and Eder could not have had any effect on Exxon's transfer of its 3/5 interest in the Pier Facilities to Getty the following year. Exhibit 54 (June 1976 conveyance).[9] Exxon's ability to transfer its interest in the Pier Facilities to Getty was not affected by the Rhode Island Supreme Court's June 1976 decision because that decision transferred to Providence and Worcester Railroad only a single piece of personal property – the Pier. Exhibit 17, p. 26. Thus, since June 1976, Getty has owned 100% of the Pier Facilities.

Capital Terminal asserts that Exxon had only a 2/5 interest in the Pier Facilities by 1976, having purportedly conveyed a 1/5 interest in those facilities to Unocal in 1969. Defendant's Post-Trial Brief, p. 26. To the contrary, the 1969 deed to Unocal on which Capital Terminal relies (Joint Exhibit 5) conveys to Unocal a 20% undivided interest in the Pier and appurtenances "except those facilities, structures, improvements and appurtenances utilized exclusively to transfer from the tanker or barge berth to the 12" and 14" pipelines extending from the Wilkesbarre Pier . . . ." Id., paragraph (b) (emphasis added). Thus, Joint Exhibit 5 on its face excludes from the conveyance the Pier Facilities, so that Exxon retained the 3/5 interest which it conveyed to Getty in 1976.

Capital Terminal should not be heard to contest Getty Properties' ownership of the Pier Facilities because it consistently acknowledged that ownership until just a few months ago. Indeed, Capital Terminal's original answer to the complaint in this case stated in paragraph 8 that "Upon information and belief Getty Properties is the present owner or lessor of the Pipelines and Pipeline easements as heretofore alleged."[10] Capital Terminal's predecessors acknowledged Getty's ownership of the Pier Facilities too. For example, a January 29, 1985 amendment to an earlier agreement between Getty and a predecessor in interest to Capital Terminal states that "[a]s used herein, the term "pipelines" includes the pipelines unloading hoses [sic], manifolds, protection system, utilities and other unloading facilities and apparatus *owned by Getty* and located on or used in conjunction with the north side of the Wilkesbarre Pier

[10] Paragraph 5 of the original Answer of Capital Terminal defined the term "Pipelines" to include certain easement areas together with the Pipelines, unloading hoses, related facilities, apparatus and equipment. Capital Terminal's amended answer dropped this language.

or the vessel berth." Joint Exhibit 21 (Third Amendment to Getty/Eder Grant and Agreement), ¶ 5 (emphasis added). Similarly, the 1985 Pier Operating Agreement recites in part that "petroleum products are to be delivered from the pier...through pipelines *owned by Getty* ...." Exhibit 79 (1985 Wilkesbarre Pier Operating Agreement), p. 2 (emphasis added). Even the 1997 Throughput Agreement refers to "Getty's pipelines." Joint Exhibit 29, p. 1.

Respectfully submitted,

GETTY PROPERTIES CORP.

By Its Attorneys,

PARTRIDGE/SNOW & HAHN LLP

James W. Ryan (#4042)
Robert K. Taylor (#6514)
180 South Main Street
Providence, RI 02903-7120
(401) 861-8200
(401) 861-8210 FAX

DATED: July 17, 2003

## CERTIFICATE OF SERVICE

I hereby certify that I served a copy of the Plaintiff's Pretrial Memorandum this 7th day of July, 2003 by hand delivery to

Craig M. Scott, Esq.
Duffy & Sweeney
1200 Turks Head Building
Providence, RI 02903

Mark W. Freel, Esq.
Edwards & Angell, LLP
2800 Financial Plaza
Providence, RI 02903

Gerald J. Petros, Esq.
Charles D. Blackman, Esq.
Hinckley, Allen & Snyder LLP
1500 Fleet Center
Providence, RI 02903

__________________________

697000_2/2900-2