# EXHIBIT AA

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

GETTY PETROLEUM MARKETING, INC. AND GETTY PROPERTIES CORP., :

vs. : C.A. No. 00-381ML

CAPITAL TERMINAL COMPANY. :

**CAPITAL TERMINAL COMPANY'S**
**POST TRIAL MEMORANDUM**

## I. INTRODUCTION

Three claims remain in this case: (1) Getty Properties' obligation to replace the distillate pipeline on the Wilksbarre Pier (the "Pier"); (2) Getty Properties' obligation for past and future fire suppression costs; and (3) Getty Properties' abandonment of its right to use the north side of the Pier and berthing facilities.

## II. FACTS

CTC requests that the Court make those specific findings set forth in the accompanying Proposed Findings of Fact. CTC incorporates those requests herein by reference.

## III. ARGUMENT

### A. THE COURT SHOULD ORDER GETTY PROPERTIES TO INSTALL THE SIXTEEN INCH DISTILLATE LINE.

Capital Terminal seeks specific performance of Getty Properties' obligation "to replace the distillate pipeline on the Wilkesbarre Pier with a sixteen inch line." Counterclaim, Count II. Getty Properties promised Robert Eder that it would install a 16 inch pipeline from the unloading

per capita, i.e., Janes v. Politis, 79 Misc.2d 941, 361 N.Y.S.2d 613 (1974) (maintenance and repair of common septic system should be borne equally between parties); others have apportioned costs in proportion to use. See, i.e., Lindhorst, supra.

CTC submits that there are basically five categories of expenses relating to the Pier that the Court must apportion: capital repairs, future maintenance, taxes, insurance, and water (which is minimal). The Court should allocate these expenses equitably and strike a fair balance of pier expenses in light of what they really are. For instance, taxes and insurance must be paid regardless of whether a party uses the Pier. Routine maintenance and water, by contrast, vary according to use. Capital repair expenses, at this point in time, are fixed costs. It would not be equitable to insist that one party shoulder the burden of rehabilitating a 130 year old Pier so that the other can saunter back, perhaps years later, and avail itself of benefits for which it did not pay.[13]

The allocation of costs to maintain natural gas pipelines presents similar considerations. Most natural gas rates are based on a "demand charge," which corresponds to those fixed costs associated with the right to have access to the pipeline, and a "usage charge" (sometimes "commodity charge"), which corresponds to those variable costs associated with actual usage. See generally ANR Pipeline Co. v. FERC, 71 F.3d 897, 899 n.5 (D.C. Cir. 1995); Columbia Gas Transmission Corp. v. FERC, 628 F.2d 578, 582 n.12 (D.C. Cir. 1979). Investment in the pipeline facilities is included in the "demand charge." Columbia Gas, id. In this case, the capital repairs necessary to rehabilitate the Pier are properly regarded as a "demand charge" or a "fixed

[13] Make no mistake. This is Getty Properties' argument here. It will argue that all future expenses at the Pier should be allocated based on proportionate use. It takes this position only because its tenant, Getty Marketing, vacated the terminal in March 2003. It seeks to have CTC completely rehabilitate the Pier at CTC's sole expense so that it can later resume using the Pier, having made no contribution to any capital renovations. This is hardly equitable.

cost." They are necessary costs to ensure that the Pier is functional and available at all times to the Pier users.

Taxes, insurance, and capital improvements should be apportioned 50-50 between the parties. These expenses must be paid regardless of whether Getty Properties actually uses the Pier.[14] Getty Properties should contribute equally because its ability to use the Pier depends on the payment of these costs. Meanwhile, routine maintenance (and water) can be allocated fairly based on use because these costs depend on use. CTC respectfully submits that this is a fair and equitable manner to resolve the entire controversy. Moreover, the Court's allocation should be applied retroactively to January 1, 1998, the date when Getty Properties' rights under the 1941 Deed supposedly accrued.

Getty and its successors, over a thirty year course of dealing, chose to put off making major improvements to the pier. The time to pay the piper has arrived. Unlike Getty Properties, CTC is prepared to puts its money where its mouth is. It does not expect to get something for nothing. Getty must share these burdens if it shares in the right to use the Pier.

3. <u>Getty Does Not Own the On-Pier Pipelines</u>

Declaratory relief is a discretionary remedy. Getty Properties' request that the Court declare that it is the owner of the pipelines on the Pier is a classic example of when declaratory relief should be withheld. There is no material dispute relating to pipeline ownership. As matters stand now, it is undisputed that Getty Properties must *maintain* the pipeline system pursuant to the 1975 Pipeline Operating Agreement, as amended. (<u>Joint Exhibits 11 and 32</u>). It is also undisputed that *CTC has the right to use* the pipelines pursuant to the 1975 Grant and Agreement, as amended. Finally, it is undisputed that once Getty Properties replaces the

---

14 Of course, taxes are allocated under the 1941 Deed. However, it is within the Court's discretion to reallocate them in light of the totality of expenses to be allocated.

pipelines on the Pier as it is obligated to under the 1975 Grant and Agreement, *then* Getty Properties will be the owner of both pipelines. Testimony of Robert Eder, 6/25/2003. Thus, the question of record title ownership to the pipelines on the Pier is beside the point. It will not be of any "practical assistance in setting the underlying controversy to rest." State of Rhode Island v. Narragansett Indian Tribe, 19 F.3d 685, 693 (1st Cir. 1994) (declaratory relief should be granted only if it will serve a useful purpose), cert. denied 513 U.S. 919 (1995). If Getty wants to own the on-pier pipelines, it should replace the lines as it promised 28 years ago.

a. CTC Owns a 100% Interest in the On-Pier Pipelines

Although the present title ownership of the pipelines on the Pier need not be resolved, CTC is presently the 100% owner of the on-Pier pipelines. Prior to 1974, the petroleum pipelines on the Pier were owned 60% by Humble (later Exxon) and 40% by Getty. Joint Exhibits 1, 2, and 3. The Pier, the underwater land, the north ship berth, and pipeline supports, by contrast, were owned 40% by Humble, 40% by Getty, and 20% by Unocal. Joint Exhibits 1, 2, 3, and 5.

In 1974, in an action by P&W against the oil companies, the Superior Court declared that P&W owned the Pier and all Pier-related property "in fee simple." Joint Exhibit 7. The Superior Court's decision was expansive and commanded Getty, Exxon, and Unocal to execute confirmatory conveyances to this effect. The oil companies appealed.

On August 6, 1975, Getty and P&W reached a settlement under which Getty agreed to withdraw its appeal. Joint Exhibits 7-15. Exxon and Unocal prosecuted their appeals to final judgment.

As settlement of the pending appeal, Getty promised to deliver to P&W a deed conforming to the 1974 Superior Court Judgment. Joint Exhibit 9. Getty did so. Joint Exhibit

Getty Properties is obligated to pay all past and future fire suppression costs, (3) declare that Getty Properties does not have any right to use the north side of the Wilkesbarre Pier, and (4) enter judgment against Getty Marketing on all remaining claims.

CAPITAL TERMINAL COMPANY,
By its attorneys

Craig M. Scott, Esq. (#4237)
DUFFY & SWEENEY, LTD.
One Turks Head Place
Providence, RI 02903
Telephone No. (401) 455-0700
Facsimile No. (401) 455-0701

Gerald J. Petros, Esq. (#2931)
Charles D. Blackman, Esq. (#5522)
HINCKLEY ALLEN & SNYDER, LLP
1500 Fleet Center
Providence, RI 02903
Telephone No. (401) 274-2000
Facsimile No. (401) 277-9600

Date: July 7, 2003