# EXHIBIT F

WILKESBARRE PIER

OPERATING AGREEMENT

OPERATING AGREEMENT made this 12th day of June, 1985, between Texaco Refining and Marketing, Inc., a Delaware corporation, formerly known as Getty Refining and Marketing Company (hereinafter called "Getty"), Union Oil Company of California, a California corporation, for its Union Chemicals Division (hereinafter called "Union"), Northeast Petroleum Corporation, a Massachusetts corporation (hereinafter called "Northeast", being the successor in interest to Northeast Petroleum Corporation of Rhode Island, a Rhode Island corporation), Capital Properties, Inc., a Rhode Island corporation (hereinafter called "CPI"), and Providence and Worcester Railroad Company, a Rhode Island corporation (hereinafter called "P&W").

WHEREAS, P&W is the owner of a pier and berthing facilities in the Seekonk River in the City of East Providence, Rhode Island, otherwise known as the Wilkesbarre Pier, (hereinafter called the the "pier"); and

WHEREAS, pursuant to a deed and agreement dated August 28, 1941 (the "Deed and Agreement") between Providence and Worcester Railroad Company (predecessor in interest to the present P&W) and Colonial Beacon Oil Company (predecessor in interest to Getty, Union and Northeast), Getty, Union, and Northeast have the right to the free and uninterrupted use of the berth on the northerly side of the pier "for the delivery of petroleum products and other merchandise used in connection with its or their petroleum products business"; and

WHEREAS, the parties desire to grant like rights to CPI; and

WHEREAS, such petroleum products and other merchandise are to be delivered from the pier (a) to Union's terminal adjacent to the pier, (b) to Getty's terminal on the easterly side of Dexter Road, through pipelines owned by Getty (c) to CPI's terminal on the westerly side of Dexter Road, through said pipelines by virtue of a Grant and Agreement by and between Getty and Robert H. Eder ("Eder") dated August 6, 1975, as amended (the latest amendment thereto being the Third Amendment to Grant and Agreement dated as of 1\29\85 by and between Getty and Edgar M. Masinter and Linda Eder, Trustees, successors to Eder's entire interest in said Grant and Agreement), and (d) to Northeast's terminal on Dexter Road, through said pipelines by virtue of an operating agreement between Getty, said Trustees and Northeast; and

WHEREAS, Getty desires to confirm and establish that vessels which deliver such petroleum products and other merchandise to the pier for or on the account of said Trustees, CPI, Northeast, Union, P & W, or any person claiming by, through or under any of them, are not in any way attributable to Getty; and

WHEREAS, P&W will use the pier in furtherance of its business; and

WHEREAS, the parties desire to provide for the orderly use and operation of the pier; and

WHEREAS, the parties (other than CPI) entered into an agreement dated May 28, 1982, entitled WILKESBARRE PIER OPERATING AGREEMENT which agreement the parties desire to terminate and replace by this new agreement.

CT 1550

NOW, THEREFORE, the parties agree as follows:

I. EFFECTIVE DATE

A. The agreement dated May 28, 1982, entitled WILKESBARRE PIER OPERATING AGREEMENT recorded at Book 468, Page 187, is terminated as of December 31, 1984. All payments accrued under said agreement shall be settled under the terms of said agreement.

B. This agreement shall be effective as of January 1, 1985.

C. The rights of Getty, Union and Northeast as successors in interest to Colonial Beacon Oil Company under the Deed and Agreement are hereby confirmed as being in full force and effect; and like rights are hereby granted to CPI; provided, however, nothing herein is intended to preclude CPI from acquiring from P&W and exercising rights which P&W may lawfully grant to CPI for use of the pier for purposes other than the delivery of petroleum products.

II. SCHEDULING OF VESSELS

A. Each party will cooperate with each other party in connection with scheduling of vessel arrivals at the berth on the northerly side of the pier so as to assure as far as possible that no party will be subjected to expense or inconvenience arising from delay of any kind.

CT 1551

(1) No later than the 15th of each month, each party will supply the other parties hereto with written notice of its tentative vessel schedule for the succeeding month and shall thereafter advise each other party of any change of estimated time of arrival.

(2) When vessels are nominated and arrival dates established, each party shall give each other party ten (10) days' telex or telephone notice in advance of each anticipated vessel arrival which shall include a reference to the draft of the vessel and an estimate of the number of hours required for the vessel to complete the loading or discharge of its cargo. Each party may, and is encouraged to, revise and update each scheduled arrival of vessels for which such party has given notice.

(3) In case of substantially simultaneous arrival of two or more scheduled vessels, priority in berthing shall always be given to the vessel whose arrival date and time is in closest agreement with its ten (10) days' notice, or alternatively, in the event two or more vessels have the same arrival date based on their ten (10) days' notice, the vessel which first arrives at the Brenton Reef Pilot Station shall be given priority.

(4) The determination of a vessel's priority is subject to the requirement that such vessel and its associated shore facilities are ready in all respects to commence and complete expeditious

loading or discharging (referred to hereafter collectively as "transferring" or "transfer") of its cargo. In the event of any inability to transfer cargo, any waiting scheduled vessel may proceed to berth. If a vessel has berthed and either it or its associated shore facilities are unable to commence expeditious transfer of its cargo, such vessel shall vacate the berth provided that a waiting scheduled vessel and its associated shore facilities are ready in all respects to commence expeditious transfer of its cargo.

(5) P&W and its designees may not schedule two (2) consecutive vessel arrivals if such arrivals interfere with another party's use of the berth, without the prior written consent of such other party, such consent not to be unreasonably withheld.

B. If a party's scheduled vessel arrives within 24 hours of the date and time, nominated by ten (10) days' notice as provided under subparagraph A(2) of this Section, then the vessel shall remain at the berth no longer than seventy-two (72) hours maximum (measured from the completion of all lines fast) if there is a scheduled vessel of another party waiting to transfer its cargo.

C. A scheduled vessel which arrives more than 24 hours after the date and time, nominated by ten (10) days' notice as provided under subparagraph A(2) of this Section, shall be treated as an unscheduled vessel.

D. Unscheduled vessels may berth so long as there is no waiting, scheduled vessel. Upon arrival of a scheduled vessel, the unscheduled vessel then must vacate the berth.

E. Any party which fails to abide by any of the above provisions shall hold each other party harmless and indemnify each other party from and against any loss, cost, damage, expense, liability, judgment, award or decision which results from or which is incurred in connection with any such failure.

III. PIER OPERATING PROCEDURE

A. Each party will cooperate with each other party in connection with the conduct of operations at the pier so as to assure as far as possible that no party will be subjected to expense or inconvenience arising from delay of any kind.

B. Each party will arrange for pilots, tugs, and other requirements to move its vessels into and out of berth.

C. Tankers or other vessels which in accordance with industry practice require tugboat assistance may not dock or undock under their own power but must be assisted by tugboats in approaching and leaving the pier except under extraordinary conditions when tugboats are not available.

D. Each party will arrange for personnel needed to handle lines for tying up its vessel to the pier and when applicable, to hook up hoses on the pier for

discharge or receipt of cargo, and to strip and disconnect hoses and lines on the pier following discharge or receipt of cargo.

E. When applicable, each party will furnish personnel for performing the following functions in connection with loading or unloading its vessels:

(1) Establish order of pumping in discharge or receipt of cargo.

(2) Gauging and sampling of vessel tanks and checking water bottoms.

(3) Analysis of samples.

(4) Ascertain that vessel is physically ready to discharge or receive cargo, checking sea cocks, hose connections, shore valves and related equipment.

(5) Provide dock watch during entire loading or unloading operation, and take line samples and maintain records in accordance with normal industry practices employed by Getty, Union, Northeast, Red Bridge and P&W.

F. Except for losses due to acts or omissions of another party hereto, or those of its agents, employees or contractors, each party during loading or unloading will be responsible for its product losses in connection with the transport of its products between pier and tank terminal.

G. Each party will prepare and handle all vessel and cargo documents and attend to all other paper work required in connection with vessel loadings and unloadings.

H. Each party will be responsible for compliance with all applicable laws and regulations relating to its own operations.

I. Without accepting any liability for its failure to do so, Union agrees to use its best efforts to repair, maintain and replace the existing water lines, electrical lines and equipment, and to supply the pier and ships with the quantities of water and electricity necessary to conduct the operations heretofore conducted at the pier.

(1) Union will invoice P&W, as expenses occur, for the cost of repairing, maintaining and replacing existing water lines, electrical lines and equipment. P&W will bill the using parties equally for this cost.

(2) Union will invoice P&W, on a quarterly basis, for the cost of any water supplied to vessels delivering or receiving product via the pier. P&W will bill the party-user for this cost.

(3) Union will invoice P&W, on a monthly basis, for the cost of the electricity supplied to the pier and facilities thereon. Subject to the following subparagraph I(4), P&W will bill all parties equally for this cost.

(4) Any party using the pier for purposes other than the delivery of petroleum products and other merchandise used in connection with its petroleum products business shall be solely responsible for all costs and expenses for water and electricity consumed by it for such other purposes. In addition, any party using the pier for such other purposes shall be responsible for any and all costs that may be incurred for additional water lines, electrical lines and equipment required to serve the pier and for the cost of repairing and/or replacing any part of the pier that is damaged as a result of use of the pier for such other purposes.

J. It shall be the responsibility of each party to use the pier in such manner as to maintain it in good working order. In the event damage is done to the pier as a result of a particular party's use of same, P&W shall, as soon as possible after obtaining knowledge of such damage, inspect the damage and provide written notice to the party allegedly causing the damage, including a report of such inspection and an estimate of the cost of the repairs necessary to correct such damage. The party so notified shall have five (5) business days to notify P&W whether it will promptly pursue such repairs to completion; in the event the party chooses to effect such repairs, it shall immediately commence such repairs and complete same expeditiously. In the event the party does not agree to expeditiously effect such repairs, P&W shall effect such repairs and bill the party for the total cost of such repairs. In the event the party does not agree that its use caused the damage, P&W shall effect

such repairs and the cause of the damage will be arbitrated pursuant to Section X of this agreement.

IV. MAINTENANCE

A. "Pier maintenance costs" as the term is used herein shall be defined as, and limited to, those costs necessary to promote the safe, orderly, convenient and lawful loading and unloading of petroleum products and other merchandise used in connection with the petroleum products businesses of the parties over the Wilkesbarre Pier (except as provided in sub-section D(3) hereof). Said costs shall include but will not be limited to the following:

(1) Repair and/or replacement of any part of the existing pier structure to the extent such repair is necessitated by use of the northerly berth of the pier for delivery of petroleum products and other merchandise used in connection with the petroleum products businesses of the parties.

(2) Real estate taxes and other fees applicable to the existing pier and/or the operation of same for delivery of petroleum products and other merchandise used in connection with the petroleum products businesses of the parties.

(3) Dredging for the full length of the northerly side of the pier as required to maintain depth of -30' (thirty) feet MLW.

(4) The cost of compliance with all City, State or Federal regulations applicable to the

operation of the existing pier in connection with delivery of petroleum products and other merchandise used in connection with the petroleum products businesses of the parties.

(5) The cost of insurance to protect against the risk of loss by fire, extended coverage perils, and other perils, to the extent arising in connection with delivery of petroleum products and other merchandise used in connection with the petroleum products businesses of the parties.

(6) All expenses incurred by P&W pursuant to its pier management responsibilities assumed under Sections III I and J, Section IV and Section X hereof; provided, however, that such expenses do not include expenses incurred by P&W or anyone claiming through or under it as a user of the pier or any overhead expenses not directly related to the management of the pier by P&W. Expenses of P&W in connection with arbitration brought by P&W for the purpose of determination of pier maintenance costs shall be included as pier maintenance costs unless P&W is determined to be solely responsible for the pier maintenance costs which are the subject of such arbitration, in which case such expenses shall be borne solely by P&W. To the extent the party or parties against whom such arbitration is brought are determined not to be liable for the pier maintenance costs which were the subject of such arbitration, such party's or parties' expenses of arbitration shall be included in the pier maintenance costs in the year when such arbitration is concluded. P & W shall reimburse such arbitration expense promptly after collection therec

B. P&W shall be responsible for administering the overall maintenance of the pier.

C. P&W shall be advised immediately when repair and/or replacement of any part of the existing pier structure is needed, and, except as otherwise provided in Section III J hereof, P&W will secure a contractor to make such repairs and/or replacements as are reasonably necessary. P&W must notify all operative members of this agreement of the proposed repairs and/or replacement and its estimated cost. Prior to making any such repair and/or replacement exceeding Ten Thousand Dollars ($10,000), three (3) operative members of the Agreement, one of which must be a major user for the previous year (other than P&W), must consent, such consent not to be unreasonably withheld. Any party may seek Arbitration, pursuant to Section X hereto, of the need for and/or cost of such repair and/or replacement.

D. Getty, Union, Northeast and CPI shall reimburse P&W on a proportionate use basis, as hereinafter provided, for all pier maintenance costs.

(1) At the end of each calendar year, the total pier maintenance costs, as defined above, will be calculated by P&W and a unit charge determined by dividing such total pier maintenance costs by the total hours all vessels were berthed at the pier during such calendar year. The hours berthed at the pier shall include the period between the time when a vessel is all secured at the pier until all shore lines are disconnected upon departure. Getty, Union,

Northeast and CPI shall be invoiced by P&W at the determined unit charge times the total hours berthed at the pier by each party during said period. Such invoices shall be paid by Getty, Union, Northeast and CPI within thirty (30) days after date of billing.

(2) P&W agrees (a) to keep complete and correct records with respect to the determination and allocation of pier maintenance costs pursuant to this agreement, (b) to retain such records for a period of not less than two years after the end of the calendar year to which such records pertain, and (c) to make such records available to Getty, Northeast, Union, CPI or their authorized representatives for inspection, copying and audit thereof at reasonable times and intervals.

(3) It is understood, however, that no party hereto shall be liable for any part of any cost which may be incurred if such cost is necessitated by or attributable solely to another party's particular or special manner of operation or use of the pier.

E. Without accepting any liability for its failure to do so, P&W agrees to use its best efforts to obtain insurance to protect the pier against any and all risk of loss by fire, extended coverage perils, and other perils which may be appropriate in view of the parties' use of the pier; this coverage will be in amounts necessary to cover the full insurable value of the pier (after taking into consideration customary

co-insurance provisions). P&W will provide reasonable notice to the other signatory parties as to what insurance it has obtained; if P&W fails to either provide this notice or fails to obtain the requisite insurance, any other signatory party may obtain the requisite insurance and invoice P&W for the cost of said insurance. Any proceeds from an insurance claim shall be used to repair the pier.

V. <u>ADDITIONS, ENLARGEMENTS OR IMPROVEMENTS</u>

A. Dredging to depths in excess of -30 feet MLW.

(1) Notwithstanding anything to the contrary in this agreement, all dredging, whether as maintenance or as an enlargement, to a depth in excess of -30 (thirty) feet MLW shall be pursuant to this sub-section.

(2) In the event that any party and/or parties desires and/or requires dredging, whether as maintenance or as an enlargement, to a depth in excess of -30 (thirty) feet MLW to the vessel berth, the party or parties desiring and/or requiring such dredging shall perform such dredging, provided such dredging does not unreasonably interfere with the operations of any party under this agreement, and shall bear the cost of the same (subject to later reimbursement as set forth below).

(3) A party hereto who subsequently thereto becomes a "new user" of said dredging made by another party or parties hereto, and who derives

additional economic or other benefit from the use of the new dredged-depth as compared with a pre-existing dredged-depth and who, but for the new dredging, could not have utilized the berth, will be obligated, by reason of such use, to notify the party or parties which dredged and/or previously used such dredging and to pay to such other party or parties its share of the cost thereof calculated as follows:

> The cost thereof less depreciation at the rate of 10% per annum from date of completion of said dredging divided by the number of parties theretofore using said dredging provided, however, that such payment shall be finally adjusted between the parties using such new dredging at the end of a two-year term from such party's first use of such new dredging based upon each party's proportionate use of said new dredging during said two-year period. [As an example, if a party performs dredging costing $1,000,000 and three years later, another party becomes a user, the original cost ($1,000,000) will be depreciated by 30% (10% per annum) or $300,000. If in the two years subsequent to this new party's first use of the improvement, the new party's proportionate use of the improvement compared to the use by all other parties is 40%, the new party will pay to the party or parties who have already paid for the improvement $280,000 ($1,000,000 less $300,000 times 40%).]

(4) The parties acknowledge that the vessel berth was dredged to -35 (thirty-five) feet MLW by Northeast under separate agreement and that no party to this agreement has any obligation to reimburse Northeast for any costs incurred in initially dredging the berth to a depth of -35 (thirty-five) feet MLW.

(5) The parties acknowledge that (a) the present depth of the vessel berth is -40 (forty) feet MLW, (b) such dredging was performed by P&W, (c) Getty has reimbursed P&W for such expenses pursuant to a separate agreement, (d) by virtue of such reimbursement Getty has the right to use the depth of -40 (forty) feet MLW without further payment to any other party hereto, (e) any "new user" using the vessel berth in excess of -35 (thirty-five) feet MLW within the ten year period commencing on the date of the completion of such dredging shall pay its proportionate share of the cost of the dredging as provided in Section V.A(3) hereof.

(6) For purposes of the preceding Section V.A(5) the term "new user" shall mean and include the following: A. P&W; B. Union; C. Northeast; D. CPI, either (i) if and to the extent that the use by CPI is for purposes other than for petroleum products, or (ii) if and to the extent that the use by CPI is for purposes of petroleum products delivered to or stored for P&W, Union or Northeast, or (iii) if and to the extent that the use by CPI is for purposes of petroleum products delivered to or stored in the terminal now owned

by Northeast, whether or not said terminal has been acquired by or leased to CPI, provided, however, that the delivery to and storage at the existing Northeast terminal premises of not more than 75,000 barrels of petroleum products at any one time by CPI incidental to its use of its own terminal shall be excluded from the operation of this clause; and further provided that nothing in this Section V.A(6) shall limit the liability of CPI for reimbursement as provided in Section V.A(3) for use of dredging of the vessel berth in excess of -40(forty) feet MLW.

B. All other additions, enlargements or improvements.

(1) In the event that any party and/or parties desires and/or requires any other additions, enlargements or improvements, to the pier and/or vessel berth not desired or required by the other party or parties, the party or parties desiring and/or requiring such work may make such additions, enlargements or improvements, provided such work does not interfere with the operations of any party under this agreement, and shall bear the entire cost of the same as well as any increase in annual maintenance costs caused thereby including any additional tax assessments, insurance costs, utility costs and any other increased costs resulting from the additions, enlargements or improvements.

(2) A party hereto who subsequently thereto becomes a new user of said addition, enlargement or improvement made by another party or parties

hereto, and who derives additional economic or other benefit from the use of the new facility as compared with a pre-existing facility replaced or altered thereby will be obligated, by reason of such use, to notify the party or parties which constructed and/or previously used such addition, enlargement or improvement and to pay such other party or parties its share of the cost thereof calculated as follows:

> The cost thereof less depreciation at the rate of 5% per annum from date of installation divided by the number of parties theretofore using said addition, enlargement or improvement provided, however, that such payment shall be adjusted between the parties using such new facilities at the end of a two-year term from such party's first use of such new facility based upon each party's proportionate use thereof during said two-year period. [As an example, if a party makes an improvement costing $1,000,000, and three years later, another party becomes a user, the original cost ($1,000,000) will be depreciated by 15% (5% per annum) or $150,000. If in the two years subsequent to this new party's first use of the improvement, the new party's proportionate use of the improvement compared to the use by all other parties is 40%, the new party will pay to the party or parties who have already paid for the improvement $340,000 ($1,000,000 less $150,000 times 40%).]

Thereafter each such user party shall bear and pay a share of the increased annual pier maintenance costs attributed to said addition, enlargement or improvement in proportion to the party's use of same.

(3) Title to said facilities shall vest in each of the owners referred to herein in proportion to their investment in the said addition, enlargement or improvement.

(4) Any "new user" using said addition, enlargement or improvement within the twenty year period commencing on the date the completion of the addition, enlargement or improvement shall pay its proportionate share of the cost of the addition, enlargement or improvement as provided in Section V. B(2) hereof.

(5) A party hereto which otherwise has a right to and in fact installs additional loading and unloading facilities and additional pipelines shall receive and discharge products over said pier in accordance with the terms of this agreement.

VI. <u>INDEMNIFICATION</u>

Each of the parties hereto agrees with respect to its own acts or omissions to defend, indemnify and save harmless each of the other parties hereto from any and all claims, suits, liabilities, losses, costs and expenses sustained by or asserted against such other parties for or in connection with:

(a.) fines or penalties imposed by any governmental authorities, as well as damages to any third parties not signatories to this agreement (whether private or public), resulting from spills into or other contaminations of the water at the dock,

(b.) injuries, death, loss and damage of any kind or character to persons or property by whomsoever suffered or asserted,

resulting from or arising out of said acts or omissions on the part of said indemnifying party, its employees, agents, or contractors.

VII. WATER/AIR POLLUTION CONTROL

Each party will comply with all laws, rules, and regulations relating to water or air pollution and will, in the case of an escape or discharge of products or materials from on or around the pier or land contiguous to the pier while such party is making use of the pier, promptly take whatever measures are necessary to prevent pollution damage from thereby arising and to mitigate any such damage.

VIII. INSURANCE

Except as otherwise provided herein, each party will assume the risk of loss or damage by fire or extended coverage perils to its facilities and cargo located on the pier.

## IX. ASSIGNMENTS, WITHDRAWALS AND TERM

A. It is the intention and purpose of the parties hereto (the parties signing this agreement being hereinafter referred to as "operative members") that there will be no more than five (5) operative members under this agreement. The parties hereto agree, however, that an operative member may permit other persons or entities to use the facilities covered in this agreement provided in any such case the operative member shall give prompt written notice of such use to every other operative member. In any such case, the operative member assumes all liability for any failures caused by any person or entity claiming through or under the operative member. If pursuant to this Section other persons or entities use the pier, the operative member at its sole discretion may permit one such other person or entity to do its own scheduling of vessels pursuant to Section II above, and have all the rights, privileges and obligations of said Section II as if a party thereto.

B. Any party hereto has the right to withdraw from this agreement upon six (6) months' written notice to the other parties hereto, provided they have retired any accrued obligations as covered by this agreement. If a party so withdrawing has the legal right to continue using the pier, such party will continue to be obligated to the provisions of Section V of this agreement, irrespective of any purported notice to the contrary.

C. This agreement will remain in full force and effect so long as there are two or more parties bound to this agreement.

D. In the event that Getty sells or leases its terminal on Massasoit Avenue, and/or Union sells or leases its terminal contiguous to the Wilkebarre Pier, and/or Northeast sells or leases its terminal on Dexter Road, and/or CPI sells or leases its terminal on Dexter Road, in any such case to a financially responsible bona fide purchaser or lessee for value, the selling or leasing party shall cause such purchaser or lessee to assume in writing the rights and responsibilities hereunder of the party so selling or leasing and shall promptly acknowledge such assumption by written communication to the other operative members. Notwithstanding any failure by such purchaser or lessee to make such written assumption, such purchaser or lessee shall by its use of such terminal be deemed to have accepted the rights and responsibilities hereunder of the party so selling or leasing the terminal. The party so selling or leasing its terminal shall be released and discharged from all obligations set forth in this agreement accruing after such sale or lease (except the obligation to cause written assumption as set forth in this paragraph D) upon written assumption of its rights and responsibilities by the purchaser or lessee of its terminal or upon such purchaser's or lessee's use of the terminal as hereinabove provided. In such an event where a lease is involved, the lessee shall cease to be an operative member of this agreement upon termination of its lease and the party leasing shall once again become the operative member, and shall provide written notice of such event to the other parties hereto.

CT 1570

E. The parties hereto agree that this agreement shall inure to and be binding upon their respective successors and assigns. The purchaser of Getty's terminal on the easterly side of the Dexter Road shall be deemed a successor of Getty for purposes hereof.

X. ARBITRATION

A. Any controversy or claim arising out of or relating to this agreement or the breach thereof may be settled by the submission of the issue to a panel of three arbitrators for determination. This determination shall be made in accordance with the Rules of the American Arbitration Association, and judgment upon the award rendered may be entered in any court having jurisdiction thereof.

The arbitrators will be selected from a list of arbitrators obtained from the American Arbitration Association. Each party or parties on opposite sides of the controversy or claim will appoint an arbitrator, and these two arbitrators shall select a third, impartial arbitrator. Failing such selection within three (3) working days, either party or parties involved in the controversy may apply to the American Arbitration Association for appointment of a third arbitrator.

The award shall be by at least two of the three arbitrators. Except as herein otherwise provided each party shall bear the expenses of its own witnesses and of the arbitrator it designates. Other costs and expenses of the arbitration, including the compensation of a third, impartial arbitrator and

stenographic expenses, if any, shall be borne equally by the party or parties on opposite sides of the controversy or claim.

B. Any party to a proposed arbitration proceeding shall have the right to designate New York City as the site for the proceeding, provided that such designation is communicated to the other party or parties involved prior to the selection of the third, impartial arbitrator.

C. It is understood and agreed, however, that proposals to add to or subtract from or change this agreement shall not be arbitrable and that no proposal to modify, amend or terminate this agreement, as well as any matter or subject arising out of and in connection with such proposals, may be referred for arbitration under this Section.

IN WITNESS WHEREOF this agreement has been duly executed the day and year aforesaid.

| | |
|---|---|
| WITNESS | TEXACO REFINING AND MARKETING INC. |
| ________________ | BY: [signature]<br>Its Vice-President |
| WITNESS: | UNION OIL COMPANY OF CALIFORNIA |
| ________________ | BY: [signature]<br>Its Mgr. Administration |
| WITNESS: | NORTHEAST PETROLEUM CORPORATION |
| [signature] | BY: [signature]<br>Its President |

WITNESS:

PROVIDENCE AND WORCESTER
RAILROAD COMPANY

_______________________

BY: [signature]
Its Chairman

WITNESS:

CAPITAL PROPERTIES, INC.

_______________________

BY: [signature]
Its PRESIDENT

CT 1573

STATE OF Oklahoma

COUNTY OF Tulsa SS:

Before me on JANUARY 28, 1985, personally appeared T. A. D. [illegible], V.P. of TEXACO REFINING AND MARKETING INC., signer and sealer of the foregoing instrument, who, being duly authorized, acknowledged the same to be his free act and deed and the free act and deed of said TEXACO REFINING AND MARKETING INC.

C. Lynne Dhanse
Notary Public
My commission expires: 8/15/88

STATE OF ILLINOIS

COUNTY OF Cook SS:

Before me on June 12, 1985, personally appeared W. M. Tarpley of UNION OIL COMPANY OF CALIFORNIA, signer and sealer of the foregoing instrument, who, being duly authorized, acknowledged the same to be his free act and deed and the free act and deed of said UNION OIL COMPANY OF CALIFORNIA.

M. Marcia Pero
Notary Public
My commission expires: 8/28/85

STATE OF MASS

COUNTY OF SUFFOLK SS:

Before me on JUNE 3, 1985 personally appeared ROBERT H TARTUCCIO PRESIDENT of NORTHEAST PETROLEUM CORPORATION, signer and sealer of the foregoing instrument, who, being duly authorized, acknowledged the same to be his free act and deed and the free act and deed of said NORTHEAST PETROLEUM CORPORATION.

Martha F. Levine
Notary Public
My commission expires:

STATE OF R. I.

COUNTY OF Providence SS:

Before me on January 29, 1985, personally appeared Robert H. Eder Chairman of PROVIDENCE AND WORCESTER RAILROAD COMPANY, signer and sealer of the foregoing instrument, who, being duly authorized, acknowledged the same to be his free act and deed and the free act and deed of said PROVIDENCE AND WORCESTER RAILROAD COMPANY.

Marguerite F. Woods
Notary Public
My commission expires:

CT 1574

MARGUERITE F. WOODS
My Commission Expires June 30, 1989

STATE OF R.I.

COUNTY OF Providence SS:

Before me on January 29 1985, personally appeared Joseph R. DiStefano President, of CAPITAL PROPERTIES, INC., signer and sealer of the foregoing instrument, who, being duly authorized, acknowledged the same to be his free act and deed and the free act and deed of said CAPITAL PROPERTIES, INC.

Marguerite F. Woods
Notary Public
My commission expires:

MARGUERITE F. WOODS
My Commission Expires June 30, 1986

CT 1575