UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| DUNELLEN, LLC, | : | |
| Plaintiff, | : | |
| v. | : | No. 06-014-ML |
| GETTY PROPERTIES CORPORATION, | : | |
| Defendant. | : | |

**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF DUNELLEN, LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO GETTY PROPERTY'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Dunellen, LLC ("Dunellen") submits this Supplemental Memorandum in Support of its Motion for Partial Summary Judgment and in Opposition to Defendant's Motion for Partial Summary Judgment. Getty Properties Corporation ("Getty Properties") contends that the 1976 Supreme Court decision in Providence and Worcester Company v. Exxon Corporation et al., 359 A.2d 329 (R.I. 1976) (the "1976 Decision") is dispositive of the motions pending before this Court because (1) the Rhode Island Supreme Court characterized the Wilkesbarre Pier (the "Pier") as "personalty" and (2) the law of easements does not apply to "personalty." Getty Properties is wrong for at least four reasons.

First, the Pier was a fixture when it was installed in the nineteenth century. A fixture exists where it (1) has been "annexed" or attached to the land; (2) adapted to use on the property in which it in embedded; (3) with the intent that it remain there permanently. The Pier was annexed or attached to the land, uniquely adapted to use on

the property in which it is embedded, with the intent that it remain there permanently. As a result, the Pier was a fixture when it was installed.

Second, a sixty-percent interest in the ownership of the Pier was constructively severed by the 1976 Decision, in which the Rhode Island Supreme Court sought to effectuate the intent of the parties to the 1941 Deed. In the 1941 Deed, the Providence and Worcester Railroad Company ("P&W") conveyed 100 percent ownership of the Pier and the underlying land, but the parties agreed that P&W would have the right to construct a new pier (the "New Pier"), in which case P&W would own the New Pier as personalty, but not own the land underneath. In the 1976 Decision, the Rhode Island Supreme Court held that P&W did not need to construct the New Pier and that P&W was the owner of the Pier. The Court also held that P&W would not own the land underneath the Pier. Therefore, the characterization of the Pier as "personalty" by P&W and the Rhode Island Supreme Court effectuated the intent of the parties to the 1941 Deed that different entities would own the land and the Pier. The Rhode Island Supreme Court did not and could not hold that the Pier was personalty to all parties in all contexts in perpetuity. The decision resulted in a constructive severance of the Pier from the land underneath.

Third, since 1997, Dunellen or its predecessors-in-interest have owned 100% of the Pier and the land underneath the Pier so the Pier is no longer constructively severed.[1] The key to determining whether personalty is a fixture is the owner's intent. The owner's intent toward a fixture means its objectively manifested indicia of intent. Here, all factors which courts use to determine if personalty is a fixture indicate objectively that the Pier is

---

[1] In 1975, P&W reacquired a 40% interest in the land. In 1990, P&W reacquired another 40% interest in the land. In 1997, P&W reacquired the remaining 20% interest in the land, so that the ownership of the Pier and the land was, once again, unified.

a fixture as between Getty Properties and Dunellen. Since Getty Properties has an easement over the Pier, it is responsible for contributing to the repair and maintenance of the Pier.

Fourth, even if the Pier is not a fixture, easements may include burdens on personalty on the servient estate.

It is also important to remember that in the 2000 litigation before this Court, Getty Properties testified under oath that its property right is "in the nature of an easement in and to the Pier." See Exhibit A hereto (Getty Properties' and Getty Petroleum Marketing's Answers to Interrogatories). In the 2000 litigation, Getty Properties perceived that characterizing its right to the Pier as "in the nature of an easement" would be beneficial to its claims. Now, Getty Properties correctly perceives that characterizing its right to the Pier as "in the nature of an easement" would be harmful to its defense and therefore it has changed its position. The Court should not permit Getty Properties to play fast and loose with the way that it characterizes its right to use the Pier.

The Court should grant Dunellen's motion for partial summary judgment and deny Getty Properties' cross-motion for partial summary judgment.

## I. BACKGROUND

Dunellen filed this lawsuit to obtain declaratory relief and to recoup costs it has incurred maintaining and repairing the Pier. Dunellen has incurred expenses associated with pier improvements, pier security improvements, electricity, engineering, insurance, real property taxes, and repairs and maintenance ("Pier expenses"). Getty Properties has an easement on the northerly side of the Pier for the delivery of petroleum products and other merchandise used in connection with its petroleum products business. Dunellen

contends that with the benefits of that easement comes the obligation to contribute to the Pier expenses.

The Pier was installed by the Wilkesbarre Coal and Iron Company in the 1870s. Providence and Worcester Company v. Exxon Corporation, 359 A.2d 329, 332 (R.I. 1976). In 1941, Providence and Worcester Company conveyed the Pier and the land underneath it to Colonial Beacon Oil Company ("Colonial"). Id. at 332. The conveyance gave Dunellen's predecessor-in-interest, P&W, the option to reclaim ownership of the Pier. Id. at 332. Colonial became Exxon through a name change. Two additional companies acquired interest in the Pier and the land underneath: Getty Oil and Unocal. Thus, the Pier and land underneath were owned by the following entities: Getty Oil owned 40%, Exxon owned 40% and Unocal owned 20%. See Exhibit A to Affidavit of Avery Noe.

In the 1970s, P&W sued Getty Oil, Exxon and Unocal to exercise its right to reclaim the Pier. Id. at 331. A Superior Court judge found the option to reclaim the Pier had been exercised and that P&W therefore owned the entire Pier. Id. at 336-37. Getty Properties' predecessor-in-interest settled with P&W on August 6, 1975, conveying its 40% interest in the Pier and the land underneath to P&W.[2] Id. at 331 n.1. Thus, before the appeal was heard, P&W already owned 40% of the Pier and the land underneath.[3] See id.

[2] In the 1976 Decision, the Rhode Island Supreme Court incorrectly noted that "[t]he current record ownership of the pier itself and the land on which it rests is 40 percent in Exxon, 40 percent in Getty and 20 percent in Union." Id. at 335. While this was the state of ownership as of the Superior Court decision, the post-judgment settlement with Getty gave P&W a 40 percent interest in the Pier and the land underneath. See Exhibit A to Affidavit of Avery Noe.

[3] Getty Oil withdrew its appeal to the Rhode Island Supreme Court on August 6, 1975. See Exhibit B hereto.

The 1976 Decision had the effect of conveying the remaining 40% and 20% interests in the Pier from Exxon and Unocal respectively to P&W. See id. at 341. The Rhode Island Supreme Court stated:

> The plaintiffs claim that, by consensus of the parties to the 1941 deed, the pier is not realty but personalty. They point out that it is constructed of wooden pilings driven into the soil, that atop these pilings are crosstimbers and plankings, and that granite blocks rest upon the outer edges of the planking and contain the earthen fill placed upon the planking. The plaintiffs' position that the pier was intended to be treated as personalty by the parties is supported by a letter dated July 17, 1941 from Colonial's attorney to P&W's president where the former stated:
>
> > "I am assuming that the pier would be deemed to be personal in view of our agreement that your Road is to own it and would thereby be taxed separate from the land. If this is to be so, we would be paying taxes on the land upon which you have your pier, and that would be contribution enough."[4]
>
> We believe that plaintiffs correctly perceived the meaning of the trial justice's order as requiring defendants to give plaintiffs a fee simple to personalty that is, a conveyance of the totality of interest in the existing pier save for defendants' right to use the north side of said pier.
>
> * * *
>
> The terms of the reservation clauses and the language of this opinion are sufficiently self-explanatory to put any interested party on notice that plaintiffs have exercised their reserved rights; that the pier is now plaintiffs' property; and that plaintiffs have a right to use the vessel berth on the north side of the pier.

Id. at 341.

Through a series of transactions between 1975 and 1997, P&W and then Dunellen acquired the entire fee interest in the land underneath the Pier. See Affidavit from Avery

[4] Here, Colonial is clarifying that P&W's "Road" (i.e., railroad) would own the New Pier as personalty if and when P&W rebuilds it, since ownership of the New Pier would be completely different from the ownership of the land. Colonial is not stating that the Pier was personalty in 1941. Further, the letter's characterization of taxation of the Pier is no longer accurate. Based on records available to Dunellen, the Pier has been taxed as realty since at least 1989. See Affidavit of Avery Noe dated October 26, 2007. Getty Properties' predecessor-in-interest paid real property taxes on the Pier when it was a party to the 1985 Pier Operating Agreement and the 1991 Amended and Restated Pier Operating Agreement. See Affidavit of Avery Noe dated October 26, 2007.

Noe (attaching deeds). Therefore, since 1997, Dunellen or its predecessor-in-interest has been the owner of 100% of the Pier, the land underneath the Pier and the adjacent ship berth.

## II. ARGUMENT

### A. THE PIER WAS A FIXTURE WHEN ANNEXED TO THE LAND.

In Rhode Island, a fixture exists where it (1) has been "annexed" or attached to the land; (2) adapted to use on the property in which it in embedded; (3) with the intent that it remain there permanently. Prospecting Unlimited v. Norberg, 376 A.2d 702, 705 (R.I. 1977). "These tests . . . are applied where the dispute concerns the legal nature of chattels which have already been put to an intended use in or on realty, that is, chattels which have been annexed to the real estate." Id.

Intent is the most important of these three factors; annexation and adaptation are relevant to determining such intention. See Everitt v. Higgins, 122 Idaho 708, 711-712 (Ida. App. 1992); Standard Oil Co. v. State Bd. of Equalization, 232 Cal.App.2d 91, 97 (1965). Only objective expressions of intent count. See In Re San Angelo Pro Hockey Club, Inc., 292 B.R. 118, 130 (N.D.Tex. 2003). Additional objective evidence of intent

> may be inferred from: (1) the nature of the article; (2) the manner of annexation to the land; (3) the injury to the land, if any, by its removal; (4) the completeness with which the chattel is integrated with the use to which the land is being put; (5) the relation which the annexer has with the land such as . . . fee owner; (6) the relation which the annexer has with the chattel such as owner, bailee or converter; (7) the local custom respecting treating such chattel as personal property or a fixture; (8) the time, place and degree of social, economic and cultural development, (e.g., a luxury in one generation is a necessity in another . . .); and (9) all other relevant facts surrounding the annexation.

Everitt, 122 Idaho at 712 (quoting R. Boyer, SURVEY OF THE LAW OF PROPERTY, ch. 14, 329 (3rd ed. 1981)).[5] When the owner of land attaches personalty, courts assume the owner intended the personalty to become a fixture. See Hughes v. Young, 115 N.C. App. 325, 329 (1994) (where grantor has affixed chattel, the presumption is "that the purpose of the annexation is to enhance the value of the land and that the attached item becomes part of the realty") (emphasis added).

Intent is often measured at the time of annexation. See Tudor Arms v. McKendall Land Co., 63 R.I. 52, 56 (1939). It may also be appropriate to measure the annexing party's "objectively manifested current intent to treat the pieces" as personalty or realty. ATC Partnership v. Town of Windham, 268 Conn. 463, 486 (2004) (emphasis added).

Here, the Pier was a fixture when installed in the 1870s. The Pier was installed by the same company that owned the realty underneath. The Pier was attached to the land with huge timbers embedded deep in the soil. The Pier is an enormous structure which cannot be moved. It was adapted for use as a pier in this locale alone. It was designed to match the unique needs of its owner, adapted to the geography of the ship's berth, the local tides and weather, and the weight of the cargo, workers and vehicles it must support. Extracting and moving this behemoth to another location would severely damage the land and the Pier and is not feasible. Unlike a pump, carpet or a fence, for example, the Pier is designed to be permanent; it was intended to be a permanent part of the realty. The Pier is approximately 130 years old and has withstood several hurricanes.

---

[5] "Whether an item is a fixture usually presents a mixed question of law and fact to be determined by the trier of fact upon proper application of the three-part test. However, where the facts are undisputed or when the evidence allows but one reasonable conclusion to be drawn therefrom, the question may be decided as a matter of law." Everitt, 122 Idaho at 712.

Furthermore, the Pier was very expensive and installed with the expectation of decades of use to recoup the substantial initial investment. These objective manifestations of the owner's intent indicate that the Pier was a fixture when installed.

### B. SIXTY PERCENT OF THE PIER WAS CONSTRUCTIVELY SEVERED FROM THE UNDERLYING LAND BY THE 1976 DECISION TO EFFECTUATE THE INTENT OF THE PARTIES TO THE 1941 DEED.

In 1941, P&W conveyed the Pier and the land underneath to Colonial, reserving the right to rebuild and retake ownership of the Pier. Providence and Worcester, 359 A.2d at 332. Subsequently, Colonial became Exxon through a name change and Getty Oil and Unocal purchased an undivided interest in the Pier and the land underneath. Exxon, Getty Oil and Unocal owned 40%, 40%, and 20% of the Pier and the land underneath respectively. In the 1970s, P&W decided to exercise its right under the 1941 Deed to reclaim the Pier and the land underneath, resulting in litigation with Getty Oil, Exxon and Unocal. In a 1975 settlement with Getty Oil, P&W purchased an undivided 40% of the Pier and the land underneath.

In the 1970s litigation, P&W took the position that the Pier was personalty. This position reflected the legal reality that P&W held a right under the 1941 Deed to reclaim only the Pier, not the land underneath. Characterizing the Pier as personalty was a way to give full effect to the intent of the parties to the 1941 Deed and the basis on which P&W could assert a legal right to reclaim the Pier.

The 1976 Decision to give P&W back its full ownership of the Pier was a constructive severance as to 60% of the Pier. The owner of a fixture can "restore" a fixture's "character of personalty distinct from the land" by severance. Myers v. Hancock, 185 Va. 454, 458 (1946). Severance is "actual" where the fixture is detached



#852708
051017-127422

from the land. Severance is "constructive" where the personalty is not detached from the land but parties manifest intent that the fixture be treated as personalty in, for instance, conveyance of the freehold. Id. In the instant case, the severance was not "actual" because the Pier has never been removed from the land. See id. The severance was "constructive" because the effect of the 1976 Decision was to restore P&W's full ownership interest in the Pier, but not its full ownership interest in the land underneath. Myers v. Hancock, 185 Va. 454, 458 (1946). As in the 1870s, the Pier itself remained unchanged, annexed to the land and wholly adapted to its unique use as a Pier for offloading oil in its locale alone.

### C. 100% OF THE PIER IS A FIXTURE TODAY.

Constructive severance is not eternal. Whether the 1976 Decision constructively severed 60% or 100% of the Pier is immaterial for neither Dunellen nor the Pier is eternally bound by P&W's or the Rhode Island Supreme Court's characterization of the Pier as personalty.

> There is no separate universe of the law in which objects are either fixtures or not, nor is there any omnipotent force which makes metaphysical changes in physical objects, changing them from "personalty" into "fixtures." Terms such as "realty," "personalty" and "fixtures" should be recognized to be not only descriptions of fact but also convenient but confusing descriptions of the nature of legal relations between persons in various factual situations . . . .

Standard Oil Co. v. State Bd. of Equalization, 232 Cal.App.2d 91, 98 (1965) (quoting Horowitz, The Law of Fixtures in California, supra, at 22). "The nature of property . . . is such that its status as either personalty or fixture is subject to multiple generations of transformation." ATC Partnership, 268 Conn. at 480. The nature of the property depends on the unique circumstances at hand and the relationship between relevant

parties. "[T]he same item that may be considered personal property in one situation may be considered real property where a different relationship exists." Hughes, 115 N.C. App. at 328. This can be simultaneous, as when a mobile home owner gives a lender a purchase money security interest in the mobile home, annexes the mobile home to realty, and mortgages the realty. Id. at 329. The mobile home is personalty as to the holder of the purchase money security interest and a fixture as to the mortgagee of the real estate. Id. Or, the transformation of property can take place over time. Accounting for an oil tank in a register of personal property and keeping the tank detached from the land is an objective manifestation of an intent to treat the tank as personalty as to relevant parties at that time. See, e.g., Waterbury Petroleum Prod. v. Canaan Oil & Fuel, 193 Conn. 208, 218 (1984). Nothing, however, prevents the owner of the tank from affixing it to the land and contracting to sell it with the land as a fixture.

Thus, the question is not what the Pier was after the 1976 Decision, but what it is today, with respect to the parties at bar. In Rhode Island, the test for determining whether property is a fixture is annexation, adaptation to the land and intent to affix the personalty permanently. Prospecting, 376 A.2d at 705. Under this test, the Pier is unquestionably a fixture because the Pier is affixed deep inside Dunellen's land and is uniquely adapted to the oil offloading business. See id.

In addition, the objective evidence shows that P&W's intent is to treat the Pier as a fixture. In 1975, P&W negotiated for and acquired 40% of the Pier and the realty underneath from Getty. See Exhibit A to Affidavit of Avery Noe. After gaining 100% of the Pier, P&W never stopped pursuing its goal of reclaiming 100% the land underneath. In 1990, P&W acquired Exxon's (then Merva's) 40 percent interest in the land



#852708
051017-127422

underneath the Pier. Affidavit of Avery Noe and Exhibit B thereto. In 1997, P&W acquired Unocal's 20 percent interest in the land underneath the Pier. Affidavit of Avery Noe and Exhibit C thereto. Thus, since 1997, P&W and then Dunellen has owned 100% of the Pier and 100% of the land underneath.

The Pier did not undergo "metaphysical changes" as a result of the 1941 Deed, P&W's characterization, or the 1976 Decision. See Horowitz, The Law of Fixtures in California, supra, at 22. Rather, the 1976 Decision was an articulation of the nature of the Pier at that point in time, for the purpose of giving full effect to the intent of parties to the 1941 Deed. "Personalty" was a description of "the nature of legal relations" between P&W on the one hand, and Getty, Exxon and Unocal on the other, at that time. Horowitz, The Law of Fixtures in California, supra, at 22. Since reacquiring the Pier, Dunellen and its predecessors-in-interest have treated it as a fixture. The City of East Providence has also treated the Pier as a fixture. Fixtures are taxed as real property. See e.g., R.I. Gen. Laws § 44-4-3 (2007); Providence Gas Co. v. Thurber, 2 R.I. 15, 18 (1851); 36A C.J.S. *Fixtures* § 6 (1996). The City of East Providence has taxed the Pier as realty since at least 1989. P&W's acquisition of the Pier was recorded in the land records of The City of East Providence. Furthermore, the Pier remains a behemoth, deeply embedded in Dunellen's realty. The land and the Pier would suffer significant damage should it be removed. The Pier remains wholly adapted to Dunellen's only use of the land, and is uniquely designed for use in the only place where it has stood since the 1870s. The easement to use the north side of the Pier is also solely and uniquely designed for petroleum purposes, which is the same use as that of Dunellen. The owner of the land and the Pier is the same. Thus, Dunellen has objectively manifested its intent

to treat the Pier as a fixture. ATC Partnership, 268 Conn. at 486; Everitt, 122 Idaho at 711-712. If Dunellen were to sell the land underneath the Pier without specifically excluding the Pier, a court would find title to the Pier to be in the buyer of the land. See Providence Gas Co. v. Thurber, 2 R.I. 15, 18 (1851) ("In the case of a mill, the trenches and raceways leading to and from the mill would pass by grant of the mill as an appurtenance thereto."); Nokomis Quarry Co. v. Dietl, 333 Ill. App.3d 480, 485 (2002) ("Because fixtures are considered to be part of the realty, they are conveyed when the real estate is conveyed, unless they are specifically excluded."); Hargrove v. Jenkins, 192 Ga. App. 83, 84 (1989) ("Where an item is attached to the land it becomes a part thereof and would ordinarily pass in a conveyance of the land." One hundred percent (100%) of the Pier is a fixture.

Thus, Getty Properties has an easement over real property, which includes the Pier.

**D. EVEN IF THE PIER IS PERSONALTY (AND NOT A FIXTURE), THE PIER IS STILL SUBJECT TO THE LAW OF EASEMENTS.**

Even if the Pier is not a fixture, Getty Properties is required to contribute toward its repair and maintenance. While an easement is an estate in land, easements often include burdens on personalty on the servient estate. For instance, in Mason v. Garrison, the Montana Supreme Court found that "Lot Owners' rights under the easement to use the 'dock' and 'swimming deck' [we]re coupled with an interest in land: the right to use the shoreline area . . . ." 299 Mont. 142, 152 (2000). The court held that where "an easement in an artificial structure (e.g., the 'dock') is coupled with an interest in land, the easement is not extinguished by destruction of the structure or the part of it upon which the easement operates." Id. at 152; see also Dobie v. Morrison, 227 Mich. App. 536, 540

(1998) (where the servient land owner placed picnic tables on a public common and the easement included access to the park and use of the picnic table). Therefore, even if the Pier is not a fixture, which it is, it is still an integral part of Getty Propertites' easement over the land and berth. As easements owners must contribute toward the repair and maintenance of the easement, absent an agreement to the contrary, Getty Properties must contribute toward the repair and maintenance of the Pier regardless of whether this Court characterizes the Pier as personalty or a fixture.

**E. GETTY PROPERTIES IS JUDICIALLY ESTOPPED FROM TRYING TO CLAIM THAT ITS RIGHT TO USE THE SHIP'S BERTH AND PIER IS NOT AN EASEMENT.**

The Court may recall that in Getty Properties' answers to interrogatories in the litigation previously pending before this Court captioned Getty Petroleum Marketing Inc. and Getty Properties Corp. v. Capital Terminal Company, C.A. No. 00-381 ML, Getty Properties stated the following under oath: "Getty Properties continues to own and enjoy a property right in the nature of an easement in and to the Pier." Exhibit A hereto (Answer to Interrogatory No. 20) (emphasis added).

Courts apply the doctrine of judicial estoppel "when a litigant is 'playing fast and loose with the courts,' and when 'intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice.'" SEC v. Happ, 392 F.3d 12, 20 (1st Cir. 2004) (internal citations omitted); see also Alternative System Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 33 (1st Cir. 2004) ("As a general matter, the doctrine of judicial estoppel prevents a litigant from pressing a claim that is inconsistent with a position taken by that litigant either in a prior legal proceeding or in an earlier phase of the same legal proceeding."). "The proponent must show 'that the



#852708
051017-127422

party to be estopped 'succeeded previously with a position directly inconsistent with the one [it] currently espouses.'" Id. (internal citations omitted); see also Thore v. Howe, 466 F.3d 173, 181-182 (1st Cir. 2006) (noting the factors for applying the doctrine of judicial estoppel: "The first factor is whether the party's later position is clearly inconsistent with its earlier position . . . . The second is whether the party has succeeded in persuading a court to accept the party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception of inconsistent court determinations, suggesting that either the first or second court was misled. The third consideration is whether an unfair advantage or detriment would be created.") (citing New Hampshire v. Maine, 532 U.S. 742, 750-51 (2001).[6] Application of the doctrine of judicial estoppel is appropriate when the previous statements were made in discovery such as at depositions and in answers to interrogatories. See e.g., Safety Ins. Co v. Burns, No. 924969, 1993 WL 818928, at *3 (Mass.Super. Aug. 30, 1993).

In the 2000 Litigation, Getty Properties argued that they had not abandoned their right to use the north side of the Pier, and that their right was in the nature of an easement. See Exhibit A (Interrogatory No. 20). Dunellen argued that Getty Properties had abandoned their right to use the Pier. This Court applied the law of easements and found for Getty Properties.

In the current litigation, Getty Properties is asserting the exact opposite proposition. The Court should bar Getty Properties from engaging in "intentional self-contradiction . . . as a means of obtaining unfair advantage in a forum provided for suitors

---

[6] The First Circuit also stated that it "rejected as a prerequisite to application of the doctrine that the party asserting the inconsistent position be shown to have benefited from the court's acceptance of the party's initial position." Thore v. Howe, 466 F.3d 173, 182 (1st Cir. 2006) (citing Alternative System Conepts, Inc. v. Synopsys, Inc., 374 F.3d 23 (1st Cir. 2004)).

seeking justice." SEC v. Happ, 392 F.3d 12, 20 (1st Cir. 2004) (internal citations omitted). Getty Properties should not be allowed to argue that its right is in the nature of an easement in the 2000 Litigation when it believes it suits its interest and argue that its right is not in the nature of an easement in this case when it does not suit its interest.

## III. CONCLUSION

For the reasons above and the reasons set forth in Dunellen's earlier memoranda of law, the Court should grant Dunellen's Motion for Partial Summary Judgment and deny Getty Properties' Cross-Motion for Partial Summary Judgment.

HINCKLEY ALLEN & SNYDER LLP

/s/Mitchell R. Edwards
Gerald J. Petros (#2931)
Mitchell R. Edwards (#6942)
50 Kennedy Plaza, Suite 1500
Providence, RI 02903-2393
(401) 274-2000
(401) 277-9600 (fax)
Attorneys for Dunellen, LLC

Dated: December 7, 2007

## CERTIFICATE OF SERVICE

I hereby certify that on December 7, 2007, a copy of foregoing Supplemental Memorandum of Law in Support of Dunellen's Motion for Partial Summary Judgment and in opposition to Getty Properties' Cross-Motion for Partial Summary Judgment was filed and sent electronically to the following counsel of record:

James W. Ryan, Esq.
Robert K. Taylor, Esq.
Partridge, Snow & Hahn LLP
180 South Main Street
Providence, RI 02903

Mark W. Freel, Esq.
Edwards Angell Palmer & Dodge LLP
2800 Financial Plaza
Providence, RI 02903

/s/Mitchell R. Edwards



#852708
051017-127422